**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON, and STATE OF WISCONSIN, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget, | |
| Defendants. | |

## INTRODUCTION

1. Since 1986, the Integrated Postsecondary Education System ("IPEDS"), administered through the Department of Education, has served as a valuable tool for the methodical collection of data and statistical reporting by universities. Until December 2025, IPEDS was a system of thirteen interrelated survey components conducted annually that gathered data from colleges, universities, and technical and vocational programs participating in federal student financial programs. Completing IPEDS is mandated by statute, and educational institutions face hefty fines and other serious consequences, including potential loss of federal funding, if they fail to submit timely and complete data through IPEDS.

2. The National Center for Education Statistics ("NCES"), a component of the Department of Education, administers IPEDS and is statutorily mandated "to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, gender, or regional bias." 20 U.S.C. § 9541(b)(3)(A).

3. Historically, IPEDS has served as a trusted data source for universities, lawmakers, and the public. Year after year, IPEDS seeks the same categories of data from Institutions of Higher Education ("IHEs") through its surveys, including financial information, admissions information, and outcome measures, among other data. Much of that information is then made available to the public through the College Navigator, a free resource offered through the Department of Education that offers comprehensive information on IHEs. Where IPEDS has sought to add new surveys or implement major changes to surveys, those additions go through rigorous, field-tested vetting among impacted educational institutions before being implemented. As part of this process, IHEs typically have at least a year to review the requirements of a new survey before they are obligated

2

to compile and produce data to NCES. This methodology ensures that any new surveys are clear to IHEs and will collect reliable and statistically valid data; that the collected data will not jeopardize student privacy; and that IHEs have the ability, resources, and time to accurately and completely respond to these surveys.

4.      The Defendants, however, seek to fundamentally change IPEDS, converting it from a reliable tool for methodical statistical reporting to a mechanism for law enforcement and the furthering of partisan policy aims. On August 7, 2025, President Trump issued the Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions*, stating that IPEDS would now become a tool to track "consideration of race in higher education admissions" and monitor university compliance with *Students for Fair Admissions Practices, Inc. v. President & Fellows of Harvard College* (hereinafter, "*SFFA*"), 600 U.S. 181 (2023). The Presidential Memorandum claims that "the persistent lack of available data – paired with the rampant use of 'diversity statements' and other overt and hidden racial proxies – continues to raise concerns about whether race is actually used in practice."

5.      That same day, Secretary of Education Linda McMahon announced that, "[a]s part of [universities'] regular data reporting process, institutions of higher education will now have to report data disaggregated by race and sex relating to applicant pool, admitted cohort, and enrolled cohort at the undergraduate level and for specific graduate and professional programs." Press Release, Dep't of Ed., U.S. Secretary of Education Linda McMahon Directs National Center for Education Statistics to Collect Universities' Data on Race Discrimination in Admissions (Aug. 7, 2025), https://perma.cc/43QS-SWEX.

6.      On December 18, 2025, following notice and comment, the Office of Management and Budget ("OMB") approved the IPEDS Admissions and Consumer Transparency Supplement

("ACTS") survey component implementing Secretary McMahon's guidance and the Presidential Memorandum. IPEDS, ACTS Collection Dates and Required Institutions (Dec. 18, 2025), https://perma.cc/7KWG-6GBE. The IPEDS ACTS survey is unprecedented in scope, seeking a vast array of disaggregated data from the 2025-2026 academic year and six prior years. Never before has IPEDS sought retroactive data; never before has IPEDS sought such a vast array of disaggregated data; and never before has the Department of Education so quickly effected a major change to IPEDS.

7.     The scope, breadth, and rushed process of implementing the ACTS survey has harmed and will continue to harm Plaintiffs. Standing alone, the sheer amount of data sought through the ACTS survey would place a considerable burden on IHEs. Here, however, that burden is compounded through the expedited timeline which IHEs have to compile that data and the error-ridden and confusing process implemented by the Department of Education to collect it. The ACTS survey also seeks seven years of data, which is inconsistent with previous IPEDS surveys that only required data for a single academic year. IHEs, however, had no notice of this retroactive request and therefore must figure out how they can compile years of data they have neither collected nor maintained.

8.     IHEs face an untenable dilemma: quickly compiling data they typically would have years to collect and submit, all the while knowing that the data may suffer from inconsistencies given the haste with which it has been prepared and the lack of guidance from the Department of Education on what key definitions and data elements mean. As the Presidential Memorandum and agency guidance make clear, the Defendants plan to rely on this data to assess compliance with *SFFA* and drive enforcement actions. The consequences from the Defendants' sloppy

implementation of the IPEDS ACTS survey are therefore severe: IHEs will face costly investigations based on unreliable data.

9.      Similarly, the level of disaggregation of the data—with data spliced across multiple categories, including race, gender, GPA, test scores, income level, and academic program—poses a risk that information submitted by IHEs may inadvertently reveal the identity of students, thus jeopardizing IHEs' obligations to maintain student privacy.

10.     As set forth herein, the Defendants' actions are contrary to law, exceed statutory authority, fail to observe the procedure required by law, and are arbitrary and capricious. Whereas past changes to IPEDS data collection methods have undergone rigorous advance vetting to ensure they will not unduly burden IHEs, this dramatic overhaul of IPEDS occurred virtually overnight. At no time during the initial notice-and-comment period did the Defendants alert universities to the actual changes to IPEDS that would be sought. The survey ultimately implemented by Defendants evinces that they did not consider the reliance interests and concerns set forth in the many comments detailing just how onerous the contemplated changes to IPEDS would be. Now, many IHEs must submit an unprecedented quantity of data, much of it containing students' personal information, without essential guidance from the federal government that would typically accompany such a dramatic change.

11.     Responses to the ACTS survey are due by March 18.  Should IHEs fail to complete the survey—or complete it in a fashion the Defendants deem incomplete or unsatisfactory—they may face fines and the risk of losing federal funding essential to their operations.

12.     For these reasons and those set forth in more detail below, the Plaintiffs seek declaratory and injunctive relief from the Defendants' unlawful actions.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. § 702.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Massachusetts.

## PARTIES

### A. Plaintiffs

15.     The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

16.     The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

17.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

18.     The State of Colorado, represented by and through the Attorney General, is a sovereign state of the United States of America. Attorney General Philip J. Weiser acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

19.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

21.     The State of Hawai'i is a sovereign state in the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, who is the chief law enforcement officer of Hawai'i.

22.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf.

23.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state of the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170

24.     Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey.

25.     Plaintiff State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

26.     The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

27.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

28.     The State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

29.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

30.     The State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

31.     Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B. Defendants**

32.     Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.  NCES and IES are components of the Department of Education.

33.     Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. 20 U.S.C. § 3412. She is sued in her official capacity.

34.     Defendant the United States OMB is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. §§ 501–07.

35.     Defendant Russell Vought is the Director of the OMB and that agency's highest-ranking official. He is sued in his official capacity. 31 U.S.C. §§ 502-03.

## BACKGROUND

**IES, NCES, and IPEDS**

36.     The Institute for Education Sciences ("IES"), created by the Education Sciences Reform Act of 2002, is the statistics, research, and evaluation arm of the Department of Education. IES's "mission is to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public." About IES, IES, https://perma.cc/7C3C-24QY. Per statute, IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . ." 20 U.S.C. § 9511(b)(2). IES comprises four National Education Centers, including NCES. *Id.* § 9511(c)(3)(B).

37.     NCES is the primary statistical agency of the Department of Education and one of sixteen recognized statistical agencies and units of the federal government under the Confidential Information Protection and Statistical Efficiency Act of 2018. *See* About Us, StatsPolicyGov, https://perma.cc/3Q3S-HDZH. Its mission is "to collect and analyze education information and statistics in a manner that meets the highest methodological standards." 20 U.S.C. § 9541(b)(1). The surveys comprising IPEDS are administered by NCES.

38.     The Higher Education Act of 1965, as amended, requires that institutions that participate in federal student aid programs report data through IPEDS. *See* 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). If an IHE fails to provide data, or provides incomplete data, the IHE can be subject to fines of up to $71,545 per violation and potential suspension or termination of Title IV eligibility. *Id.* §§ 668.84; 668.85 & 668.86.

39.     Prior to December 2025, IPEDS consisted of thirteen surveys administered during three seasonal reporting periods. These surveys collect information on such topics as twelve-month enrollment, academic libraries, admissions, completions (i.e., how many students earn degrees), fall enrollment, financial information of the institution, graduation rates, human resources information, institutional characteristics, outcome measures, and student financial aid.

40.     By and large, these surveys have stayed the same from year to year. *See* IES, The History & Origins of Survey Items for the Integrated Postsecondary Education Data System (April 2023),  https://perma.cc/4WXJ-U7R3 (outlining background of IPEDS survey prior to 2023). Where the Department of Education has sought to add surveys or change existing surveys, the process has typically involved careful study to ensure that the additions conform to statistical methodologies; are clear to respondents; and will provide useful information.

## FACTUAL ALLEGATIONS

**Presidential Proclamation and Department of Education Directive**

41.    On August 7, 2025, President Trump issued the Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions.* Pursuant to the Presidential Memorandum, IPEDS would now become a tool to track "consideration of race in higher education admissions" and monitor university compliance with *SFFA*. The Presidential Memorandum asserts, with no factual basis, that "IPEDS requires long-overdue technological upgrades to expand its data collection and fulfill its mission effectively." Nowhere does the Presidential Memorandum detail what upgrades are warranted, what IPEDS' mission is, or how it is that IPEDS has purportedly failed to fulfill that mission.

42.    Also on August 7, 2025, Secretary McMahon, in a memorandum to Matthew Soldner, Acting Director of IES and Acting Commissioner of NCES, "direct[ed NCES] to . . . collect data disaggregated by race and sex relating to the applicant pool, admitted cohort, and enrolled cohort at the undergraduate level, and for specific graduate and professional programs" within the 120-day timeline set by the Presidential Memorandum. Memo. from Sec'y McMahon to Acting Dir. Matthew Soldner, *Ensuring Transparency in Higher Education Admissions* at 2 (Aug. 7, 2025), https://perma.cc/7KDJ-C79N (hereinafter, the "McMahon Memorandum").

43.    Pursuant to the McMahon Memorandum, the new IPEDS supplement requires IHEs "to report quantitative measures of applicants and admitted students' academic achievement such as standardized test scores, GPAs, first-generation-college-student status, and other academic characteristics, for each race-and-sex pair." *Id.* To that end, Secretary McMahon "direct[ed] NCES to expand the scope of the collection for enrolled cohorts to include data for each race-and-sex pair's graduation rates, final GPAs, financial aid offered, financial aid provided, and other relevant

measures." *Id.* Secretary McMahan also "instruct[ed] NCES to determine if any additional information is needed . . . to ensure IPEDS fulfills the mission of providing transparency in admissions." *Id.*

44.     In addition, Secretary McMahon "direct[ed] NCES to develop a rigorous quality assurance process for reported data," asserting, without any basis, that "[f]or too long, the Department has operated without verifying whether data submitted to IPEDS is accurate and consistently reported across institutions." *Id.*

**Requests for Comment on Information Collection Request**

45.     One week after the issuance of the Presidential Memorandum and McMahon Memorandum, on August 15, the Department of Education, NCES, and IES posted a Request for Comment to the Federal Registrar regarding the proposed changes to IPEDS. *See* Integrated Postsecondary Education Data System (IPEDS) 2024–25 Through 2026–27 Information Collection Request, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, https://perma.cc/Q6EZ-235K (hereinafter, "Aug. 15 Request for Comment"). Proposed changes to IPEDS, because it is an information collection by the federal government, are carried out pursuant to the Paperwork Reduction Act.

46.     As set forth in the Aug. 15 Request for Comment, the Department of Education "request[ed] to add the new IPEDS 'Admission and Consumer Transparency Supplement' (ACTS) survey component," which would apply "to all four-year institutions who utilize selective college admissions, as these institutions have an elevated risk of noncompliance with the civil rights laws." *Id.*

47.     The Aug. 15 Request for Comment did not include the ACTS survey that IHEs would now be required to submit. On information and belief, the absence of the survey stands in

stark contrast to prior revisions to IPEDS, wherein the actual survey was provided to IHEs for review and analysis during the initial notice and comment period.

48.    Instead, the Aug. 15 Request for Comment listed the general categories of information that would be added to IPEDS through the ACTS survey:

a.    "For undergraduate students, we anticipate the component will collect data by race-sex pair on: (1) the count of institutions' applied, admitted, and enrolled cohorts, both overall and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, Pell Grant eligibility, and parental education; (2) the average high school grade point average and admission test score quintiles for institutions' applied, admitted, and enrolled cohorts; (3) the count of students admitted via early action, early decision, or regular admissions," *id.*;

b.    For "newly enrolled undergraduate students, we anticipate the ACTS component will collect data by race-sex pair on both the count and average amount of students receiving: (1) any institutional grant aid, (2) merit-based institutional grant aid, (3) need-based institutional grant aid and (4) any local, state, or federal aid overall, and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, and enrollment via early action, early decision, or regular admissions," *id.*;

c.    "We anticipate the ACTS component will also collect data overall and by race-sex pair on (1) students' average cumulative GPA at the end of the academic year; (2) the average cost of attendance, and further disaggregated by admission test score quintiles, ranges of high school grade point average, ranges of family income, and enrollment via early action, early decision, or regular admissions. [*sic*] (3)

graduation rates further disaggregated by admission test score quintiles and ranges of high school grade point average; and (4) graduates' final cumulative grade point average," *id.*;

d.   For graduate students, "data . . . will be further disaggregated by broad fields of study . . ." *id.*; and

e.   "[T]he new component will seek to capture data not only from the 2025-26 academic year but also from the five prior academic years." *Id.* On information and belief, IPEDS has never before sought retroactive data.

49.   The comment period for the Aug. 15 Request for Comment closed on October 14, 2025. During that time, the Department of Education received 3,462 comments, including a comment submitted by the Attorneys General of the Plaintiffs. Comment by Attorneys General of California et al. on IPEDS 2024–25 Through 2026–27 ICR (Oct. 14, 2025), https://perma.cc/7UD9-2JJN (hereinafter, "Plaintiffs Comment Letter").

50.   The Plaintiffs Comment Letter flagged many problems underlying the anticipated IPEDS ACTS survey, including the discrepancy between the proposed survey and past changes to IPEDS, which typically underwent months or even years of development to ensure that IHEs understood how to implement the changes; had the resources to implement the changes; and had the technical capability to submit the requested data. *Id.* at 5.

51.   In addition, the Plaintiffs Comment Letter observed that some of the requested data components may be unavailable for certain IHEs, rendering it impossible for many affected institutions to provide complete data and to draw meaningful comparisons across institutions. Some IHEs do not ask students to identify their race; others do not require test scores for

admission; and still others may not require certain of the identified components—for example, high school GPA—for transfer students.  *Id.* at 5-6.

52.    Similarly, the Plaintiffs Comment Letter asserted that the level of disaggregation of data posed significant data control and privacy issues. The level of disaggregation—with cells cut across five or more factors—may result in reporting cells so small (say, a handful of students or even a single student per IHE) that no statistical conclusions could be drawn, and the statistical validity of the sample would be minimal. The small cell size also poses a significant risk for student privacy, with the level of disaggregation creating the possibility of inadvertently identifying individual students and revealing highly personal information regarding those students, such as financial aid and GPA.  *Id.* at 6.

53.    Other comments raised still more concerns underlying the proposed ACTS Survey. For example, the Association of Public and Land-grant Universities ("APLU") and the Association for Institutional Research ("AIR") discussed a survey of over 500 institutional research professionals regarding the proposed ACTS survey. Comment Letter of APLU at 2, Agency Information Collection Activities; Comment Request; IPEDS 2024–25 Through 2025–26 (Oct. 13. 2025), https://perma.cc/2H4D-58N2 (hereinafter, "APLU Comment Letter"); Comment Letter of AIR, Re: Docket ID number ED-2025-SCC-0382 (Oct. 13. 2025), https://perma.cc/Q2VT-Y5EM (hereinafter, "AIR Comment Letter"). Eighty-eight percent of survey respondents identified the retrospective reporting requirement as untenable, and ninety-one percent expressed concern about the proposed schedule and their institutional capacity to meet it.  *See* AIR Comment Letter at 2-3.

54.    Based on input from the many professionals who responded to the survey, the APLU Comment Letter expressed that the ACTS survey created significant burdens for IHEs and recommended revisions to the ACTS survey, including more limited disaggregation of data;

extending the reporting deadline; and staggering the collection of data elements, among other changes. APLU Comment Letter at 2.

55. In addition to raising many concerns identified in Plaintiffs Comment Letter, the APLU Comment Letter also noted the lack of clarity and guidance on the precise data sought, which could create inconsistencies between data sets and further reduce the benefit of the data. *Id.* at 6; AIR Comment Letter at 2 (eighty-three percent of survey respondents reported uncertainty about one or more terms).

56. On November 13, 2025, NCES, IES, and the Department of Education posted a Submission to OMB for Review and Approval and Request for Comment on the IPEDS ACTS survey component. *See* Agency Information Collection Activities, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, https://perma.cc/4LDJ-BND5 (hereinafter, "Nov. 13 Request for Comment").

57. The Nov. 13 Request for Comment proposed exempting the ACTS survey for four-year institutions that accept all applicants and do not award need-based aid. Otherwise, there were few, if any, limitations or changes to the data sought; the timeline for response; or level of disaggregation. *Id.*

58. The comment period for the Nov. 13 Request for Comment closed on December 15, 2025, during which stakeholders submitted an additional 146 comments, including a second comment by the Attorneys General of Plaintiffs. *See* Comment by Attorneys General of California et al. on IPEDS 2024–25 Through 2026–27 ICR Submission to OMB for Review & Approval (Dec. 15, 2025), https://perma.cc/F2JC-9JLZ.

59. Only three days after the second notice and comment period closed, on December 18, 2025, the Defendants took final agency action: OMB approved the IPEDS ACTS Survey and

the Department of Education released the mandatory IPEDS ACTS survey and announced that submissions were due for many institutions on March 18, 2026.  IPEDS, This Week in IPEDS, ACTS Collection Dates and Required Instructions (Dec. 18, 2025), https://perma.cc/P62G-ZNQY.

**The Proposed Data Collection is Contrary to Law, Exceeds Statutory Authority, and Fails to Observe the Procedure Required by Law**

60.    The IPEDS ACTS survey is contrary to law, exceeds statutory authority, and failed to observe the procedure required by law. First, IES and NCES have statutory mandates, and neither is authorized to collect data to further partisan political ends, as the Defendants propose here. Second, the Paperwork Reduction Act sets forth multiple requirements for data collections by agencies. These requirements are mandated by statute and cannot be overcome by executive fiat.

61.    Title IV funding is essential for the operations of IHEs, and participation in the IPEDS survey is a condition of participation in the Title IV program. *See* 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). The extreme consequences of failing to submit data through IPEDS confirm that Congress did not intend for IPEDS to have the broad statutory mandate for data collection that the Defendants seek here. Past practice and statutory language confirm the limited authority that NCES and IES have to seek data through IPEDS: never before have these arms of the Department of Education requested the unprecedented array of information sought here, in so little time.

62.    Both NCES and IES are charged with a specific statutory mandate. IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . ; [and] ensure that such activities conform to high standards of quality, integrity, and accuracy; and are objective, secular, neutral, and

nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." 20 U.S.C. § 9511(b)(2)(A) & (B).

63.      Similarly, the mission of NCES, per statute, is "to collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias . . . ." 20 U.S.C. § 9541(b)(1), (2), & (3)(A).

64.      As the McMahon Memorandum makes clear, NCES and IES will no longer be acting within the confines of these statutory mandates with respect to their implementation of the IPED ACTS survey.

65.      Discussing *SFFA*, Secretary McMahon asserts that "[i]t took years of litigation and court-ordered discovery to access the information necessary to uncover Harvard's race-based admissions practices. It should not be this onerous. American taxpayers and aspiring college students deserve to know if the institutions they fund and to which they apply are discriminating on the basis of race." McMahon Memo. at 1. As this language reveals, the new IPEDS ACTS survey is not a data collection developed using rigorous statistical methodology; rather, it is a fishing expedition to obtain onerous, extra-court discovery on the admissions practices of IHEs across the country.

66.      Similarly, the Aug. 15 Request for Comment makes clear that this data will be used explicitly "to establish a baseline of admissions practices from before the Supreme Court decision in *SFFA v. Harvard*," and may even be used "to develop risk-based enforcement practices." Aug. 15 Request for Comment. Neither NCES nor IES, however, is charged with monitoring or

enforcing the law, which is exactly what is contemplated through the addition of the ACTS survey to IPEDS.

67.    The Aug. 15 Request for Comment also identifies DEI programs as the source of the need for the IPEDS ACTS Survey. *See* Aug. 15 Request for Comment ("[T]he continued widespread emphasis on [DEI] in higher education causes concerns that unlawful practices may persist because DEI has been used as a pretext to advance overt and insidious racist discrimination."). Yet this administration's focus on DEI is a policy goal. *See* White House, Ending Radical & Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025), https://perma.cc/3F48-5LY2; White House, Ending Illegal Discrimination & Restoring Merit-Based Opportunity (Jan. 21, 2025), https://perma.cc/ME9U-FJLJ. IES and NCES are statutorily mandated to act free from the influence of partisan politics. The explicit reference to DEI as a target of these additional data reporting requirements belies any claim that the IPEDS ACTS survey is consistent with this mandate.

68.    The level of disaggregation of data also creates a risk that any data submitted pursuant to this request, particularly data for small IHEs or graduate programs, will create a database that identifies individual students. The federal government, however, cannot "develop[], implement[], or maintain[] . . . a Federal database of personally identifiable information" of students in postsecondary institutions.  20 U.S.C. § 1015c(a).

69.    In addition, the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921 (2002), requires agencies to conduct privacy impact assessments for electronic information collections that implicate personally identifiable information. Assessments must address what information will be collected and why, intended use, information sharing, consent to share, and information security, among other things. 1 C.F.R. § 603.18; *see also* OMB, Paperwork

Reduction Act (PRA) Guide, Version 2.0 at 9 (Apr. 2011), https://perma.cc/XHH5-DCSN. Although the level of disaggregation provides sufficient information to discern or trace a student's identity, the Department of Education did not perform a privacy impact assessment in violation of the E-Government Act of 2002.

70.     The mechanism by which the Department of Education implemented the IPEDS ACTS survey also violated the Paperwork Reduction Act ("PRA"), which sets forth multiple requirements for data collections by agencies.

71.     The PRA was enacted to address concerns that individuals, businesses, and other entities were overburdened by completing paperwork at the behest of the federal government. The PRA requires federal agencies to obtain approval from OMB before conducting a collection of information from the public. *See* 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320.

72.     The PRA defines "collection of information" to include any requests or requirements for individuals or entities to obtain, maintain, report, or publicly disclose information. *See* 44 U.S.C. § 3502(3); 5 C.F.R. § 1320.3(c), (h)(1). Under the PRA, an agency may not conduct a collection of information unless it complies with the procedural requirements of the PRA. 44 U.S.C. § 3507; 5 C.F.R. § 1320.5.

73.     In implementing a data collection such as the IPEDS Survey, the agency "shall . . . evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3506(c)(2)(A)(i); 5 C.F.R. § 1320.8(d)(1)(i).

74.     Contrary to this statutory mandate, this information is unnecessary for the proper functioning of the Department of Education. For one, IPEDS already collects admissions data as well as data related to gender, race, and ethnicity. Further, the Department of Education already

has authority, through its Office of Civil Rights, to conduct "prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with" applicable civil rights laws, 34 C.F.R. § 100.7(b), and to "review the practices of recipients to determine" their compliance with these laws, *id.* § 100.7(a). *See* 20 U.S.C. § 3413(c)(1). None of the memoranda, guidance, and requests for comment promulgated by the Defendants with respect to the IPEDS ACTS survey even attempt to explain why the survey is "necessary for the proper performance" of the Department of Education, as the PRA requires, in light of this authority. *See* 44 U.S.C. § 3506(c)(2)(A)(i).

75.    Similarly, the PRA imposes multiple requirements on the agency, including that the collection

a.    "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency," 44 U.S.C. § 3506(c)(3)(C);

b.    "is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond," *id.* § 3506(c)(3)(D);

c.    "is to be implemented in way consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond," *id.* § 3506(c)(3)(E);

d.    "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public," *id.* § 3506(c)(3)(H); and

e. "uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected," *id.* § 3506(c)(3)(I), among other things.

76.    The IPEDS ACTS survey satisfies none of these statutory prerequisites.

77.    First, the data request does not minimize burdens on IHEs. To the contrary, the ACTS survey adds data demands upon IHEs far beyond those imposed by prior IPEDS surveys. Multiple commentors stressed to the Department of Education that the ACTS survey would place new and onerous demands upon IHEs, including respondents to the survey conducted by APLU and AIR. *See* APLU Comment Letter, RE: Docket (ED-2025-SC-0382) at 3, https://perma.cc/4WFG-W8JU (Dec. 15, 2025) ("[O]ver half of respondents (55 percent) estimate over 250 hours of staff time per annum are required to complete the survey, and another 33 percent estimate between 100 and 249 hours. One university system estimated that compliance with the ACTS component will exceed their entire current IPEDS burden."). Despite the concerns raised by commentors, the Defendants did not limit the data sought in the survey. Moreover, the ACTS survey also imposes an untested and burdensome data submission procedure, exacerbating the burden on IHEs.

78.    The burden is compounded by the abbreviated timeline for responding to the IPEDS ACTS survey. In response to the many comments that raised concerns related to this timeframe, the Department of Education "recognize[d] the challenges associated with implementing a new data collection quickly—both for institutions and the IPEDS program," but nevertheless did not alter the timeframe. Dep't of Edu., IES, & NCES, Appendix E: Response to Public Comments Received During the 60-day Comment Period and NCES Responses at 13 (Oct. 2025) (hereinafter,

"Appendix E").[1]  Instead, the Department of Education insisted that "the timeline had been specified by the Presidential Memorandum and Secretarial Directive." *Id.* Yet neither the Presidential Memorandum nor the McMahon Memorandum allows the Defendants to circumvent the statutory requirement that they "reduce[] to the extent practicable and appropriate the burden on" respondents.  44 U.S.C. § 3506(c)(3)(C). Nor did either of these memoranda direct Defendants to collect seven years of data, much less on such a rushed timeline.

79.    Nor is the data request drafted using "plain, coherent, or unambiguous terminology." *Id.* § 3506(c)(3)(D). Typically, changes to IPEDS surveys have allowed for months, if not years, of feedback from IHEs to minimize ambiguity and ensure standardization of new data elements that may have different meanings for different institutions. The abbreviated timeline did not allow for such a process here, and IHEs have been forced to self-define ambiguous terminology. Without this essential guidance, different IHEs may define a term in different ways, resulting in different datasets between IHEs and further reducing the quality of the data.

80.    Moreover, the IPEDS ACTS survey was not implemented in ways that are "consistent and compatible" with IHE's recordkeeping practices given the unprecedented nature, scope, and timeline of this data collection. *Id.* § 3506(c)(3)(E). In particular, the IPEDS ACTS survey seeks previous years' data, including information  which has never before been requested through IPEDS. The Department of Education acknowledges that the IPEDS ACTS survey seeks data elements that have "not previously been collected by IPEDS." Appendix E at 13.

81.    As noted in Plaintiffs' Comment Letters, some of the data may simply be nonexistent at certain IHEs given different requirements for test scores and GPAs, among other data elements of the ACTS survey.

---

[1] "Appendix E" is a PDF document available at the following webpage: Forms & Instruments, Regulations.Gov (Nov. 13, 2025), https://www.regulations.gov/document/ED-2025-SCC-0382-3466.

82.    In some cases, the required data is not easily available in the format required and institutions must develop new systems to obtain it. For example, for many IHEs, information requested as to graduate programs cannot be obtained from a central office. Accordingly, those IHEs need to gather data from multiple sources, identify whether the specific data exist, and determine how to compile them across graduate divisions in the required format. The many new processes that institutions must develop to respond to the IPEDS ACTS survey underscore both the time burden and the difficulty imposed by the abbreviated timeline for compliance.

83.    In addition, neither the Department of Education, IES, nor NCES are equipped to allocate resources for the adequate processing and review of this data. *See* 44 U.S.C. § 3506(c)(3)(H).  Defendant Department of Education has eliminated hundreds of positions through Reductions in Force ("RIFs"), including through reductions of the very offices charged with this data collection, and has entered into Inter-Agency Agreements transferring numerous statutorily mandated functions outside of the Department of Education. On information and belief, the unlawful dismantling of the Department of Education hinders the Department's ability to efficiently and effectively manage the data.

84.    Lastly, the IPEDS ACTS survey does not "use effective and efficient statistical survey methodology." *Id.* § 3506(c)(3)(I). In past instances where NCES has implemented changes to IPEDS surveys, such changes were the result of careful study. For example, Technical Review Panels ("TRPs") gathered information to assess the feasibility of the data collection, assess the survey methodology, ensure that the data were not redundant of information sought through preexisting IPEDS surveys, and refine survey fields and clarify instructions to ensure data quality and consistency across institutions. However, no TRP reviewed the ACTS survey, nor was there any other opportunity for mechanisms that would ensure the data conformed to valid statistical

methods of collection and analysis. The Department of Education has stated that "the feasibility of an ACTS-related IPEDS TRP was deemed infeasible" due to "the timeline established in the memorandum and its accompanying memorandum." Appendix E at 17-18. Yet the executive cannot waive the requirements of the PRA.

85.    In addition, the PRA establishes requirements for notice and comment, including that (1) an agency develop an information collection request ("ICR") with required supporting materials, including the instrument used to collect the information; (2) the agency issue an initial notice in the Federal Register that includes a sixty-day window for public comment about the information collection; (3) after the comment period has ended, the agency consider the public comments and feedback and may make revisions; (4) the agency issue a second notice to the Federal Register allowing for a thirty-day public comment period and simultaneously submit the information collection to OMB for review; and (5) OMB review the package and approve, disapprove, or request changes. *See* OMB, PRA approval process, https://perma.cc/MWE6-7KHJ; 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320.

86.    Under 5 C.F.R. § 1320.8(d)(2)(i), if the sixty-day Federal Register notice does not include a published copy of the proposed collection of information, the agency should "[p]rovide more than sixty-day notice to permit timely receipt, by interested members of the public, of a copy of the proposed collection of information and related instructions." Alternatively, it may "[e]xplain how and from whom an interested member of the public can request and obtain a copy." 5 C.F.R. § 1320.8(d)(2)(ii).

87.    The Department of Education violated 5 C.F.R. § 1320.8(d)(2) by failing to publish a copy of the collection in connection with the sixty-day comment period on the proposed collection or to provide opportunity for the public to obtain a copy of the collection to permit

meaningful review of the collection. At no time during the initial notice-and-comment period was the ACTS survey actually provided, nor did the Defendants explain how interested IHEs could obtain a copy of the survey.

88.     OMB also did not observe the requirements of the law in approving the data collection. The Department of Education was required to "demonstrate that it [took] every reasonable step to ensure that the proposed collection of information is the least burdensome necessary for the proper performance of the agency's functions to comply with legal requirements and achieve program objections" and "has practical utility" as a prerequisite to obtaining OMB's approval. 5 C.F.R. § 1320.5(d)(1)(i), (iii).  Because the Department of Education did not satisfy these requirements, OMB did not have authority to approve the ACTS survey.

89.     Further, OMB may only approve a collection where "the collection of information is necessary to satisfy statutory requirements or other substantial need." 5 C.F.R. § 1320.5(d)(2). The Defendants can satisfy neither of these provisions, and OMB therefore did not act in compliance with the law by approving the addition of the IPEDS ACTS survey.

### The Proposed Data Collection is Arbitrary & Capricious

90.     In addition to being contrary to law, the Defendants' actions are arbitrary and capricious through their failure to consider reliance interests, their deviation from past practices with no reasoned explanation, their failure to consider an important aspect of the problem, and their failure to consider reasonable alternatives, among other things.

91.     Since at least 2002, NCES has engaged in a consistent and methodical multistep process prior to introducing a new IPEDS survey component or major changes to an existing survey. This multistep process includes deliberation by one or more TRPs, collaboration with

impacted IHEs prior to developing the survey, and posting the survey during the notice-and-comment period.

92.    In a sudden departure from this established practice, the ACTS survey component was introduced and implemented without TRP review and without opportunities for consultation with IHEs. In bypassing its normal deliberative process without explanation, the Department of Education failed to consider Plaintiffs' reliance interests and failed to consider an important aspect of the problem.

93.    Since 2002, 71 TRPs have been convened by NCES or its contractors to review proposed changes to IPEDS. Each TRP includes representatives from federal and state government, IHEs, the research community, and higher education associations. Since 2002, all new IPEDS survey components have undergone review and deliberation by a TRP before implementation. *See, e.g.,* IES, The History & Origins of Survey Items for the Integrated Postsecondary Education Data System at E12-2, AL-2, ADM-1, OM-1 (April 2023), https://perma.cc/4WXJ-U7R3.

94.    Typically, TRPs meet over a two-day period to recommend implementing or refining new IPEDS survey elements. Among other things, they ensure that the burden on IHEs is minimal; that terms and definitions are unambiguous and will result in consistent data across different IHEs; that the resulting data will be usable for research; and that any proposed additions will not be duplicative of existing data collection. Summaries of these meetings are made public, and comments on any recommendations are solicited. For major changes, TRPs may convene multiple times.

95.    In addition to the TRP process, NCES also frequently solicits feedback from the National Postsecondary Education Cooperative, or NPEC, a voluntary stakeholder organization

established by NCES in 1995, as well as organizations such as the IPEDS Finance Working Group and the IPEDS Academic Libraries Joint Task Force.

96.     Only after this consultative process will NCES publish proposed changes in the Federal Register for public comment. Proposed changes are typically introduced in an ICR early in the calendar year, several months prior to that collection, to provide IHEs sufficient time to prepare for the new or revised IPEDS survey.

97.     In addition, NCES will not require IHEs to complete major changes such as the introduction of a new survey component until the following year's IPEDS collection. The introduction of a new collection will typically be preceded by an optional or preview year during which IHEs can review the instructions and survey materials with time to adapt their data collection systems.

98.     For example, the Outcomes Measure Component was first introduced during the 2015-16 data collection. Following over a year of deliberation, the Department of Education's Advisory Committee on Members of Student Success submitted its final report on the addition of this component to the Secretary of Education in December 2011. Three TRPs subsequently convened between 2012 and 2014 to provide further suggestions and recommendations on the Outcomes Measure Component, which was first administered in the 2015-16 data collection.

99.     For the ACTS survey component, however, NCES departed from its standard procedures by eliminating the TRP process and implementing the ACTS survey on a severely truncated timeline. Absent the methodical process typically used to implement changes to IPEDS, the ACTS survey is likely to lead to inconsistent and potentially useless data.

100.    The Department of Education's justification for not observing the processes that would typically accompany such a major change to IPEDS was that the Presidential Memorandum

and McMahon Memorandum obligated the Department of Education to implement changes within 120 days and dictated the data content to be included in the ACTS survey. *See* Appendix E at 17-18; Dep't of Edu., IES, & NCES, IPEDS 2024–25 Through 2026–27, Supporting Statement A at 11 (Oct. 2025).[2] This explanation is insufficient. Neither the Presidential Memorandum nor the McMahon Memorandum instructs the Defendants to circumvent the TRP process, nor do the President and Secretary have the authority to override the requirements of the PRA. In addition, the Defendants failed to consider other reasonable alternatives to the sudden and burdensome introduction of the ACTS survey, for example, by implementing a voluntary pilot; phasing the introduction of new data elements; or only seeking a single academic year of data.

101.    Because there was no TRP process to develop and refine the ACTS survey component, many data elements remain unclear or undefined. Failure to engage in the TRP process, collaborate with IHEs, and meaningfully consider input submitted during notice and comment guarantee that IHEs will continue to grapple with critical questions about how to respond to submission requests.

102.    The TRP process would also have addressed concerns about duplicative data collection. For example, IPEDS already tracks aggregated data on applications, enrollments, financial aid, and completions under an entirely different process and pursuant to guidance in existing student data collections. The ACTS component will therefore require institutions to submit the same information in two different formats, increasing the burden on IHEs.

103.    By deviating from the typical procedure for changes to IPEDS, the Defendants also subjected IHEs to a truncated timeline to review and comply with the ACTS survey. NCES released the initial ICR on August 15, 2025, the same academic year during which it is requesting

---

[2] This document is available at the following webpage: Supporting Statement, Regulations.gov (Nov. 13, 2025), https://www.regulations.gov/document/ED-2025-SCC-0382-3465.

the underlying data. Despite this short timeline, NCES omitted its usual step of an initial preview or optional year to allow IHEs to align their data collection systems with the new requirements.

104.    Further, the ACTS survey and reporting instructions were unavailable for review during the initial sixty-day comment period, so IHEs were unable to surface specific concerns about requested data elements or submission procedures and unable to effectively prepare for submission.

105.    The failure to implement the procedures that typically accompany changes to IPEDS demonstrates that the Defendants failed to consider reliance interests. Typically, IHEs have at least a year of notice after the announcement of a major new data collection to submit information through IPEDS. This time ensures that IHEs obtain complete and accurate data. Due to the rushed process accompanying the addition of the IPEDS ACTS survey, however, IHEs faced additional burdens locating data, particularly retroactive data that had not been sought through other IPEDS surveys. In particular, the request for retroactive data fails to consider that IHEs had no notice that this data would be requested and therefore may never have collected or maintained the information sought.

106.    The process accompanying the release of the IPEDS ACTS survey also underscores the arbitrary and capricious nature of this action. Initially, IHEs understood that they had two options to submit data: (1) submit student-level data directly to a third party, RTI International, for aggregation prior to submission to NCES (known as the "Aggregator Tool"); or (2) run an NCES-provided Python code locally to aggregate data within an institution's own secure environment to then be submitted to the IPEDS Data Collection System. On information and belief, the Python script was not available until early 2026, less than two months prior to the March 18 deadline.

107.    In at least one instance, IHEs struggled to obtain the Aggregator Tool from the Department of Education.  At times, IHEs received warnings that the Aggregator Tool contained a virus when they attempted to download it.

108.    Aspects of the IPEDS submission process have continued to change even after the collection was opened, underscoring the inconsistent and incoherent nature of the agency action. On January 26, 2025, RTI International released updated data templates for IHEs to submit data. The updates included clarifying definitions, changed variables for reporting income, and removed data fields. The templates were again updated on February 17, 2026. Given the volume of the data collection, many IHEs had already begun the process of identifying and locating data when these updated templates were circulated. These iterative changes to the templates have resulted in a burdensome process and confusion for the IHEs, which must now determine whether they need to redo collections of information responsive to the ACTS survey.

**The Plaintiffs Will Suffer Harm as a Result of the ACTS Survey**

109.    Plaintiffs face substantial harm arising from the Defendants' actions.

110.    First, Plaintiffs face harm arising from the burden of compiling data responsive to the IPEDS ACTS survey, including data that they had previously never been required to collect, compile, and provide. The burden requires hundreds of hours of work by Plaintiffs' IHEs, many of whom needed to divert resources from other projects in order to respond to the IPEDS ACTS survey. Even if IHEs submit data for the 2025-26 academic year, IPEDS surveys must be submitted each year, and therefore Plaintiffs will continue to face this burden going forward.

111.    The extraordinary scope of the changes to the IPEDS survey and to the submission process exacerbates Plaintiffs' harms. The sheer volume of data requested and new data elements dwarf existing data collections through IPEDS. The Defendants also require seven reporting years

of data. Prior to August 2025, IHEs had no notice of this obligation and therefore may not have collected or retained this data. The sudden requirement that IHEs track and compile previous years' data leaves open questions that IHEs could face the enforcement of fines or penalties if they fail to provide this data, despite the lack of notice as to this retroactive data request.

112.    Additionally, the Department of Education released an entirely novel and untested submission process for the ACTS survey. In past years, IHEs had the option to upload all data using an automated file import process that allowed them to instantaneously see whether data had been accepted and what errors required addressing. The new system requires IHEs to manually enter and upload data into templates, a time-intensive process that allows for much greater human error.

113.    Even after Plaintiffs submit data, however, they will continue to face imminent harm as a result of the IPEDS ACTS survey.  Unlike past revisions to IPEDS surveys, the dramatic changes accompanying the addition of the ACTS survey did not include a pilot, TRP, or other review process that would have ensured consistent definitions across IHEs and a standard and reliable statistical methodology. Without the essential guidance produced through these processes, IHEs are at an imminent risk of facing government enforcement efforts, including efforts to fine them or suspend or terminate their federal funding, should Defendants determine that their submissions did not satisfy the requirements of IPEDS.

114.    The Defendants have also stated their intent to use this data as a basis for enforcement actions against IHEs. The Defendants, however, did not follow typical procedures that would ensure the collection of meaningful and reliable data. Plaintiffs therefore face the additional harm of costly investigations and enforcement actions—and the reputational harm that may accompany such actions—premised on unreliable data.

115.    Plaintiffs will also suffer harm from the considerable privacy risks arising from the data disclosures required by the IPEDS ACTS survey. The level of disaggregation of data—with data parsed across multiple categories, including in small IHEs or graduate programs—necessarily means that small cell sizes may inadvertently identify individual students and reveal those students' personal information. In response to this concern, the Department of Education merely states that "small cell sizes in IPEDS are common." Appendix E at 19.  Yet no IPEDS component requires the disaggregation of sensitive student information demanded by the ACTS survey. Moreover, the Department of Education recognizes that "IPEDS data are not collected under a pledge of confidentiality." *Id.*

116.    IHEs have data protection obligations to their students, including under the Family Education Rights and Privacy Act, Privacy Act and other federal and state laws. Many IHEs may also have internal policies that restrict how and when they can share student information. Given the Defendants' goal "of providing transparency in admissions," it is likely this information will be made public. McMahon Memo. at 2. Even if it is not, however, information submitted through ACTS could be subject to public records requests or Freedom of Information Act requests. The requirements of the IPEDS ACTS survey thus present IHEs with the question of how to protect students' privacy, at the same time that they face the risks of hefty fines and loss of federal funding.

## CAUSES OF ACTION

### COUNT I

**Substantive Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (2)(C)—
Contrary to Law and in Excess of Statutory Authority**

117.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

118.    Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

119.    The approval and implementation of the IPEDS ACTS survey constitute final agency action. 5 U.S.C. § 704.

120.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(A) & (C).

121.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Loper Bright Enters.*, 603 U.S. at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

122.    An agency may not take any action that exceeds the scope of its statutory authority or is contrary to law.

123.    No authority authorizes federal agencies to act outside their statutory authorities or to violate federal law.

124.    The statutory mandates of NCES and IES are set forth in 20 U.S.C. § 9511 and 20 U.S.C. § 9541. Neither authority authorizes these components of the Department of Education to collect data for purposes of partisan ends or for purposes of either monitoring compliance with or enforcing the law.

**COUNT II**

**Substantive Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (2)(D) — Without Observance of Procedure Required by Law**

125.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

126.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with the law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).

127.    The PRA, 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320, imposes requirements for any information collection by a federal agency.  The IPEDS ACTS survey is a data collection governed by the PRA.

128.    In addition, the IPEDS ACTS survey is an electronic information collection that implicates personally identifiable information.

129.    The Defendants committed agency action without observance of procedure required by law when they implemented this data collection without complying with the requirements of the PRA, as well as the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921 (2002), requiring agencies to conduct privacy impact assessments for

electronic information collections that implicate personally identifiable information. Such agency action was also contrary to law.

## COUNT III

**Substantive Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—
Arbitrary & Capricious**

130.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

131.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

132.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

133.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019). And when an agency takes an administrative action that deviates from past policy or practice, and the action implicates "serious reliance interests," an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009).

134.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

135.    The Defendants failed to consider an important aspect of the problem in approving and implementing the IPEDS ACTS survey by disregarding the onerous burden that the new survey would place on IHEs.

136.    The Defendants also failed to consider important reliance interests by IHEs in approving and implementing the IPEDS ACTS survey without engaging in the deliberative process that they have previously used to implement major change to IPEDS, without providing sufficient time for IHEs to collect and submit required information, and in requiring IHEs to provide multiple prior years of information without prior notice.

137.    The Defendants failed to consider reasonable alternatives to implementing the IPEDS ACTS survey, including implementing changes to IPEDS that would have been less burdensome on IHEs, allowed sufficient time to develop methods of collecting reliable data from IHEs, and implemented adequate safeguards to protect the privacy of sensitive student data.

138.    The Defendants have implemented the IPEDS ACTS survey in an incoherent and inconsistent manner by using a method of submission that has confused the process and increased the possibility for manual error. Similarly, the Defendants' rushed implementation of the IPEDS ACTS Survey has resulted in the survey being implemented in an incoherent and inconsistent manner.

139.    The Defendants deviated from past methods of implementing major changes to IPEDS without adequate explanation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Declare that the Defendants acted contrary to law in approving and implementing the IPEDS ACTS Survey;

ii.   Pursuant to the APA, vacate and set aside the actions taken by the Defendants to approve and implement the IPEDS ACTS survey;

iii.  Stay the implementation of the IPEDS ACTS survey pursuant to 5 U.S.C. § 705;

iv.   Enjoin the Defendants from compelling Plaintiffs to complete the IPEDS ACTS survey; accessing any information entered into the IPEDS ACTS survey; penalizing any Plaintiff for failing to complete the IPEDS ACTS survey; and commencing any enforcement action or investigation against Plaintiffs on the basis of submissions to the IPEDS ACTS Survey;

v.    Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi.   Grant other such relief as this Court may deem proper.

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
By: /s/ *Michelle R. Pascucci*
Michelle R. Pascucci
  *State Trial Counsel*
Laila Ameri
Jared Cohen
Carol Guerrero
  *Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
michelle.pascucci@mass.gov
laila.ameri@mass.gov
jared.b.cohen@mass.gov
carol.guerrero@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
  *Attorney General for the State of California*
By: /s/ *Brandy Doyle*
Brandy Doyle
Michael L. Newman
  *Senior Assistant Attorney General*
Virginia Corrigan
  *Supervising Deputy Attorney General*
Brandy Doyle
Nicholas Keats
  *Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3563
Michael.Newman@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Brandy.Doyle@doj.ca.gov
Nicholas.Keats@doj.ca.gov

*Counsel for the State of California*

ANTHONY G. BROWN
  *Attorney General for the State of Maryland*
By: /s/ *Virginia A. Williamson*
Virginia A. Williamson
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
vwilliamson@oag.maryland.gov

*Counsel for the State of Maryland*

JENNIFER DAVENPORT
  *Attorney General of New Jersey*
By: /s/ *Nancy M. Trasande*
Nancy M. Trasande
  *Civil Rights Section Chief*
Jonathan Mangel
  *Deputy Attorney General*
Jillian Ollwerther
  *Deputy Attorney General*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 696-5365
Nancy.Trasande@law.njoag.gov
Jonathan.Mangel@law.njoag.gov
Jillian.Ollwerther@law.njoag.gov

*Counsel for the State of New Jersey*

AARON D. FORD
 *Attorney General*
By: /s/ K. Brunetti Ireland
K. Brunetti Ireland
 *Chief of Special Litigation*
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

PHILIP J. WEISER
 *Attorney General of Colorado*
By: /s/ Nora Passamaneck
Nora Passamaneck
 *Senior Assistant Attorney General*
Sarah H. Weiss
 *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
nora.passamaneck@coag.gov
sarah.weiss@coag.gov

*Counsel for the State of Colorado*

WILLIAM TONG
 *Attorney General of Connecticut*
By: /s/ Mary Lenehan
Mary Lenehan
 *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Mary.Lenehan@ct.gov

*Attorney for the State of Connecticut*

LETITIA JAMES
 *Attorney General of New York*
By: /s/ Jessica Ranucci
Jessica Ranucci
 *Special Counsel*
Rabia Muqaddam
 *Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov

*Counsel for the State of New York*

DAN RAYFIELD
 *Attorney General of Oregon*
By: /s/ Derek Olson
Derek Olson
 *Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

PETER F. NERONHA
 *Attorney General of Rhode Island*
By: /s/ Chandana Pandurangi
Chandana Pandurangi
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

KATHLEEN JENNINGS
 *Attorney General of the State of Delaware*
By: /s/ *Ian R. Liston*
Ian R. Liston
 *Director of Impact Litigation*
Rose E. Gibson
Vanessa L. Kassab
 *Deputy Attorneys General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

CHARITY R. CLARK
 *Attorney General of Vermont*
*By: /s/ Ryan P. Kane*
Ryan P. Kane
 *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

ANNE E. LOPEZ
 *Attorney General for the State of Hawaiʻi*
By: /s/ *Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes
 *Solicitor General*
David D. Day
 *Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

JAY JONES
 *Attorney General of Virginia*
By: /s/ *Tillman J. Breckenridge*
Tillman J. Breckenridge
 *Solicitor General*
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

KWAME RAOUL
   *Attorney General*
   *State of Illinois*
By: /s/ *Aleeza Strubel*
Aleeza Strubel
   *Complex Litigation Counsel*
Elizabeth H. Jordan
   *Social Equity Counsel*
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Aleeza.Strubel@ilag.gov
Elizabeth.Jordan@ilag.gov

*Counsel for the State of Illinois*

NICHOLAS W. BROWN
   *Attorney General*
   *State of Washington*

By: /s/ *Molly Powell*
Molly Powell
Mina Shahin
   *Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
molly.powell@atg.wa.gov
mina.shahin@atg.wa.gov

*Counsel for the State of Washington*

JOSHUA L. KAUL
   *Attorney General*
   *State of Wisconsin*
By: /s/ *Faye B. Hipsman*
Faye B. Hipsman
   *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

## <u>CERTIFICATE OF SERVICE</u>

I, Michelle Pascucci, certify that on March 11, 2026, I provided a copy of the foregoing document to the following attorneys at the U.S. Department of Justice by electronic mail:

Brad Rosenberg
Special Counsel
Federal Programs Branch
U.S. Department of Justice
brad.rosenberg@usdoj.gov

Abraham George
Chief, Civil Division
U.S. Attorney's Office for the District of Massachusetts
abraham.george@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

/s/ Michelle Pascucci
Michelle Pascucci (BBO #690889)