# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Commonwealth of Massachusetts, et al.,

*Plaintiffs,*

v.

Department of Education, et al.,

*Defendants.*

Case No. 1:26-cv-11229

**EMERGENCY HEARING REQUESTED**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

     A.    Until 2025, IPEDS' Purpose Was Methodical Statistical Reporting...........2

     B.    President Trump and Secretary McMahon Direct the Department of Education to Use IPEDS to Monitor Alleged Race-Based Admissions................................................................................................4

     C.    The Department of Education Implements the ACTS Survey in Disregard of Many Concerns Raised During the Notice-and-Comment Periods ..........................................................................................5

LEGAL STANDARD..........................................................................................................8

ARGUMENT .......................................................................................................................9

     A.    Plaintiffs Have Standing to Bring Suit........................................................9

     B.    Plaintiffs Are Likely to Succeed on the Merits............................................9

     C.    Plaintiffs Will Continue to Suffer Irreparable Harm Absent Court Relief..........................................................................................................18

     D.    The Public Interest and Equities Favor Immediate Relief........................20

CONCLUSION..................................................................................................................20

**INTRODUCTION**

By Wednesday, March 18, 2026, Plaintiffs' Institutions of Higher Education ("IHE") must complete data submission for a new component of the Integrated Postsecondary Education Data System ("IPEDS"), a system of interrelated surveys that collect data on an annual basis from universities and, in turn, report that data to the public. For decades, the Department of Education (the "Department"), through its National Center for Education Statistics ("NCES"), has administered IPEDS. This new component of IPEDS, the Admissions and Consumer Transparency Supplement ("ACTS") survey, converts IPEDS from a tool for methodical reporting and analysis to a global subpoena seeking years of information, a large portion of which IHEs had no idea they needed to collect, maintain, or report until only months ago. The consequences of not completing the IPEDS survey are steep: IHEs face the possibility of tens of thousands of dollars in fines and the loss of critical Title IV funding.

Defendants' actions in implementing the ACTS survey violate their statutory mandate to conduct statistical data collections in an objective and non-partisan manner. There can be no question that Defendants seek to use the ACTS survey as a tool to penalize and investigate IHEs across the country: they are explicit that they seek to monitor which IHEs may be engaged in race-based admissions in violation of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023), and will penalize states for allegedly inaccurate reporting. To that end, the Department, through IPEDS, has demanded that IHEs provide seven years of extensive disaggregated data from colleges and universities—including data elements never sought in previous IPEDS surveys—in only a few months.

The Plaintiffs face imminent and irreparable harm as a result of the ACTS survey. Because the Department seeks highly disaggregated data, including data pertaining to personal information

1

such as GPA and income level, the data itself may reveal the identities of individual students and therefore jeopardize student privacy. Further, since at least 2002, changes to IPEDS have been subject to a methodical process to ensure that surveys were clear; that IHEs were on notice of what data they needed to collect; and that the submitted data would be reliable and usable. In violation of the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*, however, the Department disregarded the burden this new collection places upon IHEs and implemented the survey in a rushed manner that increased the possibility of inadvertent error.

Because Defendants' actions in implementing the latest IPEDS survey are contrary to law, exceed statutory authority, do not observe the procedure required by law, and are arbitrary and capricious, Plaintiffs ask that, prior to March 18, 2026, this Court stay the agency action pursuant to 5 U.S.C. § 705 during the pendency of the litigation and grant a temporary restraining order.

## BACKGROUND

### A.    Until 2025, IPEDS' Purpose Was Methodical Statistical Reporting

Since 1986, IPEDS has served as a valuable tool for the methodical collection of data and statistical reporting by universities. NCES, which administers IPEDS, is a component of the Institute for Education Sciences ("IES"), the statistics, research, and evaluation arm of the Department, and one of sixteen recognized statistical agencies and units of the federal government. *See* About Us, StatsPolicyGov, https://perma.cc/3Q3S-HDZH.

Year after year, IPEDS has sought the same categories of data from IHEs, much of which is available to the public through the College Navigator, a college search tool. College Navigator, NCES, https://perma.cc/EGV4-QG3S. IPEDS surveys collect information for a single academic year on topics such as twelve-month enrollment, academic libraries, admissions, completions (i.e., counts of total numbers of students who earned degrees), fall enrollment, financial in-

formation of the institution, graduation rates, and human resources information. *See* IES, The History & Origins of Survey Items for the Integrated Postsecondary Education Data System (April 2023), https://perma.cc/4WXJ-U7R3 ("History & Origins") (outlining background of IPEDS).

Historically, IPEDS has served as a trusted data-source for universities, lawmakers, and the public, in part because the data requested through IPEDS surveys go through rigorous, field-tested vetting among impacted educational institutions before being implemented. Doe Dec. (Ex. AA)[1] ¶ 6. This process ensures that the burden on IHEs is minimal; terms and definitions are unambiguous and will result in consistent data; the resulting data will be usable for research; and any proposed additions will not be duplicative of existing data collections. Guthrie Dec. (Ex. Y) ¶ 11. Since 2002, all new IPEDS survey components have undergone review and deliberation by a Technical Review Panel ("TRP"). *See, e.g.*, History & Origins at E12-2, Al-2, ADM-1, OM-1; Doe Dec. (Ex. AA) ¶ 8. Each TRP includes representatives from federal and state government, IHEs, and the research community. Since 2002, at least seventy-one TRPs have reviewed proposed changes to IPEDS. *See* NCES, IPEDS TRP Summary Open for Comment, This Week in IPEDS (Dec. 11, 2024), https://perma.cc/RDE7-QPHA (describing the meeting of the seventy-first TRP in December 2024).

Typically, TRPs meet to recommend implementing or refining new IPEDS survey elements. For major changes, multiple TRPs may convene. *See*, *e.g.*, History & Origins at E12-2 (describing TRPs that convened for additional component). In addition to the TRP process, NCES also frequently solicits feedback from the National Postsecondary Education Cooperative, a voluntary stakeholder organization established by NCES in 1995. *Id.* at 1; Doe Dec. (Ex. AA) ¶ 9.

---

[1] All exhibits are attached to the Declaration of Michelle Pascucci, which is being filed in connection with Plaintiffs' Motion and Memorandum. The full citation for each exhibit is listed in that declaration. In addition, all citations in this brief have internal citations and quotation marks omitted unless otherwise stated.

Only after this consultative process will NCES publish proposed changes in the Federal Register for public comment. Even after a new survey or major change to IPEDS is approved, however, NCES would not require IHEs to respond to the new request until the following year's IPEDS collection, allowing IHEs at least a year to review the survey materials and adapt their data collection systems.  Doe Dec. (Ex. AA) ¶ 11; Supporting Statement A (Ex. A) at 1 (proposing "larger changes . . . for the 2023-24 data collection with a 'preview' year in 2022-23 to allow institutions more time to prepare to submit the required data.").[2] After undergoing this rigorous process, the changes to IPEDS would be implemented prospectively—that is, for a current or future year's collection—and would not require IHEs to submit data from prior academic years. Defendants, however, have bypassed this process with respect to the ACTS survey. As set forth herein, no TRPs were held, and there was no similar process, such as a limited pilot or phased implementation of new data elements, that would minimize the burden and confusion that resulted from the rushed implementation of the ACTS survey.

B.     **President Trump and Secretary McMahon Direct the Department of Education to Use IPEDS to Monitor Alleged Race-Based Admissions**

The first indication of a major change to IPEDS arose on August 7, 2025. That day, President Trump issued the Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions,* stating that IPEDS would now become a tool to track "consideration of race in higher education" and investigate university compliance with *SFFA*. Memo. from Pres. Trump to Sec'y. McMahon, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://perma.cc/ZEG5-SB53 ("Pres. Memo."). The Presidential Memorandum directs Secretary

---

[2] As one example, the Outcomes Measure Component was first introduced during the 2015-16 data collection.  After over a year of deliberation, the Department 's Advisory Committee on Members of Student Success submitted its final report on the addition of this component in December 2011. Three TRPs subsequently convened between 2012 and 2014 to provide further suggestions and recommendations on the component before the 2015-16 data collection. *See* History & Origins at OM-1.

of Education Linda McMahon, "[w]ithin 120 days of the date of this memorandum, and to be initiated this 2025-2026 school year . . . [to] expand the scope of required reporting to provide adequate transparency into admissions, as determined by the Secretary of Education, consistent with applicable law." *Id.* The Presidential Memorandum also directs the Secretary to "take remedial action, consistent with Title IV of the Higher Education Act of 1965 and other applicable laws, if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data." *Id*.

That same day, Secretary McMahon announced that, "[a]s part of [universities'] regular data reporting process, institutions of higher education will now have to report data disaggregated by race and sex relating to applicant pool, admitted cohort, and enrolled cohort at the undergraduate level for specific graduate and professional programs." Memo. from Sec'y McMahon to Acting Dir. Matthew Soldner, *Ensuring Transparency in Higher Education Admissions* at 2 (Aug. 7, 2025), https://perma.cc/7KDJ-C79N ("McMahon Memo."). Pursuant to this directive, the new IPEDS supplement would require IHEs "to report quantitative measures of applicants and admitted students' academic achievement such as standardized test scores, GPAs, first-generation-college student status, and other academic characteristics, for each race-and-sex pair." *Id.* In addition, Secretary McMahon "direct[ed] NCES to develop a rigorous quality assurance process for reported data," asserting, without any basis, that "[f]or too long, the Department has operated without verifying whether data submitted to IPEDS is accurate and consistently reported across institutions." *Id.*

### C.    The Department of Education Implements the ACTS Survey in Disregard of Many Concerns Raised During the Notice-and-Comment Periods

One week later, the Department of Education, NCES, and IES posted a Request for Comment to the Federal Register regarding the proposed changes to IPEDS. *See* Agency Information

Collection    Activities    Comment    Request,    IPEDS    2024–25    Through    2026–27,

https://perma.cc/Q6EZ-235K (Aug. 15, 2025)  ("Aug. 15 Request for Comment").  As   required

by the PRA, there were two notice and comment periods as to the new ACTS survey—an initial

sixty-day comment period prior to submission to the Office of Management and Budget ("OMB")

for approval and a shorter thirty-day comment period upon submission. *See* 44 U.S.C. §§

3506(c)(2)(A), 3507(b) Following the Aug. 15 Request for Comment, which closed on October

14, 2025, NCES, IES, and the Department posted a Submission to OMB for Review and Ap-

proval and Request for Comment on the IPEDS ACTS Survey component on November 13,

2025. *See* Submission to OMB; IPEDS 2025–26 Through 2026–27, https://perma.cc/4LDJ-BND5

(Nov. 13, 2025) ("Nov. 13 Request for Comment").

The Aug. 15 Request for Comment introduced "the new IPEDS 'Admissions and Consumer

Transparency Supplement' (ACTS) survey component," which would apply "to all four-year in-

stitutions who utilize selective college admissions, as these institutions have an elevated risk of

noncompliance with the civil rights laws." Aug. 15. Request for Comment. Contrary to prior ad-

ditions to IPEDS, which included the actual survey instrument during the sixty-day comment pe-

riod, the Aug. 15 Request for Comment did not include the ACTS survey instrument that IHEs

would now be required to submit. *See*, *e.g.*, Dep't of Ed., *Forms and Instruments*, Docket No. ED-

2022-SCC-0026 (Feb. 25, 2022), https://perma.cc/8H77-NCZ7 (survey materials and instructions

posted the date of the sixty-day Federal Register notice); Dep't of Ed., *Forms and Instruments*,

Docket No. ED-2019-ICCD-0028 (Mar. 20, 2019) https://perma.cc/AJ8U-FYM3 (same).

Instead, the Aug. 15 Request for Comment listed in general, undefined terms the data de-

mands that the Department of Education "anticipate[d]" would be included in the ACTS survey,

among other things,

> data by race-sex pair on: (1) the count of institutions' applied, admitted, and enrolled co-
> horts, both overall and further disaggregated by admission test score quintiles, GPA quin-
> tiles, ranges of family income, Pell Grant eligibility, and parental education; (2) the average
> high school grade point average and admission test score quintiles for institutions' applied,
> admitted, and enrolled cohorts; (3) the count of students admitted via early action, early
> decision, or regular admissions; . . .
>
> Among newly enrolled undergraduate students . . . data by race-sex pair on both the
> count and average amount of students receiving: (1) any institutional grant aid, (2) merit-
> based institutional grant aid, (3) need-based institutional grant aid and (4) and local, state,
> or federal aid overall, and further disaggregated by admission test score quintiles, GPA
> quintiles, ranges of family income, and enrollment via early action, early decision, or reg-
> ular admissions . . . .

Aug. 15 Request for Comment. For graduate students, the data "will be further disaggregated by

broad fields of study." *Id*. The Aug. 15 Request for Comment also stated that the ACTS survey

would seek years of retroactive data. *Id*.

During the initial comment period, 3,462 comments were received, including a com-

ment submitted by many of the Plaintiffs. Attorneys General of California et al., Comment Letter

on IPEDS Information Collection Request (Oct. 14, 2025), https://perma.cc/7UD9-2JJN. The

comment letter outlined many problems underlying the anticipated IPEDS ACTS survey, includ-

ing the concern that the proposed disaggregation posed significant data control and privacy issues.

The level of disaggregation—with cells cut across five or more factors—may result in reporting

cells so small (say, a handful of students per IHE) that no statistical conclusions could even be

drawn, and the statistical validity of the sample would be minimal. The small cell size also poses

a significant risk for student privacy, creating the possibility of inadvertently identifying individ-

ual students and revealing their highly personal information. *Id.* at 5-6.

In another comment, the Association of Public and Land-grant Universities ("APLU") dis-

cussed a survey of over 500 institutional research professionals regarding the ACTS survey.

APLU, Comment Letter on IPEDS ICR at 2 (Oct. 13. 2025),  https://perma.cc/2H4D-58N2. Based

on input from these respondents, the APLU Comment Letter expressed that the ACTS survey created significant burdens for IHEs and recommended revisions to the ACTS survey, including more limited disaggregation of data, extending the reporting deadline, and staggering the collection of data elements, among other things. *Id*.

The comment period for the Nov. 13 Request for Comment closed on December 15, 2025, during which an additional 146 comments were submitted, including an additional comment by many of the Plaintiffs. *See* Attorneys General of California et al., Comment Letter on IPEDS Submission to OMB (Dec. 15, 2025), https://perma.cc/F2JC-9JLZ. The following day, on December 16, 2025, OMB approved the ACTS survey. Office of Information & Regulatory Affairs, OMB, Reginfo.gov (Dec. 16, 2025), https://perma.cc/B4JX-4C8U. Two days later, the Department announced the opening of the survey, with submissions due for many IHEs on March 18, 2026. NCES, *ACTS Collection Dates and Required Instructions*, This Week in IPEDS (Dec. 18, 2025), https://perma.cc/P62G-ZNQY. Despite the many recommendations from commenters alerting Defendants to the reliance interests at stake and reasonable alternatives to the proposed survey, there were no material changes to the data sought, the timeline for response, or level of disaggregation in the final ACTS survey.

## LEGAL STANDARD

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) The last two factors "merge when the Government is the party opposing" the motion. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The standard is same for a temporary restraining order. *Massachusetts v. NIH*,

770 F. Supp. 3d 277, 295 (D. Mass. 2025). All factors here overwhelmingly support granting a preliminary injunction.

## ARGUMENT

### A.    Plaintiffs Have Standing to Bring Suit

Plaintiffs have standing because, through their public IHEs, they will suffer an "injury in fact" that is "fairly traceable" to their submission of the ACTS survey and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). Plaintiffs can show standing based on a "substantial risk" that they will suffer proprietary harms, including fiscal injuries. *Massachusetts v. HHS*, 923 F.3d 209, 222 (1st Cir. 2019) (state can "establish[] standing under a traditional Article III analysis" via its "demonstration of fiscal injury"). The Higher Education Act of 1965, as amended, requires institutions that participate in federal student aid programs to report data through IPEDS. *See* 20 U.S.C. § 1094(a)(17) 34 C.F.R. § 668.14(b)(19). If an institution fails to provide data, or provides incomplete data, the institution can be subject to fines of up to $71,545 per violation and potential suspension or termination of Title IV eligibility. *Id.* §§ 668.84; 668.85 & 668.86. Because of this risk of imminent financial injury, as well as the burden and time of addressing the ACTS survey (*see* § C *infra*), Plaintiffs have standing to challenge the ACTS survey.

### B.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their claim that the ACTS survey violates the Administrative Procedure Act ("APA"). Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "without observance of procedure required by law," *id.* § 706(2)(D), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). The ACTS survey violates each of these provisions.

### 1. Defendants Took Final Agency Action When They Approved and Implemented the ACTS Survey

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. An agency action is "final" within the meaning of § 704 when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Both conditions are easily met here. The ACTS survey imposes additional data reporting obligations on Plaintiffs, and Plaintiffs risk significant fines and loss of federal funding if they do not complete the survey. The "decisionmaking process" is therefore complete—*i.e.*, there is nothing "tentative or interlocutory" about the agency's pronouncement. *Id.* at 597. And from this decision flows an unavoidable "legal consequence" of potentially losing federal funding and incurring fines. *Id.*

### 2. Defendants' Actions Exceed Their Statutory Authority and Are Contrary to Law in Violation of 5 U.S.C. §§ 706(2)(A), (2)(C).

"When an executive agency administers a federal statute, the agency's power to act is authoritatively prescribed by Congress." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* IES and NCES have statutory mandates, and neither is authorized to collect data to further partisan political ends or for the purpose of enforcing the law, as Defendants have openly acknowledged is the purpose of the survey. *See* Aug. 15 Request for Comment ("Greater transparency through the collection of this type of information will help to expose unlawful practices [and] enable the Department to better enforece [sic] Title VI . . . .").

IES and NCES, the components of the Department tasked with administering IPEDS, have specific statutory mandates that instruct how they are to administer IPEDS. IES

10

shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . and ensure that such activities . . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. 9511(b)(2). Similarly, NCES's statutory mission is

to collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias . . . .

20 U.S.C. §§ 9541(b)(1) (2), (3)(A). Neither NCES nor IES is authorized to conduct law enforcement or undertake investigations of allegedly unlawful conduct.

NCES and IES act in excess of statutory authority with respect to their implementation of the ACTS survey. In discussing *SFFA*, Secretary McMahon asserts that

It took years of litigation and court-ordered discovery to access the information necessary to uncover Harvard's race-based admissions practices. It should not be this onerous. American taxpayers and aspiring college students deserve to know if the institutions they fund and to which they apply are discriminating on the basis of race.

McMahon Memo. at 1. As this language reveals, the ACTS survey originated as a fishing expedition to obtain onerous, extra-court discovery on the admissions practices of IHEs across the country rather than as a rigorous statistical collection. Similarly, the Aug. 15 Request for Comment makes clear that this data may be used explicitly "to develop risk-based enforcement practices." Aug. 15 Request for Comment. Per statute, NCES and IES must act in a "neutral" manner. *See* 20 U.S.C. § 9511(b)(2)(B); 20 U.S.C. § 9541(b)(1) (2), (3)(A). But Secretary McMahon is explicit that the ACTS survey's purpose is to circumvent established law enforcement mechanisms and convert IPEDS into a tool to identify alleged wrongdoers and drive enforcement actions. Neither NCES nor IES has this authority. To the contrary, the Department's Office of Civil Rights ("OCR") has the authority "to collect or coordinate the collection of data necessary to ensure com-

pliance with civil rights laws within the jurisdiction of the [OCR]." 20 U.S.C. § 3413(c)(1).  Congress has given this authority to OCR because it is OCR—and not IES or NCES—that is responsible for civil rights compliance and enforcement activities. Given the onerous penalties associated with failure to complete IPEDS, including the loss of Title IV funding, Congress would have been explicit had it conferred such authority upon NCES and IES.

### 3. Defendants' Actions are Contrary to Law and Do Not Observe the Procedure Required by Law in Violation of 5 U.S.C. §§ 706(2)(A), (2)(D).

Defendants also violate the PRA, which establishes requirements for data collections by agencies. *Orr v. Trump*, 778 F. Supp. 3d 394, 425 (D. Mass. 2025) (failed "observance of procedure required by the PRA, [is] in violation of the APA."). Neither the President nor Secretary McMahon can waive Defendants' obligations to comply with the PRA. *See, e.g.*, *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 567 (D. Md. 2025) ("[W]hen the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

The IPEDS ACTS survey is a "collection of information" under the PRA. *See* 44 U.S.C. § 3502(3). Pursuant to the PRA, for the Department to implement the ACTS survey, it must "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3506(c) (32)(A) 5 C.F.R. § 1320.8(d)(1)(i). The Department cannot satisfy this requirement. For one, while the ACTS survey seeks swaths of information that IHEs were on no notice they needed to collect, it also demands some data already required in preexisting IPEDS components that IHEs now must resubmit through the ACTS survey. *See* Case Dec. (Ex. D) ¶ 21 ("ACTS . . . span[s] and integrate[s] data elements that intersect with multiple existing IPEDS student data collections, in-

12

cluding enrollment, financial aid, and completion/graduation outcomes."). Moreover, OCR already has authority to conduct civil rights investigations. *See* § B.2 *supra*. Defendants simply cannot show that it "is necessary for the proper performance of the" Department for NCES to conduct independent civil rights investigations, nor could the Department grant NCES such authority without Congress.

The PRA imposes additional requirements on the Department, including that the collection "is not unnecessarily duplicative of information otherwise reasonably accessible to the agency," 44. U.S.C. § 3506(c)(3)(B); "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency," *id.* § 3506(c)(3)(C); "is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond," *id.* § 3506(c)(3)(D); "is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond," *id.* § 3506 (c)(3)(E); "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of information to be collected," *id.* § 3506(c)(3)(H); and "uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected," *id.* § 3506 (c)(3)(I), among other things. The IPEDS ACTS survey satisfies none of these mandates.

First, the data request does not minimize burdens on IHEs. *See* 44 U.S.C. § 3506 (c)(3)(C). To the contrary, the ACTS survey dwarfs the scope of preexisting IPEDS components. *See* Case Decl. (Ex. D) ¶¶ 21-22 ("[T]he ACTS-related effort—particularly the interpretation, mapping, and ad hoc data collection required—has been comparable to or greater than the combined effort required to implement the IPEDS reporting changes we have addressed over the last decade."). During notice and comment, multiple commentors raised that this burden

would place onerous demands upon IHEs. APLU, Comment Letter on IPEDS Submission to OMB at 3, https://perma.cc/5PLA-MKWJ (Dec. 15, 2025) ("[O]ver half of respondents (55 percent) estimate over 250 hours of staff time per annum are required to complete the survey, and another 33 percent estimate between 100 and 249 hours. One university system estimated that compliance with the ACTS component will exceed their entire current IPEDS burden."). Despite these concerns, Defendants did not limit the data sought in the survey.

Moreover, the Department imposed an unreasonably abbreviated timeline for IHEs to complete the ACTS survey.  Responding to concerns regarding this timeframe, the Department "recognize[d] the challenges associated with implementing a new data collection quickly—both for institutions and the IPEDS program," but insisted that "the timeline ha[d] been specified by the Presidential Memorandum and Secretarial Directive." Appendix E (Ex. B) at 13. Yet neither the President nor the Secretary can circumvent the statutory requirement that they "reduce[] to the extent practicable and appropriate the burden on" respondents. 44 U.S.C. § 3506(c)(3)(C).

A data request must also be drafted using "plain, coherent, or unambiguous terminology." *Id.* § 3506(c)(3)(D). Changes to IPEDS surveys have allowed for months, if not years, of feedback from IHEs to minimize ambiguity and ensure standardization of data elements that may have different meanings for different institutions. The expedited process rendered such standardization impossible. *See*, *e.g.*, Barton Dec. (Ex. L) ¶¶ 21-22; Markiss Decl. (Ex. V) ¶ 23. So too, the ACTS Survey cannot be implemented in ways that are "consistent and compatible" with IHE's recordkeeping practices given the unprecedented nature of this data collection. 44 U.S.C. § 3506(c)(3)(E). The ACTS Survey seeks previous years' data—which has never before been requested through IPEDS—including data elements never collected in prior surveys. Appendix E at

14

13 (Department acknowledging that certain data elements have "not previously been collected by IPEDS"); Barton Dec. (Ex. L) ¶ 23; Brown Dec. (Ex. C) ¶ 26.

In addition, the Department is ill-equipped to allocate resources for the adequate processing and review of this data. *See* 44 U.S.C. § 3506(c)(3)(H). The Department eliminated hundreds of positions through Reductions in Force ("RIFs"), including reductions of the very offices charged with this data collection. *See* Decl. of Doe Declarant #12 ¶ 12, *New York v. McMahon*, 1:25-cv-10601 (D. Mass. ECF No. 71-64); Decl. of Doe Declarant #18 ¶ 12, *New York v. McMahon*, 1:25-cv-10601 (D. Mass. ECF No. 102-9). Without this staff, Defendants simply have no means to process or review this data. Lastly, the IPEDS ACTS Survey does not "use effective and efficient statistical survey methodology," 44. U.S.C. § 3506(c)(3)(I), in part because Defendants bypassed the typical procedures that would ensure a reliable methodology. Doe Dec. (Ex. AA) ¶ 14. Despite comments warning Defendants of the risk of small data sets and unclear definitions, Defendants declined to implement procedures that would have addressed these issues.

Nor is the methodology imposed "appropriate to the purpose for which the information is to be collected." 44. U.S.C. § 3506(c)(3)(I). Even if Defendants' purpose of enforcing the law were appropriate, the data collected by the ACTS survey could never serve this purpose, for the lack of an effective and efficient statistical methodology and the rushed process implemented by Defendants (*see* § B.4 *infra*) undermine the reliability and quality of the data. Doe Dec. (Ex. AA) ¶ 23; Strout Decl. (Ex. N) ¶ 21 (observing that the "inconsistency [as to GPAs] could lead to discrepancies between institutions, and potentially lead to inaccurate interpretations of Worcester State University's submission."). So too, the data does not account for many factors that influence admissions decisions, such as geographic location, academic interest, and personal essays and interviews. Irudayam Decl. (Ex. X) ¶ 30; Deess Decl. (Ex. P) ¶ 34.

15

4.     **Defendants' Actions Are Arbitrary and Capricious in Violation of 5 U.S.C. § 706(2)(A).**

The APA's prohibition against arbitrary and capricious action "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency decision fails this test if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants violated these principles in at least four ways: they failed to consider reliance interests of the IHEs, failed to consider an important aspect of the problem, deviated from past practices with inadequate explanation, and failed to consider reasonable alternatives.

Agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents*, 591 U.S. 1, 33 (2020). NCES had an established multistep process for assessing and implementing proposed changes to IPEDS. Plaintiffs relied on the notice they received through that process, which provided them the timeframe to adapt to and satisfy new data requirements. *See, e.g.*, Brown Decl. (Ex. C) ¶ 14. Here, IHEs had inadequate notice of the need to collect data elements and lacked essential guidance from the Department on data element definitions and submission procedures. *See, e.g.*, *id.* ¶ 24; Irudayam Decl. (Ex. X) ¶ 21. As a result, IHEs are at risk of submitting incomplete or inaccurate data through no fault of their own. Defendants also subjected IHEs to a truncated timeline to comply with the ACTS survey. Typically, IHEs have at least a year after the announcement of a major new data collection before submitting information through IPEDS. Due to the rushed process accompanying the addition of the ACTS survey, however, IHEs faced additional burdens locating data, particularly retroactive data that had not been

sought through other IPEDS surveys and that they had no notice was required prior to late 2025. *See*, *e.g.*, Reeves Decl. (Ex. I) ¶ 23; Stringer Decl. (Ex. W) ¶ 25.

Defendants also failed to consider an important aspect of the problem when they implemented the ACTS survey through a rushed process and without the typical methods of ensuring reliable and consistent data collection. Due to the lack of a TRP, some of the data sought by the ACTS survey is redundant: IPEDS already tracks data on applications, enrollments, financial aid, and completions—all information sought through the ACTS survey—under an entirely different process and pursuant to guidance in existing student data collections. *See* Brown Dec. (Ex. C ) ¶ 21 ("ACTS . . . duplicates collections already required—such as for test scores—by the existing IPEDS admissions survey."). The ACTS survey will therefore require institutions to submit the same information in two different formats, unnecessarily increasing the burden on IHEs. In addition, failure to engage in the TRP process, collaborate with IHEs, and meaningfully consider comments also guarantee that IHEs will continue to grapple with critical questions about how to comply with ambiguous submission requests and data definitions. *See*, *e.g.*, May Decl. (Ex. Q) ¶ 22 (observing "significant and varied gaps in the data submitted by different" New Jersey IHEs); Markiss Decl. (Ex. V) ¶ 22.

The process accompanying the release of the ACTS survey also underscores the arbitrary and capricious nature of this action. Initially, IHEs understood that they had two options to submit data: an "Aggregator Tool" that would allow them to submit student-level data for aggregation prior to submission to NCES, and a Python script that allows IHEs to aggregate data themselves. Both options are different from prior tools for entering data in IPEDS and have been riddled with errors that increased the burden upon IHEs. *See*, *e.g.*, Chellman Decl. (Ex. R) ¶ 35; Case Decl. (Ex. D) ¶ 42; Ribble Decl. (Ex. G) ¶ 43. Indeed, when some IHEs tried to download these tools, they

received malware and virus warnings. *See*, *e.g.*, Chellman Decl. (Ex. R) ¶ 36; Jones Decl. (Ex. J) ¶¶ 40-41. Similarly, the Python script option was not made available until two months prior to the end of the survey response period. *See*, *e.g.*, Guthrie Decl. (Ex. Y) ¶ 41. Aspects of the IPEDS submission process have continued to change even after the collection was opened. *See*, *e.g.*, Jones Dec. (Ex. J) ¶ 22 (University of Illinois staff "have received different responses [from the NCES help desk] to the same question depending on who happens to pick up the phone at the help desk . . . ."); Guthrie Decl. (Ex. Y) ¶ 25; Chellman Decl. (Ex. R) ¶ 20; Haggerty Decl. (Ex. U) ¶¶ 18, 20. These iterative changes have resulted in a burdensome process and confusion for the IHEs, who must now determine whether they need to redo submissions to the ACTS survey.

Defendants also failed to adequately explain their departure from past practice of implementing changes to IPEDS. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agencies "may not . . . depart from a prior policy sub silentio"). Defendants rely on the Presidential Memorandum and McMahon Memorandum as the sole bases for their rushed implementation of the IPEDS data collection, yet neither memorandum compels Defendants to bypass the procedures that would ensure methodical data collection as required by the PRA. Lastly, "[a]n agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021); *Massachusetts v. HHS*, 513 F. Supp. 3d 215, 225 (D. Mass. 2021). Multiple alternatives were available to Defendants, including phased implementation of data elements or a voluntary pilot. Defendants offered no explanation for their failure to implement these or other options.

## C.    Plaintiffs Will Continue to Suffer Irreparable Harm Absent Court Relief

Court-ordered relief is necessary to avoid irreparable harm and protect the equities and public interest. *See*, *e.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) (noting salutary "purpose of a preliminary injunction is to preserve the status quo" and

"freez[e] an existing situation" to avoid injuries while court engages in "full adjudication"). Because of the arbitrary and capricious method in which the IPEDS ACTS survey was implemented, Plaintiffs have faced and will continue to face a significant burden in compiling data. *See Assoc. of Am. Univ. v. Dep't. of Defense*, 792 F. Supp. 3d 143, 176-77 (D. Mass. 2025) (recognizing that ongoing financial and operational burdens constitute irreparable harm).

The survey demands hundreds of hours of work from Plaintiffs' IHEs, many of whom needed to divert resources from other projects to respond to the ACTS survey. *See* Barton Decl. (Ex. L) ¶ 24; Guthrie Decl. (Ex. Y) ¶ 24; Markiss Decl. (Ex. V) ¶ 26. And even if some Plaintiffs submit data ahead of the March 18 deadline, they have and will continue to face imminent harm. Unlike past revisions to IPEDS surveys, the introduction of the ACTS survey did not include a review process that would have ensured consistent definitions across IHEs and a reliable statistical methodology. Yet IHEs are at imminent risk of fines and loss of federal funding should Defendants determine that their submissions were unsatisfactory. *See*, *e.g.*, Guthrie Decl. (Ex. Y) ¶ 30; Chellman Decl. (Ex. R) ¶ 23; Deess Decl. (Ex. P) ¶¶ 29-30. Nor is this harm speculative: the Defendants are to "take remedial action . . . if institutions . . . are found to have submitted incomplete or inaccurate data." Pres. Memo; *cf.* McMahon Memo. at 2 ("direct[ing] NCES to develop a rigorous quality assurance process for reported data").

Plaintiffs also face harm from the considerable privacy risks arising from the data disclosures required by the ACTS survey. The level of disaggregation of data—with data parsed across multiple categories, including in small IHEs or graduate programs—necessarily means that small cell sizes may inadvertently reveal students' personal information. *See*, *e.g.*, Chellman Decl. (Ex. R) ¶ 33; Haggerty Decl. (Ex. U) ¶ 28; Stringer Decl. (Ex. W) ¶ 38. In response to this concern, the Department merely states that "small cell sizes in IPEDS are common." Appendix E at 18-19. Yet

19

no IPEDS survey requires the level of disaggregation required pursuant to the ACTS survey, and the Department recognizes that "IPEDS data are not collected under a pledge of confidentiality." *Id.* Many IHEs have data protection obligations to their students. *See*, *e.g.*, Barton Decl. (Ex. L) ¶¶ 34-39. The requirements of the IPEDS ACTS survey thus present IHEs with an untenable choice between protecting students' privacy at the risks of fines and loss of federal funds or potentially exposing student personal information.

### D.    The Public Interest and Equities Favor Immediate Relief

The equities and public interest overwhelmingly demand immediate relief. Plaintiffs will suffer imminent harm from the burden of submitting information, the risk of imminent financial and reputational harm, and considerable privacy risks arising from the data disclosures required by the ACTS survey. By contrast, the harm to Defendants is minimal: Plaintiffs will still submit information through preexisting IPEDS components, as they always have, and the data submitted through the ACTS survey is likely to be inconsistent and unreliable based on Defendants' failure to follow procedures designed to ensure a valid statistical methodology. Simply put, Defendants' desire for inconsistent and unreliable data to punish Plaintiffs and drive baseless enforcement actions should not militate against the Court's grant of temporary relief for Plaintiffs.

### CONCLUSION

Plaintiffs respectfully request a stay of the agency action pursuant to 5 U.S.C. § 705 and that this Court enjoin Defendants from

(1) accessing information uploaded by Plaintiffs for the ACTS survey;

(2) requiring that Plaintiffs complete the ACTS survey by March 18, 2026;

(3) assessing penalties on Plaintiffs based on their submissions to the ACTS survey; and

(4) using the ACTS survey as a basis for any investigation or enforcement action against Plaintiffs.

Respectfully submitted,                    Dated: March 13, 2026

ANDREA JOY CAMPBELL
   *Attorney General*
   *Commonwealth of Massachusetts*
By: */s/ Michelle R. Pascucci*
Michelle R. Pascucci
   *State Trial Counsel*
Laila M. Ameri
Jared Cohen
Carol Guerrero
   *Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
michelle.pascucci@mass.gov
laila.ameri@mass.gov
jared.b.cohen@mass.gov
carol.guerrero@mass.gov

*Counsel for the Commonwealth of Massa-chusetts*

ROB BONTA
   *Attorney General for the State of Califor-nia*
By: */s/ Brandy Doyle*
Brandy Doyle
Michael L. Newman
   *Senior Assistant Attorney General*
\*Virginia Corrigan
   *Supervising Deputy Attorney General*
\*Brandy Doyle
\*Nicholas Keats
\*Kenneth Sugarman
   *Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
(415) 510-3563
Michael.Newman@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Brandy.Doyle@doj.ca.gov
Nicholas.Keats@doj.ca.gov

*Counsel for the State of California*

ANTHONY G. BROWN
   *Attorney General for the State of Maryland*
By: */s/ Virginia A. Williamson*
\*Virginia A. Williamson
   *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
vwilliamson@oag.maryland.gov

*Counsel for the State of Maryland*

JENNIFER DAVENPORT
   *Attorney General of New Jersey*
By: */s/ Nancy M. Trasande*
Nancy M. Trasande
   *Civil Rights Section Chief*
Jonathan Mangel
   *Deputy Attorney General*
Jillian Ollwerther
   *Deputy Attorney General*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 696-5365
Nancy.Trasande@law.njoag.gov
Jonathan.Mangel@law.njoag.gov
Jillian.Ollwerther@law.njoag.gov

*Counsel for the State of New Jersey*

AARON D. FORD
  *Attorney General*
By: /s/ K. Brunetti Ireland
K. Brunetti Ireland
  *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

LETITIA JAMES
  *Attorney General of New York*
By: /s/ Jessica Ranucci
*Jessica Ranucci
  *Special Counsel*
*Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov

*Counsel for the State of New York*

PHILIP J. WEISER
  *Attorney General of Colorado*
By: /s/ Nora Passamaneck
*Nora Passamaneck
  *Senior Assistant Attorney General*
*Sarah H. Weiss
  *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
nora.passamaneck@coag.gov
sarah.weiss@coag.gov

*Counsel for the State of Colorado*

DAN RAYFIELD
  *Attorney General of Oregon*
By: /s/ Derek Olson
*Derek Olson
  *Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

WILLIAM TONG
  *Attorney General of Connecticut*
By: /s/ Mary Lenehan
*Mary Lenehan
  *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Mary.Lenehan@ct.gov

*Attorney for the State of Connecticut*

PETER F. NERONHA
  *Attorney General of Rhode Island*
By: /s/ Chandana Pandurangi
*Chandana Pandurangi
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

KATHLEEN JENNINGS
 *Attorney General of the State of Delaware*
By: /s/ *Ian R. Liston*
Ian R. Liston
 *Director of Impact Litigation*
Rose E. Gibson
Vanessa L. Kassab
 *Deputy Attorneys General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

CHARITY R. CLARK
 *Attorney General of Vermont*
*By: /s/ Ryan P. Kane*
*Ryan P. Kane
 *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

ANNE E. LOPEZ
 *Attorney General for the State of Hawaiʻi*
By: /s/ *Kalikoʻonālani D. Fernandes*
*Kalikoʻonālani D. Fernandes
 *Solicitor General*
*David D. Day
 *Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

JAY JONES
 *Attorney General of Virginia*
By: /s/ *Tillman J. Breckenridge*
Tillman J. Breckenridge
 *Solicitor General*
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

KWAME RAOUL
   *Attorney General*
   *State of Illinois*
By: /s/ *Aleeza Strubel*
Aleeza Strubel
   *Complex Litigation Counsel*
Elizabeth H. Jordan
   *Social Equity Counsel*
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Aleeza.Strubel@ilag.gov
Elizabeth.Jordan@ilag.gov

*Counsel for the State of Illinois*

NICHOLAS W. BROWN
   *Attorney General*
   *State of Washington*

By: /s/ *Molly Powell*
*Molly Powell
*Mina Shahin
   *Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
molly.powell@atg.wa.gov
mina.shahin@atg.wa.gov

*Counsel for the State of Washington*

JOSHUA L. KAUL
   *Attorney General*
   *State of Wisconsin*
By: /s/ *Faye B. Hipsman*
Faye B. Hipsman
   *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

*\*Pro Hac Vice* motions forthcoming or pending

## <u>CERTIFICATE OF SERVICE</u>

I, Michelle Pascucci, certify that on March 13, 2026, I provided a copy of the foregoing document to the following attorneys at the U.S. Department of Justice by electronic mail:

> Brad Rosenberg
> Special Counsel
> Federal Programs Branch
> U.S. Department of Justice
> brad.rosenberg@usdoj.gov
>
> Abraham George
> Chief, Civil Division
> U.S. Attorney's Office for the District of Massachusetts
> abraham.george@usdoj.gov
>
> Rayford Farquhar
> Chief, Defensive Litigation, Civil Division
> U.S. Attorney's Office for the District of Massachusetts
> rayford.farquhar@usdoj.gov
>
> */s/ Michelle Pascucci*