# EXHIBIT X

**<u>DECLARATION OF IRENE IRUDAYAM</u>**

I, Irene Irudayam, declare as follows:

1. I am over the age of 18 and understand the obligations of an oath.

2. I am the Assistant Vice President of Institutional Research and Chief Data Officer at Vermont State Colleges d/b/a Vermont State University, a public institution of higher education ("IHE") in the State of Vermont, a position I have held since 2022. Vermont State University (the "University") has 87 undergraduate and 27graduate programs, enrolling a total of approximately 5179 students for the 2025–2026 academic year.

3. The University participates in federal student financial assistance programs under Title IV of the Higher Education Act, and, as a condition of that participation, is required to collect and submit institutional data to the Integrated Postsecondary Education Data System ("IPEDS"), a data collection system administered by the National Center for Education Statistics ("NCES") within the U.S. Department of Education. I serve as the University's designated keyholder overseeing the collection, coordination, and submission of institutional data to IPEDS.

4. I have personal knowledge of all the facts stated herein, based on my professional experience and my review of information and records provided to me, including direct knowledge of how IPEDS data collection, coordination, and submission operate for the University. If called as a witness, I could and would testify competently to the matters set forth below.

<u>Integrated Postsecondary Education Data System</u>

5. The Integrated Postsecondary Education Data System is a series of interrelated surveys conducted by the U.S. Department of Education's National Center for Education Statistics to gather and analyze data related to postsecondary institutions. Through IPEDS, NCES fulfills its congressional mandate contained in the Education Sciences Reform Act of 2002, 20 U.S.C. § 9543,

1

to collect, report, analyze, and disseminate comprehensive institution-level data on postsecondary educational institutions for statistical and public reporting purposes.

6. Every college, university, and technical or vocational institution in the United States that participates in Title IV federal financial aid programs is required to complete IPEDS surveys as a condition of participation. The University is subject to this requirement and would face significant fines (up to $71,545 per violation) and other serious consequences, such as threats of loss of federal funding, if it fails to submit timely and complete data through IPEDS.

7. Each year, NCES releases national-level statistics and institution-level data through the College Navigator college search Web site and through the IPEDS Data Center. It is my understanding that many organizations and individuals, including students, parents, researchers, and educators, rely on IPEDS data and depend on its standardization and accuracy.

8. IPEDS requires institutions to submit aggregate data across multiple areas, including enrollment, program completion, faculty, staff, graduation rates, financial aid, finances, admissions, libraries, cost, and outcome measures. Annual reporting occurs in three collection cycles—Fall, Winter, and Spring.

9. Typically, NCES provides detailed definitions, reporting standards, and technical guidance for each IPEDS survey component, including written instructions, data definitions, training materials, and validation procedures. For example, NCES publishes an IPEDS Glossary containing standardized definitions for hundreds of terms. Glossary, IPEDS Data Collection System 2025-26, https://surveys.nces.ed.gov/ipeds/public/glossary. The University depends on these materials and other guidance from NCES to ensure that it interprets reporting requirements as NCES intends and to report data that can be standardized across years and institutions.

10. As I understand it, when NCES considers a major change to IPEDS collections, it often takes more than 24 months from the initial proposal to the first required institutional reporting.

This length of time reflects several formal steps NCES usually undertakes to ensure technical vetting, feasibility, and compliance with federal data collection laws. Among the several steps in this process, a Technical Review Panel will convene to help guide the design, revision, and implementation of the new or revised collection. Based on my experience, this review and development process is essential because it provides IHEs with clear definitions, technical guidance, and advance notice of new reporting requirements, allowing institutions to adjust their data systems, train staff, and ensure that the information ultimately submitted to IPEDS is accurate and reported consistently across institutions.

<u>Vermont State University's IPEDS Data Collection, Collation, and Reporting</u>

11.     To submit its IPEDS survey data and as required by law, the University has appointed a keyholder responsible for ensuring that the institution collects and submits complete and accurate data. Typically, for each survey, institutions enter data into the IPEDS Data Collection System, either by direct entry or file upload. Next, the institution proceeds through a series of validation checks, which identify data entry issues that must be resolved before the institution may "lock" the data—that is, formally submit the data to NCES. During this validation process, institutions can immediately see any errors that require correction. Once the data is locked, it is my understanding that the final data is then transferred to the IPEDS Data Center. At this stage, the Data Collection System automatically calculates totals, averages, and other statistical data.

12.     Preparing and submitting IPEDS data requires substantial institutional effort and coordination. The information reported through IPEDS is drawn from multiple institutional systems and administrative offices, including financial aid systems, human resources systems, student information systems, and financial accounting systems. Each IPEDS reporting cycle requires IHESs to extract data from these systems, apply the definitions and reporting rules specified by NCES, and ensure that the resulting data conform to IPEDS reporting requirements.

13.     In many cases, the information required for IPEDS reporting is not stored in a single, readily producible dataset.   Instead, institutional staff must perform additional analysis and calculations to produce the required aggregate reporting data.  Staff must also review the data for accuracy and consistency, reconcile discrepancies across institutional systems, and respond to automated validation checks generated by the IPEDS reporting platform.

14.     Because IPEDS reporting has typically occurred on a recurring annual cycle using established definitions and reporting structures, the University has developed internal processes that have been able to meet these requirements.  Even using these time-tested processes, it typically takes the University 2-3 months to collect, compile, validate, and submit IPEDS survey responses.

### IPEDS ACTS Survey

15.     I understand that, on August 7, 2025, President Trump issued a presidential memorandum, which explained that IPEDS would now become a tool to track "consideration of race in higher education admissions" and investigate university compliance with *Students for Fair Admissions v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023).  The Presidential Memorandum instructed the Secretary of Education to, among other things, expand the scope of required reporting by IHEs and directed "remedial action, consistent with Title IV of the Higher Education Act of 1965 and other applicable laws, if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data."

16.     I also understand that on August 7, 2025, Secretary of Education Linda McMahon directed NCES to "collect data disaggregated by race and sex relating to the applicant pool, admitted cohort, and enrolled cohort at the undergraduate level, and for specific graduate and professional programs" within 120 days.  Secretary McMahon's directive set out that a new IPEDS supplement would require IHEs "to report quantitative measures of applicants and admitted students' academic

achievement such as standardized test scores, GPAs, first-generation-college student status, and other academic characteristics, for each race-and-sex pair."

17.    I am also aware that, on August 15, 2025, the U.S. Department of Education, NCES, and the Institute for Education Sciences ("IES") posted a Request for Comment to the Federal Register regarding proposed changes to IPEDS.  The August 15 request for comment listed extensive data demands that would be added to IPEDS through a supplemental survey later named the IPEDS Admissions and Consumer Transparency Supplement ("ACTS").  The ACTS survey itself was not made available with the August 15 request for comment. However, the ACTS survey component would be required for all four-year institutions that utilize selective college admissions. Subsequently, on November 13, the U.S. Department of Education, NCES, and IES posted a second request for comment on the supplemental survey component.

18.     It is my understanding that the State of Vermont submitted comments, along with several other States, to the August 15 and November 13 requests, flagging many problems underlying the anticipated IPEDS ACTS survey, including the discrepancy between the proposed survey and past changes to IPEDS, which typically underwent months or even years of development to ensure that IHEs understood how to implement the changes, had the resources to implement the changes, and had technical capability to submit the requested data.  The comment letter observed that some of the requested data components may be unavailable to certain IHEs, rendering it impossible for many affected institutions to provide complete data.  The comment letter also raised concerns about the level of disaggregation of data and risks to student privacy.

19.    I understand that on December 18, 2025, OMB approved the IPEDS ACTS Survey and the Department of Education announced the opening of the IPEDS ACTS survey, with submissions due for many institutions on March 18, 2026, a date unmoored to the standard IPEDS collection cycles.

<u>Institutional Burden of Gathering and Preparing IPEDS ACTS Survey Data</u>

20.     The IPEDS ACTS survey was introduced without the definitions, guidance, and technical assistance that NCES typically provides.  As a result, the University faces significant uncertainty regarding how to interpret the ACTS survey's reporting requirements and how to compile the requested data and enhanced burden in preparing IPEDS data over a compressed period of time and in the face of ambiguity about reporting standards.

21.     The University has had to devote substantial additional time and resources to interpreting ambiguous reporting requirements and determining how to compile the requested information. Institutional staff estimate that preparing the ACTS survey requires approximately 160 hours of staff time, significantly exceeding the time typically required for standard IPEDS surveys. This effort has involved coordinating across multiple offices, reconciling competing internal definitions, and attempting to interpret federal reporting expectations in the absence of clear federal guidance. For example, the survey requests information related to test scores and graduate application data from prior years, which requires institutions to retrieve and reconstruct historical data that were not previously collected or stored in a format consistent with ACTS reporting requirements.

22.     NCES has distributed guidance to define potentially ambiguous terms, but this guidance is insufficient to resolve the questions that have arisen during data collection and compilation.  In some instances, the definitions do not appear to have been thoroughly vetted and are inconsistent with standard institutional practice. While NCES has made available a help desk, this resource has at times provided conflicting advice.

23.     The IPEDS ACTS survey seeks data from previous years, including data that have never been sought through previous IPEDS surveys.  Certain data requested through the ACTS survey are not centrally stored within the institution's enterprise system, requiring significant effort

6

to identify, locate, and compile information from multiple offices and legacy records. For example, retrieving historical test score data and graduate application data across several years requires manual retrieval from other systems, which substantially increases the reporting burden.to the University. The University has never had a selective enrollment process such as that addressed in *SFFA*, making the collection of this prior data unnecessary and not useful.

24.    In addition, the University has had to divert important resources from other projects in order to complete the ACTS survey. This diversion is particularly burdensome because other major IPEDS reporting components—including Human Resources, Fall Enrollment, and Finance—are due April 8th, creating overlapping reporting timelines. As a result, staff who would normally be focused on preparing these required reports have had to shift significant time and attention to the ACTS survey. This overlap places considerable strain on limited institutional research and reporting resources and increases the risk of errors or delays across multiple federally required submissions.

25.    Without clear federal definitions and reporting standards, the University may inadvertently interpret key terms and reporting instructions differently from other institutions, resulting in inconsistent reporting practices and unreliable data.  This may lead to the publication or use of statistics that do not accurately reflect institutional operations or student outcomes at the University.

26.    Of even more significant harm to the University, the federal government has indicated that IHEs may be subject to substantial financial penalties, which I understand may exceed $70,000 per violation, or other sanctions for inaccurate reporting.  The risk of financial penalties places The University in an untenable position: either delay or decline to report requested data, or submit data based on uncertain interpretations while facing the possibility of penalties if those interpretations are later deemed incorrect.

27.    The University must submit data for IPEDS surveys on an annual basis.  Therefore,

the burden of submitting the ACTS survey will be recurring, as the University will need to submit the ACTS survey for subsequent academic years.

Institutional Harms from Using IPEDS ACT Survey Data as a Law Enforcement Tool

28.    IPEDS has historically functioned as a statistical reporting system intended to provide consistent national information about higher education in the United States.

29.    The U.S. Department of Education's plans to use IPEDS submissions as a basis for investigative or law enforcement activity—particularly data derived from the IPEDS ACTS survey, which lack the definitions, guidance, and standardization processes typically provided by NCES—creates significant risks and harms for reporting IHEs such as the University.

30.    The aggregate statistical data reported through IPEDS does not include the contextual information necessary to assess admissions decisions or policies.  In my experience, admissions decisions are influenced by a wide range of factors such as geographic location and academic interest that are not reflected in IPEDS ACTS or other IPEDS reporting data.  The University faces significant risk of financial penalties or other sanctions based on incomplete and decontextualized information pulled from its IPEDS ACTS survey responses.

31.    Additionally, because the IPEDS ACTS survey lacks standardized definitions and clear reporting instructions, the University may interpret survey questions differently from other IHEs, which would increase the likelihood that reported data vary across institutions for reasons unrelated to actual institutional practices.  Such inconsistencies are likely to reflect differences in reporting interpretations rather than differences in admissions policies or practices.

32.    If IPEDS ACTS data is used to identify potential targets for enforcement actions or investigations, IHEs will face significant legal and reputational harms based on incomplete or unreliable information.  For example, institutions could be subjected to federal civil rights

investigations or other forms of government inquiry based on statistical patterns derived from data that were collected without standardized reporting guidance.  Responding to such investigations would require substantial institutional resources.

33.    IPEDS data is publicly available.  If federal agencies began signaling that they interpret certain IPEDS data as indicating noncompliance with federal law, this could trigger shifts in public perception, resulting in reputational harm, and may lead to enrollment declines.

Privacy Harms

34.    The University maintains substantial amounts of sensitive, personal information about its students, including academic records, financial aid information, and other data protected by federal privacy laws and institutional policies.

35.    IHEs, including the University, are required to safeguard this information under the Family Educational Rights and Privacy Act ("FERPA") and other applicable federal and state privacy protections governing student records. These obligations require institutions to carefully limit the disclosure of personally identifiable student information and to ensure that institutional reporting processes protect student privacy.

36.    For that reason, IHEs typically report IPEDS data in aggregate form, rather than as individual student records.  This aggregation of data serves an important privacy function because it reduces the risk that individual students could be identified from the reported information.

37.    Congress has also expressed clear concern about the privacy risks associated with federal collection of individual student data.  Federal law prohibits the Department of Education from creating a record system containing individual student-level data on postsecondary students.  20 U.S.C. § 1015c.  Despite these privacy protections, the IPEDS ACTS survey demands that IHEs provide highly disaggregated student information, which enhances privacy risks for students. In my

9

experience, privacy risks become significantly greater when educational data are reported at increasingly granular levels.  When demographic information, academic programs, and other characteristics are broken down into highly specific categories, the resulting data cells may contain only a very small number of students.  In such circumstances, it may be possible for individuals to infer the identity of particular students even when direct identifiers such as names or student identification numbers are not included.  In my professional judgment, the IPEDS ACTS survey creates such enhanced risks.

38.     These risks stemming from the IPEDS ACTS survey are particularly acute in smaller programs or for demographic groups with limited populations at a particular IHE.  At the University, some graduate programs and specialized academic programs enroll relatively small cohorts of students each year. When data are disaggregated by characteristics such as program, demographic categories, or admissions metrics (test scores), there is an increased risk that individuals could be indirectly identified due to the small number of students represented in those categories.

39.     NCES has not explained any process by which it will address these privacy concerns. But even if NCES intends to take steps to try to prevent the identification of particular students, the University remains concerned about the possibility that data submitted to IPEDS could be the subject of public information requests under applicable federal or state transparency laws. The University must account for the possibility that submitted IPEDS data may well become publicly available and, once disclosed, cannot be practically recalled or removed from circulation or aggregation efforts.

40.    The IPEDS ACTS survey raises serious concerns for IHEs such as the University that are responsible for protecting student privacy and complying with federal and state privacy laws.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of March 2026, in Houston, Texas.

IRENE IRADAYAM
Assistant Vice President
of Institutional Research
& Chief Data Officer
Vermont State University
124 Admin Drive,
PO Box 500
Randolph Center, VT
05061

11