**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON, and STATE OF WISCONSIN,

*Plaintiffs*,

*v.*

U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and

Budget,

*Defendants*.

Case No.1:26-cv-11229

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**

**<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

**TABLE OF CONENTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.    THE NATIONAL CENTER FOR EDUCATION STATISTICS AND IPEDS .................. 2

II.   TITLE IV ................................................................................................................. 3

III.  THE ACTS COMPONENT ...................................................................................... 3

IV.   PROCEDURAL HISTORY ....................................................................................... 8

LEGAL STANDARD ...................................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM. ...................................... 9

    A.    Plaintiffs' Delay in Bringing Suit Shows That They Have Not Suffered
        Irreparable Harm. ....................................................................................... 9

    B.    Plaintiffs' Alleged Harms Are Speculative and Not Imminent. ........................ 10

II.   PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUCCEED
    ON THE MERITS. ................................................................................................. 13

    A.    NCES and the Department Have Statutory Authority for the ACTS
        Component. ................................................................................................ 13

    B.    Defendants Did Not Violate the Paperwork Reduction Act. ............................ 15

    C.    The ACTS Component Is Not Arbitrary or Capricious. .................................. 16

III.  THE SCOPE OF THE REQUESTED INJUNCTION IS OVERBROAD ...................... 20

CONCLUSION .............................................................................................................. 20

**TABLE OF AUTHORITIES**

**CASES**

*A. O. Smith Corp. v. FTC*,
530 F.2d 515 (3d Cir. 1976) ................................................................................... 11

*Am. Hosp. Ass'n v. Harris*,
625 F.2d 1328 (7th Cir. 1980) ................................................................................ 11

*Asymmetrx Med., Inc. v. McKeon*,
932 F. Supp. 2d 232 (D. Mass. 2013) ....................................................................... 9

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) ................................................................................... 13

*Benisek v. Lamone*,
585 U.S. 155 (2018) .................................................................................................. 9

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ................................................................................... 20

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ................................................................................... 10

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ................................................................................................ 17

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ................................................................................................ 20

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................................................................ 13

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ................................................................................................ 17

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) .................................................................................... 11

*Fuchs v. Steel-Fab, Inc.*,
356 F. Supp. 385 (D. Mass. 1973) ........................................................................... 10

*Gillan v. Town of Carver*,
2025 WL 1836609 (D. Mass. July 3, 2025) ............................................................... 9

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........................................................................................... 12, 20

*In re Rare Coin Galleries of Am., Inc.*,
   862 F.2d 896 (1st Cir. 1988) ................................................................................ 11

*Knight v. Alabama*,
   787 F. Supp. 1030 (N.D. Ala. 1991), *aff'd in part, vacated in part, rev'd in part*,
   14 F.3d 1534 (11th Cir. 1994) ............................................................................. 14

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................................. 13

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................................. 20

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ............................................................................................... 8

*Morgan v. Fletcher*,
   518 F.2d 236 (5th Cir. 1975) ............................................................................... 11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................... 15

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................... 9

*Orr v. Trump*,
   778 F. Supp. 3d 394 (D. Mass. 2025) ................................................................. 16

*P.R. Tel. Co. v. Telecomms. Regul. Bd. of P.R.*,
   665 F.3d 309 (1st Cir. 2011) ............................................................................... 13

*Phyllis Schlafly Revocable Tr. v. Cori*,
   924 F.3d 1004 (8th Cir. 2019) ............................................................................. 10

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) ................................................................................. 10

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025) ...................... 17

*Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*,
   2023 WL 3660689 (D. Mass. May 25, 2023) ..................................................... 10

*Shaffer v. Globe Prot., Inc.*,
   721 F.2d 1121 (7th Cir. 1983) ............................................................................. 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.),*
   397 F. Supp. 3d 126 (D. Mass. 2019), *aff'd sub nom. Students for Fair Admissions, Inc. v.
   President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020),
   *rev'd*, 600 U.S. 181 (2023) ..................................................................................... 14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
   600 U.S. 181 (2023) ................................................................................................ 2

*Sutton v. Providence St. Joseph Med. Ctr.,*
   192 F.3d 826 (9th Cir. 1999) .................................................................................. 15

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) .............................................................................................. 20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) .............................................................................................. 17

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
   423 F.3d 137 (2d Cir. 2005) .................................................................................. 10

*Wilson v. HSBC Mortg. Servs., Inc.,*
   744 F.3d 1 (1st Cir. 2014) ..................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................... 8

*Wreal, LLC v. Amazon.com, Inc.,*
   840 F.3d 1244 (11th Cir. 2016) ............................................................................. 10

*Zavala Santiago v. Gonzalez-Rivera,*
   553 F.2d 710 (1st Cir. 1977) ................................................................................. 10

**STATUTES**

5 U.S.C. § 706 ..................................................................................................... 13

20 U.S.C. § 1094 ............................................................................................... 3, 14

20 U.S.C. § 9541 ................................................................................................... 2

20 U.S.C. § 9543 .............................................................................................. 2, 14, 15

20 U.S.C. § 9544 ................................................................................................... 2

44 U.S.C. § 3506 ............................................................................................... 6, 15, 16

44 U.S.C. § 3512 ................................................................................................. 16

**REGULATIONS**

34 C.F.R. § 668.14 ........................................................................................................................ 14

34 C.F.R. §§ 668.84-668.86 ......................................................................................................... 11

**INTRODUCTION**

Plaintiffs challenge the Department of Education's (Department) collection of admissions data, disaggregated by race, sex, and other characteristics, in the Admissions and Consumer Transparency Supplement (ACTS) to the Integrated Postsecondary Education Data System (IPEDS).  Despite knowing since August 2025 about the Department's intention to require institutions of higher education (IHEs) to complete the ACTS component, and the ACTS component being open since December 18, 2025, Plaintiffs waited until three business days before the due date for the ACTS component to seek emergency relief.  Claiming that their public IHEs will suffer imminent irreparable harm, Plaintiffs seek to enjoin the Department from requiring their public IHEs to complete the ACTS component; accessing their uploaded information; penalizing their public IHEs for failing to submit the ACTS component; or using information from the ACTS component in any investigation or enforcement action against their public IHEs.

Plaintiffs' request for emergency relief should be denied because they are not at imminent risk of irreparable harm.  First, Plaintiffs' three-month delay in bringing this suit belies their allegation of imminent harm.  Second, even if their request were timely, Plaintiffs have not alleged an irreparable or imminent injury.  Rather, they claim the burden of compliance is too high and speculate that, should they fail to comply, they may be subjected to fines or other enforcement. But the costs of regulatory compliance are not irreparable harms for which courts grant injunctions. And speculation as to future proceedings, in which any subject IHE could present its own defense, cannot be an imminent irreparable harm.

Plaintiffs also fail to show that they are likely to succeed on the merits of their claims, which allege a laundry list of Paperwork Reduction Act (PRA) and Administrative Procedure Act (APA) violations.  At heart, Plaintiffs' dispute is with the policy underlying the ACTS component—transparency into colleges' admissions and their compliance with the 14th

1

Amendment's Equal Protection Clause and the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA v. Harvard*).    The Department followed the correct procedures—the ACTS component was introduced after two rounds of notice and comment in which the Department carefully and comprehensively addressed the issues Plaintiffs raise in their complaint.  As the APA permits only review for legal and procedural defects and does not authorize courts to resolve policy disagreements, Plaintiffs cannot succeed on the merits of their claims.

For these reasons, Defendants respectfully ask this Court to deny Plaintiffs' request for a temporary restraining order.

## BACKGROUND

### I.   THE NATIONAL CENTER FOR EDUCATION STATISTICS AND IPEDS

The National Center for Education Statistics (NCES) is an agency operating within the Department.  It was established to, among other things, "collect, analyze, and report education information and statistics in a manner that—(A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public."  20 U.S.C. § 9541(b)(3).  Its duties include "collecting, analyzing, cross-tabulating, and reporting, to the extent feasible, information by gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, and other population characteristics, when such disaggregated information will facilitate educational and policy decisionmaking."  *Id.* § 9543(a)(3).  To collect this information, NCES may "use information collected . . . from . . . institutions of higher education," and other sources.  *Id.* § 9544(b)(2)(A).

NCES oversees several studies and surveys, including IPEDS.  IPEDS is a system of interrelated survey components conducted annually to gather data from every college, university,

and technical and vocational institution that participates in federal student financial aid programs. Ex. A. The data collections occur in fall, winter, and spring. IPEDS collects a wide variety of data, including fall enrollment and admissions by race/ethnicity, gender, and other characteristics. Ex. B, Ex. C. NCES makes IPEDS data available to the public and IPEDS data has long been used by the Department's Office for Civil Rights and Office of Inspector General. Exs. D at 1-2, E.

## II. TITLE IV

Title IV of the Higher Education Act of 1965 provides for the administration of federal student financial aid programs. To qualify for any Title IV program, an IHE must complete "surveys conducted as a part of [IPEDS] or any other Federal postsecondary institution data collection effort, as designated by the Secretary, in a timely manner and to the satisfaction of the Secretary," among other requirements. 20 U.S.C. § 1094(a)(17).

## III. THE ACTS COMPONENT

On August 7, 2025, President Trump issued a Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions*. Ex. F. The Memorandum explained that it is "the policy of [the Trump] Administration to ensure institutions of higher education receiving Federal financial assistance are transparent in their admissions practices." *Id.* The Memorandum instructed the Secretary of Education, in coordination with NCES, to "expand the scope of required reporting to provide adequate transparency into admissions, as determined by the Secretary of Education, consistent with applicable law" within 120 days. *Id*. § 3(a).

The same day, Secretary of Education Linda McMahon directed NCES "to collect admissions data for institutions of higher education that will allow Americans to ensure race-based preferences are not used in university admissions processes." Ex. G. The Secretary announced that, "[a]s part of their regular data reporting process, institutions of higher education will now have to report data disaggregated by race and sex relating to their applicant pool, admitted cohort,

3

and enrolled cohort at the undergraduate level and for specific graduate and professional programs," including "quantitative measures of applicants' and admitted students' academic achievements such as standardized test scores, GPAs and other applicant characteristics." *Id.*

On August 15, 2025, the Department published a notice (the August Notice) in the Federal Register formally announcing the proposed changes to IPEDS and requesting comments from interested parties. Agency Information Collection Activities; Comment Request; Integrated Postsecondary Education Data System (IPEDS) 2024-25 Through 2026-27, 90 Fed. Reg. 39,384 (Aug. 15, 2025) (attached hereto as Ex. H.) The August Notice explained that collections of "racial data on admissions and scholarships" would provide "[g]reater transparency," and "will help to expose unlawful practices, enable the Department to better [enforce] Title VI [of the Civil Rights Act of 1964], and create good incentives for voluntary compliance." *Id.* at 39,385. The August Notice proposed a new IPEDS component—ACTS—for all four-year institutions using selective college admissions. *Id.* It detailed the information expected to be requested in the proposed ACTS component: data by race-sex pair for undergraduate students and applicants on:

(1)    the count of institutions' applied, admitted, and enrolled cohorts, both overall and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, Pell Grant eligibility, and parental education;

(2)    the average high school grade point average and admission test score quintiles for institutions' applied, admitted, and enrolled cohorts;

(3)    the count of students admitted via early action, early decision, or regular admissions . . .

the count and average amount of students receiving:

a.    any institutional grant aid,

b.    merit-based institutional grant aid,

c.    need-based institutional grant aid, and

d.    any local, state, or federal government aid overall,

and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, and enrollment via early action, early decision, or regular admissions;

(1)    students' average cumulative GPA at the end of the academic year;

4

(2)     the average cost of attendance, and further disaggregated by admission test score quintiles, ranges of high school grade point average, ranges of family income, and enrollment via early action, early decision, or regular admissions;
(3)     graduation rates further disaggregated by admission test score quintiles and ranges of high school grade point average; and
(4)     graduates' final cumulative grade point average;
[a]dditional data may be gathered to better understand remedial or other non-credit coursework for newly enrolled students.

*Id.* For graduate students, the August Notice explained that universities with selective admission would have to provide the same information, "further disaggregated by broad fields of study." *Id.* The August Notice further explained that, for the 2025-2026 year only, the ACTS component would collect retrospective data from the five previous academic years to establish a baseline of admissions practices from before the Supreme Court decision in *SFFA* v. *Harvard*. *Id.*

The Department received 3,458 comments before closure of the comment period on October 15, 2025, including a comment from the some of the Plaintiffs, which raises some of the same alleged issues as their complaint in this case. Ex. I. Most comments—3,064 of them—provided support for the ACTS component, highlighting the benefits of transparency in admissions decisions necessary to ensure the effective implementation of applicable law. Ex. J at 8.

A month later, the Department published in the Federal Register a further notice (the November Notice), seeking authorization from the Office of Management and Budget (OMB) to make a change to IPEDS data collection. Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; Integrated Postsecondary Education Data System (IPEDS) 2025-26 Through 2026-27, 90 Fed. Reg. 50,940 (Nov. 13, 2025) (attached hereto as Ex. K.) The Department provided the ACTS component with the November Notice. Ex. L. It also provided its responses to the comments received on the August Notice. Ex. J. In response to comments about what institutions should be required to complete the ACTS component, which indicated that open-access institutions, such as community

5

colleges and trade schools, have minimal or no risk for civil rights noncompliance in admissions because they admit all or almost all applicants and likely do not provide aid based upon race, the Department proposed limiting the ACTS component to only 4-year public, private for-profit, and private not-for-profit institutions and proposed exempting any IHE that did not award non-need-based aid and admitted all applicants in that year. *Id.* at 5-6.

Again, some of the Plaintiffs submitted a comment on the November Notice, reiterating their objections to the proposed ACTS component on much the same grounds. Ex. M. Including Plaintiffs' second comment, the Department received 146 comments on the November Notice.

After close of the second comment period, the Department certified its compliance with the PRA requirements of 44 U.S.C. § 3506(c)(3). Ex. N. Specifically, the Department certified that the ACTS component (1) is necessary for the proper performance of agency functions; (2) avoids unnecessary duplication; (3) reduces burden on small entities; (4) uses plain, coherent, and unambiguous language that is understandable to respondents; (5) will be implemented consistent and compatible with current reporting and recordkeeping practices; (6) was developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected; (7) uses effective and efficient statistical survey methodology (if applicable); and (8) makes appropriate use of information technology, among other certifications. *Id.* The Department also provided justifications for these certifications. Exs. O, P.

The Department also published its responses to the comments received in response to the November Notice. Ex. Q. In response to comments about the burden the ACTS component might impose on IHEs, the Department explained:

- NCES used variables and variable definitions used elsewhere in the IPEDS collection to reduce complexity. *Id.* at 3.
- NCES introduced a new two-step process to collect responses in which IHEs would first prepare a student-level file aligned to predefined submission templates and would then

upload the file to the IPEDS Aggregation Tool, thus removing the burden associated with local calculations or manual entry.  *Id.* at 3-4.

- NCES provides a Help Desk to assist IHEs having trouble with data submissions.  *Id.* at 4.

In response to comments raising concerns about the timeline for implementing the ACTS component:

- NCES explained that it would extend the collection window for the ACTS component beyond that of other surveys in the winter collection window to provide additional focused time for response.  *Id.* at 6,

In response to comments raising concerns that IHEs might not have all the data requested by the ACTS component:

- NCES explained that it requires IHEs to report only data they have available and does not anticipate IHEs collecting new data in response to the ACTS component.  *Id.* at 6-7.

In response to comments suggesting that retrospective data should only be collected to 2023—the year of *SFFA v. Harvard*:

- NCES responded that a five year lookback period was necessary to collect time-series data that are amenable to a wide range of analytic techniques, including trend analyses that depend upon multiple years of data to credibly distinguish underlying secular trends from other potential causes.  *Id.* at 9-10.

In response to comments concerned that the requested data might raise privacy concerns:

- NCES explained that prior to public release, the ACTS data will be reviewed by the Institute of Education Sciences' Disclosure Review Board (DRB), which would recommend or review statistical techniques applied to data that mitigate the risk that data could be used to reidentify any individual.  *Id.* at 10-13.
- The DRB may also recommend that NCES make ACTS data available only as a Restricted Use Data File that could only be licensed to qualified researchers who agree to confidentiality provisions.  *Id.*
- NCES also noted that it is impossible to know with certainty whether any privacy issues will actually occur prior to data collection and promised to prepare and review initial tabular reports arising from the ACTS data to understand the potential impact of small cell sizes on its utility.  *Id.*

The Department opened the ACTS component to IHEs on December 18, 2025, giving them three months (90 days) to complete the component.  Ex. R.  NCES determined from comments received in response to the August Notice that it would take no more than 200 hours—25 full work-

7

days—to complete the ACTS component. Ex. J at 7. Other IPEDs components have shorter response times: the fall component has a 42-day response time and the winter component has a 63-day response time. Ex. S ¶ 2. In addition to the extended completion time for the ACTS component, the Department offered a 3-week extension to institutions that 1) complete ACTS screening questions for all reporting years; and 2) upload data for at least three ACTS reporting years. *Id.* ¶ 10.

Of the 2,052 currently eligible IHEs, more than 657 had completed their submissions by March 23. *Id.* ¶¶ 7, 9. Another 1,043 had substantially completed their submissions and thereby qualified for the three-week extension. *Id.* ¶ 9.

## IV. PROCEDURAL HISTORY

Four months after the Department published the ACTS component as part of its November Notice, and only three business days before the deadline to respond, Plaintiffs filed the instant case on March 13, 2026. The same day, they sought a temporary restraining order, arguing that the looming submission deadline justified their request for emergency relief. Mem. in Supp. of Pls.' Mot. for a TRO, ECF No. 7 ("Br."). Before Plaintiffs served their complaint on Defendants, (ECF No. 19), this Court granted an *ex parte* 7-day temporary restraining order extending the deadline for ACTS submissions, (ECF No. 12).

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

8

20 (2008); *see also Gillan v. Town of Carver*, 2025 WL 1836609, at \*1 (D. Mass. July 3, 2025) (explaining that "[c]ourts apply the same standard in assessing motions for a temporary restraining order and motions for a preliminary injunction").  The third and fourth factors of the analysis— harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM.

#### A. Plaintiffs' Delay in Bringing Suit Shows That They Have Not Suffered Irreparable Harm.

Plaintiffs' delay in filing suit undermines their irreparable harm argument.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  Plaintiffs have not.  They have known about the kinds of data that would be sought by the ACTS component since August 15, 2025, Ex. H, and have had access to the ACTS component itself since November 13, 2025, Ex. K.  The ACTS component opened to IHEs on December 18, 2025, giving them 90 days to complete the ACTS component before its original due date of March 18, 2026—longer than the time provided to complete the fall and winter IPEDS collections, each of which require response to multiple components.  Ex. S ¶ 2.  If Plaintiffs truly believed they faced irreparable harm that justified a temporary restraining order, there was no reason to wait three months since the opening of the ACTS component before filing this suit and seeking this purportedly time-sensitive relief.

Courts in this District have held that an "unexplained delay in seeking injunctive relief belies . . . claims for irreparable harm." *Asymmetrx Med., Inc. v. McKeon*, 932 F. Supp. 2d 232, 237-38 (D. Mass. 2013) (denying motion for injunctive relief without considering the other preliminary injunction factors because plaintiff had "not demonstrated a risk of irreparable

9

injury"); *see also Zavala Santiago v. Gonzalez-Rivera*, 553 F.2d 710, 712-13 (1st Cir. 1977).  In one case, a court denied a preliminary injunction motion where the plaintiff delayed "nearly four months" in bringing it.  *Fuchs v. Steel-Fab, Inc.*, 356 F. Supp. 385, 388 (D. Mass. 1973).  The court reasoned that the delay "in seeking the injunction leads this Court to believe that the alleged harm petitioner complains of is not as immediate nor as irreparable, in fact, as petitioner has represented" and concluded that if the motion were denied, irreparable harm would not occur.  *Id.  See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004); *Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*, 2023 WL 3660689, at *4 (D. Mass. May 25, 2023).

Courts around the country have likewise relied on comparable, or shorter, delays to deny preliminary relief.  *See, e.g., Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1010 & n.4 (8th Cir. 2019) (five-month delay fatal to request for injunctive relief); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (six months is "a long delay in seeking relief" that "indicates that speedy action is not required" (citation omitted)); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (two month "delay is inconsistent with a claim of irreparable injury").

## B.  Plaintiffs' Alleged Harms Are Speculative and Not Imminent.

Even if Plaintiffs had brought this suit and their request for emergency relief promptly, they would still fail to show that they are at imminent risk of irreparable harm.  Plaintiffs first argue that they are harmed by the burden of compiling ACTS component data.  Br. at 19.  But courts have repeatedly held that the cost of regulatory compliance is not an irreparable harm justifying a

10

preliminary injunction. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("ordinary compliance costs are typically insufficient to constitute irreparable harm"); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."); *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." (citation omitted)).

Next, Plaintiffs complain that their public IHEs may be subject to enforcement actions and, potentially, fines, if they do not timely submit data. Br. at 19. This alleged harm is not irreparable for two reasons. First, it is speculative. "Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction." *In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 902 (1st Cir. 1988). Fines and enforcement action are not automatic on an IHE's failure to submit information by the requested deadline. *See* 34 C.F.R. §§ 668.84-668.86 (the Secretary "may" impose a fine, or limit, suspend, or terminate Title IV participation).

Second, any enforcement action provides opportunity for a proceeding in which an IHE may raise defenses, including the complaints that the States raise in the instant complaint, to the extent they are applicable. 34 C.F.R. §§ 668.84-668.86 (establishing procedures required before an IHE may be fined or have its Title IV status impacted). Thus, any harm that an IHE may face from speculative, future enforcement action is not imminent.

Finally, Plaintiffs claim that they face irreparable harm due to a privacy risk that ACTS data will reveal students' personal information. Br. at 19. At the outset, the Plaintiffs lack standing to raise this alleged privacy harm, which would be borne by third-party students and not by the states. *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 8 (1st Cir. 2014) ("[A] plaintiff must also generally show 'that his claim is premised on his own legal rights (as opposed to those of a third party).'" (quoting *Pagan v. Calderon*, 448 F.3d 16, 27 (1st Cir. 2006))); *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023) ("[A] State does not have standing as *parens patriae* to bring an action against the Federal Government."). Moreover, this purported harm is not imminent or irreparable, as the Department has already explained how it will mitigate the risk. Plaintiffs misstate the Department's response to this privacy concern raised in comments as "merely stat[ing] that 'small cell sizes in IPEDS are common.'" Br. at 19 (citation omitted). The Department instead provided an extensive response to this concern. Ex. Q at 10-13. Among other things, the Department explained that prior to public release, the ACTS data will be reviewed by the DRB, which would recommend or review statistical techniques applied to data that mitigate the risk that data could be used to reidentify any individual. *Id.* The DRB may also recommend that NCES make ACTS data available only as a Restricted Use Data File, which could only be licensed to qualified researchers who agree to confidentiality provisions. *Id.* NCES also noted that it is impossible to know with certainty whether any privacy issues will actually occur prior to data collection and promised to prepare and review initial tabular reports arising from the ACTS data to understand the potential impact of small cell sizes on its utility. *Id.* Plaintiffs ignore this response.

Plaintiffs fail to establish an imminent risk of irreparable harm and failed to seek their requested emergency relief in a timely matter. For these reasons, Defendants respectfully ask the Court to deny Plaintiffs' request for an injunction.

12

II.    **PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS.**

Plaintiffs also fail to establish that they are likely to succeed on the merits of their claims. They argue that the Defendants exceeded their statutory authority, that the adoption of the ACTS component was contrary to the PRA, and that the adoption of the ACTS component was arbitrary and capricious. Plaintiffs fail to establish likelihood of success on any of these arguments—many of which amount to little more than policy disagreements with the Department.

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing a contrary-to-law claim, "courts must exercise independent judgment in determining the meaning of statutory provisions" and "set aside" any action that is "inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 394 (2024). When determining whether an agency decision was arbitrary or capricious, a court must leave the decision undisturbed "unless 'the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors.'" *P.R. Tel. Co. v. Telecomms. Regul. Bd. of P.R.*, 665 F.3d 309, 319 (1st Cir. 2011) (citation omitted). Review under the arbitrary-and-capricious standard is "highly deferential": a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citation omitted). Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

**A. NCES and the Department Have Statutory Authority for the ACTS Component.**

NCES has broad authority to collect data, including the disaggregated data sought by the ACTS component. Its statutory duties include "collecting . . . information by *gender, race,*

13

*ethnicity, socioeconomic status*, limited English proficiency, mobility, disability, urban, rural, suburban districts, *and other population characteristics*, when such *disaggregated information* will facilitate *educational and policy decisionmaking*." 20 U.S.C. § 9543(a)(3) (emphasis added). Thus, NCES has statutory authority to gather disaggregated data on gender, race, and socioeconomic status—exactly the information gathered in the ACTS component—to facilitate policy decisionmaking—such as providing greater transparency into colleges' admissions and compliance with civil rights laws.

The Secretary's statutory authority under Title IV to collect data from IHEs is even broader. Title IV requires IHEs to "complete surveys conducted as a part of [IPEDS] or any other Federal postsecondary institution data collection effort, as designated by the Secretary, in a timely manner and to the satisfaction of the Secretary." *Id.* § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). Nothing in the statute forbids the Secretary from gathering data to promote transparency into IHEs' admissions or from gathering data that might be used to identify violations of law.

Plaintiffs assert that only the Department's Office for Civil Rights (OCR) has authority to gather data necessary to ensure compliance with civil rights laws, implying that OCR must blind itself to information collected by NCES or redo those data collection efforts. But there is no statutory or regulatory basis for precluding IPEDS or any other survey administered by NCES from being used in the enforcement of civil rights laws. Indeed, IPEDS data has long been used to uncover discrimination in IHEs. *Knight v. Alabama*, 787 F. Supp. 1030, 1377 (N.D. Ala. 1991) (using data collected by IPEDS in deciding whether state had fulfilled its obligation to remedy vestiges of past *de jure* segregation) , *aff'd in part, vacated in part, rev'd in part*, 14 F.3d 1534

14

(11th Cir. 1994).[1]  Both OCR and the Department's Office of Inspector General frequently use IPEDS data.  Exs. D, E.

Plaintiffs argue that the ACTS component is inherently partisan because information gathered as part of that survey may be used to enforce civil rights laws.  But enforcement of civil rights laws is not partisan.  Nor is transparency.  The ACTS component is well within the statutory purview of NCES and the Department to gather information—including information disaggregated by race, gender, socioeconomic status, and other population characteristics—to facilitate policy decisionmaking.  *See* 20 U.S.C. § 9543(a)(3).

### B.  Defendants Did Not Violate the Paperwork Reduction Act.

Plaintiffs assert a laundry list of PRA violations.  Specifically, they allege the introduction of the ACTS component violates nearly every subsection of 44 U.S.C. § 3506(c)(3).  But § 3506(c)(3) requires that the agency "certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information" fulfills the requirements of subsections (A) through (J).  The Department provided the required certifications, Ex. N, and justifications, Exs. O, P, and thus has followed the PRA.  That Plaintiffs disagree with the Department's certifications does not provide grounds, under the PRA, which does not provide a private right of action, *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999), or the APA, to invalidate or delay the ACTS component.  Under the APA, neither Plaintiffs nor courts can "substitute [their] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

---

[1] IPEDS data has also been used by IHE admissions officers to track the racial composition of their applicant pool. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 145 (D. Mass. 2019) (explaining how Harvard used IPEDS to track racial composition) , *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020), *rev'd*, 600 U.S. 181 (2023).  Admissions officers have noted that previous versions of IPEDS were "less reflective" of the diversity of their classes because the data collected was not granular enough.  *Id.* at 145 n.22.

There have been very few cases addressing alleged PRA violations under the APA. The only case cited by Plaintiffs—*Orr v. Trump*—found the plaintiff likely to succeed on the merits of its APA claim based on the agency's failure to provide a 60-day notice and comment period as required by 44 U.S.C. § 3506(c)(2)(A).[2] 778 F. Supp. 3d 394, 425 (D. Mass. 2025). Here, by contrast, the Department followed the PRA's requirement of a 60-day notice and comment period, Ex. H, followed by a 30-day notice and comment period, as required by § 3507(b) of the PRA. The Department then certified and provided justification for all aspects of the ACTS component required by § 3506(c)(3) of the PRA. Exs. N, O, P. OMB then approved the Department's collection of information via the ACTS component—a decision that "shall not be subject to judicial review." 44 U.S.C. § 3507(d)(6). There was no procedural flaw under the PRA, and therefore no chance that Plaintiffs' can prevail in an APA claim premised on a PRA violation.

Even if Plaintiffs could show a procedural flaw, the PRA only permits parties to raise the issue "in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto" and does not contemplate enjoining agency action. *Id.* at § 3512(b).

### C. The ACTS Component Is Not Arbitrary or Capricious.

Plaintiffs first argue that they had a reliance interest in NCES using a "multistep process for assessing and implementing proposed changes to IPEDS," which they assert gave them "the timeframe to adapt to and satisfy new data requirements." Br. at 16. They assert that, because the process of finalizing the ACTS component took months rather than years, they are "at risk of submitting incomplete or inaccurate data." *Id.*

---

[2] After this decision, the agency in *Orr* completed the PRA process for a new set of forms, thereby mooting the plaintiffs' APA claim premised on a PRA violation in that case. The instant case is therefore on all fours with *Orr* as it currently stands—there is no procedural defect in either case and therefore no potential APA violation.

16

Plaintiffs' reliance interest argument is forfeited, as they did not raise it in either of their comments.  Exs. I, M.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) (holding that respondents forfeit arguments not raised in their comments); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1, 24 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025) (same).

Even if Plaintiffs had not forfeited their argument that they have a reliance interest in the Department's use of a complex and time-consuming survey drafting method, that claim would fail on the merits as Plaintiffs cannot claim a "legitimate reliance." *See Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 585 (2025) (citation omitted).  The Supreme Court has held that "a belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interest.'" *Id.* (citation modified).  Similarly, Plaintiffs alleged reliance on "notice they received through" the "multistep process for assessing and implementing proposed changes to IPEDS," Br. at 16,—which is supported only by a single paragraph in a declaration from the Vice President for Institutional Research and Planning at the University of California, stating that previous IPEDS changes involved "a review process of about two years, sometimes longer," *Id.*, citing Brown Decl. Ex. C ¶ 14—does not provide the "decades of reliance" on an agency's prior policy required by Supreme Court precedent. *Wages & White Lion*, 604 U.S. at 585.  There is no written policy or guidance requiring that the Department undertake years of process before changing IPEDS.  And if the Department has, in the past, taken longer to enact changes to IPEDS, that past practice does not prevent the Department from now moving more quickly and enacting changes over the course of months rather than years.  It is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978).

17

Finally, the harm that Plaintiffs allege they will suffer from the Department's alleged use of an abbreviated IPEDS modification process—that they "are at risk of submitting incomplete or inaccurate data," Br. at 16—has already been addressed by the Department. The Department explained to IHEs in an attachment to its November Notice that they could indicate if any requested data was unavailable. Ex. L at 62. The ACTS component also gives IHEs opportunities to explain any missing data. *Id.* Similarly, the ACTS component provides options for IHEs concerned about the accuracy of their data, allowing them to report any inaccurate data as missing data. *Id.* Thus, IHEs can complete the ACTS component even if they are missing some of the requested data or have concerns about accuracy. If any IHE does face enforcement based on missing or inaccurate data, it will have an opportunity to present a defense. *Supra* at 12-13.

Second, Plaintiffs argue that they have "a truncated timeline to comply with the ACTS survey" that increases their burden in replying. Br. at 16-17. The Department twice solicited comments pertaining to the burden, *see* Ex. H, 90 Fed, Reg, at 39,385; Ex. K, and responded to those comments by explaining that it anticipated the burden to be no more than 200 hours per IHE in the first year, and explaining the steps it was taking to minimize the burden through "useful reporting resources and [] novel data collection methodologies," Ex. J at 16. The Department also took steps to mitigate the burden by using variables and variable definitions used elsewhere in the IPEDS collection to reduce complexity and by using a new two-step process to collect responses in which IHEs would first prepare a student-level file aligned to predefined submission templates and would then upload the file to the IPEDS Aggregation Tool, thus removing the burden associated with local calculations or manual entry. Ex. Q. Under the APA, this is sufficient.

Third, Plaintiffs argue the Department failed to consider an important aspect of the problem, that the ACTS component seeks data already sought by other IPEDS components. Br. at

18

17. The Department considered this issue when it considered the burden on IHEs, which is exactly how Plaintiffs presented the issue in their December comment, where they claimed the "burden of producing the same information in two different ways is also unreasonable." *See* Ex. J at p. 4 n.11.

Fourth, Plaintiffs allege that flaws in the submission process show that the Department acted arbitrarily and capriciously. Br. at 17-18. As an initial matter, the fact that over 550 IHEs completed their submissions by March 18 and another 1,000+ IHEs substantially completed their submissions, rendering them eligible for a three-week extension, Ex. S ¶ 8, indicates that the submissions process was not hindered by these alleged flaws. Moreover, even if true, Plaintiffs cite no caselaw indicating that hiccups in a rollout process render the underlying administrative action arbitrary and capricious, nor are Defendants aware of any such caselaw.

Fifth, Plaintiffs argue that Defendants did not adequately explain their departure from past practice for changes to IPEDS. Br. at 18. Not so. In response to comments, NCES explained that "convening a TRP as part of the IPEDS development cycle is at NCES's discretion"; noted its confidence in IHEs' ability to respond to the ACTS component due to the availability of the data required to respond to other aspects of IPEDS "because the majority of the underlying data elements needed to fulfill the ACTS survey component requirements are also necessary to complete other IPEDS surveys" or "are commonly tracked by postsecondary institutions"; stated that "all data elements will be clearly defined in documentation associated with the ACTS component"; and that IHEs with questions could contact the IPEDS Help Desk. Ex. J at 18.

Finally, Plaintiffs argue that Defendants "offered no explanation for their failure to" implement proposed alternatives of "phased implementation of data elements or a voluntary pilot." Br. at 18. Again, this is not accurate. In responding to comments, NCES explained that those alternatives were not necessary for collection of high-quality data in response to the ACTS

19

component "because the majority of the underlying data elements needed to fulfill the ACTS survey component requirements are also necessary to complete other IPEDS surveys" or "are commonly tracked by postsecondary institutions." Ex. J at 17-18.

### III. THE SCOPE OF THE REQUESTED INJUNCTION IS OVERBROAD

The Plaintiff States do not represent private IHEs. Nor do they represent any IHEs outside of their borders. Indeed, they admit that their standing is based on "their public IHEs," and nowhere do they mention other IHEs. Br. at 9. Thus, if this Court grants an injunction (and it should not), any injunction should be limited to only public IHEs of the plaintiff states.

The Supreme Court has held that a state cannot sue on behalf of its private citizens ostensibly to protect them from the application of federal law or regulation. *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923); *Haaland*, 599 U.S. at 294-95. Rather, relief is "party-specific," and courts cannot "interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 833 (2025) (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Thus, universal injunctions "fall[] outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* In the APA context too, courts have denied nationwide injunctions where "an injunction that applies only to the plaintiff states would provide complete relief to them." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Thus, any injunction should be limited to only Plaintiffs' public IHEs.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court deny Plaintiffs' request for an injunction. In light of this Court's grant of a one-week *ex parte* temporary restraining order, the fulsome briefing on Plaintiffs' motion, and the hearing that this Court will conduct, Defendants request that the Court treat Plaintiffs motion as seeking a preliminary injunction rather than a further temporary restraining order.

Dated:  March 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General


MICHELLE BENNETT
Assistant Director, Federal Programs Branch


*/s/ Brittany S. Bruns*
BRITTANY S. BRUNS (D.C. Bar 1658394)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L ST. N.W.
Washington, DC 20005
Tel:  (202) 531-1325
brittany.s.bruns@usdoj.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing (NEF).

Dated:  March 23, 2026                          Respectfully submitted,


*/s/ Brittany S. Bruns*
BRITTANY S. BRUNS