**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.,* | |
| *Plaintiffs*, | Case No. 1:26-cv-11229-FDS |
| v. | Leave to File Granted: |
| U.S. DEPARTMENT OF EDUCATION, *et al.,* | March 24, 2026 |
| *Defendants*. | |

**BRIEF OF ASSOCIATION OF AMERICAN UNIVERSITIES,
AMERICAN COUNCIL ON EDUCATION, ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, AND OTHER HIGHER EDUCATION
ASSOCIATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..........................................................1

INTRODUCTION ...................................................................................................3

ARGUMENT ..........................................................................................................4

I.      The Enormous Burden Imposed by ACTS Reflects the Arbitrary and Capricious
        Nature of the Department's Actions ................................................................4

        A.      The Extraordinary Scope of the ACTS Data Collection Creates an
                Enormous New Burden on Institutions.................................................4

        B.      The Rushed Implementation Timeline and Departure from Established
                Procedures Compound the Burden on *Amici*'s Members .........................6

        C.      ACTS Calls for Data That May Not Exist or Be Practicable to Submit, and
                Will Not Reliably Reflect Admissions Practices ....................................10

        D.      The Stakes of Potential Noncompliance Are Extraordinarily High.......................12

II.     The Department Has Not Sufficiently Addressed Serious Privacy Concerns. ..................13

III.    Unaddressed Data Concerns Undermine the Reliability of the ACTS Collection ...........16

IV.     Relief Under APA Section 705 Is Appropriate and Necessary .........................................19

CONCLUSION.......................................................................................................20

i

**TABLE OF AUTHORITIES**

CASES

*American Federation of Teachers v. Department of Education*, 779 F. Supp. 3d 584 (D. Md. 2025) ...............................................................................................................19

*Canadian Association of Petroleum Producers v. FERC*, 254 F.3d 289 (D.C. Cir. 2001) ..........................................................................................................................9

*Career Colleges & Schools of Texas v. United States Department of Education*, 98 F.4th 220 (5th Cir. 2024) .................................................................................19

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799 (2024) .........................................................................................................................19

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...............................................9

*New York v. Trump*, No. 25-CV-11221, __ F. Supp. 3d __, 2025 WL 3514301 (D. Mass. Dec. 8, 2025), *appeal docketed*, No. 26-1174 (1st Cir. Feb. 23, 2026).................... 19-20

*Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025)...............................................................19

STATUTES

5 U.S.C. § 705...............................................................................................................19, 20

20 U.S.C. § 1094(a)(17)........................................................................................................12

20 U.S.C. § 1232g..................................................................................................................14

OTHER AUTHORITIES

5 C.F.R. § 1320.8(d)(2)...........................................................................................................7

34 C.F.R. § 668.84 ................................................................................................................12

34 C.F.R. § 668.85 ................................................................................................................12

34 C.F.R. § 668.86 ................................................................................................................12

*Admissions and Consumer Transparency Supplement (ACTS)*, IPEDS 2025-26 Data Collection System, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid=30156 (last visited Mar. 18, 2026) ...............................5

*Agency Information Collection Activities, Comment Request, IPEDS 2024-25 Through 2026-27*, 90 Fed. Reg. 39,384 (Aug. 15, 2025) ........................................................13

American Association of Collegiate Registrars and Admissions Officers Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 10, 2025).......................10

American Council on Education Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 7, 2025)................................................................................. *passim*

Association of American Medical Colleges Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 13, 2025) .......................................................8, 11, 12

Association of American Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025)................................................................. *passim*

Association of American Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025)..................................................... *passim*

Association of Public and Land-grant Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 13, 2025)...............................................17, 18

Association of Public and Land-grant Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Dec. 15, 2025).......................................................16

D. Jones & C. Keller, *ACTS Progress and Barriers Survey Report*, Association for Institutional Research (2026), https://www.airweb.org/publication/acts-progress-and-barriers...............................................................................................................16, 18

D. Jones et al., *AIR Survey Results: Feedback to the Proposed Admissions and Consumer Transparency Supplement (ACTS)*, Association for Institutional Research (2025), https://www.airweb.org/publication/feedback-to-the-proposed-ACTS..................................................................................................................5, 10

Elise Miller McNeely, *The History & Origins of Survey Items for the Integrated Postsecondary Education Data System*, Institute of Education Sciences (Apr. 2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf.....................................................................................................................7

National Association of Independent Colleges and Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025).................... *passim*

National Center for Education Statistics, *Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27, Appendix E: Response to Public Comments Received During the 60-day Comment Period and NCES Responses* (revised Oct. 2025)........................................................................................... *passim*

PostsecData Comments on IPEDS, Docket ID ED-2025-SCC-0844 (U.S. Dep't Educ. Oct. 15, 2025) ................................................................................................4, 9

PostsecData Comments on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Dec. 15, 2025)..............................................................................................5, 17

*The Premed Competencies for Entering Medical Students*, American Association of Medical Colleges, https://students-residents.aamc.org/real-stories-demon strating-premed-competencies/premed-competencies-entering-medical-stud ents (last visited Mar. 16, 2026).......................................................................................12

Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://www.whitehouse.gov/presidential-actions/ 2025/08/ensuring-transparency-in-higher-education-admissions/.................................9, 13, 14

Letter from Association for Institutional Research, to NCES Requesting Extension of ACTS Deadline, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Feb. 25, 2026) ..................................................................................................................................8

*Report and Suggestions from IPEDS Technical Review Panel #64*, Technical Review Panel (2021), https://ipedstrp.rti.org/............................................................................17

*State Student Privacy Laws*, Public Interest Privacy Center, https://publicinterest privacy.org/resources/state-student-privacy/ (last visited Mar. 16, 2026)..............................14

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are leading national higher education associations whose members collectively include and represent the vast majority of colleges and universities in the United States. Together, *Amici'*s members and their institutions span the full breadth of American higher education—from large public research universities and land-grant institutions to small liberal arts colleges, historically Black colleges and universities, community colleges, faith-based colleges, and schools of law, medicine, and other professions. They educate millions of students, employ hundreds of thousands of faculty and staff, and serve as engines of research, innovation, and economic growth in communities across the nation. *Amici* are:

- The **Association of American Universities** ("AAU") was founded in 1900 and is composed of America's leading research universities. AAU's member universities earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's visionary leaders and innovators. Its members include 69 public and private research universities in the United States.

- The **American Council on Education** ("ACE") is the major coordinating body for the nation's colleges and universities, with a diverse membership of nearly 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S.-accredited, degree-granting colleges and universities.

- The **Association of American Medical Colleges** ("AAMC") is a nonprofit association dedicated to improving the health of people everywhere through medical education, clinical care, biomedical research, and community collaborations. Its members are all 163 U.S. medical schools accredited by the Liaison Committee on Medical Education; nearly 500 academic health systems and teaching hospitals; and more than 70 academic societies.

- The **American Association of Collegiate Registrars and Admissions Officers** ("AACRAO"), founded in 1910, is a non-profit, voluntary, professional association of more than 18,000 higher education professionals who represent approximately 2,300 institutions in more than 40 countries. Its mission is to provide professional development, guidelines, and voluntary standards to be used by higher education officials regarding the best practices in records management, admissions, enrollment management, administrative information technology, and student services. AACRAO represents institutions in every part of the higher education community, from large public institutions to small, private liberal arts colleges.

- The **American Association of State Colleges and Universities** ("AASCU") represents the sector of over 500 regional public colleges, universities, and systems united by their

1

shared commitment to make affordable, high-quality education available to all students. Its members share a learning- and teaching-centered culture and a dedication to research and creativity that advances their regions' economic progress and cultural development.

- The **Association of Governing Boards of Universities and Colleges** ("AGB") believes in the power of higher education to transform lives, strengthen inclusive democracy, and support a thriving society. AGB provides advocacy, leading practices, educational resources, expert support, and renowned programs that advance board excellence for 40,000 AGB members from more than 2,000 institutions and foundations.

- The **Council of Graduate Schools** ("CGS") is an organization of approximately 450 institutions of higher education in the United States, Canada, and across the globe engaged in graduate education, research, scholarship, and the preparation of candidates for master's and doctoral degrees.

- The **Council of Independent Colleges** ("CIC") is an association of more than 700 nonprofit independent colleges and universities, state-based councils of independent colleges, and other higher education affiliates, that works to support college and university leadership, advance institutional excellence, and enhance public understanding of independent higher education's contributions to society.

- The **National Association of College and University Business Officers** ("NACUBO"), founded in 1962, is a nonprofit professional organization representing chief administrative and financial officers at more than 1,900 colleges and universities across the country. NACUBO works to advance the economic vitality, business practices, and support of higher education institutions in pursuit of their missions.

- The **National Association of Independent Colleges and Universities** ("NAICU") serves as the unified national voice of private, non-profit higher education in the United States. With more than 5 million students attending 1,700 independent colleges and universities in all 50 states, the private sector of American higher education has a dramatic impact on our nation's larger public interests.

- The **National Association of Student Financial Aid Administrators** ("NASFAA") is the only national, nonprofit association with a primary focus on information dissemination, professional development, and legislative and regulatory analysis related to federal student aid programs authorized under Title IV. Its membership consists of more than 29,000 financial aid professionals at nearly 3,000 colleges, universities, and career schools across the country. NASFAA member institutions serve nine out of every 10 undergraduates in the United States.

*Amici* file this brief because the Admissions and Consumer Transparency Supplement ("ACTS") at issue in this case directly and profoundly affects their members. The ACTS survey imposes unprecedented data collection requirements on institutions of higher education ("IHEs") with remarkably little notice, creating severe practical burdens, unresolved privacy risks, and data quality concerns that the Department of Education ("the Department" or "ED") has not adequately

addressed.  As associations whose members serve the vast majority of students in American higher education, *Amici* are uniquely positioned to describe the challenges that ACTS presents to IHEs.

## INTRODUCTION

*Amici*'s members have for decades relied on the Department of Education's well-established, deliberative, and collaborative processes—including Technical Review Panels ("TRPs"), preview years, and transparent notice-and-comment procedures—to ensure that new Integrated Postsecondary Education Data System ("IPEDS") data collections are clearly defined, technically feasible, and implemented with sufficient lead time to produce reliable data.  ACTS upends those reliance interests, giving IHEs a few short months to comply with its sweeping requirements, including—for the first time—retrospective data going back seven years.  In a stark departure from the practices that have governed changes to IPEDS for decades, ACTS is a data collection of extraordinary scope and complexity on a severely compressed timeline and without procedural safeguards that have historically ensured data quality and institutional readiness.  ED implemented ACTS in the face of thousands of comments, from *Amici* and other stakeholders, pointing out these problems and raising serious concerns around its proposed feasibility, implementation, and timeline.

The resulting collection, encompassing nearly 70,000 new reporting fields, "dwarfs" any prior change to IPEDS.  Pls.' Mem. in Supp. of Mot. for TRO at 13 ("Pls.' Mem."), ECF No. 7; AAU Comments on IPEDS at 7-8, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025) [hereinafter "AAU Oct. Comments"].  It creates enormous burdens on institutions.  It presents meaningful risks to student privacy.  And it will generate data of questionable reliability that risks misleading, rather than informing, the public.  ED's response to comments failed to meaningfully engage with the serious and well-documented concerns raised by stakeholders across the higher education community.  As Plaintiffs have explained, the rushed implementation and

3

failure to engage with commenters violate both the Paperwork Reduction Act and the Administrative Procedure Act ("APA"), and the government has acted without statutory authority in implementing ACTS. *See generally* Pls.' Mem. *Amici*'s members' experience confirms the breadth and severity of these problems and the need for preliminary relief under the APA.

## ARGUMENT

### I. The Enormous Burden Imposed by ACTS Reflects the Arbitrary and Capricious Nature of the Department's Actions.

ACTS has created a perfect storm for institutions of higher education: a data collection of unprecedented scope, implemented on a severely compressed timeline outside the established processes, demanding data that many institutions do not possess, or possess only in a highly decentralized way—all under threat of severe consequences for noncompliance. Each of these elements would be burdensome on its own; together, they make abundantly clear that the government's actions are unlawful, arbitrary, and capricious.

#### A. The Extraordinary Scope of the ACTS Data Collection Creates an Enormous New Burden on Institutions.

ACTS represents the single largest expansion of IPEDS in its more than forty-year history, and the data IHEs must submit under ACTS is both granular and extensive. *See* ACE Comments on IPEDS at 1-2, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 7, 2025) [hereinafter "ACE Oct. Comments"]; PostsecData Comments on IPEDS at 2-3, Docket ID ED-2025-SCC-0844 (U.S. Dep't Educ. Oct. 15, 2025) [hereinafter "PostsecData Oct. Comments"]. ACTS requires nearly 70,000 new reporting fields, including the seven additional years of data now demanded by the Department. *See* Compl. ¶¶ 6-7, ECF No. 1; ACE Oct. Comments 1-2. At the undergraduate level, institutions must compile and report data for each stage of the admissions process—applicants, admitted students, and enrolled students—including data regarding race, sex, admission test scores, GPA, family income, Pell Grant eligibility, parental education, and

4

admissions type (early action, early decision, or regular admissions). *See Admissions and Consumer Transparency Supplement (ACTS)*, IPEDS 2025-26 Data Collection System, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid= 30156 (last visited Mar. 18, 2026). At the graduate level, data must be further disaggregated by field of study. *See id*.

Producing this extensive data has and will continue to severely strain institutional time and resources. ED estimates the burden at an *additional* 200 hours per institution for the first year—on top of the work IHEs must complete for existing IPEDS components. *See* ACE Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025) [hereinafter "ACE Dec. Comments"]. This is "more than double the estimated burden for all existing components combined (78.5 hours)." *See* PostsecData Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Dec. 15, 2025) [hereinafter "PostsecData Dec. Comments"];[1] *see* ACE Oct. Comments at 5. But even this estimate is "woefully inadequate": Over half of respondents to a survey about ACTS implementation (55%) estimated they would need more than 250 hours of staff time per year to complete ACTS, and another 25% estimated that it would take over 500 hours. *See* AAU Oct. Comments at 7; ACE Oct. Comments at 6; NAICU Comments on IPEDS at 3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025) [hereinafter "NAICU Comments"]; D. Jones et al., *AIR Survey Results: Feedback to the Proposed Admissions and Consumer Transparency Supplement (ACTS)*, Association for Institutional Research at 9 (2025), https://www.airweb.org/publication/feedback-to-the-proposed-ACTS [hereinafter "September 2025 AIR Survey"].

---

[1] *Amicus* NASFAA signed onto PostsecData's comment letters.

The burden falls especially hard on institutions with decentralized structures and those with graduate and professional schools. Many institutions house admissions, financial aid, and academic program data in separate offices that use different systems. For graduate and professional programs, data is often managed at the department or school level rather than centrally, despite the fact that institutions must report their data collectively, rather than by department or school. Collecting, reconciling, and formatting this data across multiple sources and systems is a time-intensive undertaking even for well-resourced institutions. For institutions with small institutional research offices—offices already stretched thin by other federal reporting obligations—the task is overwhelming. *See* NAICU Comments at 2 (explaining that IHEs frequently employ "only one individual who reports data to IPEDS").

### B. The Rushed Implementation Timeline and Departure from Established Procedures Compound the Burden on *Amici*'s Members.

ACTS was developed and implemented in a manner fundamentally at odds with the processes governing changes to IPEDS since at least 2002. Historically, major changes to IPEDS involved careful vetting through TRPs—multistakeholder panels that review proposed changes to ensure feasibility, clarity, and consistency—followed by "preview" or optional years that allow institutions to prepare. *See* Compl. ¶¶ 91-98; Pls.' Mem. at 2-4; *see also* AAU Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025) [hereinafter "AAU Dec. Comments"]; ACE Oct. Comments at 3-4. Since 2002, at least 71 TRPs have been convened to review proposed changes to IPEDS, and until now, every new IPEDS survey component underwent TRP review before implementation. Compl. ¶ 93. But no TRP reviewed the ACTS survey.

6

The contrast with prior practice is striking.  When the National Center for Education Statistics ("NCES"),[2] introduced the Outcomes Measure Component—the last major new survey component added to IPEDS—the process spanned years.  The Department's Advisory Committee submitted its final report in December 2011; three TRPs convened between 2012 and 2014; and the component was first administered in 2015-16.  *See* Elise Miller McNeely, *The History & Origins of Survey Items for the Integrated Postsecondary Education Data System*, Institute of Education Sciences at OM-1 (Apr. 2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf.  Even smaller changes have involved years of deliberation, testing, and refinement before the Department makes them mandatory.  *See* Pls.' Mem. at 3-4.

Here, however, the Department announced the ACTS survey on August 15, 2025, opened the collection on December 18, 2025, and initially required submissions by March 18, 2026—giving institutions approximately three months to comply with the most extensive new data collection in IPEDS's history.  In yet another departure from past practice, the actual survey instrument was not even available during the initial sixty-day comment period, depriving stakeholders of the ability to evaluate the specific data elements and submission procedures they would very soon be required to abide by.  *See* Compl. ¶¶ 47, 104; 5 C.F.R. § 1320.8(d)(2).  These deviations from longstanding procedure have forced institutions to hire additional staff or divert limited staff resources away from serving students.  *See* NAICU Comments at 3 ("[B]ecause the survey involves multiple campus offices, essential student services such as advising, admissions, and financial aid counseling will be disrupted."); *see also* AAU Oct. Comments at 7-8.

---

[2] NCES is the component of ED responsible for collecting, analyzing, and reporting education-related data.

Despite acknowledging this difficulty, ED declined to extend the submission deadline, asserting only that the timeline was "specified by the Presidential Memorandum and Secretarial Directive."  NCES, Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27, Appendix E: *Response to Public Comments Received During the 60-day Comment Period and NCES Responses* at 13 (revised Oct. 2025) [hereinafter "Response to Comments"]. This is not a reasoned response to the many comments emphasizing the burden of not only the ACTS collection, but the timeline for implementation.  *See* AAMC Comments on IPEDS at 3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 13, 2025) [hereinafter "AAMC Comments"]; AAU Dec. Comments at 6-7; ACE Oct. Comments at 2.

Two additional difficulties underscore the problems with such a rushed process.  To start, ED keeps moving the goalposts.  On January 26, 2026, ED updated templates that institutions use to compile and submit their data, including new definitions, changing variables for reporting income, and removing some data fields.  *See* Compl. ¶ 108.  The templates were updated again on February 17, 2026—less than 30 days before the submission deadline.  *Id.*  Institutions that had already begun compiling data had to assess whether their work remained valid—a particularly burdensome task given the volume of data at issue.  *See id.*  As one stakeholder group recently explained, "compressed timelines combined with evolving systems and guidance increase the likelihood of inconsistent interpretation and avoidable validation errors."  Letter from Ass'n for Institutional Research ("AIR"), to NCES Requesting Extension of ACTS Deadline, Docket ID ED-2025-SCC-0382 at 2 (Feb. 25, 2026).  These ongoing revisions are precisely the kind of problem that processes like TRP review are designed to prevent.

Further compounding the problem, ED has drastically reduced staff at NCES and the Institute for Education Sciences ("IES"), the very offices tasked with administering IPEDS:  After

recent reductions in force, only three of NCES's 100 employees remain. PostsecData Oct. Comments at 10. NCES historically has provided feedback on IPEDS submissions to help institutions correct errors and ensure data quality. AAU Dec. Comments at 2-3. Without sufficient staff to serve the thousands of institutions submitting much larger than usual data files, it is unlikely the data will be processed or reviewed in a timely manner. *See id.*; Compl. ¶ 83.

The Department's Response to Comments reveals a pattern of non-engagement that pervades all of these concerns. Commenters raised detailed objections organized across at least eight distinct categories—including timeline, data quality, burden, guidance and definitions, privacy, data unavailability, decentralized admissions, and operational disruptions. *See* Response to Comments at 4-22. Rather than address the substance of any of those concerns, the Department responded to nearly every category with the same boilerplate language—reciting, nearly verbatim, the Presidential Memorandum and Secretarial Directive that initiated ACTS. *See id.*; *see also* Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/. This approach—of simply repeating the same justification across eight substantively distinct categories of concern—is not the "reasoned explanation" that the APA demands. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 298-99 (D.C. Cir. 2001) ("An [agency]'s failure to respond *meaningfully*" to objections raised by a party "renders its decision … arbitrary and capricious." (emphasis added)). The fact that the President directed the Department to act does not relieve the agency of its obligation to consider and respond to significant comments regarding *how* it acts. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[A]n agency must give adequate reasons for its decisions").

### C. ACTS Calls for Data That May Not Exist or Be Practicable to Submit, and Will Not Reliably Reflect Admissions Practices.

Some of the data elements newly required by ACTS are simply not collected by many institutions and may be unavailable, particularly on a retrospective basis. Despite acknowledging that certain data "have not previously been collected by IPEDS," Response to Comments at 13, ED has not provided meaningful guidance or accommodation for institutions that lack that data.

The scale of potential data gaps is extensive. In the September 2025 AIR Survey, respondents identified the following data fields as the most problematic to capture for undergraduate students: parental education, family income ranges, test score quintiles, GPA quintiles, average cost of attendance, and financial aid type and amount. *See* ACE Oct. Comments at 2-4. For graduate students, the gaps are even more severe: 63% of respondents reported that parental education data simply does not exist at their institution; 47% reported the same for family income ranges; and 43% for test score quintiles. *See id.* These restrictions create additional barriers for institutions attempting to compile the cross-tabulated data that ACTS demands: They cannot report data they do not have.

This problem is particularly acute for retrospective data. ED requires institutions to submit data for seven years—from academic years 2019-20 through 2025-26. But institutions were given no notice before late 2025 that this data would be required, and many IHEs may not have retained the underlying records. For example, some state-level data retention periods are as short as one year, so institutions may not have the required years of retrospective data for non-matriculated students. *See* AACRAO Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 10, 2025).

IHEs face further obstacles when it comes to their graduate and professional programs. First, unlike undergraduate admissions, which is often centralized, graduate admissions is typically

managed at the program or department level. In addition, many graduate programs do not collect the data that ACTS demands, or at least not in the standardized format required. For example:

- "At the graduate level, admissions data has never been collected by the federal government for all Title IV institutions."

- Entrance requirements vary significantly across departments (*e.g.*, some evaluate undergraduate GPA, while others prioritize professional experience), making standardized collection exceedingly difficult. AAU Oct. Comments at 5-6.

- Graduate funding structures (such as assistantships, stipends, and tuition waivers) do not necessarily align with undergraduate financial aid classifications, making meaningful reporting difficult.

- The majority of graduate students do not complete the FAFSA, making the required collection of family income difficult if not impossible.

- In medical schools, there is "significant variation in grading systems and curricular structures . . . complicating both within-school aggregation and cross-school comparisons." *See* AAMC Comments at 2.

The Department's response to the comments raising these concerns was entirely inadequate. The Department acknowledged the "challenges of reporting prior-year data due to varying records retention policies governing different types of data, institutional decisions about information architecture, and changes in data and data systems over time" and conceded that "the accessibility of some data may be limited." Response to Comments at 20. But the Department responded only that the data are "considered critical and necessary" and directed institutions experiencing difficulties to "notify the IPEDS Help Desk as early as practicable in the submission window to receive additional guidance." *Id.* But no amount of technical assistance can conjure data from records that do not exist.

Moreover, many institutions use a holistic admissions process that cannot be fully explained or evaluated through the data ACTS calls for. These institutions consider a broad range of academic and non-academic factors, including leadership, service, artistic or athletic talent, and other qualities that reflect a student's potential contributions to the campus community. *See* AAU Oct. Comments at 4. The medical school context is one example that illustrates the limitations of

11

ACTS, even for the government's stated purpose. *See* AAMC Comments at 2-3. Like many schools, medical school admissions decisions rely on a far broader range of criteria than test scores and GPAs, including professionalism, clinical aptitude, volunteer and work experience, empathy, ethics, interpersonal skills, communication skills, teamwork, and alignment with the school's mission. *See The Premed Competencies for Entering Medical Students*, AAMC, https://students-residents.aamc.org/real-stories-demonstrating-premed-competencies/premed-competencies-entering-medical-students (last visited Mar. 18, 2026); *see also* AAMC Comments at 2 (explaining that the ACTS framework "risks undermining" admissions goals "by prioritizing metrics that are incomplete predictors of long-term success and do not reflect the full range of attributes needed"). Because of this, disaggregating medical school data by test scores and GPA quintiles "reinforces an incomplete picture of student readiness and overlooks qualities essential to becoming a physician." AAMC Comments at 1-2.

Across the board, requiring institutions to report data on metrics that do not reflect their admissions processes is not only burdensome, but misleading, as AAMC cautioned in its comments, "[d]isproportionate focus on a small number of variables to draw inferences about compliance with civil rights laws" risks misrepresenting institutions' legitimate, "evidence-based admissions" practices. *Id.* at 2.

### D. The Stakes of Potential Noncompliance Are Extraordinarily High.

Rounding out this perfect storm for institutions are the potentially enormous consequences of failing to comply with ACTS's new, onerous requirements—even inadvertently.

*First*, by statute and regulation, institutions that fail to provide complete IPEDS data risk fines of up to $71,545 per violation, as well as potential suspension or termination of their eligibility to participate in the Title IV federal financial aid program. *See* 20 U.S.C. § 1094(a)(17); 34 C.F.R. §§ 668.84-86. For the vast majority of institutions, Title IV funding is essential to their

12

ability to serve their students and fulfill their missions.  Many students depend on federal financial aid to attend college, so any disruption to an institution's Title IV eligibility would directly harm its students.  And the federal government has made clear it intends to enforce IHEs' obligation to submit data through IPEDS: The Presidential Memorandum explicitly directs the Secretary of Education to "take remedial action, consistent with Title IV of the Higher Education Act of 1965 and other applicable laws, if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data."  *See* Presidential Memorandum.

*Second*, the Department has stated that it intends to use ACTS data to "develop risk-based enforcement practices" and to "establish a baseline of admissions practices" for use in potential future enforcement actions.  *Agency Information Collection Activities, Comment Request, IPEDS 2024-25 Through 2026-27*, 90 Fed. Reg. 39,384, 39,385-86 (Aug. 15, 2025).  As Plaintiffs have argued, NCES lacks the authority "to circumvent established law enforcement mechanisms and convert IPEDS into a tool to identify alleged wrongdoers and drive enforcement action."  Pls.' Mem. at 11-12.  And this means institutions are faced with the possibility of being targeted, not because their admissions practices are actually unlawful but because the data, distorted by ED's own failures to provide adequate time, clear definitions, and established procedures, makes them appear as outliers.  *See* ACE Oct. Comments at 4-5.  One gets the sense the system is rigged: Institutions are being required to submit data that may be incomplete or unreliable, in order to avoid potentially disastrous penalties for non-submission, even though the data could then be used as a basis for unwarranted, and reputationally damaging, investigations or enforcement actions.

## II.     The Department Has Not Sufficiently Addressed Serious Privacy Concerns.

ACTS demands that institutions report sensitive student data—race, sex, family income, test scores, GPA, Pell eligibility, and parental education—disaggregated across so many categories that the resulting data cells will, in some cases, contain only a handful of students or even a single

individual.  *See* AAU Oct. Comments at 7 (explaining that ACTS will include cells with a size of 1, "which is essentially reporting on individuals rather than the aggregate"); *see also* Compl. ¶ 9; Pls.' Mem. at 19-20.  This level of granularity is unprecedented in previous IPEDS data collections. Consequently, information that students provided to their institutions in confidence may become identifiable and publicly accessible.  Specifically, small ACTS cells may expose information about a student's race, income, GPA, test scores, and financial aid in a single data point.

One of the central functions of IPEDS has always been to make data available to the public through tools such as the College Navigator.  Indeed, the stated purpose of ACTS is to promote "transparency."    *See* Presidential Memorandum.  Assuming that, consistent with NCES's longstanding practice and the Department's stated objectives, ACTS data is made public, the risk of identifying individual students becomes acute.  Even if the Department did not proactively publish the data itself, information submitted through ACTS could be subject to Freedom of Information Act requests or state public records laws.  *See* Compl. ¶ 116.

*Amici*'s members take seriously their obligations to protect student information and privacy.  These obligations arise from various sources, including the Family Educational Rights and Privacy Act (known as FERPA), 20 U.S.C. § 1232g, state privacy laws, *see, e.g.*, *State Student Privacy Laws*, Public Interest Privacy Center, https://publicinterestprivacy.org/resources/state-student-privacy/ (last visited Mar. 18, 2026) (surveying student privacy laws in 47 states and D.C.), and IHEs' own institutional policies.  Students trust that the sensitive personal information they provide to their institutions—including information about their race, family income, grades, test scores, and financial aid—will be safeguarded.  Now, however, ambiguity around how student data may be used and made public risks violating that trust.

The Department's response to commenters' privacy concerns was dismissive, at best. *First*, the Department simply asserted that "small cell sizes in IPEDS are common." Response to Comments at 19. But it did not address—never mind grapple with—the critical distinction between prior IPEDS data collections and ACTS: No previous IPEDS component has required this degree of disaggregation of sensitive student information. And so no existing IPEDS component poses the same concern, to the same degree. *Second*, the Department asserted that the "statutory requirements [that] govern the collection of IPEDS data . . . do not specify data suppression or other privacy protections." *Id.* But that borders on nonresponsive: Even if there are no statutory provisions mandating specific privacy protections around IPEDS, the Department entirely failed to reckon with other, existing legal obligations to protect student data. *Third*, the Department acknowledged the need for privacy protections but deferred any action to an unspecified future date, stating that "NCES will determine the most appropriate disclosure avoidance approach for the ACTS data following its collection and implement that approach prior to any public release of data arising from it." *Id.* But this sequencing is backwards: ED is requiring institutions to submit sensitive, highly disaggregated student data now—with enforcement consequences for noncompliance—while deferring any determination of how that data will be protected to some future point after collection is complete. This "just trust us" approach, with no concrete commitments or opportunity for input, is especially untenable given ED's own admission that "IPEDS data are not collected under a pledge of confidentiality." *Id.* In other words, institutions have no assurance that the highly personal data they are being compelled to submit will not ultimately be disclosed in identifiable form.

The Department's alternative data submission pathway adds an additional layer of privacy risks. The Department has offered institutions the option of uploading individual student-level

15

data to a third-party aggregator, to reduce the burden of aggregating data themselves. But institutions that use this option must transfer individual student records—containing sensitive personal information including race, income, test scores, and GPA—to a third party, without any assurances about who will have access to that data, how it will be secured, or for what purposes it may be used. *See* Response to Comments at 19. This presents institutions with a no-win situation: either shoulder the enormous burden of self-aggregation, or transmit sensitive student data to a third party under terms that remain unclear and may well jeopardize student privacy. *See* APLU Comments on IPEDS at 2-3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Dec. 15, 2025).

**III.    Unaddressed Data Concerns Undermine the Reliability of the ACTS Collection.**

For data to be meaningfully compared across institutions and over time, a data collection system must use carefully defined terms and validated collection methodologies. But ACTS introduces numerous new elements with unclear definitions and inadequate guidance. This has consequences. In September 2025, 83% of survey respondents reported uncertainty about at least one ACTS term, and these problems have persisted: in a February 2026 survey, 74% of respondents reported encountering a moderate or major challenge in interpreting ACTS's definitions and guidance. *See* ACE Oct. Comments at 2; D. Jones & C. Keller, *ACTS Progress and Barriers Survey Report* at 4, AIR (2026), https://www.airweb.org/ publication/acts-progress-and-barriers [hereinafter "AIR Feb. 2026 Survey"].

As a number of commenters raised, fundamental questions remain unanswered: How should institutions handle the diverse formats in which secondary schools report grades and GPAs? *See* AAU Dec. Comments at 2. How should institutions define "selective admissions" or "first-generation" student status when there is no universally agreed-upon definition? *See id.*; NAICU Comments at 1. What should institutions report when students have opted not to disclose their race—a choice students are entitled to make? *See* AAU Dec. Comments at 1-2. How should

16

institutions report data for international students given that GPA scores and scales vary from country to country? *See* Association of Public and Land-grant Universities Comments on IPEDS, Docket ID ED-2025-SCC-0382 7 (U.S. Dep't Educ. Oct. 13, 2025) [hereinafter "APLU Oct. Comments"]. Which test scores should institutions report for students who submitted multiple sets of scores? PostsecData Dec. Comments at 1-2.

Without clear and consistent definitions, different institutions will inevitably interpret terms differently, rendering cross-institutional comparisons unreliable and the resulting dataset misleading. This is precisely the kind of problem that the TRP process is designed to prevent. *See supra* at 6-7. TRPs have historically served to identify definitional ambiguities, test reporting instructions, and refine data elements before they are imposed on institutions. *See, e.g.*, *Report and Suggestions from IPEDS Technical Review Panel #64*, Technical Review Panel at 2, 5 (2021), https://ipedstrp.rti.org/ (explaining that a TRP was formed "to engage the postsecondary community in a discussion about how IPEDS could change, refine, or adjust data elements, [or] definitions . . . to provide more meaningful and useful data related to admissions considerations, rates, and test scores"). The Department's decision to forgo that process—apparently driven solely by the unreasonable timeline set by the Presidential Memorandum, *see* Response to Comments at 17-18—has all but guaranteed that the resulting data will suffer from inconsistencies that undermine its utility. And the Department's mid-course corrections have not solved the problem. While the Department provided updated data templates on January 26, 2026, and again on February 17, 2026, these revisions—issued after institutions had already begun compiling data— only compounded the confusion. *See* Compl. ¶ 108.

The TRP process also would have addressed the problem of duplicative data collection. IPEDS already tracks aggregated data on applications, enrollments, financial aid, and completions.

17

ACTS requires institutions to submit much of the same information in a different format, increasing the burden on institutions without corresponding benefit. *See* NAICU Comments at 1. Indeed, commenters urged the Department to explore ways to "streamline the ever-increasing number of data collections requested by the federal government," rather than imposing an entirely new and redundant survey. AAU Dec. Comments at 4. Other commenters noted that ED could have incorporated additional data elements into existing IPEDS components, where definitions and reporting procedures are already well established. *See* APLU Oct. Comments at 5 (recommending that ED "[b]uild[] the collection of financial aid data into the IPEDS Financial Aid component" to "smooth the transition"). Instead, the Department created an entirely new collection framework, with new tools, new templates, and new procedures—maximizing, rather than minimizing, the burden on respondents.

The cumulative effect of the problems described above—the extraordinary scope of the collection, compressed timeline, absence of TRP review, ambiguous definitions, ongoing mid-collection changes, and gaps in available data—is that the data produced through ACTS will be of fundamentally questionable quality. IHEs' experiences gathering the data make this clear. The February 2026 AIR Survey found that 60% of respondents were "concerned" about their "ability to submit accurate data," with an additional 11% reporting uncertainty—meaning that "more than seven in ten institutions" either lacked confidence in or were unsure about the accuracy of the data they would submit a month out from the original submission deadline. *See* AIR Feb. 2026 Survey at 1-2. The combination of unreliable data and high-stakes enforcement risks harm to institutions that may be wrongly targeted based on data distorted by the Department's own flawed process. As ACE warned, "any attempt to draw conclusions [about] institutions' admissions practices from this data will be at best misleading and most likely, simply wrong." ACE Oct. Comments at 4.

18

**IV.    Relief Under APA Section 705 Is Appropriate and Necessary.**

Finally, *Amici* write to emphasize their support for a stay of the ACTS deadline under Section 705 of the APA. *See* Plaintiffs' Mot. for a TRO at 1-2 (Mar. 13, 2026), ECF No. 6; Compl. at 38. Section 705 provides that, at a preliminary stage in the proceedings and "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705. Like permanent APA relief, this early-stage remedy operates on the agency action itself: here, the deadline to submit ACTS data. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action" (citation omitted)), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025) (declining to grant review as to remedy). That is because, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed," *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (citation omitted), and it "would make little sense to limit the stay of a[n agency action] that is likely procedurally and substantively defective in numerous respects to the parties in this case," *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 632 (D. Md. 2025). Although the Supreme Court held last year that so-called "universal injunctions" "likely exceed the equitable authority that Congress has granted to federal courts," *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025), the Court "specifically declined to alter existing law on 'whether the [APA] authorizes federal courts to vacate federal agency action.'" *New York v. Trump*, No. 25-CV-11221, --- F. Supp. 3d ---, 2025 WL 3514301, at *17 (D. Mass.

19

Dec. 8, 2025), (quoting *CASA*, 606 U.S. at 847 & n.10), *appeal docketed*, No. 26-1174 (1st Cir. Feb. 23, 2026).

Here, Plaintiffs have shown that the implementation of ACTS is likely to be found arbitrary and capricious and contrary to law, so it would "make little sense"—for IHEs, the Department, or the public interest, which includes an interest in accurate and consistent data—for the collection of data pursuant to ACTS to pause for Plaintiffs but proceed apace for non-Plaintiff parties. Anything less than a stay of ACTS would produce the worst of both worlds: an uneven compliance landscape that disadvantages institutions subject to the collection while generating a partial dataset too incomplete to serve any legitimate transparency purpose.

## CONCLUSION

For nearly four decades, the Department of Education has administered IPEDS through a careful, collaborative process that has ensured data is reliable, consistent, and useful. ACTS abandons this process. The result is a survey of unprecedented scope on an unrealistic and ultimately harmful timeline, that leaves unanswered questions around risks to student privacy, and that will produce data of questionable quality and reliability. The Department has not adequately addressed the serious concerns raised by *Amici* and thousands of other commenters during the rulemaking process. Instead, it has pressed forward with a data collection that prioritizes speed over accuracy, scope over feasibility, and enforcement over transparency. For these reasons, and for those stated in Plaintiffs' memorandum in support of their motion for a temporary restraining order, *Amici* respectfully request that the Court grant Plaintiffs' motion for a stay of the agency action under 5 U.S.C. § 705.

Dated:  March 24, 2026                                  Respectfully submitted,

                                                        /s/ Shoba Pillay

JENNER & BLOCK LLP

Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha *(pro hac vice)*
Lindsay C. Harrison *(pro hac vice)*
Elizabeth Henthorne *(pro hac vice)*
Mary-Claire Spurgin *(pro hac vice)*
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
BHenthorne@jenner.com
MSpurgin@jenner.com

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

Dated: March 24, 2026                    /s/ Shoba Pillay

Shoba Pillay, BBO No. 659739
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

22