# EXHIBIT 1



October 14, 2025

To:    Mr. Matthew Soldner
       Acting Commissioner, National Center for Education Statistics
       Acting Director, Institute of Education Sciences
       United States Department of Education

From:  CJ Powell, Associate Vice President
       Association of American Universities

**Docket ID ED-2025-SCC-0382, Comments on IPEDS "Admissions and Consumer Transparency Supplement" (ACTS) Survey**

On behalf of the Association of American Universities (AAU), I am pleased to provide comments in response to the Department of Education's request for comments on utilizing the Admissions and Consumer Transparency Supplement (ACTS) survey component to expand data collection on admissions in higher education, as outlined in the August 7 presidential memorandum ("Ensuring Transparency in Higher Education Admissions").[1] AAU represents 69 leading public and private nonprofit research universities in the United States. AAU appreciates the opportunity to provide comments to the Department of Education (ED or Department) on the addition of this new survey component.

AAU offers the following overarching recommendations to help the Department to develop a survey that is both effective and sustainable while at the same time will responsibly serve the interests of students, families and policymakers alike:

- Utilize the full range of established tools and processes under the Paperwork Reduction Act (PRA) to ensure methodological rigor, and public trust.
- Re-engage Technical Review Panels to strengthen the ACTS survey by incorporating insights from higher education practitioners and data specialists.
- Draw upon institutional expertise of undergraduate and graduate admissions practices to ensure that survey design reflects the complexity and variety of admissions structures across sectors.
- Realistically assess the reporting burden and provide adequate time and guidance for implementation.

---

[1] https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/



- Safeguard student privacy and avoid unnecessary risks of disclosure through disaggregation of small data sets.

The following are our full comments in response to this request for comment:

**AAU and its member institutions share the Department's commitment to providing students and families with accurate, useful information about college admissions.**
Colleges and universities already provide a bevy of information to students and families through federal tools such as the College Scorecard and College Navigator. On these platforms, applicants can learn about the average GPAs and test scores (if required) of recent classes.
However, it is important to note that while institutions provide averages of student data there will still be applicants with scores higher and lower than the average who will receive admissions decisions ranging from accepted to denial for several legitimate and noteworthy reasons.

**AAU encourages the Department to use the full range of established tools available under the Paperwork Reduction Act (PRA) to ensure that the ACTS survey is developed through a process that supports accuracy, transparency, and public trust.**
The Paperwork Reduction Act of 1995 (PRA) mandates that federal agencies submit information collection requests (ICRs) to the Office of Management and Budget (OMB) for approval. This process requires agencies to certify that the ICR uses effective and efficient statistical survey methods that are appropriate to the purpose of the information being collected. Utilizing the procedure in the PRA would ensure the Department is meeting the important and appropriate checkpoints to ensure a survey instrument that meets the desired outcome of transparency for prospective students and taxpayers in an efficient and effective manner.

**Failure to engage Technical Review Panels will result in an inferior survey instrument**
Re-engaging Technical Review Panels (TRPs) for this effort would greatly strengthen the Department's work by incorporating insights from higher education professionals and data specialists who understand the landscape of institutional practices and the complexity of admissions data. TRPs are conducted to obtain peer review of IPEDS-related project plans and products, and to foster communications with potential users of the data.[2] In the case of this expanded data request, a TRP would be helpful to the Department for a number of reasons:

1) **TRPs Provide Critical Insight into Feasibility and Institutional Burden**
   A TRP will provide the Department with a more accurate picture of various aspects on the information collection requests such as the feasibility of collecting certain

---

[2] https://ipedstrp.rti.org/#footer



data, the multiple ways institutions may or may not collect certain data, and the burden they impose on institutions. However, since the Department made this decision unilaterally and without the insight of outside experts, we fear it will be challenging for institutions to comply with this data request in part because graduate and professional schools have an admissions process that is more decentralized and fundamentally different than undergraduate admissions.

2) **TRPs Facilitate Expert Feedback to Improve Survey Design**
A TRP can serve as an effective vehicle to facilitate publishing a proposed survey to solicit comments from higher education and statistical experts. The opportunity to receive comments would ultimately improve survey design and feasibility. Skipping these important steps jeopardizes the ability of IPEDS to ensure that the collected data are complete, high-quality, and trustworthy - qualities that are paramount for earning the trust of consumers and the public, as the memo's name suggests.

3) **TRPs Help Establish Standards and Ensure Data Utility**
Finally, as this is the first time this type of admissions data has been requested, a TRP can develop and propose standards to ensure data consistency and integrity, as well as provide valuable insight into whether the proposed data elements effectively capture valuable information that will, in fact, inform decision-making. Ultimately, the overly broad nature of this data request without clearer definitions could actually inhibit – as opposed to promoting – data collection that would be helpful to the primary constituency, the consumer.

**AAU urges the Department to draw upon institutional expertise to ensure that survey design reflects the complexity and variety of admissions structures across sectors.** We recommend that ED any new survey be designed in a manner that accurately reflects the complexity of the admissions process and does not inadvertently suggest that academic metrics alone can determine admissions outcomes. The administration has issued multiple executive orders and guidance materials focused on considerations of race and diversity in higher education. This is also reflected in the overly broad interpretation of the U.S. Supreme Court's decision in *Students for Fair Admissions (SFFA) v. Harvard* and *SFFA v. UNC*. For these reasons, it is imperative that the administration understands that admission decisions are not based solely on quantitative metrics such as test scores and grade point averages (GPAs), nor should they be for the reasons outlined below.

1. **High School Academic Records Are Inherently Varied and Contextual**
First, our nation's secondary schools are as diverse as the students they serve and as a result have a wide range of methods by which they measure and report students' academic progress and success. Selective colleges and universities will



receive applications from students at upwards of 10,000 unique high schools. While GPA is noted, many of these institutions are more interested in the rigor of courses taken rather than simply the grades received in an applicant's transcript. This is to understand how a student manages the academic challenges of a demanding schedule like the one they will encounter in college.

Some secondary schools weigh GPAs so that students are rewarded for taking more challenging Advanced Placement (AP) or International Baccalaureate (IB) courses. Weighted GPAs can have a number of implications. Students who do not perform as well and earn a C or D can earn extra quality points toward their GPA, making their grade equivalent to an A or B in a standard course. Alternatively, many high schools operate on a completely different GPA scale including 12.0, 8.0, and 4.0. In addition, dozens of secondary schools do more qualitative assessments and simply issue Pass/Fail grades with descriptions of a pupil's achievements and areas of growth. With the understanding of the range of ways secondary and home school students receive academic feedback, colleges and universities must obtain additional information about a student's academic environment, interests, and ability to contribute to a campus community.

2.  **Admissions Decisions Consider a Broad Range of Non-Quantifiable Factors**
    The proposed ACTS survey component requests a substantial amount of institutional admissions data—at potentially considerable administrative and financial cost. While understanding the factors influencing admissions decisions is a worthwhile goal, it is important to recognize that GPA and standardized test scores represent only part of a comprehensive review process. Selective institutions evaluate applicants holistically, taking into account a range of academic and non-academic factors, such as leadership, service, artistic or athletic talent, and other qualities that reflect a student's potential contribution to the campus community. Accordingly, data disaggregated solely by GPA, test scores, race, or gender would not provide a complete or accurate picture of institutional decision-making or student merit.

3.  **Public Institutions Admissions Policies May Reflect Local Priorities and Legal Mandates**
    Relying solely upon GPA and test scores for admissions decisions would be particularly problematic for many public institutions throughout our country. As the



Department is aware, many state institutions navigate locality preferences in admissions based on state constitutions or laws passed by state legislatures. For example, in North Carolina, no more than 18% of an incoming first year class can come from outside the state. [3] This naturally results in some in-state applicants having lower test scores and GPAs than out-of-state applicants. Clearly, this policy indicates that in North Carolina, it is important that public colleges and universities serve the people of North Carolina. Another locality preference is exhibited in "Top 10 percent" policies like those in place in Texas which guarantees Texas students who graduated in the top 10 percent of their high school class automatic admission to all state-funded universities, but the students' test scores may vary. [4] The Department should respect a state's rights to dictate the admissions policies of public institutions as this directly aligns with the Secretary's priorities of returning education decision-making to the states. [5]

4. **Quintile-Based Reporting Oversimplifies Academic Performance**
   The separation of GPAs and test scores into arbitrary quintiles creates a false distinction between otherwise comparable candidates. Grades and test results are on a continuum, and differences among applicants within the same test or GPA quintile may be more significant than the differences between two applicants in different quintiles.

5. **Graduate and Professional Admissions Are Highly Specialized and Diverse Causing Them to Require and Rely Upon Different Types of Data**
   When it comes to professional schools, doctoral studies, and other graduate programs, admission processes vary profoundly because the academic subjects and programs of study vary so significantly. There can be no one size fits all admissions approach for postbaccalaureate degree offerings that include everything from molecular biology to romance languages to accounting. There are programs where research interest and experience are weighed more significantly than test scores and GPA due to the nature of those programs and the skills required to be successful. For professional schools such as business programs, students may submit the GMAT, GRE, Executive Assessment, or apply for test waivers. This all

---

[3] https://www.northcarolina.edu/apps/policy/doc.php?id=789
[4] https://capitol.texas.gov/tlodocs/75R/billtext/html/HB00588F.htm
[5] https://www.ed.gov/about/news/press-release/secretary-mcmahon-announces-returning-education-states-50-state-tour



amounts to inconsistent or non-existent data not for nefarious or careless reasons, but for reasons that are consistent with the demands of the degree program in question.

**The requested timeframe for collecting retrospective data is problematic and will result in skewed and misrepresentative data. We therefore urge ED to reconsider the timeframe.**

Per the request in the Federal Register, the Department is seeking data from the past 5 academic years. This timeframe includes the COVID-19 pandemic when many institutions made standardized testing optional for undergraduate admissions. Many institutions no longer require applicants to submit test scores for several reasons, including challenges accessing standardized tests. According to an Urban Institute study, the number of four-year colleges and universities with test-optional policies nearly doubled from Spring 2020 to Fall 2024. [6] This means that the Department will likely not receive scores representing all applicants to an institution, and this could result in skewed data. Students with higher test scores are more likely to include them in application materials, while applicants with lower scores are less likely to include them, and students who chose not to take the test would have no test scores to include at all.

On the graduate and professional level, that 5-year lookback is even more disconcerting. Graduate and professional schools handle admissions very differently from colleagues working in undergraduate admissions, and the pandemic forced even more adaptability. For instance, law schools may require the LSAT, but an increasing number began accepting the GRE. Some programs didn't collect undergraduate students' GPA at all or may have provided alternatives for those who have been out of school for an extended period of time. The data lookback will not yield any discernible trends and if anything could produce more confusion for consumers due to the variety of pathways students take to enter graduate and professional school.

The five-year lookback period encompasses a time of significant change and adaptation in college admissions, shaped by the extraordinary circumstances of the COVID-19 pandemic and subsequent legal and policy developments. During this period, institutions continued to evolve their admissions approaches to reflect shifting contexts and expectations, while maintaining their core commitments to fairness, access, and educational opportunity These factors, among many, could lead to gaps or inconsistencies in the requested data due to year-to-year changes in admissions practices. Finally, the Department has yet to disclose how it would account for such omissions in admissions data through no fault of institutions themselves.

---

[6] https://www.urban.org/research/publication/how-test-optional-college-admissions-expanded-during-covid-19-pandemic



Engaging with the field would elucidate these and many other reasons why the survey as suggested is not actually workable nor productive to meet the desired outcomes.

**The Department must take steps to safeguard student privacy and avoid unnecessary risks of disclosure of individual and private student information through disaggregation of small data sets.**

For many programs that enroll small number of students ranging from niche undergraduate programs to graduate programs with smaller cohorts, disaggregating data in the ways proposed in the memorandum presents a danger of revealing personally identifiable information to the public by creating many small cell sizes as a result of many graduate programs being smaller in size. Typically, small cells are redacted, making the data unusable for the purposes of this data request. In the new survey there would be several cells with a size of less than 5, and some will simply be 1, which is essentially reporting on individuals rather than the aggregate.

This could reveal academic records and history to the public, which would be prohibited according to the Department of Education's guidance under the Family Education Rights and Privacy Act (FERPA).[7]  What causes particular concern is that the Department has been unclear about data that will be collected versus those that are made public. Typically, all IPEDS reporting is made public, setting up tension between the stated purpose of transparency to taxpayers and college applicants of this new data request and the federal privacy laws designed to protect student identities.

**AAU encourages the Department to assess the reporting burden realistically and to provide sufficient time and guidance for implementation.**

It is unclear how the total number of annual burden hours was calculated but at 740,511, it seems woefully inadequate. Based on the data requested, the reporting fields for the current year alone could be more than 11,000 with more than 100 new questions. If you combine this requirement with the 5-year lookback, that number increases to almost 70,000 new reporting fields.[8] Attempts to adapt the current system to collect and disaggregate the sheer volume of data by the proposed timeline will require many institutions to hire additional staff in undergraduate admissions and admissions office of graduate and professional programs across their campuses.

Meeting the requirements of this new admissions data request may necessitate organizational or procedural adjustments within some institutions to ensure accurate and

---

[7]

https://studentprivacy.ed.gov/sites/default/files/resource_document/file/An%20Eligible%20Student%20Guide%20to%20FERPA_0.pdf

[8] https://jamessmurphy.com/2025/08/19/the-significant-technical-problems-with-the-trump-administrations-new-admissions-survey-component/



timely reporting. Institutions may be forced to revise contracts with vendors that help process applications and manage applicant data.  These changes could come at great cost to institutions and in the case of public colleges and universities, great cost to the taxpayer.

The timeline for completing this data collection on an annual basis also adds significant burden to the institution. Most institutions that participate in selective admissions have a wide range of graduate and professional school offerings. Understanding that graduate and professional admission processes are often highly decentralized, many offices would have to develop new systems to report the expanded data that the Department requested. This could result in adding more part-time or full-time staff across the campus to meet the Department's extensive data requests on the current expedited timeline. Departments may also have to expand costly contracts with vendors to try and capture the sought-after data.

Adding to the new burden is the request that parental education information be provided for all applicants. Many colleges and universities do not currently ask for such parental information beyond whether the parent has attended college. If an application includes this question, it is rarely required, resulting in an incomplete dataset.  Additionally, it is unclear what information the Department seeks regarding parental education. For example: Does the Department want to know the highest level of education achieved by an applicant's parents, the institutions they attended, or both? How are institutions to account for students whose parents were not educated in the United States?

It would be helpful if the Department could clarify how this relates to legacy status or first-generation status and if so, provide a clear definition as these terms mean different things at different institutions. This is even more pronounced for graduate and professional students as those questions are not universally asked of applicants.

The new admissions data request coincides with recent updates to the undergraduate admissions component of IPEDS implemented in the prior reporting cycle. Institutions are evaluating how to align this additional request with existing data collection frameworks to ensure consistency and accuracy. Regardless of approach, the expanded reporting expectations are expected to increase administrative and resource demands across campuses.

### Summary and Conclusion
In summary, AAU and its member institutions share the Department's commitment to providing students and families with accurate, useful information about college admissions. We urge, however, that the Department use the established processes under the PRA, re-engage Technical Review Panels, and collaborate with higher education experts to ensure that the ACTS survey component produces reliable and meaningful data.



Given the issues, concerns and suggestions raised above, we urge the department to reconsider how and when it undertakes this new data collection request. To successfully do this, we urge the Department to consider delaying this additional data collection requirement by one academic year. If ED were to delay and further refine that new collection process to include data institutions currently collect, it could significantly improve the quality and value of the data and information requested and received by the Department while at the same time assure maximum compliance and data consistency among institutions. Furthermore, delaying this data collection by at least one academic year would allow institutions to make appropriate adjustments to internal processes to accurately collect the necessary data.

We appreciate your attention to these comments and look forward to working with you to ensure everyone has access to our nation's esteemed colleges and universities.