# EXHIBIT 2



Association of American Universities
America's Leading Research Universities

December 15, 2025

To:      Mr. Ross Santy
         Data Officer
         Office of Planning, Evaluation and Policy Development
         United States Department of Education

From:  CJ Powell, Associate Vice President
         Association of American Universities

**Docket: ED-2025-SCC-0382-3464, Comments on Department of Education's Submission to the Office of Management and Budget (OMB) for Review and Approval of IPEDS "Admissions and Consumer Transparency Supplement" (ACTS) Survey**

On behalf of the Association of American Universities (AAU), I am pleased to provide comments in response to the Department of Education's (Department) request for comments on their submission the Office of Management and Budget (OMB) for review and approval of the Admissions and Consumer Transparency Supplement (ACTS) survey. This additional data submission requirement component to expand data collection on admissions in higher education was in response to the August 7th presidential memorandum ("Ensuring Transparency in Higher Education Admissions").[1] AAU represents 69 leading public and private nonprofit research universities in the United States, all of whom would be required to submit based on the new criteria as they accept fewer than 100% of all applicants. AAU appreciates the opportunity to provide comments to the Department of Education (ED or Department) on the specific questions related to the addition of this new burdensome survey component.

**Is this collection necessary to the proper functions of the Department?**

No. This expanded data collection is not necessary for the proper functions of the Department. Based on the current form of the ACTS survey, it would not assist the Department in the enforcement of civil rights laws or compliance with federal law. In fact, the various ways the data is disaggregated in ACTS raises serious concerns about compliance with federal student privacy laws such as Family Educational and Rights and Privacy Act (FERPA). There's insufficient clarity on definitions of terms included in the

---

[1] https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/

1200 New York Ave NW, Washington, DC 20005 Suite 500 | **P**: 202.408.7500 | www.aau.edu  X in f ⓸ⓖ ▶ @AAUniversties



survey such as first-generation student status. There has been a dearth of communication regarding how the Department wants institutions to handle the diverse formats of data provided by students and secondary schools. For instance, given the variety of ways that grades are reported to postsecondary institutions, should colleges and universities normalize grade point averages (GPA)? How would this be affected if secondary schools do not provide grades at all? How will the Department handle empty cells or submissions of 'not applicable'? Without clear protocols established for how the Department intends to act on these likely common scenarios, it will be challenging for institutions to provide the Department with the data for which they are looking that would prove necessary to the proper functions.

**Will this information be processed and used in a timely manner?**

No. Without appropriate time for institutions to come into compliance and locate the relevant data to fulfill the request, which is more expansive than previous data requests, it will prove impossible for the information to be compiled, reviewed, verified, and used in a timely manner. If the Department had engaged a Technical Review Panel (TRP), they would have better insight into what is required to process the requested data in a timely manner. Indeed, this is one of the foundational purposes of a TRP, to obtain peer review of IPEDS-related project plans and products, and to foster communications with potential users of the data.[2]

Additionally, with Department efforts to seek the robust data that is required by ACTS beginning this academic year, institutions will be incredibly challenged to gather information from the myriad places admission information for undergraduate and graduate applicants is housed. As we noted in our previous comment, the requested timeframe for collecting retrospective data is problematic.[3] By not only requesting substantial information from the current academic cycle for all applicants, but including the previous five years, institutions will not be able to comply with the request as they are currently organized.

Finally, the reduced staff at the Department and the National Center for Education Statistics (NCES) causes great concern as it relates to processing data in a timely manner. NCES provides feedback on submissions for submitting institutions to correct to ensure the data is high quality and accurate. Without sufficient staff to serve the thousands of

---

[2] https://ipedstrp.rti.org/#footer
[3] https://www.aau.edu/key-issues/aau-comments-ipeds-acts-survey



America's Leading Research Universities

institutions and their large data files, it is unlikely that the information will be processed in a timely manner.

**Is the estimate of burden accurate?**

No. It remains unclear how the total number of burden hours was calculated, but it is likely woefully inadequate. Based on the data requested, the reporting fields for the current year alone could be more than 11,000 with more than 100 new questions. If you combine this requirement with the five year lookback, that number increases to almost 70,000 new reporting fields.[4] Attempts to adapt the current system to collect and disaggregate the sheer volume of new data by the proposed timeline will require many institutions to hire additional staff in undergraduate admissions and admissions offices of graduate and professional programs across their campuses.

Institutions may be forced to revise contracts with vendors that help process applications and manage applicant data.  These changes could come at great cost to institutions and in the case of public colleges and universities, great cost to the taxpayer.

Understanding that graduate and professional admission processes are often highly decentralized, many institutions and their admission offices would have to develop new systems to report the expanded data that the Department requested. This could result in adding more part-time or full-time staff across the campus to meet the Department's extensive data requests on the current expedited timeline. Departments may also have to expand costly contracts with vendors to try and capture the sought-after data.

An instance of adding to the new burden is the request that parental education information be provided for all applicants. Many colleges and universities do not currently ask for such parental information beyond whether the parent has attended college. If an application includes this question, it is rarely required, which could result in an incomplete dataset. Additionally, it is unclear what information the Department seeks regarding parental education. For example: Does the Department want to know the highest level of education achieved by an applicant's parents, the institutions they attended, or both? How are institutions to account for students whose parents were not educated in the United States?

This one additional question highlights the clarification that would be sought by institutional staff compiling the data which would add time as they consulted guidance or waited for feedback from a subject matter expert at the Department. This multiplied by the

---

[4] https://jamessmurphy.com/2025/08/19/the-significant-technical-problems-with-the-trump-administrations-new-admissions-survey-component/

1200 New York Ave NW, Washington, DC 20005 Suite 500 | **P**: 202.408.7500 | www.aau.edu  X in f ⊚ ⑥ ▶ @AAUniversties



number of new questions on their own would lead to burden exceeding the Department's estimation. In combination with the expanded retrospective window of five years during a pandemic, the estimation of burden highlights a lack of understanding of what is required to come into compliance.

**How might the Department enhance the quality, utility, and clarity of the information to be collected**?

The Department should follow the well-established processes for creating new data collections. To have sufficient time to do that, the Department should delay this data collection by at least one academic year. If ED were to delay and further refine that new collection process to include data institutions currently collect, it could significantly improve the quality, utility, clarity, and value of the data and information requested and received by the Department while at the same time assure maximum compliance and data consistency among institutions. Furthermore, delaying this data collection by at least one academic year would allow institutions to make appropriate adjustments to internal processes to accurately collect the necessary data. The time would additionally create space for the Department to engage with the tools currently at its disposal, such as the College Scorecard and College Navigator, so that they can determine what is necessary for their expressed goal of providing transparency to prospective students and taxpayers.

**How might the Department minimize the burden of this collection on the respondents, including through the use of information technology?**

The Department should follow the well-established processes for creating a new data collection. Additionally, the Department could explore ways to streamline the ever-increasing number of data collections requested by the federal government. This includes, but is not limited to, adding components of the ACTS survey into other existing data collections, provide sufficient time to test codes, and review the various data collections and eliminate redundancies, perhaps with the use of information technology. However, the timing and size of this data collection as currently planned does the opposite by maximizing the burden of this collection on respondents.

**Summary and Conclusion**

AAU and its members endeavor to provide accurate, useful information to the public to aid in their postsecondary decision making. However, this is not possible with the current design of the ACTS data collection. This data collection will increase burden on institutions and result in low quality data due to the unprecedented size and scope of this new data



request. Institutions working to come into compliance will have fewer ways to get constructive feedback and questions answered due to the reduced staff at the Department of Education. Finally, there is still far too much ambiguity for institutions to plausibly meet the timeline set by the Department.

If the Department delayed this additional data collection requirement by at least one academic year, ED could further refine the new collection process to include data institutions currently collect which would improve the quality of data received by the Department. Furthermore, delaying this data collection by at least one academic year would allow institutions to make appropriate adjustments to internal processes to accurately collect the necessary data.

We appreciate your attention to these comments and look forward to working with you to ensure everyone has access to our nation's esteemed colleges and universities.