**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.,*<br><br>    *Plaintiffs,*<br><br>    v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.,*<br><br>    *Defendants.* | Case No. 1:26-cv-11229-FDS |

**[PROPOSED] COMPLAINT IN INTERVENTION**

1.    The Admissions and Consumer Transparency Supplement ("ACTS") survey imposes unprecedented data collection requirements on institutions of higher education ("IHEs") with remarkably little notice. These new requirements impose severe burdens, create significant privacy risks, and entail serious data quality concerns that the Department of Education ("the Department" or "ED") has not adequately grappled with, let alone addressed.

2.    The Association of American Universities ("AAU") is composed of America's leading research universities, and the ACTS survey directly and profoundly affects its U.S.-based members. Those members are required to complete the ACTS survey or else risk significant consequences.

3.    ACTS is a novel addition to the Integrated Postsecondary Education System ("IPEDS"), a data-collection tool administered by the Department that has for decades enabled the methodical collection of data and statistical reporting by universities. On August 7, 2025, a Presidential Memorandum directed the Secretary of Education, "[to] expand the scope of required

reporting to provide adequate transparency into admissions … [w]ithin 120 days of the memorandum." Presidential Memorandum § 3, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://perma.cc/JR8J-PRDC. That same day, Secretary of Education Linda McMahon announced that institutions would be required to "report data disaggregated by race and sex" related to different cohorts and programs. Press Release, Dep't of Educ., *U.S. Secretary of Education Linda McMahon Directs National Center for Education Statistics to Collect Universities' Data on Race Discrimination in Admissions* (Aug. 7, 2025), https://perma.cc/43QS-SWEX.

4.      Following those announcements, the Department quickly rolled out ACTS in a matter of months. Substantively, ACTS requires a massive new data collection—including, for the first time, retrospective data going back seven years—with a total of 70,000 new reporting fields. These changes have upended AAU's members' reliance interests, requiring data collection of extraordinary scope in very little time.

5.      ED implemented ACTS in the face of thousands of comments, from AAU and other stakeholders, pointing out these problems and raising serious concerns around its proposed feasibility, implementation, and timeline. The Department's response to comments failed to meaningfully engage with the serious and well-documented concerns raised by stakeholders across the higher education community.

6.      IHEs now face an untenable dilemma: They must quickly compile data they typically would have had years to collect and submit, all while knowing that the data may suffer from inconsistencies given the timeline and lack of critical guidance from the Department and that they may be subject to enforcement on the basis of that flawed data.

7.      As set forth in more detail below, the ACTS survey and the procedure by which it was implemented are contrary to the statutes authorizing IPEDS, the Paperwork Reduction Act ("PRA"), and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities and their actions have nationwide impact. A substantial part of the events or omissions giving rise to the Complaint occurred and continues to occur within this District. Additionally, Plaintiff-Intervenor Association of American Universities has members that are located in this District.

## PARTIES

10.      Plaintiff-Intervenor Association of American Universities ("AAU") is an association composed of 69 leading research universities in the United States. Its goal is transforming lives through education, research, and innovation. AAU's member organizations are public and private research universities that are world-renowned centers of scientific and technological research and innovation.  All U.S.-based members of AAU are required to submit data through IPEDS.

11.      Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411. The National Center for Education Statistics ("NCES") and the Institute for Education Sciences ("IES") are components of the Department.

12.      Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest-ranking official. She is charged with the supervision and

management of all decisions and actions of that agency. 20 U.S.C. § 3412. She is sued in her official capacity.

13.    Defendant United States Office of Management and Budget ("OMB") is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. §§ 501–507.

14.    Defendant Russell Vought is the Director of OMB and that agency's highest-ranking official. 31 U.S.C. §§ 502–503. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.  Past IPEDS Practice.

15.    IES—and one of IES's components, NCES—are the statistical arms of ED. 20 U.S.C. § 9511(b)(2), (c)(3)(B); *see About IES*, IES, https://perma.cc/7C3C-24QY (last visited Mar. 25, 2026); About Us, StatsPolicyGov, https://perma.cc/3Q3S-HDZH. By statute, IES is required to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need." 20 U.S.C. § 9511(b)(2). NCES is mandated "to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias." 20 U.S.C. § 9541(b)(3).

16.    IPEDS surveys are administered by NCES. Completing IPEDS is mandated by statute and regulation, *see* 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19), and educational institutions face hefty fines and other serious consequences, including potential loss of federal funding, if they fail to submit timely and complete data through IPEDS, *see* 34 C.F.R. §§ 668.84, 668.85; 668.86.

17.     Prior to 2025, IPEDS surveys were largely consistent from year to year. *See* Elise Miller McNeely, T*he History & Origins of Survey Items for the Integrated Postsecondary Education Data System*, Inst. of Educ. Scis. (Apr. 2023), https://perma.cc/4WXJ-U7R3. Where the Department has sought to add new survey components or implement major changes to existing surveys, those additions have gone through rigorous, field-tested vetting among impacted educational institutions before being implemented. ED has for decades employed well-established, deliberative, and collaborative processes—including Technical Review Panels ("TRPs"), preview years, and transparent notice-and-comment procedures—to ensure that new IPEDS data collections are clearly defined, technically feasible, and implemented with sufficient lead time to produce reliable data.

18.     As part of this process, IHEs typically have had at least a year to review the requirements of a new survey before they were obligated to compile and produce data to NCES. This methodology ensured that any new survey requirements are clear to IHEs; that those surveys will collect reliable and statistically valid data; that the collected data will not jeopardize student privacy; and that IHEs have the ability, resources, and time to accurately and completely respond to these surveys.

**B.  Presidential Memorandum and Secretary McMahon's Directive.**

19.     On August 7, 2025, the President issued a Presidential Memorandum directing that the IPEDS collection be expanded by December 5, 2025. *See* Pres. Memo.

20.     Also on August 7, Secretary McMahon issued a directive implementing the Presidential Memorandum. *See* Memorandum from Sec'y McMahon, to Acting Dir. Matthew Soldner, *Ensuring Transparency in Higher Education Admissions* at 2 (Aug. 7, 2025),

https://perma.cc/7KDJ-C79N (hereinafter, "McMahon Memorandum"). In that Memorandum, the Secretary:

    a. "direct[ed] NCES to expand the scope of the collection for enrolled cohorts to include data for each race-and-sex pair's graduation rates, final GPAs, financial aid offered, financial aid provided, and other relevant measures,"

    b. "instruct[ed] NCES to determine if any additional information is needed . . . to ensure IPEDS fulfills the mission of providing transparency in admissions," and

    c. "direct[ed] NCES to develop a rigorous quality assurance process for reported data," asserting, without any basis, that "[f]or too long, the Department has operated without verifying whether data submitted to IPEDS is accurate and consistently reported across institutions." *Id.*

21.    Pursuant to the McMahon Memorandum, ACTS, the new IPEDS supplement, requires IHEs "to report quantitative measures of applicants and admitted students' academic achievement such as standardized test scores, GPAs, first-generation-college-student status, and other applicant characteristics, for each race-and-sex pair." *Id.* Secretary McMahon directed NCES "to make [these] changes within the 120-day timeline" set forth in the Presidential Memorandum (*i.e.*, by December 5, 2025). *Id.*

**C. The Education Department and OMB's Administrative Process.**

22.    On August 15, the Department of Education posted a Request for Comment to the Federal Register regarding the proposed changes to IPEDS. *See* Integrated Postsecondary Education Data System (IPEDS) 2024–25 Through 2026–27 Information Collection Request, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, 90 Fed. Reg. 39,384 (Aug. 15, 2025), https://perma.cc/Q6EZ-235K (hereinafter, "Aug. 15 Request for Comment"). The Request applied to all four-year institutions with selective admissions. *Id.*

23.    In a break from past practice, the Aug. 15 Request for Comment did not include the ACTS survey instrument that IHEs are now required to submit; it instead provided only general categories of information the Department "anticipate[d]" would be included in ACTS:

a. "For undergraduate students, we anticipate the component will collect data by race-sex pair on: (1) the count of institutions' applied, admitted, and enrolled cohorts, both overall and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, Pell Grant eligibility, and parental education; (2) the average high school grade point average and admission test score quintiles for institutions' applied, admitted, and enrolled cohorts; (3) the count of students admitted via early action, early decision, or regular admissions," *id.*;

b. For "newly enrolled undergraduate students, we anticipate the ACTS component will collect data by race-sex pair on both the count and average amount of students receiving: (1) any institutional grant aid, (2) merit-based institutional grant aid, (3) need-based institutional grant aid and (4) any local, state, or federal government aid overall, and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, and enrollment via early action, early decision, or regular admissions," *id.*;

c. "We anticipate the ACTS component will also collect data overall and by race-sex pair on (1) students' average cumulative GPA at the end of the academic year; (2) the average cost of attendance, and further disaggregated by admission test score quintiles, ranges of high school grade point average, ranges of family income, and enrollment via early action, early decision, or regular admissions. [*sic*] (3) graduation rates further disaggregated by admission test score quintiles and ranges of high school grade point average; and (4) graduates' final cumulative grade point average," *id.*;

d. For graduate students, "data . . . will be further disaggregated by broad fields of study . . ." *id.*; and

e. "[T]he new component will seek to capture data not only from the 2025-26 academic year but also from the five prior academic years." *Id.* On information and belief, IPEDS has never before sought retroactive data.

**D. AAU's Comments**

24.     The initial comment period closed on October 14, 2025, with the Department having received 3,462 comments on the ACTS proposal, including a comment from AAU. *See* AAU Comment on IPEDS, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025), (hereinafter, "AAU Oct. Comments").

25.    AAU in its initial comments flagged many problems with the proposed ACTS survey, including that:

a.    The amount of additional time NCES estimated IHEs would need to spend on responding to the ACTS survey was "woefully inadequate." AAU Oct. Comments at 7.  Over half of respondents to a survey about ACTS implementation (55%) estimated they would need more than 250 hours of staff time per year to complete ACTS, and another 25% estimated that it would take over 500 hours. *See id.*

b.    Many graduate programs do not collect the data that ACTS demands, at least not in the standardized format required. *Id.* at 5-6.

c.    Entrance requirements vary significantly across departments (*e.g.*, some evaluate undergraduate GPA, while others prioritize professional experience), making standardized collection exceedingly difficult. *Id.*

d.    Many institutions use a holistic admissions process that cannot be fully explained or evaluated through the data ACTS calls for. These institutions consider a broad range of academic and non-academic factors, including leadership, service, artistic or athletic talent, and other qualities that reflect a student's potential contributions to the campus community. *Id.* at 4.

e.    ACTS demands that institutions report sensitive student data—race, sex, family income, test scores, GPA, Pell eligibility, and parental education— disaggregated across so many categories that the resulting data cells will, in some cases, contain only a handful of students or even a single individual—an eventuality that risks "reporting on individuals rather than the aggregate." *See id.* at 7.

26.    Other commenters raised still more concerns. For example, one commenter noted that ACTS represents the single largest expansion of IPEDS in the survey's more than forty-year history and that several new ACTS data fields represent statistics that are not captured at a significant proportion of institutions, meaning that data derived from ACTS is likely to be misleading or wrong. *See* ACE Comments on IPEDS at 1-2, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 7, 2025).

27.    Another commenter explained that the medical school context illustrates the limitations of ACTS, even for the government's stated purpose. *See* AAMC Comments on IPEDS

at 2-3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 13, 2025). The Association of American Medical Colleges ("AAMC") explained that medical school admissions decisions rely on a far broader range of criteria than test scores and GPAs, including professionalism, clinical aptitude, and other skills. See *id.* at 2. As AAMC explained, requiring institutions to report data on metrics that do not reflect their admissions processes is not only burdensome, but misleading. *Id.*

28.     On November 13, 2025, the Department of Education issued a second request for comments as part of its submission of the ACTS survey for the required OMB review. *See* Integrated Postsecondary Education Data System (IPEDS) 2025-26 Through 2026-27, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, 90 Fed. Reg. 50,940 (Nov. 13, 2025), https://perma.cc/4LDJ-BND5 (hereinafter, "November 13 Request for Comment").

29.     The November 13 request proposed exempting institutions that accept all applicants and do not award need-based aid, but the Department did not otherwise meaningfully change its proposal in response to the comments submitted earlier in the fall. *Id.*

30.     The comment period for the November 13 Request for Comment closed on December 15, 2025, during which stakeholders, including AAU, submitted a total of 146 additional comments. *See* AAU Comments on IPEDS, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025) (hereinafter, "AAU Dec. Comments").

31.     In those comments, AAU flagged several additional issues, including:

a.  that historically, major changes to IPEDS involved careful vetting through TRPs, followed by "preview" or optional years that allow institutions to prepare. *Id.* at 2.

b.  that NCES historically has provided feedback on IPEDS submissions to help institutions correct errors and ensure data quality. *Id.* at 2-3.

c.  that fundamental questions remain unanswered concerning ACTS, such as how institutions should handle the diverse formats in which secondary schools report

9

grades and GPAs and how institutions define "selective admissions" or "first generation" student status when there is no universally agreed-upon definition of those terms. *Id.* at 1-2.

32.     In their own December comments, other stakeholders raised still more concerns about the proposed ACTS survey. For example:

    a.     One commenter noted that the survey requires institutions to either shoulder the enormous burden of self-aggregation of data, or transmit sensitive student data to a third party under terms that remain unclear and may well jeopardize student privacy. *See* APLU Comments on IPEDS at 2-3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Dec. 15, 2025) (hereinafter "APLU Dec. Comments").

    b.     Another raised that producing the extensive data required by ACTS has and will continue to severely strain institutional time and resources. *See* ACE Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025).

**E.  ED's Response to Comments and Implementation of ACTS.**

33.     The Department's Response to Comments, issued after receiving the October Comments but prior to receipt of the December Comments, reveals a pattern of non-engagement with the issues identified by commenters. NCES, Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27, Appendix E: *Response to Public Comments Received During the 60-day Comment Period and NCES Responses* (revised Oct. 2025) (hereinafter "Response to Comments").

34.     Rather than address the substance of commenters' concerns, the Department responded to nearly every category with the same boilerplate language—reciting, nearly verbatim, language from the Presidential Memorandum and Secretarial Directive. *See id.*

35.     For example, the Department's response to comments raising concerns that many IHEs do not collect all the categories of data sought by ACTS, and did not do so for prior years, was entirely inadequate. The Department acknowledged the "challenges of reporting prior-year data due to varying records retention policies governing different types of data, institutional

10

decisions about information architecture, and changes in data and data systems over time" and conceded that "the accessibility of some data may be limited." Response to Comments at 20. But the Department responded only that the data are "considered critical and necessary" and directed institutions experiencing difficulties to "notify the IPEDS Help Desk as early as practicable in the submission window to receive additional guidance." *Id.* But without sufficient staff to serve the thousands of institutions submitting much larger than usual data files, it is unlikely the data will be processed or reviewed in a timely manner. *See* PostsecData Comments on IPEDS at 2-3, Docket ID ED-2025-IES-0844, at 10 (U.S. Dep't Educ. Oct. 15, 2025) (hereinafter, "PostsecData Comments") (noting a dramatic decrease in NCES's employee headcount, down from 100 to just three).

36.     The Department's response to commenters' privacy concerns was similarly inadequate. *First*, the Department simply asserted that "small cell sizes in IPEDS are common." Response to Comments at 19. *Second*, the Department asserted that the "statutory requirements [that] govern the collection of IPEDS data . . . do not specify data suppression or other privacy protections." *Id*. *Third*, the Department acknowledged the need for privacy protections but deferred any action to an unspecified future date, stating that "NCES will determine the most appropriate disclosure avoidance approach for the ACTS data following its collection and implement that approach prior to any public release of data arising from it." *Id.*

37.     Only three days after the second notice-and-comment period closed, on December 18, 2025, Defendants took final agency action: OMB approved the ACTS survey, and the Department of Education released the mandatory survey and announced that submissions were due on March 18, 2026. IPEDS, This Week in IPEDS, ACTS Collection Dates and Required Instructions (Dec. 18, 2025), https://perma.cc/P62G-ZNQY.

**F. The Plaintiff States' Lawsuit.**

38.    On March 11, 2026, the states of Massachusetts, California, Maryland, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin (together the "Plaintiff States") together filed a complaint for declaratory and injunctive relief challenging the ACTS survey. ECF No. 1.

39.    On March 13, 2026, the Plaintiff States moved for a temporary restraining order. ECF No. 6. Later that day, the Court issued a temporary restraining order extending the deadline to complete the ACTS survey through March 25, 2026, for all IHEs, including AAU's members. ECF No. 12. The Department of Education separately communicated to IHEs on March 18 that the deadline was extended to March 25, 2026, for all IHEs.

40.    The Court held a hearing on March 24, 2026, at which it issued a further temporary restraining order extending the deadline to complete the ACTS survey for the named Plaintiff States and their constituent IHEs through April 6, 2026. ECF No. 75.

41.    On March 25, 2026, ED communicated to IHEs that it would extend the deadline for all institutions to comply with ACTS until March 31, 2026.

42.    Because the relief ordered at the March 24 hearing includes some but not all of AAU's members, AAU has filed a motion to intervene in order to obtain relief for all of its members.

**G. The Proposed Data Collection is Contrary to Law, Exceeds Statutory Authority, and Fails to Observe the Procedure Required by Law**

43.    Defendants' implementation of the ACTS survey is contrary to law, exceeds statutory authority, and failed to observe the procedures required by law. IES and NCES have statutory mandates, and neither is authorized to collect data for the reasons proposed by Defendants

here. And the Paperwork Reduction Act sets forth multiple requirements for data collections by agencies that are mandated by statute and were not observed here.

44. Both NCES and IES are charged with specific statutory mandates. IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . [; and] ensure that such activities conform to high standards of quality, integrity, and accuracy; and are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." 20 U.S.C. § 9511(b)(2)(A) & (B).  Similarly, the statutory mission of NCES is "to collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias." *Id.* § 9541(b)(1), (2), & (3)(A).

45. As the McMahon Memorandum and the August 15 Request for Comment make clear, NCES and IES are not acting within the confines of these statutory mandates with respect to their implementation of the ACTS survey. Instead, ACTS data will be used "to establish a baseline of admissions practices" and to inform and "develop risk-based enforcement practices." Aug. 15 Request for Comment. Neither NCES nor IES, however, is charged with monitoring or enforcing the law.

46. The Department's implementation of the ACTS survey also violated the PRA, which sets forth multiple requirements for data collections by agencies, as well as the APA.

47. The PRA requires federal agencies to obtain approval from OMB before conducting a "collection of information" from the public. *See* 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320.1. The

PRA defines "collection of information" to include any requests or requirements for individuals or entities "to obtain, maintain, retain, report, or publicly disclose information." *See* 44 U.S.C. § 3502(3); 5 C.F.R. § 1320.3(c), (h)(1). An agency may not conduct a "collection of information" unless it complies with the procedural requirements of the PRA. 44 U.S.C. § 3507; 5 C.F.R. § 1320.5.

48.     When an agency implements a data collection, like the ACTS survey, the PRA requires that the agency "shall . . . evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3506(c)(2)(A)(i); 5 C.F.R. § 1320.8(d)(1)(i).

49.     But the information required by ACTS is unnecessary for the proper functioning of the Department. IPEDS already collects admissions data as well as data related to gender, race, and ethnicity. And there is already a component of the Department tasked with collecting education data for law enforcement purposes: The Department's Office of Civil Rights ("OCR") has the authority "to collect or coordinate the collection of data necessary to ensure compliance with civil rights laws within the jurisdiction of the [OCR]." 20 U.S.C. § 3413(c)(1). NCES and IES may not assume that role for themselves. None of the memoranda, guidance, or requests for comment promulgated by Defendants concerning the ACTS survey explains why the survey is "necessary for the proper performance" of the Department, as the PRA requires. See 44 U.S.C. § 3506(c)(2)(A)(i).

50.     Similarly, the PRA imposes multiple requirements on agencies, including that any "information collection":

     a.  "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency," *id.* § 3506(c)(3)(C);

     b.  "is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond," *id.* § 3506(c)(3)(D);

14

c.  "is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond," *id.* § 3506(c)(3)(E);

d.  "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public," *id.* § 3506(c)(3)(H); and

e.  "uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected," *id.* § 3506(c)(3)(I), among other things.

51.     The ACTS survey satisfies none of these statutory prerequisites because it does not minimize burdens on IHEs. To the contrary, the ACTS survey adds data demands far beyond those imposed by prior IPEDS surveys and imposes an untested and burdensome data submission procedure, exacerbating the burden on IHEs. Multiple commenters, including AAU, stressed to the Department that the ACTS survey would place new and onerous demands upon IHEs. *See, e.g.*, AAU Oct. Comments at 7-8; AAU Dec. Comments at 3-4; APLU Dec. Comment at 3 ("[O]ver half of respondents (55 percent) estimate over 250 hours of staff time per annum are required to complete the survey, and another 33 percent estimate between 100 and 249 hours. One university system estimated that compliance with the ACTS component will exceed their entire current IPEDS burden."). Despite the concerns raised by commenters, Defendants did not limit the data sought in the survey.

52.     The abbreviated timeline for responding to the ACTS survey amplifies the burdens on IHEs. The Department's response to comments regarding the compressed timeline was to state that "the timeline has been specified by the Presidential Memorandum and Secretarial Directive." Response to Comments at 13. Yet neither the Presidential Memorandum nor the McMahon Memorandum allows Defendants to circumvent the statutory requirement that they "reduce[] to the extent practicable and appropriate the burden on" respondents. 44 U.S.C. § 3506(c)(3)(C).

15

53.     Compounding these concerns, neither the Department of Education, IES, nor NCES are equipped to allocate resources for the adequate processing and review of ACTS data. *See* 44 U.S.C. § 3506(c)(3)(H). The Department has drastically reduced staff at NCES and IES—after recent reductions in force, AAU's understanding is that only three of NCES's 100 employees remain on the job. *See* PostsecData Comments at 10. NCES historically has provided feedback on IPEDS submissions to help institutions correct errors and ensure data quality. Without sufficient staff to serve the thousands of institutions submitting much larger than usual data files, it is unlikely the data will be processed or reviewed in a timely manner.

**H.  The Proposed Data Collection is Arbitrary & Capricious**

54.     In addition to being contrary to law, Defendants' actions are arbitrary and capricious—they failed to consider reliance interests, deviated from past practice with no reasoned explanation, failed to consider important aspects of the problem, and failed to consider reasonable alternatives, among other problems.

55.     The ACTS survey's introduction and implementation have been a stark departure from NCES's established process for introducing a new IPEDS survey component or major changes to an existing survey, which typically involved one or more TRPs, collaboration with stakeholder organizations and impacted IHEs prior to developing the survey, and posting the survey during the notice-and-comment period.

56.     Moreover, to reduce the burden on IHEs, NCES typically has not required IHEs to complete major changes such as the introduction of a new survey component until the following year's IPEDS collection. The introduction of a new component will typically be preceded by an optional or preview year during which IHEs can review the instructions and survey materials with time to adapt their data collection systems.

16

57.　For the ACTS survey component, however, NCES departed from its standard procedures by eliminating the TRP process and implementing the survey on a severely truncated timeline. Absent the methodical process typically used to implement changes to IPEDS, the ACTS survey is likely to lead to inconsistent data that may not further the Department's goals.

58.　As its sole rationale for abandoning its longstanding process, the Department cited the timelines set forth in the Presidential Memorandum and McMahon Memorandum. *See* Response to Comments at 17-18; Dep't of Edu., IES, & NCES, *Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27*, *Supporting Statement A*, OMB No. 1850-0582 v. 33, at 11 (revised Oct. 2025). That response is not sufficient, in part because it makes clear that Defendants failed to consider reasonable alternatives, including, for example, implementing a voluntary pilot; phasing the introduction of new data elements; or only seeking a single academic year of data. *See, e.g.*, Response to Comments at 17–18; APLU Comments on IPEDS 5, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 13, 2025).

59.　Aspects of the IPEDS submission process have continued to change after the collection opened, demonstrating the ongoing arbitrariness of Defendants' actions. For example, the Department made mid-collection changes to templates and definitions, requiring institutions that had already begun compiling data to revise their processes and, in some cases, start over entirely.

## I.　AAU Will Suffer Harm as a Result of the ACTS Survey

60.　AAU and its members face substantial, imminent harm arising from Defendants' actions, as detailed more fully in AAU's forthcoming Memorandum in support of its Motion for a Temporary Restraining Order and accompanying declaration.

61.     Such harm arises from the burden of compiling seven years of responsive data, including data that IHEs had never previously been required to collect, compile, and provide. This will require hundreds of hours of work by AAU's member IHEs. What's more, Defendants have stated their intent to use this data as a basis for enforcement actions against IHEs, so AAU's member IHEs face the additional harm of costly investigations and enforcement actions—and the reputational harm that may accompany such actions—premised on unreliable data.

62.     AAU's member IHEs will also suffer privacy-related harms. The level of disaggregation of data creates serious and potentially irreversible risks to student privacy, which schools have an obligation to protect. The Department has not addressed this concern in a substantive way.

## CAUSES OF ACTION

### COUNT I

### Violation of Administrative Procedure Act—Contrary to Law

### (Agency Action Unauthorized by Statute)

63.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

64.     Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

65.     The approval and implementation of the ACTS survey constitutes final agency action under the APA. 5 U.S.C. § 704.

66.     A court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(A) & (C).

67.     An agency may not take any action that exceeds the scope of its statutory authority or is contrary to law.

68.    No authority authorizes federal agencies to act outside their statutory authorities or to violate federal law.

69.    The statutory mandates of NCES and IES are set forth in 20 U.S.C. §§ 9511 and 9541. Under § 9511(b)(2), IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . and ensure that such activities. . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." Under § 9541, NCES's mission is to "collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias."

70.    The Department has explained it plans to use ACTS data for purposes other than those outlined in NCES and IES's respective statutory mandates, including for law-enforcement purposes. *See* Aug. 15 Request for Comment at 39385 ("Greater transparency through the collection of this type of information will help to expose unlawful practices [and] enable the Department to better enforece [sic] Title VI . . . ."); Pres. Memo. at 2 ("Greater transparency is essential to exposing unlawful practices. . . .").

71.    Neither statute authorizes NCES or IES to collect data for law enforcement purposes, rendering Defendants' actions contrary to law under the APA.

19

## COUNT II

### Violation of Administrative Procedure Act—Contrary to Law

### (Noncompliance with the Paperwork Reduction Act)

72. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

73. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).

74. The PRA imposes requirements for any information collection by a federal agency. 44 U.S.C. § 3501 *et seq.*; *see also* 5 C.F.R. § 1320.

75. The ACTS survey is a data collection governed by the PRA and is an electronic information collection that implicates personally identifiable information.

76. Defendants failed to follow legally required procedures when they implemented ACTS without complying with the requirements of the PRA, as well as the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921-23, requiring agencies to conduct privacy impact assessments for electronic information collections that implicate personally identifiable information. Such agency action was contrary to law.

## COUNT III

### Violation of Administrative Procedure Act—Arbitrary & Capricious

77. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

78. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

79.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

80.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.* v. *New York*, 588 U.S. 752, 785 (2019). And when an agency takes an administrative action that deviates from past policy or practice, and the action implicates "serious reliance interests," an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

81.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *State Farm*, 463 U.S. at 43) (alterations in original).

82.    Defendants failed to articulate a reasoned basis for the enormous new burden they have created for IHEs, and they failed to acknowledge IHEs' significant reliance interests in the Department following its well-established past practices for instituting new IPEDS components, rendering their actions arbitrary and capricious in violation of the APA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Intervenor respectfully prays for the following relief:

a.    Declaratory judgment finding that Defendants acted contrary to law in approving and implementing the ACTS survey;

b.    Vacatur of the actions taken by Defendants to approve and implement the ACTS survey;

21

c.   A stay of the implementation of the ACTS survey pursuant to 5 U.S.C. § 705;

d.   An injunction preliminarily and permanently prohibiting Defendants from: (i) compelling Plaintiff-Intervenor's members to complete the ACTS survey; (ii) accessing any information uploaded or entered by Plaintiff-Intervenor's members to the ACTS survey; (iii) penalizing any of Plaintiff-Intervenor's members for failing to complete the ACTS survey; and (iv) commencing any enforcement action or investigation against Plaintiff-Intervenor's members on the basis of submissions related to the ACTS survey;

e.   An order awarding Plaintiff-Intervenor's costs and reasonable attorneys' fees and expenses pursuant to any applicable law;

f.   Any such further relief as this Court deems equitable, just, and proper.


Dated:  March 25, 2026                    Respectfully submitted,

                                          /s/ Lindsay C. Harrison

                                          JENNER & BLOCK LLP

                                          Lindsay C. Harrison (pro hac vice)
                                          Ishan K. Bhabha (pro hac vice)
                                          Elizabeth Henthorne (pro hac vice)
                                          Hilary Ledwell (pro hac vice pending)
                                          Mary-Claire Spurgin (pro hac vice)
                                          1099 New York Avenue NW
                                          Suite 900
                                          Washington, DC 20001
                                          Tel: (202) 639-6000
                                          LHarrison@jenner.com
                                          IBhabha@jenner.com
                                          BHenthorne@jenner.com
                                          HLedwell@jenner.com
                                          MSpurgin@jenner.com

                                          Shoba Pillay, BBO No. 659739
                                          353 North Clark Street
                                          Chicago, IL 60654
                                          Tel: (312) 222-9350
                                          SPillay@jenner.com

                                          Counsel for Association of American
                                          Universities

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

Dated: March 25, 2026

/s/ Lindsay C. Harrison

Lindsay C. Harrison (*pro hac vice)*
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LHarrison@jenner.com