**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.,* | |
| *Plaintiffs*, | Case No. 1:26-cv-11229-FDS |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, *et al.,* | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENOR'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

**INTRODUCTION**

The original deadline for institutions of higher education ("IHEs") to submit their responses to the Admissions and Consumer Transparency Supplement ("ACTS") survey was March 13, 2026. The Court initially granted a temporary restraining order ("TRO"), staying that deadline until March 25. Yesterday, March 24, the Court narrowed its earlier TRO, such that going forward, it provides relief only to the Plaintiff States and their constituent IHEs. *See* ECF No. 75. Separately—and while this case was pending—the Department of Education communicated to IHEs two extensions of the deadline, first to March 25, 2026, and then again (earlier today) to March 31, 2026. Accordingly, the Association of American Universities ("AAU") and its members (other than those that are constituent IHEs of the Plaintiff States) are faced with an imminent deadline of March 31 to submit responses to the ACTS survey. ACTS puts an unprecedented burden on IHEs that is unlawful on any timeline. But the short runway to comply, coupled with the threat of severe sanctions for non-compliance, has made the circumstances urgent for AAU's members. AAU therefore now seeks emergency relief on behalf of those members.

AAU is an association of America's leading research universities. Its member universities earn the majority of competitively awarded federal funding for research that improves public health, addresses national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's leaders and innovators. AAU's members include 69 public and private research universities in the United States, which enroll both graduate and undergraduate students. AAU and its members have long participated in Integrated Postsecondary Education Data System ("IPEDS") data collections. For decades, AAU has relied on the Department of Education's well-established, deliberative, and collaborative processes—including Technical Review Panels ("TRPs"), preview years, and transparent notice-and-comment procedures—to

ensure that new IPEDS data collections are clearly defined, technically feasible, and implemented with sufficient lead time to produce reliable data.

ACTS upends those reliance interests, introducing sweeping substantive changes pursuant to a remarkably abbreviated process. Defendants gave IHEs a few short months to comply with a mass of new requirements, including—for the first time—retrospective data going back seven years. Like the Plaintiff States to whom the Court has now granted emergency relief, AAU's members will suffer irreparable harm if forced to comply with the existing ACTS deadline. Because AAU will suffer such harm, has standing, is likely to prevail on the merits, and the balance of the equities tips in its favor, this Court should grant a temporary restraining order.

## STATEMENT OF FACTS

Given the Court's familiarity with the facts, AAU provides only a brief overview. For a full recitation of the facts, AAU respectfully directs the Court to its Proposed Complaint (filed simultaneously with this motion) and the Plaintiff States' motion for emergency relief, ECF No. 7.

In brief, the new ACTS survey rolled out by the Department of Education ("the Department" or "ED") imposes unprecedented data collection requirements on IHEs, including AAU's U.S.-based members. ACTS requires a staggering amount of data. For this year alone, the reporting fields could "exceed 11,000 with more than 100 new questions." Declaration of AAU President Barbara R. Snyder ¶ 8 (hereinafter "Snyder Decl."). ACTS also requires—for the first time ever—retrospective data stretching back seven years.

Historically, major changes to IPEDS involved careful vetting through TRPs— multistakeholder panels that review proposed changes to ensure feasibility, clarity, and consistency—followed by "preview" or optional years that allow institutions to prepare. *See* Plaintiff States' Complaint ¶¶ 91-98, ECF No. 1 (hereinafter "Pl. States' Compl."); Mem. in Supp.

2

of Pl. States' Mot. for a Temp. Restraining Order at 2-4, ECF No. 7 (hereinafter "Pl. States' Mem."); *see also* AAU Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025) (hereinafter, "AAU Dec. Comments"). For example, when the National Center for Education Statistics ("NCES"), introduced the Outcomes Measure Component—the last major new survey component added to IPEDS—the process spanned years. The Department's Advisory Committee submitted its final report in December 2011; three TRPs convened between 2012 and 2014; and the component was first administered in 2015-16. *See* Elise Miller McNeely, *The History & Origins of Survey Items for the Integrated Postsecondary Education Data System*, Inst. of Educ. Sci. at OM-1 (Apr. 2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf (hereinafter "History and Origins of IPEDS Survey Items"). Even smaller changes have involved years of deliberation, testing, and refinement before the Department makes them mandatory. *See* Pl. States' Mem. at 3-4.

None of that happened here. The Department announced the ACTS survey on August 15, 2025, opened the collection on December 18, 2025, and initially required submissions by March 18, 2026—giving institutions approximately three months to comply with the most extensive new data collection in IPEDS's history. And in yet another departure from past practice, the actual survey instrument was not even available during the initial sixty-day comment period, depriving stakeholders of the ability to evaluate the specific data elements and submission procedures they would very soon be required to abide by. *See* Pl. States' Compl. ¶¶ 47, 104; 5 C.F.R. § 1320.8(d)(2).

Complicating matters further, ED kept moving the goalposts. On January 26, 2026, ED updated templates that institutions use to compile and submit their data, including new definitions,

changing variables for reporting income, and removing some data fields. *See* Pl. States' Compl. ¶ 108. The templates were updated again on February 17, 2026, less than 30 days before the submission deadline. *Id.* Institutions that had already begun compiling data had to assess whether their work remained valid—a particularly burdensome task given the volume of data at issue. *See id.*

Finally, IHEs are navigating this process with less support than usual: historically, ED has provided feedback on IPEDS submissions to help institutions correct errors and ensure data quality. AAU Dec. Comments at 2. But ED has drastically reduced staff at NCES and the Institute for Education Sciences ("IES"), the very offices tasked with administering IPEDS.

In recognition of these challenges, a group of states sued the Department. Pl. States' Compl., ECF No. 1. The Court granted an emergency temporary restraining order on March 13, extending the ACTS submission deadline to March 25, 2026. ECF No. 12. At the hearing on March 24, the Court extended the submission deadline again for Plaintiff States IHEs only. *See* ECF No. 75. All other IHEs are now required to submit their ACTS survey data by March 31. Snyder Decl. ¶ 9. This emergency motion followed.

## LEGAL STANDARD

The burden of proof for a temporary restraining order is the same as that for a preliminary injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The moving parties must show that the weight of the following factors favors granting preliminary relief: "[1] likelihood of success on the merits; [2] potential for irreparable injury, [3] balance of the relevant equities; and [4] effect on the public interest if the Court grants or denies the TRO." *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025) (citing *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981)). When defendants are government entities or officials sued in their official capacities, the

4

balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

**ARGUMENT**

### I.      The Organizational Plaintiffs Have Standing.

AAU has standing to bring this suit on behalf of its university members.[1] An association has standing to bring suit on behalf of its individual members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Actions for declaratory, injunctive and other forms of prospective relief"—as the Organizational Plaintiffs seek here—are "particularly suited to group representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).

First, AAU's members have standing to sue individually. *See Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023). AAU's member universities face immediate and severe consequences should they be forced to comply with the March 31st ACTS deadline, *see* Snyder Decl. ¶¶ 30-31, all of which could be averted if this Court were to stay or enjoin the Department of Education's action. The declaration accompanying this motion details the injuries to AAU's member schools, including substantial potential fines, violations of student privacy that IHEs are obligated to protect, and data-quality degradation. *See id.* ¶¶ 12-13, 25-28, 30-31. These imminent injuries would be redressed by the relief requested: a stay under the APA and declaratory

---

[1] Other courts in this district have previously affirmed AAU's standing to seek relief about governmental action on behalf of its members.  *See, e.g.*, *AAU v. DOE*, 789 F. Supp. 3d 118, 136 (D. Mass. 2025); *AAU v. NSF*, 788 F. Supp. 3d 106, 122-25 (D. Mass. 2025); *AAU v. DOD*, 792 F. Supp. 3d 143, 160-61 (D. Mass. 2025); *AAU v. DOD*, 806 F. Supp. 3d 79, 90 (D. Mass. 2025); *see also Massachusetts v. NIH*, 770 F. Supp. 3d 277, *judgment entered*, No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *aff'd* 164 F.4th 1 (1st Cir. 2026).

5

and injunctive relief preventing the ACTS survey from going into effect. *See Housatonic River Initiative*, 75 F.4th at 265.

Second, the interests at stake are "germane" to AAU's purposes. *See id.* at 264-66. AAU's "primary goal is to provide a forum for the development and implementation of institutional and national policies promoting strong programs of academic research and scholarship and undergraduate, graduate, and professional education." Snyder Decl. ¶ 3. AAU's core mission is supporting IHEs, and the ACTS survey detracts from IHEs' ability to carry out their educational mission by imposing unprecedented data collection requirements on them with remarkably little notice, creating severe practical burdens and associated resource diversions, unresolved privacy risks, and data quality concerns. *Id.* ¶¶ 3-8.

Finally, AAU's individual members are not required for the claims asserted or the relief requested. Vacating the ACTS survey and enjoining its implementation will offer the individual members complete relief. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986) (reasoning that this requirement is met where "the remedy, if granted, will inure to the benefit" of all members (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). As explained in the accompanying declaration, the ACT Survey's burden would divert key resources from AAU's member's educational missions. Snyder Decl. ¶¶ 7-24. Eighteen of AAU's members are already protected by a temporary restraining order, as they fall within the original class of Plaintiff States. For AAU's other 51 members, an order extending the ACTS survey deadline will avert each of the institutions' injuries.

## II.    AAU Has a Strong Likelihood of Success on Its Claims.

Courts must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "without

6

observance of procedure required by law," *id*. § 706(2)(D), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C).

As AAU initially explained in an amicus brief before seeking to intervene,[2] ACTS has created a perfect storm for institutions of higher education: a data collection of unprecedented scope, implemented on a severely compressed timeline outside the established processes, demanding data that many institutions do not possess, or possess only in a highly decentralized way—all under threat of severe consequences for noncompliance. Each of these elements would be burdensome on its own; together, they make abundantly clear that, just as the Plaintiff States, AAU is likely to succeed in showing that the ACTS survey must be set aside.

### A.  The ACTS Survey Must Be Set Aside as Arbitrary and Capricious.

ACTS runs afoul of the APA's prohibition on arbitrary and capricious agency action. several times over. 5 U.S.C. § 706(2)(A). Under the APA, an agency must provide a reasoned basis for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). This standard requires, at minimum, a "rational connection between the facts found and the choice made." *Id*. at 43 (quotations omitted). And an agency cannot fail to consider "important aspect[s] of the problem" in setting forth its policy explanation. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, when an agency "changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (internal quotation

---

[2] At the time AAU moved for leave to file an amicus brief, AAU was not a party to this action. It was only after filing an amicus brief that AAU learned that its members would not be protected by the relief to the Plaintiff States, prompting this Motion to Intervene.

marks and citation omitted). As explained both below and in the Plaintiff States' motion for a TRO, Pl. States' Br. 16-18, Defendants violated each of these tenets.

*First*, the extraordinary scope of the ACTS data collection creates an enormous new burden on institutions, which was compounded by the rushed implementation timeline and departure from established procedures. Defendants have failed to articulate a reasoned basis for this burden, and, more, they have failed to acknowledge—let alone to account for—reliance interests.

ACTS represents the single largest expansion of IPEDS in the survey's more-than-forty-year history, and the data IHEs must submit under ACTS is both granular and extensive. Despite this massive expansion, the Department has not provided a reasoned basis for its actions. AAU and other commenters raised detailed objections across at least eight distinct categories—including timeline, data quality, burden, guidance and definitions, privacy, data unavailability, decentralized admissions, and operational disruptions. *See* NCES, Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27, Appendix E: *Response to Public Comments Received During the 60-day Comment Period and NCES Responses* at 4-22 (revised Oct. 2025) (hereinafter, "Response to Comments"). Rather than address the substance of any of those concerns, the Department responded to nearly every category with the same boilerplate language—reciting, nearly verbatim, the Presidential Memorandum and Secretarial Directive that initiated ACTS. *See id.*; *see also* Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/ (hereinafter "Pres. Mem."). This approach—of simply repeating the same justification across eight substantively distinct categories of concern—is not the "reasoned explanation" that the APA demands. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 298-99 (D.C. Cir. 2001) ("The

[agency]'s failure to respond *meaningfully*" to objections raised by a party "renders its decision … arbitrary and capricious." (emphasis added)).  And the fact that the President directed the Department to act does not relieve the agency of its obligation to consider and respond to significant comments regarding *how* it acts.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016).

Before changing course, as here, agencies are also "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. Historically, changes to IPEDS took years, allowing the Department to do just that. *See* History and Origins of IPEDS Survey Items at OM-1. But for ACTS, no such consideration occurred. To the contrary, the Department's expedited timeline and deviations from longstanding procedure have forced institutions to scramble to hire additional staff or divert limited staff resources away from serving students.  *See also* AAU Comments on IPEDS at 7-8, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025) (hereinafter "AAU Oct. Comments"). Many IHEs explained this to the Department; but the Department declined to extend the submission deadline, asserting only that the timeline was "specified by the Presidential Memorandum and Secretarial Directive."  Response to Comments at 13. This response is not the reasoned one the APA demands, let alone consideration of the reliance interests IHEs have developed over the course of decades.

*Second*, ACTS calls for data that may not exist or be practicable to submit, and will not reliably reflect admissions practices. The mismatch between the data sought and the data institutions have, as well as the inadequate responses provided when IHEs raised data-related issues, again demonstrate the arbitrary nature of the Defendants' actions.

9

The problems plaguing ACTS create a process that is unlikely to produce reliable data, revealing the lack of a rational connection between the Department's actions and stated goals. For data to be meaningfully compared across institutions and over time, a data collection system must use carefully defined terms and validated collection methodologies. But ACTS introduces numerous new elements with unclear definitions and inadequate guidance. That lack of clarity has consequences. In a September 2025 survey, 83% of survey respondents reported uncertainty about at least one ACTS term, and these problems have persisted: in a February 2026 survey, 74% of respondents reported encountering a moderate or major challenge in interpreting ACTS's definitions and guidance. *See* ACE Oct. Comments at 2; D. Jones & C. Keller, *ACTS Progress and Barriers Survey Report* at 4, Ass'n for Institutional Rsch. (2026), https://www.airweb.org/publication/acts-progress-and-barriers.

As AAU emphasized in its comments, fundamental questions remain unanswered:  How should institutions handle the diverse formats in which secondary schools report grades and GPAs? *See* AAU Dec. Comments at 2.  How should institutions define "selective admissions" or "first-generation" student status when there is no universally agreed-upon definition?  *See id.* at 1-2; AAU Oct. Comments at 8. What should institutions report when students have opted not to disclose their race—a choice students are entitled to make?  *See* AAU Dec. Comments at 1-2.  These questions are not simply academic: Without clear and consistent definitions, different institutions will inevitably interpret terms differently, rendering cross-institutional comparisons unreliable and the resulting dataset misleading.

This problem is precisely the type that the TRP process is designed to prevent. TRPs have historically served to identify definitional ambiguities, test reporting instructions, and refine data elements before they are imposed on institutions.  *See, e.g.*, *Report and Suggestions from IPEDS*

*Technical Review Panel #64*, Technical Review Panel at 2, 5 (2021), https://ipedstrp.rti.org/ (explaining that a TRP was formed "to engage the postsecondary community in a discussion about how IPEDS could change, refine, or adjust data elements, [or] definitions . . . to provide more meaningful and useful data related to admissions considerations, rates, and test scores").  The Department's decision to forgo that process—apparently driven solely by the unreasonable timeline set by the Presidential Memorandum, *see* Response to Comments at 17-18—has all but guaranteed that the resulting data will suffer from inconsistencies that undermine its utility.  And the Department's mid-course corrections have not solved the problem.  While the Department provided updated data templates on January 26, 2026, and again on February 17, 2026, these revisions—issued after institutions had already begun compiling data—only compounded the confusion.  *See* Pl. States' Compl. ¶ 108.

Further, much of the data ACTS calls for is simply not collected by many institutions and may be unavailable, particularly on a retrospective basis. The scale of potential data gaps is extensive.  In a September 2025 survey, respondents identified the following data fields as the most problematic to capture for undergraduate students: parental education, family income ranges, test score quintiles, GPA quintiles, average cost of attendance, and financial aid type and amount. *See* ACE Oct. Comments at 2-4 (citing survey conducted by Association for Institutional Research). For graduate students, the gaps are even more significant: 63% of respondents reported that parental education data simply does not exist at their institution; 47% reported the same for family income ranges; and 43% for test score quintiles. *See id.* These restrictions create additional barriers for institutions attempting to compile the cross-tabulated data that ACTS demands: They cannot report data they do not have. The Department acknowledged the inherent "challenges of reporting prior-year data" and conceded that "the accessibility of some data may be limited,"

11

Response to Comments at 20, but its only response was to say it considers the data "critical and necessary" and direct institutions experiencing difficulties to "notify the IPEDS Help Desk . . . to receive additional guidance." *Id.* But no amount of technical assistance can conjure data from records that do not exist. Further compounding the problem, ED has drastically reduced staff at NCES and IES, the very offices tasked with administering IPEDS that are supposed to offer the assistance that ED identifies: After recent reductions in force, only three of NCES's 100 employees remain.  PostsecData Comments on IPEDS at 10, Docket ID ED-2025-SCC-0844 (U.S. Dep't Educ. Oct. 15, 2025).

**B.  The ACTS Survey Must Be Set Aside Because It Was Enacted Without Observance of Procedure Required by Law.**

ACTS is also unlawful insofar as it was enacted without observance of the procedures required by law. 5 U.S.C. §§ 706(2)(A), (2)(D). Specifically, for the reasons set forth by the Plaintiff States in their brief in support of their motion for a temporary restraining order, Defendants violated the Paperwork Reduction Act's ("PRA") requirements for data collections by agencies. *See* Pl. States' Br. 12-15. In the interest of efficiency, Plaintiff-intervenor AAU incorporates and adopts those arguments made by the Plaintiff States. *See, e.g.*, *Femino v. Sedgwick Claims Mgmt. Servs., Inc.*, No. CV 20-11373-FDS, 2021 WL 3190817, at *1 n.1 (D. Mass. July 28, 2021) (considering arguments made by one defendant but "relied on and incorporate[d]" by the other defendant as if raised by both). As another court in this district recently held, failed "observance of procedure required by the PRA" is itself "a violation of the APA." *Orr v. Trump*, 778 F. Supp. 3d 394, 425 (D. Mass. 2025), *appeal docketed*, No. 25-1579 (1st Cir. June 13, 2025). This violation requires that ACTS be set aside.

**C.  The ACTS Survey Must be Set Aside Because It Is In Excess of IES and NCES's Statutory Authority.**

12

ACTS must also be set aside because it exceeds the "statutory jurisdiction, authority, or limitations" 5 U.S.C. § 706(2)(C) of IES and NCES—the components of the Department tasked with administering IPEDS. Indeed, it is well-established that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation omitted).

Congress has specifically mandated how IES and NCES are to administer IPEDS and collect data. IES:

> shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . and ensure that such activities. . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). And NCES's statutory mission is to:

> collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias    .    .    .    .

20 U.S.C. § 9541(b)(1) (2), (3)(A).

But the Department of Education has explained it plans to use this data for purposes other than those outlined in NCES and IES's respective statutory mandates, including for law-enforcement purposes. *See* Agency Information Collection Activities; Comment Request; Integrated Postsecondary Education Data System (IPEDS) 2024-25 Through 2026-27, 90 Fed. Reg. 39384, 39384 (Aug. 15, 2025) ("Greater transparency through the collection of this type of information will help to expose unlawful practices [and] enable the Department to better enforce [sic] Title VI . . . .") ; Pres. Mem. at 2 ("Greater transparency is essential to exposing unlawful practices. . . ."). But law enforcement is not an authorized purpose for which NCES and IES may

collect this data. Critically, there is already a component of the Department that *is* tasked with collecting education data for law enforcement purposes: The Department's Office of Civil Rights ("OCR") has the authority "to collect or coordinate the collection of data necessary to ensure compliance with civil rights laws within the jurisdiction of the [OCR]." 20 U.S.C. § 3413(c)(1). NCES and IES may not assume that role for themselves.

While Defendants now argue there is no basis for "precluding IPEDS or any other survey administered by NCES from being used in the enforcement of civil rights laws," Defs.' Opp'n to Pl. States' Mot. for Temp. Restraining Order at 14, ECF No. 68 (hereinafter "Defs.' Opp'n"), there is a distinction between *incidental* use of such data that was collected to comply with NCES and IES's statutory mandates and the approach here, where NCES and IES set out to collect data explicitly for law enforcement purposes, rather than the neutral statistical purposes their statutes authorize. These actions exceed their statutory mandate.

## III.     The Other Factors Favor a Temporary Restraining Order.

The remaining factors—irreparable harm, balance of the equities, and the public interest—also weigh strongly in favor of emergency injunctive relief here.

### A.  The ACTS Survey Is Already Causing and Will Continue to Cause Irreparable Harm

As set forth in the accompanying declaration, AAU's members face irreparable harm both in the form of the burden of compliance, infringements on student privacy, and risk of enforcement based on misleading and incomplete data. Snyder Decl. ¶¶ 12, 30. Because of the threat of severe penalties for noncompliance with IPEDS, AAU's members face an untenable choice: submit data they know may be incomplete, inaccurate, and potentially in tension with their obligations to uphold student privacy, or face steep fines and the possible loss of Title IV funding. This Court's intervention is necessary to prevent either outcome.

14

*First*, the ACTS survey imposes an enormous and unjustified reporting burden on AAU's members. The required data includes nearly 70,000 new reporting fields. Snyder Decl. ¶ 8. The Department estimates the burden at an additional 200 hours per institution for the first year—more than double the estimated burden for all existing IPEDS components combined. *See* Response to Comments at 7, 16. But even this estimate is inadequate: over half of respondents to a survey of institutional research professionals estimated they would need more than 250 hours of staff time per year to complete ACTS, and with 25% estimating that it would take over 500 hours. *See* D. Jones et al., *AIR Survey Results: Feedback to the Proposed Admissions and Consumer Transparency Supplement (ACTS),* Ass'n for Institutional Rsch. at 9 (2025), https://www.airweb.org/publication/ feedback-to-the-proposed-ACTS.

The burden falls with particular force on AAU members' graduate and professional programs, where admissions processes are highly decentralized and vary profoundly across disciplines. There is no one-size-fits-all admissions approach for postbaccalaureate programs that range from molecular biology to accounting, and many of these programs weigh factors such as research experience more heavily than test scores or GPA. Snyder Decl. ¶ 17. This may result in inconsistent or non-existent data, not for lack of care, but for reasons that are consistent with the demands of each degree program. *Id.*

Compounding these burdens, the Department's rushed implementation has been marked by conflicting guidance from the IPEDS help desk, technical problems with the Aggregator Tool as well as the software tool NCES offered as an alternative, and mid-collection changes to templates and definitions that forced AAU's members to revise their processes and, in some cases, start over. Snyder Decl. ¶¶ 20–23. These problems have been further aggravated by reduced

15

staffing at NCES, which has left AAU's members with fewer avenues for constructive feedback. *Id.* ¶ 24.

*Second*, the ACTS survey's disaggregation requirements create serious and potentially irreversible risks to student privacy, which schools have an obligation to protect. *Id.* ¶ 25. For many programs that enroll small numbers of students—including niche undergraduate programs and graduate programs with smaller cohorts—the level of disaggregation ACTS requires will produce group sizes (displayed in data table cells) so small that individual students could be identified. Snyder Decl. ¶ 26. Under the new survey, there would be several cells with fewer than five students, and some cells will contain only a single student—which is, in effect, reporting on individuals rather than the aggregate. *Id.* This disaggregation could reveal students' academic records and history to the public, in tension with the Department's own guidance implementing the Family Educational Rights and Privacy Act ("FERPA"), *id.* ¶ 26, and possibly also in tension with members' state-law privacy obligations. Because all IPEDS reporting is typically made public, there is a direct conflict between the stated goal of transparency and the federal privacy laws designed to protect student identities. The Department has not adequately addressed how it intends to prevent the disclosure of personally identaifiable student information; in their opposition to the Plaintiff States' motion for a temporary restraining order and again at the TRO hearing, Defendants claimed that they would take steps to mitigate any privacy issues. But putting off the privacy question to a later date is unacceptable to the schools that have been told they must submit data in less than a week. *Id.* ¶ 28.

*Finally*, the threat of enforcement action heightens the harm that AAU's members face if the ACTS deadline goes into effect. Institutions that fail to comply with IPEDS reporting requirements risk fines of up to $71,545 per violation and potential suspension or termination of

16

Title IV eligibility, the loss of which would be devastating for AAU's members and the students they serve. *See* 34 C.F.R. §§ 668.84, 668.85, 668.86. This threat is not speculative: the Presidential Memorandum expressly directs the Secretary to "take remedial action" if institutions "fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data." Pres. Mem. at §3(c). Further, the Presidential Memorandum and Request for Comments both indicate that Defendants intend to use the data collected through the ACTS survey to enforce civil rights laws. *Id.* at § 1; 90 Fed. Reg. at 39386. Accuracy in the data collected is thus particularly critical to ensure that enforcement actions are not initiated on the basis of misleading or incorrect information.

### B.  The Balance of the Equities and Public Interest Overwhelmingly Favor Relief.

As the Court found for the Plaintiff States, the equities and public interest overwhelmingly favor immediate relief for AAU's members.

If ACTS goes into effect, AAU's members will suffer imminent harm from the burden of submitting information, risk imminent financial and reputational harm, and run considerable privacy risks.  In stark contrast, the harm to Defendants is minimal. AAU's members will continue to provide information through other preexisting IPEDS components, as they always have. Given the problems with the ACTS survey, detailed above and in multiple other submissions in this case, the additional data sought will be of limited utility. The balance of the equities and public interest clearly favor  AAU. Defendants' own brief in opposition to the Plaintiff States' Motion for  a TRO only underscores this imbalance of the equities: Defendants fail to muster even a single argument about the balance of equities and public interest.  *See* Defs.' Opp'n at 8-9 (reciting the legal standard), 9-20.

17

**IV.    Relief Under APA Section 705 Is Appropriate and Necessary.**

AAU respectfully requests that the Court stay the ACTS deadline under Section 705 of the APA for the reasons explained in its amicus brief. *See* ECF No. 73. At a preliminary stage in the proceedings and "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," Section 705 provides that courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705. Like the permanent APA relief of vacatur available under Section 706, Section 705 operates on the agency action itself—the deadline to submit ACTS data—and thus would have the effect of staying the deadline as to any entity that would otherwise be required to submit data pursuant to ACTS. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("the scope of preliminary relief under Section 7054 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' unlawful agency action" (citation omitted)), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025) (declining to grant review as to remedy).  Although the Supreme Court held last year that so-called "universal injunctions" "likely exceed the equitable authority that Congress has granted to federal courts," *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025), the Court "specifically declined to alter existing law on 'whether the [APA] authorizes federal courts to vacate federal agency action.'" *New York v. Trump*, No. 25-CV-11221, --- F. Supp. 3d ---, 2025 WL 3514301, at *17 (D. Mass. Dec. 8, 2025) (quoting *CASA*, 606 U.S. at 847 & n.10), *appeal docketed*, No. 26-1174 (1st Cir. Feb. 23, 2026).

AAU additionally requests that the Court issue an injunction as to its members to relieve them of the obligation to submit ACTS data pending final resolution of this suit.

18

**CONCLUSION**

Plaintiff-Intervenor respectfully requests a stay of the agency action pursuant to 5 U.S.C. § 705 and, alternatively, that this Court enjoin Defendants from:

(1) accessing information uploaded by Plaintiff-Intervenor's members for the ACTS survey;

(2) requiring that Plaintiff-Intervenor's members complete the ACTS survey by March 25, 2026 and/or March 31, 2026;

(3) assessing penalties on Plaintiff-Intervenor's members based on their submissions to the ACTS survey; and

(4) using the ACTS survey as a basis for any investigation or enforcement action against

Plaintiff-Intervenor's members.

Dated:  March 25, 2026

Respectfully submitted,

/s/ Lindsay Harrison

JENNER & BLOCK LLP

Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha *(pro hac vice)*
Lindsay C. Harrison *(pro hac vice)*
Elizabeth Henthorne *(pro hac vice)*
Hilary Ledwell *(pro hac vice* pending*)*
Mary-Claire Spurgin *(pro hac vice)*
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
BHenthorne@jenner.com
HLedwell@jenner.com
MSpurgin@jenner.com

*Counsel for Association of American Universities*

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

Dated: March 25, 2026

/s/ Lindsay C. Harrison

Lindsay C. Harrison (*pro hac vice)*
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LHarrison@jenner.com