**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Commonwealth of Massachusetts, et al., *Plaintiffs,* v. Department of Education, et al., *Defendants.* | Case No. 1:26-cv-11229 *Leave to File Granted at Doc. No. 74* |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

A.    Defendants' Arguments as to Plaintiffs' PRA Claims Fail .........................1

B.    The Alleged "Support" for Defendants' Certification of
       Compliance with the PRA Is Inaccurate at Best and Misleading at
       Worst...........................................................................................................4

C.    Plaintiffs Will Continue to Suffer Irreparable Harm from the
       ACTS Survey Absent Further Court Relief...................................................7

# TABLE OF AUTHORITIES

CASES

*Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007) ............................... 8

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) .................................................................... 1

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025) ...................................................................................... 8

*Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018) ................................................................................. 2

*New York v. DOJ*, 804 F. Supp. 3d 294 (D.R.I. 2025) .................................................................. 8, 9

*Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003) ................................................ 8

*Steele v. United States*, 144 F.4th 316 (D.C. Cir. 2025) .................................................................. 2


STATUTES

44 U.S.C. § 3506 ......................................................................................................................... *passim*

44 U.S.C. § 3507 ............................................................................................................................... 2

44 U.S.C. § 3512 ............................................................................................................................... 2

5 U.S.C. § 706 ................................................................................................................................... 3


REGULATIONS

5 C.F.R. § 1320.5 .............................................................................................................................. 4

5 C.F.R. § 1320.8 ........................................................................................................................... 3, 4

**INTRODUCTION**

During the hearing on Plaintiffs' Motion for a Temporary Restraining Order, Defendants' counsel asserted that Defendants' decision to administer the IPEDS ACTS survey[1] is a policy choice not subject to the Court's review. But that is not so. The ACTS survey is an "information collection" that Defendants must conduct according to federal law, including the PRA. The PRA is not a suggestion; it is a requirement, imposed by Congress, designed to protect against onerous and ill-considered information collections, such as the ACTS survey, conducted by agencies without sufficient planning or resources. And Defendants' certification that they complied with the PRA is premised on inaccurate representations that conflict with the facts before the Court. Courts "are not required to exhibit a naivete from which ordinary citizens are free," *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019),[2] and Defendants' inaccurate representations cannot cure the survey's many deficiencies. Plaintiffs have suffered and, absent further Court relief, will continue to suffer irreparable harm as a result of the ACTS survey. For this reason, the Court should enter preliminary relief for Plaintiffs.

A.    **Defendants' Arguments as to Plaintiffs' PRA Claims Fail**

Defendants argue that the PRA bars judicial review and that, in any event, they satisfied their obligations under the PRA by certifying compliance. Defs. Opp. 15-16, Dkt. No. 68. Defendants are wrong. The authority relied upon by Defendants is inapplicable to their judicial review claims, and Defendants cite no authority for their position that the Court cannot review the facts underlying

---

[1] All defined terms are adopted from Plaintiffs' Motion for a Temporary Restraining Order and Memorandum in Support (Doc. Nos. 6 and 7), unless otherwise stated. As Plaintiffs set forth in briefing and at argument, the ACTS survey is unlawful and should be enjoined for multiple reasons, including that it exceeds statutory authority; does not observe the procedure required by law; and is arbitrary and capricious. In light of the briefing presently before the Court, this Reply Brief does not address every argument raised by Defendants and focuses on Defendants' arguments regarding the PRA and irreparable harm. To the extent the Court requires additional briefing on any topic, Plaintiffs will gladly provide additional information at the Court's request.

[2] All citations are emphasis added and internal citation omitted unless otherwise stated.

the Department's certification. Moreover, even if the certification were unreviewable (and it is not), the ACTS survey is plagued with violations of the PRA far exceeding the certification.

In arguing that judicial review is precluded, Defendants invoke two sections of the PRA, 44 U.S.C. §§ 3507(d)(6) and 3512, that are inapplicable here. Section 3507(d)(6) provides that the OMB director's decision "to approve or not act upon a collection of information *contained in an agency rule* shall not be subject to judicial review." This section is limited to information collections "in an agency rule." *Hyatt v. OMB*, 908 F.3d 1165, 1171 (9th Cir. 2018) ("[T]he PRA's bar on judicial review . . . is demonstratively narrow in scope [and] . . . does not prohibit judicial review of an OMB decision to approve collections that are not contained in an agency rule."). Because the ACTS survey is not an information collection in an agency rule, § 3507(d)(6) does not apply. And § 3512 pertains to information collections that do not display a valid control number—which is entirely irrelevant to the issues before this Court.

Defendants' reliance on their certification of PRA compliance is equally misplaced. Merely "certifying" their own survey does not transform Defendants' legal violations and procedural deficiencies into compliance. *See Steele v. United States*, 144 F.4th 316, 322-23 (D.C. Cir. 2025) ("[W]here a statute is silent, we presume Congress did not displace the courts' ordinary role in determining whether an agency has acted within the bounds of its legal authority. . . . [T]he PRA . . . governs the process authorizing *how* any agency collects information that suits its objectives. It prescribes a framework to ensure oversight, not to expand substantive power."). Nothing in the statute (nor any other authority) precludes the Court from reviewing the underlying facts to ensure Defendants' compliance with law and observance of mandatory process. *See* 44 U.S.C. § 3506(c)(3) (requiring agency to certify "and provide a record supporting such certification" that each information collection satisfies the complete list of mandatory justification criteria); 5 U.S.C.

2

§ 706(2)(A), (2)(D) (court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with the law" and "without observance of procedure required by law").

Even beyond the certification, the ACTS survey violates other portions of the PRA. Defendants must provide at least sixty days' notice and comment for the ACTS survey instrument, not only a general summary of its content. *See* 44 U.S.C. § 3506(c)(2)(A) (requiring "60-day notice in the Federal Register" for "each proposed collection of information"); 5 C.F.R. § 1320.8(d)(2) (if the agency does not "publish a copy of the proposed collection of information, together with the related instructions, as part of the Federal Register notice" the agency should "[p]rovide more than 60-day notice to permit timely receipt" or explain how the public can obtain a copy of the collection and instructions). Contrary to this legal requirement and past agency practice, the Department did not publish the ACTS survey instrument or provide any means for the public to obtain it in the initial Request for Comment. Instead, the Department merely described the types of information it "anticipated" would be sought, without providing the details necessary for IHEs to address the implementation concerns now at issue: for example, ambiguity in survey fields, data elements, and instructions; the lack of privacy protections; or deficiencies in the new submission methods.

The Department failed to provide more than sixty days' notice to permit "timely receipt" because they did not release the proposed survey and instructions until submitting the ICR to OMB for approval in the Nov. 13 Request for Comment. *See* Dep't of Ed., *Forms and Instruments*, Docket No. ED-2025-SCC-0382 (Nov. 12, 2025), https://perma.cc/ZR2B-2HRB (ACTS survey component and related instructions posted online). By then, the Department had already finalized the survey and instructions. This timing left no opportunity for the public to meaningfully suggest changes to the survey or instructions, violating the requirements of both 5 C.F.R. § 1320.8(d)(2)

and the PRA. *See* 8 S. Rep. No. 104-8, at 14, 45 (1995) (Congress amended the PRA to require agencies to seek public comment on a proposed survey *before* submitting to OMB "[t]o strengthen and expand opportunities for more meaningful public comment and participation," which would ensure "a more complete airing out of issues during the course of the agency's development of an information collection proposal").

Regulations also bar OMB from approving a collection "[r]equiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records, for more than three years," unless the agency can demonstrate that it is "necessary to satisfy statutory requirements or other substantial need." 5 C.F.R. § 1320.5(d)(2)(iv); s*ee* Attorneys General of California et al., Comment Letter on IPEDS ICR at 4-5 n.18 (Oct. 14, 2025), https://perma.cc/7UD9-2JJN. Defendants violated this provision by approving and implementing—without adequate justification or demonstration of necessity—the requirement that IHEs provide seven years of extensive disaggregated data from IHEs.

### B. The Alleged "Support" for Defendants' Certification of Compliance with the PRA Is Inaccurate at Best and Misleading at Worst

The record provided by Defendants as alleged "support" for the certification fails at every turn. Contrary to Defendants' claims that the ACTS survey complied with the PRA, the record reveals an untested, undeveloped process in which Defendants changed the parameters with each passing day while imposing an unprecedented burden on IHEs, with no resources allocated to make use of the data. If the PRA is to have any force, the ACTS survey and its hasty, irresponsible implementation cannot withstand judicial scrutiny.

Defendants tout their "novel data collection methodology" as a tool to reduce the burden upon respondents. App. E at 13, Dkt. No. 69-10. But declaration after declaration submitted by IHEs demonstrate that the "Aggregator Tool" increased those burdens. The tool was flagged as a

4

virus by multiple institutions, Jones Decl. ¶¶ 40-41, Dkt. No. 9-10, suffered system outages, Ribble Decl. ¶ 43, Dkt. No. 9-7, and required hours to input and review data, Case Decl. ¶¶ 41-42, Dkt. No. 9-4; Barton Decl. ¶ 41, Dkt. No. 9-12; Strout Decl. ¶ 39, Dkt. No. 9-14; Chellman Decl. ¶ 35, Dkt. No. 9-18. And the only options that allowed IHEs to avoid uploading—and potentially exposing—individual student records were not made available until over a month after the survey was released. Stringer Decl. ¶¶ 40-41, Dkt. No. 9-23; Case Decl. ¶ 42, Dkt. No. 9-4. These problems are far more than "hiccups in a rollout process." Defs. Opp. 19, Dkt. No. 68. They continue to plague IHEs and exacerbate the heavy burden the ACTS survey already imposes upon Plaintiffs.

Defendants also claim that "[t]he majority of the underlying data elements" were already required "to complete other IPEDS surveys" and therefore were "likely to be available, accurate, and familiar to submitters." App. E at 13, Dkt. No. 69-10. Again, this claim is contradicted by the actual ACTS survey, which is replete with undefined terms and terms inconsistent with prior collections. Brown Decl. ¶ 24, Dkt. No. 9-3; Fuerst Decl. ¶ 21, Dkt. No. 9-8; Foster Decl. ¶ 21, Dkt. No. 9-19; Haggerty Decl. ¶ 20, Dkt. No. 9-21; Guthrie Decl. ¶ 25, Dkt. No. 9-25. More concerning, definitions for data elements changed throughout the collection process. Reeves Decl. ¶ 24, Dkt. No. 9-9; Appel Decl. ¶¶ 23, 25, Dkt. No. 9-11; Chellman Decl. ¶ 20, Dkt. No. 9-18; Stringer Decl. ¶ 24, Dkt. No. 9-23. And even if the ACTS survey sought some data elements collected in existing surveys, requiring resubmission of data is prohibited under the PRA, 44 U.S.C. § 3506(c)(3)(B) (barring Defendants from certifying an information collection "unnecessarily duplicative of information otherwise reasonably accessible to the agency"), and Defendants fail to explain why they need data they already collected, particularly where Defendants themselves estimate that the ACTS survey imposes a burden of 200 hours, or "25 full work-days" (a manifest understatement, *see*,

5

*e.g.*, Reeves Decl. ¶ 16, Dkt. No. 9-9) in what was initially just a three-month period for response. Defs. Opp. 13-14, Dkt. No. 68.

Defendants also assert that the request for retroactive data does not unduly burden Plaintiffs because NCES "requires IHEs to report only data they have available and does not anticipate IHEs collecting new data in response to the ACTS component." *Id.* at 13. This assertion minimizes the tremendous burden IHEs experience in determining whether requested data—particularly data that may be years old—is even available. And if the data is available, they then must ensure the data is in the correct form for submission, which may require retrieving and reformatting information from multiple systems across multiple campuses or institutions. To perform these tasks, universities must work with third-party organizations that housed their data, Fuerst Decl. ¶¶ 23, Dkt. No. 9-8, and access outdated systems and platforms which were never designed for this purpose, Reeves Decl. ¶ 25, Dkt. No. 9-9; Deess Decl. ¶ 25, Dkt. No. 9-16; Foster Decl. ¶ 22, Dkt. No. 9-19.

During the hearing, when asked about Defendants' certification that the Department "has planned and allocated resources for the efficient and effective management and use of the information to be collected," 44 U.S.C. § 3506(c)(3)(H), counsel for Defendants was unaware of the current staffing of NCES and IES. Recent evidence suggests there may be fewer than three employees who remain. Pls. Memo., Doc. No. 7 at 17; John Doe Decl. ¶ 15, Dkt. No. 9-27; Jane Doe Decl. ¶ 15, Dkt. No. 9-28. To the extent Defendants contract for these services, Defendants likely have hamstrung those contracts as well. *See* Jill Barshay, *Inaccurate, Impossible: Experts Knock New Trump Plan to Collect College Admissions Data*, Hechinger Report (Aug. 18, 2025), https://perma.cc/KHT9-JPDN (reporting that lead IPEDS contractor's $10 million contract to manage IPEDS was cut approximately in half, and another IPEDS contract to check data quality

was also reduced); Contract Award 91990022F0021, Sam.Gov (Jun. 18, 2025) (attached as Ex. A to the Second Declaration of Michelle Pascucci) (approximately $5 million reduction in IPEDS contract value due to "de-scope").

Lastly, the Department's justifications submitted in support of its certification confirm that Defendants lack the "planned and allocated resources for the efficient and effective management and use of the" data sought. 44 U.S.C. § 3506(c)(3)(H). Defendants' supporting statement acknowledges that "[a] final determination about the methods of release of the new ACTS component have [*sic*] not been made"; that availability of the ACTS data will "vary" from the remaining data sought through IPEDS; and that there will be a "lag[]" to provide time for quality assurance review of ACTS data and the "design . . . of reports, tables, and other ACTS data products"— in other words, NCES will figure everything out later. Doc. No. 69-15 at 37. But "figure it out later" is not a plan, and the actual implementation of the ACTS survey undermines any claim that proper resources were allocated to this task. Chellman Decl. ¶ 20; Dkt. No. 9-18 (observing difficulty of receiving assistance from Defendants given that "NCES staffing and IPEDS training support have been significantly reduced"). Defendants' complete lack of preparation undermines any claim that the requested data is necessary or usable and stands in stark contrast to the thousands of hours required of IHEs to submit the data.

### C. Plaintiffs Will Continue to Suffer Irreparable Harm from the ACTS Survey Absent Further Court Relief

Defendants argue that administrative burdens do not constitute irreparable harm. Doc. No. 68 at 10-11. Yet time and again, such administrative harms have provided cause for preliminary relief. *See Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025) (court did not abuse discretion when it determined states would face irreparable harm stemming from overhauling verification systems

7

required by new federal policy); *New York v. DOJ*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025) (compliance costs for states to implement a new immigration status screening system constitute irreparable injury).

The hours spent on the ACTS survey are more than a matter of money: absent court relief, they require IHEs to restructure their data collection systems and divert resources from essential operations, such as financial aid decisions and hiring. *See*, *e.g.*, Jensen Decl. ¶ 24, Dkt. No. No. 9-5; Appel Decl. ¶ 27, Dkt. No. 9-11; Barton Decl. ¶¶ 23-24, Dkt. No. 9-12. Moreover, the funds expended as a result of these lost hours, *see, e.g.*, Reeves Decl. ¶ 26, Dkt. No. 9-9, constitute irreparable harm, as Plaintiffs can never recover those substantial costs. *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) ("Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists."); *cf. Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 58 (1st Cir. 2007) (APA waives sovereign immunity for only equitable actions that do not seek monetary relief). Defendants argue that some IHEs have managed to complete the survey, but IHEs vary significantly. For some IHEs, the required data may be so voluminous as to make compliance impracticable. By contrast, smaller IHEs or those with limited technical staff may lack the resources to comply. *See, e.g.*, Brown Decl. ¶¶ 3, 11-12, Dkt. No. 9-3; Barton Decl. ¶ 24, Dkt. No. 9-12.

And the fact that some IHEs submitted data cannot erase the irreparable harm that will continue to accrue without continued Court relief. Even absent the substantial harm arising from the time and cost of the ACTS survey, "the threat of enforcement and the uncertainty that stems from that threat is likely sufficient" to constitute irreparable harm, *New York*, 804 F. Supp. 3d at 331. Such harm is particularly acute because Defendants have announced their intent to use this data to penalize Plaintiffs. *See* Memo. from Pres. Trump to Sec'y. McMahon, *Ensuring Transparency in*

*Higher Education Admissions* (Aug. 7, 2025), https://perma.cc/ZEG5-SB53 (directing the Secretary to "take remedial action, consistent with Title IV of the Higher Education Act of 1965 and other applicable laws, if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data").

Respectfully submitted,

Dated: March 30, 2026

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
By: /s/ *Michelle R. Pascucci*
Michelle R. Pascucci
  *State Trial Counsel*
Laila M. Ameri
Jared B. Cohen
Carol Guerrero
  *Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
michelle.pascucci@mass.gov
laila.ameri@mass.gov
jared.b.cohen@mass.gov
carol.guerrero@mass.gov

*Counsel for the Commonwealth of Massa-chusetts*

ANTHONY G. BROWN
  *Attorney General for the State of Maryland*
By: /s/ *Virginia A. Williamson*
Virginia A. Williamson
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
vwilliamson@oag.maryland.gov

*Counsel for the State of Maryland*

ROB BONTA
  *Attorney General for the State of Califor-nia*
By: /s/ Delbert Tran
Delbert Tran
  *Deputy Attorney General*
Michael L. Newman
  *Senior Assistant Attorney General*
Virginia Corrigan
*Supervising Deputy Attorney General*
Brandy Doyle
Nicholas Keats
Kenneth Sugarman
  *Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
(415) 510-3563
Michael.Newman@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Brandy.Doyle@doj.ca.gov
Nicholas.Keats@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov
Delbert.Tran@doj.ca.gov

*Counsel for the State of California*

JENNIFER DAVENPORT
  *Attorney General of New Jersey*
By: /s/ *Nancy M. Trasande*
Nancy M. Trasande
  *Civil Rights Section Chief*
Jonathan B. Mangel
  *Deputy Attorney General*
Jillian Lewis Ollwerther
  *Deputy Attorney General*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 696-5365
Nancy.Trasande@law.njoag.gov
Jonathan.Mangel@law.njoag.gov
Jillian.Ollwerther@law.njoag.gov

*Counsel for the State of New Jersey*

10

AARON D. FORD
   *Attorney General*
By: /s/ K. Brunetti Ireland
K. Brunetti Ireland
   *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*


PHILIP J. WEISER
   *Attorney General of Colorado*
By: /s/ *Nora Passamaneck*
Nora Passamaneck
   *Senior Assistant Attorney General*
Sarah H. Weiss
   *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
nora.passamaneck@coag.gov
sarah.weiss@coag.gov

*Counsel for the State of Colorado*




WILLIAM TONG
   *Attorney General of Connecticut*
By: /s/ *Mary Lenehan*
Mary Lenehan
   *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Mary.Lenehan@ct.gov

*Attorney for the State of Connecticut*

LETITIA JAMES
   *Attorney General of New York*
By: /s/ *Jessica Ranucci*
Jessica Ranucci
   *Special Counsel*
Rabia Muqaddam
   *Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov

*Counsel for the State of New York*


DAN RAYFIELD
   *Attorney General of Oregon*
By: /s/ *Leanne E. Hartmann*
Leanne E. Hartmann
   *Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*




PETER F. NERONHA
   *Attorney General of Rhode Island*
By: /s/ *Chandana Pandurangi*
Chandana Pandurangi
   *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

11

KATHLEEN JENNINGS
  *Attorney General of the State of Delaware*
By: /s/ *Ian R. Liston*
Ian R. Liston
  *Director of Impact Litigation*
Rose E. Gibson
Vanessa L. Kassab
  *Deputy Attorneys General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

ANNE E. LOPEZ
  *Attorney General for the State of Hawai'i*
By: /s/ *Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes
  *Solicitor General*
David D. Day
  *Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

CHARITY R. CLARK
  *Attorney General of Vermont*
By: /s/ *Ryan P. Kane*
Ryan P. Kane
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

JAY JONES
  *Attorney General of Virginia*
By: /s/ *Tillman J. Breckenridge*
Tillman J. Breckenridge
  *Solicitor General*
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

12

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
By: /s/ *Aleeza Strubel*
*Aleeza Strubel
  *Complex Litigation Counsel*
*Elizabeth H. Jordan
  *Social Equity Counsel*
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Aleeza.Strubel@ilag.gov
Elizabeth.Jordan@ilag.gov

*Counsel for the State of Illinois*

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*

By: /s/ *Molly Powell*
Molly Powell
Mina Shahin
  *Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
molly.powell@atg.wa.gov
mina.shahin@atg.wa.gov

*Counsel for the State of Washington*

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
By: /s/ *Faye B. Hipsman*
Faye B. Hipsman
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

13

## CERTIFICATE OF SERVICE

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/ Michelle Pascucci*

14