# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON, and STATE OF WISCONSIN,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br><br>*Defendants*. | Case No.1:26-cv-11229 |

## DEFENDANTS' SUPPLEMENTAL BRIEFING IN OPPOSITION TO

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

I.    THE DEPARTMENT'S CERTIFICATION PURSUANT TO 44 U.S.C § 3506(c)(3)(H) AND 5 C.F.R. § 1320(9)(h) IS JUSTIFIED. ............................................. 1

II.    LARGE IHES HAVE COMPLETED THE ACTS COMPONENT. ................................... 5

III.    THE ACTS COMPONENT DOES NOT VIOLATE 5 C.F.R. § 1320.5(D)(2)(iv) ............ 8

IV.    THE BALANCE OF EQUITIES MILITATES AGAINST A PRELIMINARY INJUNCTION ................................................................................................... 10

CONCLUSION ................................................................................................... 12

## TABLE OF AUTHORITIES

**CASES**

*Doe v. Trs. of Bos. Coll.*,
  942 F.3d 527 (1st Cir. 2019) ............................................................................................ 10

*Kosilek v. Misi*,
  630 F. Supp. 3d 328 (D. Mass. Sept. 26, 2022) ............................................................... 9

*Maryland v. King*,
  567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ....................................................... 11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................................... 12

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................................ 10

*OfficeMax, Inc. v. Levesque*,
  658 F.3d 94 (1st Cir. 2011) ............................................................................................. 10

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ............................................................................................ 8

**STATUTES**

44 U.S.C. § 3506 ............................................................................................................... 1, 5

**REGULATIONS**

5 C.F.R. § 1320.5 ......................................................................................................... 8, 9, 10

5 C.F.R. § 1320.9 ................................................................................................................. 1

Defendants the Department of Education (Department), Secretary of Education Linda McMahon, the Office of Management and Budget (OMB) and Director of OMB Russell Vought submit this supplemental brief in response to the Court's March 24, 2026, order permitting supplemental briefing.  Defendants write to clarify two factual issues, to address a point of law raised by Plaintiffs for the first time at the hearing held on March 24, 2026, and to explain why the balance of equities militates against granting a preliminary injunction.

## I. THE DEPARTMENT'S CERTIFICATION PURSUANT TO 44 U.S.C. § 3506(c)(3)(H) AND 5 C.F.R. § 1320.9(h) IS JUSTIFIED.

During the hearing, the Court raised questions about the Department's certification pursuant to 44 U.S.C. § 3506(c)(3)(H) and 5 C.F.R. § 1320.9(h), which require the Department to certify to OMB that the Admissions and Consumer Transparency Supplement (ACTS) component of the Integrated Postsecondary Education Data System (IPEDS) "[h]as been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public." Specifically, the Court questioned how recent reductions-in-force affect the Department's ability to certify that it has "planned and allocated resources."

As the Department explained to OMB in its certification and the supporting materials it provided alongside that certification, the Department has planned and allocated resources for the efficient and effective management and use of the information to be collected in the ACTS component.  In its supporting documents, the Department explained that contractors handle "all activities related to program support; data collection system maintenance; help desk support activities; programming and software modifications and documentation; training of contractor staff, institutional respondents, and data users; data collection, data review, and analysis; survey

1

administration; imputations; file preparation, reporting, and data dissemination; TRP meetings; and other related activities." Ex. A at 21-22. In preparation for the ACTS component, the Department has bolstered its long-standing contract with RTI International, including by adding funds to support the IPEDS Help Desk, which supports Institutions of Higher Education (IHEs) during the ACTS submissions process. Ex. B ¶¶ 4-6, 8. As the Department explained in supporting information submitted to OMB, the "total annual cost" for the IPEDS collection of 2025-2026 "will be approximately $11.3 million with the inclusion of the ACTS beginning in 2025-26." Ex. C at 36. "More than 95 percent of this amount will be spent in direct support of the collection, analysis, and reporting of the IPEDS data . . . ." *Id.* "The contract amount includes all activities related to program support; data collection system maintenance; help desk support activities; programming and software modifications and documentation; training of contractor staff; data collection, data review, and analysis; survey administration; imputations; file preparation, reporting, and data dissemination; and other related activities." *Id.*

The Department further explained that it uses technological tools "for the efficient and effective management and use of the information to be collected." The Department noted that it uses a "fully automated web-based data collection;" uses a system "designed to migrate reported/edited data to an SQL server as soon as the administrative functions have been performed and [the National Center for Education Sciences (NCES)] has cleared the data" to provide IHEs prompt access to data from other IHEs; enables IHEs to submit de-identified "student-level data, on which code will be run to produce the aggregated and calculated values" to reduce time needed for data gathering and production; enables IHEs "to run Python code locally to product aggregated tables," easing the burden of data production; and other technological improvements. Ex. C at

2

21-22 (emphasis omitted).  This redesigned system "improve[s] the timeliness and quality of IPEDS data by increasing the efficiency of data collection." *Id.* at 15.

In responses to comments received on the November Notice, the Department explained that:

> NCES and its IPEDS contractor have confidence in their joint capacity to collect, validate, and report the ACTS data.  The Fall 2025-26 IPEDS collection cycle was conducted successfully in late 2025. NCES anticipates the Winter 2025-26 collection will be similarly successful.

> NCES anticipates that the inaugural publication and release of the ACTS data will proceed on a timeline that lags that of other Winter components.  This lag will provide ample time for (1) thorough quality assurance and disclosure risk reviews and (2) the design, review, and publication of reports, tables, and other ACTS data products.

> Some commenters expressed concern that sufficient technical assistance will not be available to support institutions as they complete ACTS.  The IPEDS Helpdesk is available and prepared to respond to inquiries from institutions in all phases of the collection.

Ex. D at 24.

*Amici* claim that only 3 of over a hundred NCES employees remain at the agency.  Br. of Ass'n of Am. Univs., Am. Council on Educ., Ass'n of Am. Med. Colls., & other Higher Educ. Ass'ns as *Amici Curiae* in Supp. of Pls.' Mot. for a TRO at 9, ECF No. 73.  That statement is misleading.  NCES has long heavily relied on contractors to support IPEDS data collection and processing efforts.  Ex. B ¶ 4.  A handful of employees in NCES manage the contractors—but the contractors themselves do all of the data collection and processing.  *Id.* ¶¶ 5-7.

In February of 2025, before initiation of any of the 2025 reductions-in-force, there were eight employees in NCES that worked on IPEDS.  *Id.* ¶ 2.  The vast majority of the work of IPEDS was, and still is, done by contractors.  *Id.* ¶¶ 4-7.  As of today, there are thirteen employees at NCES—twelve full time employees and one detailee.  *Id.* ¶ 2.  The reduction in force has not

affected the agency's ability to manage its contractors or the ACTS data that it is receiving. *Id.* ¶ 7. For the ACTS component, NCES has bolstered its contract with its contractor, RTI International, to account for any additional work required for the data collection. *Id.* ¶ 8.

Nor have reductions-in-force affected the Departments ability to perform the fulsome privacy review it outlined in its submissions in support of OMB certification. *Id.* ¶¶ 12-15. NCES's contractor, RTI, will first analyze the privacy risks associated with the generation and potential release of data files arising from the ACTS collections. *Id.* at 13. RTI will then prepare a Disclosure Avoidance Plan outlining steps to be taken to minimize the risk that any data files that NCES might choose to release, either publicly or to qualified researchers under NCES's Restricted Use Data Licensing Program, could be used to identify individual students. *Id.* RTI's plan will be reviewed by the Institute of Education Science's Disclosure Review Board. *Id.* Once approved, RTI will implement the Disclosure Avoidance Plan and submit a record of their activities to the Disclosure Review Board for review. *Id.* The Disclosure Review Board will make the final determination about whether the plan has been faithfully executed and the resulting data are "Safe to Release." *Id.*

Moreover, the Department has recently released a document outlining its strategy for "Reimagining the Institute of Education Sciences" (Strategy Plan). The document explains the importance of IPEDS, both to the Department and the public, and outlines the Department's plans to maintain and improve IPEDS while making certain processes more efficient and effective. Ex. E. In its Strategy Plan, the Department explains that "[i]t is imperative that IES continue to collect national statistics (such as IPEDS . . .), as they serve the public good[.]" *Id*. at 2-3. "Virtually everyone agrees that IES has an imperative, via NCES, to continue to collect critical information about schools, students, teachers, and education programs from early childhood

4

through post-secondary education, adult education, and the workforce." *Id*. at 15. But "other parts of NCES, and much of the work of IES's other three Centers . . . are long overdue for transformation." *Id*. at 3. To achieve this transformation, IES describes a "Big Shift" in which it will, among other modernization efforts, "[e]xpand its use of strategies to accelerate the release of data, such as increasing the use of automated data verification and quality assurance activities." *Id*. at 7; *see also id*. at 25-26. It also recommends NCES "[i]ncrease the speed at which data are collected, vetted, and shared" to benefit the public and, in particular, the "higher education accreditation community," which "would appreciate an expanded release of provisional data to improve timely oversight of IHEs." *Id*. at 26 n.30. The Strategy Plan also notes that "research organizations outside of NCES are sometimes able to gather, analyze, and present data more quickly or efficiently than NCES," and directs NCES to "consider collaborating with these external efforts rather than duplicating them, which could be done at much lower costs." *Id*. at 7. The Strategy Plan shows that IES intends to improve the operations of NCES, showing that not only was the ACTS component "developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public" as certified by the Department, but that IES has long-term plans for the success of IPEDS and the ACTS component.

## II.   LARGE IHES HAVE COMPLETED THE ACTS COMPONENT.

During the March 24, 2026, hearing, the Court questioned whether large universities had successfully completed the ACTS component. Specifically, the Court expressed concern that the burden borne by large IHEs may be prohibitive.

As the Department noted repeatedly in its responses to comments, and throughout the information submitted to OMB in support of the Department's certification that the ACTS

component "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities," 44 U.S.C. § 3506(c)(3)(C), the Department has taken several steps to reduce burden, many of them technological. For example:

> Institutions can enter data manually on a web-based form or upload a file containing the data. In many instances, prior-year data are provided for comparison purposes. The data are edited as they are entered into the system, and respondents must either correct any errors identified or enter an explanation to submit their response to NCES. This process shortens data processing time, increases data quality, and reduces burden on institutions by precluding the need for repeated callbacks from NCES contractors.

Ex. C at 10.

> The IPEDS web-based data collection uses advanced technology to reduce respondent burden and to improve the timeliness and quality of the reported data. NCES has taken several actions to facilitate the cooperation of postsecondary institutions responding to IPEDS.

*Id*. at 21.

> For ACTS only, enabling institutions to transmit student-level data, on which code will be run to produce the aggregated and calculated values. This option is designed to reduce burden on institutions by not requiring them to perform the aggregations and calculations themselves. This will reduce the time needed for institutions to gather the data. For ACTS only, enabling institutions to run Python code locally to produce aggregated tables. This option is designed to reduce burden on institutions by not requiring them to perform the aggregations and calculations themselves and provide an option for those institutions who do not want to submit student-level data over the internet.

*Id*. at 22 (emphasis omitted).

The ACTS component also minimizes the burden on IHEs by leveraging relevant data elements and data definitions already used elsewhere in IPEDS. Ex. B ¶ 9. For example, other IPEDS components see data on total applicants and enrollees, disaggregated by sex; data on the number of undergraduate students receiving grant aid; the subset of first-time, full-time students receiving grant aid; the 25th, 50th, and 75th percentiles of SAT (separately for reading and math and

6

ACT (composite, and then separately for English and math); and the number of students in specific income bands along with the average amount of their aid awards.  *Id.*  The ACTS component seeks similar data, typically known to the IHE, to be further disaggregated.  *Id.*  The Department limited the burden of the ACTS component by avoiding disaggregation by wholly new or unfamiliar variables.  *Id.*

> In responses to comments received on the November Notice, the Department stated:

> First, whenever appropriate, NCES has used variables and/or variable definitions that are used elsewhere within the IPEDS collection. This reduces the complexity of complying with a wholly new requirement.

> Second, NCES is introducing an innovation in IPEDS collection through the use of a new two-step process. In the first step, institutions prepare a student-level file aligned to predefined submission templates. In the second, institutions import the file into the IPEDS Aggregation Tool (or perform the aggregation locally) and then upload the resulting file to the IPEDS Collection System. This removes burden associated with local calculations or manual entry.

> As always, the IPEDS HelpDesk remains available to assist institutions who experience difficulties submitting their ACTS data.

Ex. D at 3-4.

> Additionally, in responses to comments received on both rounds of notice and comment, the Department explained that:

> Based upon [estimates received in comments] and NCES's proposed collection methodology, we anticipate burden not to exceed 200 hours per institution in the component's first year. This includes up to 40 hours to gather required institutional data, 144 hours for data processing, and 16 hours for data uploading and verification. In subsequent years, NCES anticipates burden not to exceed 40 hours.

Ex. F at 7; Ex. D at 21.  This estimate is the maximum time required, including for large universities.  Smaller schools may take less time.[1]

---

[1] NCES originally intended the ACTS component to follow the collection cycle of the IPEDS winter collection.  Based on comments and feedback received by the Department regarding the burden of the ACTS component, the Department decided to separate the ACTS component from

That the burden is reasonable has been borne out by the fact that many IHEs have completed the ACTS component. After this Court extended its temporary restraining order as to Plaintiffs' public IHEs to April 6, and allowed its temporary restraining order for other IHEs to expire on March 25, the Department extended the time to respond for all IHEs to March 31, in order to give IHEs ample opportunity to respond in light of the shifting deadlines caused by this litigation. Ex. B ¶ 11. As of March 30, 2026, 890 IHEs have completely responded to the ACTS component and 991 IHEs have submitted at least three years of data and are eligible for a further extension to April 8. *Id.* ¶ 17. These IHEs include many universities larger than Plaintiffs' public universities. For example, University of Phoenix-Arizona, University of Maryland Global Campus, Arizona State University Digital Immersion, American Public University System, Liberty University, Arizona State University Campus Immersion, University of Central Florida, Texas A&M University – College Station, Floria International University, University of Arizona, Ohio State University – Main Campus, Purdue University, The University of Texas at Austin, and University of Minnesota – Twin Cities—all of which have more than 50,000 students, and some having more than 100,000 or even 150,000 students—have submitted data for all years requested by the inaugural ACTS component data collection. *Id.* at 18. In contrast, the University of Wisconsin and the University of California systems, two public IHEs in Plaintiff states, have failed to even log in to the submissions portal to complete the screening questions used to determine if IHEs are required to complete the ACTS component. *Id.* ¶ 19. These IHEs should not be heard to complain about the purported difficulty of complying when, in the three months since the survey opened, they have made no efforts to comply.

---

the winter survey and extend the deadline to March 18, 2026, instead of requiring the winter survey's February 4, 2026, deadline.

### III. THE ACTS COMPONENT DOES NOT VIOLATE 5 C.F.R. § 1320.5(D)(2)(iv).

At the March 24 hearing, for the first time, Plaintiffs asserted that the ACTS component violates 5 C.F.R. § 1320.5(d)(2)(iv). As a preliminary matter, this claim was not raised in the Complaint, and thus this Court does not have the authority to issue a preliminary injunction based on this new claim. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."); *see also Kosilek v. Misi*, 630 F. Supp. 3d 328, 334 (D. Mass. Sept. 26, 2022) ("A party who moves for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." (quotation omitted)).

Even if this argument were timely raised, it is not accurate.

5 C.F.R. § 1320.5(d)(2)(iv) states:

Unless the agency is able to demonstrate, in its submission for OMB clearance, that such characteristic of the collection of information is necessary to satisfy statutory requirements or other substantial need, OMB will not approve a collection of information—
. . .
(iv) Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records, for more than three years;

The ACTS component does not violate 5 C.F.R. § 1320.5(d)(2)(iv) for two reasons.

First, the ACTS component does not require IHEs to retain records for more than three years—it merely asks IHEs to report data that they currently possess from the current academic year and five previous academic years. The supporting information the Department submitted to OMB is replete with explanations that IHEs need only provide the data in their possession and do not have to modify their data retention policies to retain additional data:

- "As noted in the collection materials accompanying the ACTS, NCES requires institutions report only those ACTS data they have available," Ex. D at 9; *see also id.* at 17;

9

- "Some institutions may have records retention policies such that some ACTS data elements have already been destroyed. NCES requires institutions report only those ACTS data they have available," *id*. at 18.

Second, the Department demonstrated in its submission for OMB clearance that a 5-year lookback period was necessary to satisfy a substantial need for the requested information. Specifically, in its response to comments about the lookback period, the Department explained:

- "NCES proposed lookback period is designed to collect time-series data that are amenable to a wide range of analytic techniques. We are particularly mindful that trend analyses depend upon multiple years of data to credibly distinguish underlying secular trends from other potential causes," Ex. D at 9; and
- "NCES recognizes the challenges of reporting prior-year data due to varying records retention policies governing different types of data, institutional decisions about information architecture, and changes in data and data systems over time. NCES acknowledges that, as a result, the accessibility of some data may be limited. Nonetheless, the ACTS data are considered critical and necessary to provide insight into policy-relevant questions raised by the Presidential Memorandum and Secretarial Directive. Institutions that experience challenges providing data required by the ACTS component should notify the IPEDS Help Desk as early as practicable in the submission window to receive additional guidance," Ex. G at 20.

For either of these reasons or because Plaintiffs failed to raise this argument in their complaint or briefing, Defendants respectfully ask this Court to reject Plaintiffs' belated claim that the ACTS component violates 5 C.F.R. § 1320.5(d)(2)(iv).

## IV. THE BALANCE OF EQUITIES MILITATES AGAINST A PRELIMINARY INJUNCTION.

Because Plaintiffs have not demonstrated a likelihood of success on the merits or irreparable harm, this Court need not consider the remaining two preliminary injunction factors, *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019); *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 100 (1st Cir. 2011), which merge in cases involving the federal government, *Nken v. Holder*, 556 U.S. 418, 435 (2009). In any event, Plaintiffs likewise failed to establish that the balance of harms and public interest weigh in favor of a preliminary injunction.

The Department has authority to collect the data requested in the ACTS component and followed all procedures required by law in adopting the ACTS component, including providing

10

two public comment opportunities, responding fulsomely to those comments, and certifying its collection as required by the Paperwork Reduction Act.  Thus, it would intrude on the Department's authority, clearly given by Congress, to enter an injunction.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (The government "suffers a form of irreparable injury" when it "is enjoined by a court from effectuating [a] statute[] enacted by representatives of its people.").

These factors further weigh against a preliminary injunction because delays in the Department's collection of ACTS component data will necessarily delay the release of the results of the statistical analysis based on that data to the public.  If the Department is able to complete its data collection efforts by April 8 at the latest, it anticipates being able to provide at least some preliminary analysis based on that data by the summer of 2026, in time for that data to be useful to college applicants.  Ex. B ¶ 16.  Most college applicants submit their applications to IHEs from November to January.  If data collection is delayed, the public release of admissions statistics will also be delayed, and an entire year of college applicants will be denied fulsome information on their chances of securing a coveted spot at their dream schools based on their race, sex, and other characteristics.  These students may spend money on college application fees for schools to which they otherwise might not apply because the data shows that they have no realistic chance of admission.  The goal of the ACTS component is transparency.  And delaying that transparency until it is no longer useful for an entire year of college applicants would not serve the public interest.

Delays also increase the risk that data may not be available for collection at all.  As explained *supra* at pages 9-10, the ACTS component does not require IHEs to retain information from more than three years ago.  IHEs may destroy records currently in their possession during

the period of any injunction such that, if the injunction is reversed, less data is ultimately available. To mitigate the risk of loss of data, if this Court enters an injunction, Defendants ask that it require Plaintiffs to retain any records currently in their possession.

## V.    CONCLUSION

Plaintiffs' complaints about the ACTS component boil down to two issues.  First, they do not agree with the policy underlying the ACTS component, which would increase transparency into IHEs' admissions, because such transparency may reveal civil rights issues and thus be used to enforce the civil rights laws.  But the Department has clear statutory authority to implement the ACTS component, and mere disagreements about policy are not properly brought under the Administrative Procedures Act.  *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").  Second, Plaintiffs complain about an allegedly rushed process.  But the Department followed the timeline established in the Paperwork Reduction Act, and Plaintiffs do not claim any other statutory or regulatory timing requirement applies.  Thus, if Plaintiffs have concerns about the timeline of the creation of the ACTS component, their dispute is with Congress and its drafting of the statute, not with the Department, which has closely adhered to the law Congress enacted.

For the reasons provided in this supplemental brief and in Defendants' opposition brief, ECF No. 68, Defendants respectfully ask this Court to deny Plaintiffs' request for a preliminary injunction.

Dated:  March 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General


MICHELLE BENNETT
Assistant Director, Federal Programs Branch


*/s/ Brittany S. Bruns*
BRITTANY S. BRUNS (D.C. Bar 1658394)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L ST. N.W.
Washington, DC 20005
Tel:  (202) 531-1325
brittany.s.bruns@usdoj.gov
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing (NEF).

Dated:  March 30, 2026                           Respectfully submitted,


*/s/ Brittany S. Bruns*
BRITTANY S. BRUNS