**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS,
*et al.,*

     *Plaintiffs*,

  v.

U.S. DEPARTMENT OF EDUCATION,
*et al.,*

     *Defendants*.

Case No. 1:26-cv-11229-FDS

**MEMORANDUM IN SUPPORT OF CONNECTICUT CONFERENCE OF INDEPENDENT COLLEGES, MAINE INDEPENDENT COLLEGES ASSOCIATION, NORTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, AND OREGON ALLIANCE OF INDEPENDENT COLLEGES AND UNIVERSITIES' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

The original deadline for institutions of higher education ("IHEs") to submit their responses to the Admissions and Consumer Transparency Supplement ("ACTS") survey was March 18, 2026. The Court initially granted a temporary restraining order ("TRO"), staying that deadline until March 25. On March 24, the Court narrowed its earlier TRO, such that going forward, it provides relief only to the Plaintiff States and their constituent IHEs. *See* ECF No. 75. Separately—and while this case was pending—the Department of Education (the "Department" or "ED") communicated to IHEs two extensions of the deadline, first to March 25, 2026, and then again to March 31, 2026. ED also communicated that IHEs could obtain a brief further extension— to April 8, 2026—if they submitted three years of ACTS data by March 31.

Members[1] of the Connecticut Conference of Independent Colleges ("CCIC"), Maine Independent Colleges Association ("MICA"), North Carolina Independent Colleges and Universities ("NCICU"), and Oregon Alliance of Independent Colleges and Universities ("OAICU," and collectively, the "Associations") took one of two approaches to the ACTS deadline: some submitted three years of the data called for by ACTS in order to secure the extension to April 8 for full submission, and some completed their submissions by the deadline. But notwithstanding these members' best efforts at compliance with the Department's requirements to date, they remain at urgent risk. The Associations therefore now seeks emergency relief on behalf of those members.

Each of the Associations is composed of degree-granting, accredited, independent colleges and universities across their respective state. Each works to support and advance its members' interests, including by increasing those members' organizational capacities, supporting members

---

[1] NCICU does not refer to its constituent institutions as "members," but the Associations use that umbrella term for the sake of convenience.

through research and analysis, and advocating on issues of public policy that impact members, among other things. The Associations' members have long participated in Integrated Postsecondary Education Data System ("IPEDS") data collections. For decades, those members have relied on the Department of Education's well-established, deliberative, and collaborative processes—including Technical Review Panels ("TRPs"), preview years, and transparent notice-and-comment procedures—to ensure that new IPEDS data collections are clearly defined, technically feasible, and implemented with sufficient lead time to produce reliable data.

ACTS upends those reliance interests, introducing sweeping substantive changes pursuant to a remarkably abbreviated process. Defendants gave IHEs a few short months to comply with a mass of new requirements, including—for the first time—retrospective data going back seven years. Like the Plaintiff States and other proposed intervenors to whom the Court has granted emergency relief, the Associations' members will suffer irreparable harm if forced to comply with the ACTS deadline of April 8, if their data is publicly disclosed, or if the Department is permitted to begin using the data that they have submitted. Because the Associations will suffer such harm, have standing, are likely to prevail on the merits, and the balance of the equities tips in their favor, this Court should grant a temporary restraining order.

## STATEMENT OF FACTS

Given the Court's familiarity with the facts, the Associations provide only a brief overview. For a full recitation of the facts, the Associations respectfully direct the Court to its Proposed Complaint (filed simultaneously with this motion) and the Plaintiff States' motion for emergency relief, ECF No. 7.

In brief, the new ACTS survey rolled out by the Department of Education imposes unprecedented data collection requirements on IHEs, including the Associations' members. ACTS

requires a staggering amount of data and, for the first time ever, retrospective data stretching back seven years.

Historically, major changes to IPEDS involved careful vetting through TRPs— multistakeholder panels that review proposed changes to ensure feasibility, clarity, and consistency—followed by "preview" or optional years that allow institutions to prepare. *See* Plaintiff States' Complaint ¶¶ 91-98, ECF No. 1 (hereinafter "Pl. States' Compl."); Mem. in Supp. of Pl. States' Mot. for a Temp. Restraining Order at 2-4, ECF No. 7 (hereinafter "Pl. States' Mem."). For example, when the National Center for Education Statistics ("NCES"), introduced the Outcomes Measure Component—the last major new survey component added to IPEDS—the process spanned years. The Department's Advisory Committee submitted its final report in December 2011; three TRPs convened between 2012 and 2014; and the component was first administered in 2015-16. *See* Elise Miller McNeely, *The History & Origins of Survey Items for the Integrated Postsecondary Education Data System*, Inst. of Educ. Sci. at OM-1 (Apr. 2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf (hereinafter "History and Origins of IPEDS Survey Items"). Even smaller changes have involved years of deliberation, testing, and refinement before the Department makes them mandatory. *See* Pl. States' Mem. at 3-4.

None of that happened here. The Department announced the ACTS survey on August 15, 2025, opened the collection on December 18, 2025, and initially required submissions by March 18, 2026—giving institutions approximately three months to comply with the most extensive new data collection in IPEDS's history. And in yet another departure from past practice, the actual survey instrument was not even available during the initial sixty-day comment period, depriving stakeholders of the ability to evaluate the specific data elements and submission

3

procedures they would very soon be required to abide by. *See* Pl. States' Compl. ¶¶ 47, 104; 5 C.F.R. § 1320.8(d)(2).

Complicating matters further, ED kept moving the goalposts. On January 26, 2026, ED updated templates that institutions use to compile and submit their data, including new definitions, changing variables for reporting income, and removing some data fields.  *See* Pl. States' Compl. ¶ 108. The templates were updated again on February 17, 2026, less than 30 days before the submission deadline. *Id.* Institutions that had already begun compiling data had to assess whether their work remained valid—a particularly burdensome task given the volume of data at issue. *See id.*

Finally, IHEs are navigating this process with less support than usual: historically, ED has provided feedback on IPEDS submissions to help institutions correct errors and ensure data quality. *See* AAU Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382-3464 (U.S. Dep't Educ. Dec. 15, 2025) (hereinafter, "AAU Dec. Comments"). But ED has drastically reduced staff at NCES and the Institute for Education Sciences ("IES"), the very offices tasked with administering IPEDS.

In recognition of these challenges, a group of states sued the Department. Pl. States' Compl., ECF No. 1. The Court granted an emergency temporary restraining order on March 13, extending the ACTS submission deadline to March 25, 2026. ECF No. 12. At the hearing on March 24, the Court extended the submission deadline again for Plaintiff States IHEs only. *See* ECF No. 75. Two other associations of IHEs then sought leave to intervene and file their own temporary restraining orders; the Court provisionally allowed those associations to intervene and granted them temporary relief on March 31. All other IHEs—that is, IHEs that are neither Plaintiff States' IHEs nor members of one of those two associations—were therefore still required to either submit

their full ACTS survey data by March 31 or submit three years of data by March 31 to obtain a short extension to April 8 for full compliance. The Associations' members have thus submitted some data, though many still have to submit four additional years of data by the April 8 deadline. This emergency motion followed.

## LEGAL STANDARD

The burden of proof for a temporary restraining order is the same as that for a preliminary injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The moving parties must show that the weight of the following factors favors granting preliminary relief: "[1] likelihood of success on the merits; [2] potential for irreparable injury, [3] balance of the relevant equities; and [4] effect on the public interest if the Court grants or denies the TRO." *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025) (citing *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981)). When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

### I.    Each of the Associations Has Standing.

The Associations have standing to bring this suit on behalf of their college and university members. An association has standing to bring suit on behalf of its individual members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Actions for declaratory, injunctive and other forms of prospective relief"—as the Associations seek here—are "particularly suited to group

representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).

First, the Associations' members have standing to sue individually. *See Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023). Each Association's member colleges and universities face immediate and severe consequences associated with their submission of the ACTS survey, *see* Declaration of Jennifer Widness, President of CCIC ¶¶ 7-24 (hereinafter "CCIC Decl."); Declaration of Dan Walker, Legal Counsel to MICA ¶¶ 7-23 (hereinafter "MICA Decl."); Declaration of Hope Williams, President for NCICU ¶¶ 7-26 (hereinafter "NCICU Decl."); Declaration of Brent Wilder, President of OAICU ¶¶ 7-24 (hereinafter "OAICU Decl."), all of which could be averted if this Court were to stay or enjoin the Department of Education's action. The declarations accompanying this motion detail the injuries to the Associations' member schools, including substantial potential fines, violations of student privacy that schools are obligated to protect, and data-quality issues that create a risk of enforcement based on incomplete or inaccurate data. *See* CCIC Decl. ¶¶ 20-24; MICA Decl. ¶¶ 20-23; NCICU ¶¶ 22-26; OAICU ¶¶ 20-24. These imminent injuries would be redressed by the relief requested: a stay under the APA and declaratory and injunctive relief preventing Defendants from enforcing the ACTS survey deadline against the Associations' members and from using any data already submitted at least until the court has had a chance to fully adjudicate the Associations' claims on the merits. *See Housatonic River Initiative*, 75 F.4th at 265.

Second, the interests at stake are "germane" to each of the Association's purposes. *See id.* at 264-66.

- CCIC's purpose is to improve, strengthen, and grow Connecticut private colleges and independent universities by coordinating member services and providing research for its members. CCIC Decl. ¶¶ 3-5.

6

- MICA's purpose is to help its diverse members serve the different educational needs of Maine's people. MICA Decl. ¶¶ 3-5.

- NCICU's purpose is to represent North Carolina independent higher education institutions in matters of state and federal public policy as well as to provide research and staff development opportunities and facilitate collaboration across NCICU institutions. NCICU Decl. ¶¶ 3-4.

- OAICU's purpose is to serve its member institutions by fostering collaboration across its members and helping increase their organizational capacity, as well as championing the transformative power of independent, nonprofit higher education. OAICU Decl. ¶¶ 3-4.

In other words, each Association's core mission is centered on supporting IHEs, and the ACTS survey detracts from IHEs' ability to carry out their educational mission by imposing unprecedented data collection requirements on them with remarkably little notice, creating severe practical burdens and associated resource diversions, unresolved privacy risks, and data quality concerns. CCIC Decl. ¶¶ 7-24; MICA Decl. ¶¶ 7-23; NCICU Decl. ¶¶ 7-26; OAICU Decl. ¶¶ 7-24.

Finally, the Associations' individual members are not required for the claims asserted or the relief requested. Vacating the ACTS survey and enjoining its implementation will offer the individual members complete relief. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986) (reasoning that this requirement is met where "the remedy, if granted, will inure to the benefit" of all members (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). As explained in the accompanying declarations, the burden of submitting additional data to comply with the current ACTS survey deadline will divert key resources from each Association's members' educational missions and institutions are at risk *right now* of fines or enforcement actions based on data already submitted. CCIC Decl. ¶¶ 10-23; MICA Decl. ¶¶ 10-22; NCICU ¶¶ 10-25; OAICU ¶¶ 10-23. An order extending the ACTS survey deadline and enjoining Defendants from using already-submitted data will avert those injuries.

## II.    The Associations Have a Strong Likelihood of Success on Their Claims.

Courts must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "without observance of procedure required by law," *id*. § 706(2)(D), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C).

ACTS has created a perfect storm for institutions of higher education: a data collection of unprecedented scope, implemented on a severely compressed timeline outside the established processes, demanding data that many institutions do not possess or possess only in a highly decentralized way—all under threat of severe consequences for noncompliance. Each of these elements would be burdensome on its own; together, they make abundantly clear that, just as is so as to the Plaintiff States and other proposed intervenors, the Associations are likely to succeed in showing that the ACTS survey must be set aside.

### A.  The ACTS Survey Must Be Set Aside as Arbitrary and Capricious.

ACTS runs afoul of the APA's prohibition on arbitrary and capricious agency action several times over. 5 U.S.C. § 706(2)(A). Under the APA, an agency must provide a reasoned basis for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). This standard requires, at minimum, a "rational connection between the facts found and the choice made." *Id*. at 43 (quotations omitted). And an agency cannot fail to consider "important aspect[s] of the problem" in setting forth its policy explanation. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, when an agency "changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (internal quotation

8

marks and citation omitted). As explained both below and in the Plaintiff States' motion for a TRO, Pl. States' Br. at 16-18, Defendants violated each of these tenets.

*First*, the extraordinary scope of the ACTS data collection creates an enormous new burden on institutions, which was compounded by the rushed implementation timeline and departure from established procedures. Defendants have failed to articulate a reasoned basis for this burden, and, more, they have failed to acknowledge—let alone to account for—reliance interests.

ACTS represents the single largest expansion of IPEDS in the survey's more-than-forty-year history, and the data IHEs must submit under ACTS is both granular and extensive. Despite this massive expansion, the Department has not provided a reasoned basis for its actions. AICUM[2] and other commenters raised detailed objections across at least eight distinct categories— including timeline, data quality, burden, guidance and definitions, privacy, data unavailability, decentralized admissions, and operational disruptions. *See* NCES, Integrated Postsecondary Education Data System (IPEDS) 2024-25 through 2026-27, Appendix E: *Response to Public Comments Received During the 60-day Comment Period and NCES Responses* at 4-22 (revised Oct. 2025) (hereinafter, "Response to Comments"); *see, e.g.*, NAICU Comments on IPEDS at 1-3, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025) (hereinafter "NAICU Comments") (raising concerns on behalf of more than 30 higher education associations, including each of the Associations here). Rather than address the substance of any of those concerns, the Department responded to nearly every category with the same boilerplate language—reciting, nearly verbatim, the Presidential Memorandum and Secretarial Directive that initiated ACTS. *See* Response to Comments at 4-22; *see also* Presidential Memorandum, *Ensuring Transparency*

---

[2] AICUM joined the National Association of Independent Colleges and Universities ("NAICU") and more than 30 other higher education associations in submitting a joint comment in response to the Department's proposed addition of the Admissions and Consumer Transparency Supplement ("ACTS") to IPEDS. *See* NAICU Comments on IPEDS, Docket ID at 3, ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025).

*in Higher Education Admissions* (Aug. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/ (hereinafter "Pres. Mem."). This approach—of simply repeating the same justification across eight substantively distinct categories of concern—is not the "reasoned explanation" that the APA demands. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 298-99 (D.C. Cir. 2001) ("The [agency]'s failure to respond *meaningfully*" to objections raised by a party "renders its decision … arbitrary and capricious." (emphasis added)). And the fact that the President directed the Department to act does not relieve the agency of its obligation to consider and respond to significant comments regarding *how* it acts. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016).

Before changing course, as here, agencies are also "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. Historically, changes to IPEDS took years, allowing the Department to do just that. *See* History and Origins of IPEDS Survey Items at OM-1. But for ACTS, no such consideration occurred. To the contrary, the Department's expedited timeline and deviations from longstanding procedure have forced institutions to scramble to hire additional staff or divert limited staff resources away from serving students. *See also* AAU Comments on IPEDS at 7-8, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 14, 2025) (hereinafter "AAU Oct. Comments"). Many IHEs explained this to the Department; but the Department declined to extend the submission deadline, asserting only that the timeline was "specified by the Presidential Memorandum and Secretarial Directive." Response to Comments at 13. This response is not the reasoned one the APA demands, let alone consideration of the reliance interests IHEs have developed over the course of decades.

10

*Second*, ACTS calls for data that may not exist or be practicable to submit, and will not reliably reflect admissions practices. The mismatch between the data sought and the data institutions have, as well as the inadequate responses provided when IHEs raised data-related issues, again demonstrate the arbitrary nature of the Defendants' actions.

The problems plaguing ACTS create a process that is unlikely to produce reliable data, revealing the lack of a rational connection between the Department's actions and stated goals. For data to be meaningfully compared across institutions and over time, a data collection system must use carefully defined terms and validated collection methodologies. But ACTS introduces numerous new elements with unclear definitions and inadequate guidance. That lack of clarity has consequences. In a September 2025 survey, 83% of survey respondents reported uncertainty about at least one ACTS term, and these problems have persisted: in a February 2026 survey, 74% of respondents reported encountering a moderate or major challenge in interpreting ACTS's definitions and guidance. *See* ACE Comments on IPEDS at 2, Docket ID ED-2025-SCC-0382 (U.S. Dep't Educ. Oct. 7, 2025) (hereinafter "ACE Oct. Comments"); D. Jones & C. Keller, *ACTS Progress and Barriers Survey Report* at 4, Ass'n for Institutional Rsch. (2026), https://www.airweb.org/ publication/acts-progress-and-barriers; *see also* NAICU Comments at 2-3. The Associations' members' experienced the Department's lack of clarity firsthand when compiling and submitting their data: members were forced to make key definitional decisions that ED failed to make, and to otherwise make assumptions at critical junctures as to what the Department required. *See e.g.*, CCIC Decl. ¶¶ 19, 21-23; MICA Decl. ¶¶ 18, 20-22; NCICU ¶¶ 18, 21-22; OAICU ¶¶ 16-18.

As the Associations and others emphasized in comment letters, fundamental questions remain unanswered:  How should institutions define "selective admissions" or "first-generation"

student status when there is no universally agreed-upon definition?  *See* NAICU Comments at 1. How should institutions handle the diverse formats in which secondary schools report grades and GPAs?  *See* AAU Dec. Comments at 2.  What should institutions report when students have opted not to disclose their race—a choice students are entitled to make?  *See id.*  These questions are not simply academic: Without clear and consistent definitions, different institutions will inevitably interpret terms differently, rendering cross-institutional comparisons unreliable and the resulting dataset misleading.

This problem is precisely the type that the TRP process is designed to prevent. TRPs have historically served to identify definitional ambiguities, test reporting instructions, and refine data elements before they are imposed on institutions.  *See, e.g.*, *Report and Suggestions from IPEDS Technical Review Panel #64*, Technical Review Panel at 2, 5 (2021), https://ipedstrp.rti.org/ (explaining that a TRP was formed "to engage the postsecondary community in a discussion about how IPEDS could change, refine, or adjust data elements, [or] definitions . . . to provide more meaningful and useful data related to admissions considerations, rates, and test scores").  The Department's decision to forgo that process—apparently driven solely by the unreasonable timeline set by the Presidential Memorandum, *see* Response to Comments at 17-18—has all but guaranteed that the resulting data will suffer from inconsistencies that undermine its utility.  And the Department's mid-course corrections have not solved the problem.  While the Department provided updated data templates on January 26, 2026, and again on February 17, 2026, these revisions—issued after institutions had already begun compiling data—only compounded the confusion.  *See* Pl. States' Compl. ¶ 108.

Further, much of the data ACTS calls for is simply not collected by many institutions and may be unavailable, particularly on a retrospective basis. The scale of potential data gaps is

extensive. In a September 2025 survey, respondents identified the following data fields as the most problematic to capture for undergraduate students: parental education, family income ranges, test score quintiles, GPA quintiles, average cost of attendance, and financial aid type and amount. *See* ACE Oct. Comments at 2-4 (citing survey conducted by Association for Institutional Research); NAICU Comments at 2. For graduate students, the gaps are even more significant: 63% of respondents reported that parental education data simply does not exist at their institution; 47% reported the same for family income ranges; and 43% for test score quintiles. *See* ACE Oct. Comments at 2-4. These restrictions create additional barriers for institutions attempting to compile the cross-tabulated data that ACTS demands: They cannot report data they do not have. The Department acknowledged the inherent "challenges of reporting prior-year data" and conceded that "the accessibility of some data may be limited," Response to Comments at 20, but its only response was to say it considers the data "critical and necessary" and direct institutions experiencing difficulties to "notify the IPEDS Help Desk . . . to receive additional guidance." *Id.* But no amount of technical assistance can conjure data from records that do not exist.

### B. The ACTS Survey Must Be Set Aside Because It Was Enacted Without Observance of Procedure Required by Law.

ACTS is also unlawful insofar as it was enacted without observance of the procedures required by law. 5 U.S.C. §§ 706(2)(A), (2)(D). Specifically, for the reasons set forth by the Plaintiff States in their brief in support of their motion for a temporary restraining order, Defendants violated the Paperwork Reduction Act's ("PRA") requirements for data collections by agencies. *See* Pl. States' Br. at 12-15. In the interest of efficiency, the Associations incorporate and adopt those arguments made by the Plaintiff States. *See, e.g.*, *Femino v. Sedgwick Claims Mgmt. Servs., Inc.*, No. CV 20-11373-FDS, 2021 WL 3190817, at *1 n.1 (D. Mass. July 28, 2021) (considering arguments made by one defendant but "relied on and incorporate[d]" by the other

13

defendant as if raised by both). As another court in this district recently held, failed "observance of procedure required by the PRA" is itself "a violation of the APA." *Orr v. Trump*, 778 F. Supp. 3d 394, 425 (D. Mass. 2025), *appeal docketed*, No. 25-1579 (1st Cir. June 13, 2025). This violation requires that ACTS be set aside.

### C. The ACTS Survey Must Be Set Aside Because It Is In Excess of IES and NCES's Statutory Authority.

ACTS must also be set aside because it exceeds the "statutory jurisdiction, authority, or limitations" 5 U.S.C. § 706(2)(C) of IES and NCES—the components of the Department tasked with administering IPEDS. Indeed, it is well-established that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation omitted).

Congress has specifically mandated how IES and NCES are to administer IPEDS and collect data. IES:

> shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need . . . and ensure that such activities. . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). And NCES's statutory mission is to:

> collect and analyze education information and statistics in a manner that meets the highest methodological standards; to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan influence and racial, cultural, gender, or regional bias . . . .

20 U.S.C. § 9541(b)(1) (2), (3)(A).

But the Department of Education has explained it plans to use this data for purposes other than those outlined in NCES and IES's respective statutory mandates, including for law-enforcement purposes. *See* Agency Information Collection Activities; Comment Request;

Integrated Postsecondary Education Data System (IPEDS) 2024-25 Through 2026-27, 90 Fed. Reg. 39384, 39384 (Aug. 15, 2025) ("Greater transparency through the collection of this type of information will help to expose unlawful practices [and] enable the Department to better enforce [sic] Title VI . . . .") (hereinafter "Aug. 15 Comment Request"); Pres. Mem. at 2 ("Greater transparency is essential to exposing unlawful practices. . . ."). But law enforcement is not an authorized purpose for which NCES and IES may collect this data. Critically, there is already a component of the Department that *is* tasked with collecting education data for law enforcement purposes: The Department's Office of Civil Rights ("OCR") has the authority "to collect or coordinate the collection of data necessary to ensure compliance with civil rights laws within the jurisdiction of the [OCR]." 20 U.S.C. § 3413(c)(1). NCES and IES may not assume that role for themselves.

While Defendants now argue there is no basis for "precluding IPEDS or any other survey administered by NCES from being used in the enforcement of civil rights laws," Defs.' Opp'n to Pl. States' Mot. for Temp. Restraining Order at 14, ECF No. 68 (hereinafter "Defs.' Opp'n"), there is a distinction between *incidental* use of such data that was collected to comply with NCES and IES's statutory mandates and the approach here, where NCES and IES set out to collect data explicitly for law enforcement purposes, rather than the neutral statistical purposes their statutes authorize. These actions exceed their statutory mandate.

## III.    The Other Factors Favor a Temporary Restraining Order.

The remaining factors—irreparable harm, balance of the equities, and the public interest— also weigh strongly in favor of emergency injunctive relief here.

A.  **The ACTS Survey Is Already Causing and Will Continue to Cause Irreparable Harm**

As set forth in the accompanying declarations, the Associations' members face irreparable harm both in the form of the risk of enforcement actions based on data that was rushed, incomplete, and may even be misleading due to ACTS's flawed design, the burden of compliance for those with data still outstanding, and infringements on student privacy. CCIC Decl. ¶¶ 7-24; MICA Decl. ¶¶ 7-23; NCICU Decl. ¶¶ 7-26; OAICU Decl. ¶¶ 7-24.   Now that their members have submitted at least some data, this Court's intervention is necessary to prevent the Associations' members from being penalized for their submissions and to avert the further burden on members who have submitted only partial data.

*First*, the Associations' members risk two significant enforcement threats that timely relief from this Court is necessary to avert. Institutions that have fully or partially submitted their data are facing the possibility of enforcement actions based on alleged noncompliance with federal antidiscrimination law. *See, e.g.*, Pres. Mem. at 2 (ACTS survey "essential to exposing unlawful practices"); Aug. 15 Comment Request (collecting ACTS "will help to expose unlawful practices [and] enable the Department to better enforce [sic] Title VI . . . ."). While all the Associations' members comply with the law, ACTS's flawed design will inevitably elicit incomplete and misleading data at least in some cases. The risks associated with data integrity are, moreover, exacerbated by the extreme time pressure members faced to submit ACTS data, whether in full or in part. Any institution that has now submitted data—including those that have partially submitted and are subject to the April 8 deadline—face a further threat. If their data is deemed incomplete— which might occur, for example, for data that ACTS demands but these institutions have never collected—they could be subject to penalties for IPEDS noncompliance. This risk is further heightened by the lack of clarity around what ACTS requires: the ACTS survey did not define

16

critical variables (such as "selective admissions" and "first-generation status") and the Department has still not standardized key proposed metrics, like graduating cohort or GPA quintiles. *See, e.g.*, CCIC Decl. ¶ 19; MICA Decl. ¶ 18; OAICU Decl. ¶¶ 16, 19. And where the Association's members sought additional guidance—whether through FAQs or by reaching out to the Help Desk—they were met with days-long delays, hour-long hold times, and ultimately conflicting guidance. *See* OAICU Decl. ¶ 17. The IHEs thus risk that—despite their best efforts—the Department could deem their ACTS submissions incomplete because of a disagreement with how the institution understood certain terms or submitted certain data. Institutions that fail to comply with IPEDS reporting requirements risk fines of up to $71,545 per violation and potential suspension or termination of Title IV eligibility, the loss of which would be devastating for the Associations' members and the students they serve. *See* 34 C.F.R. §§ 668.84, 668.85, 668.86; CCIC Decl. ¶ 22; MICA Decl. ¶ 21; NCICU ¶ 24; OAICU ¶ 22. There are some IHEs for whom the loss of Title IV funding would be an existential threat. CCIC Decl. ¶ 22. But even for those that would survive, a lapse in Title IV funding—even a temporary one—would be devastating to their students who may struggle to continue in their education. OAICU Decl. ¶ 22. This threat is not speculative: the Presidential Memorandum expressly directs the Secretary to "take remedial action" if institutions "fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data." Pres. Mem. at §3(c).

*Second,* the ACTS survey's disaggregation requirements create serious and potentially irreversible risks to student privacy, which schools have an obligation to protect. CCIC Decl. ¶ 24; MICA Decl. ¶ 23; NCICU ¶ 26; OAICU ¶ 24. For many programs that enroll small numbers of students—including niche undergraduate programs and graduate programs with smaller cohorts— the level of disaggregation ACTS requires will produce group sizes (displayed in data table cells)

so small that individual students could be identified. CCIC Decl. ¶ 24; MICA Decl. ¶ 23; NCICU ¶ 26; OAICU ¶ 24. This disaggregation could reveal students' academic records and history to the public, in tension with the Department's own guidance implementing the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and possibly also in tension with members' state-law privacy obligations. Because all IPEDS reporting is typically made public, there is a direct conflict between the stated goal of transparency and the federal privacy laws designed to protect student identities. The Department has not adequately addressed how it intends to prevent the disclosure of personally identifiable student information; in their opposition to the Plaintiff States' motion for a temporary restraining order and again at the TRO hearing, Defendants claimed that they would take steps to mitigate any privacy issues. But putting off the privacy question to a later date is unacceptable to the schools that have now already submitted data, not to mention to the schools that have further data to submit. The Department must be barred from publicly disclosing this information—and from requiring the schools that have further data to submit to complete their submission—to prevent irreparable harm.

*Finally*, IHEs that have submitted partial data still run the risk of irreparable harm in complying with the balance of the ACTS survey because of the enormous and unjustified reporting burden it imposes on the Associations' members. The volume of data requested is staggering and compliance—even just for the partial submission—consumed significant institutional resources. CCIC Decl. ¶¶ 11-13; MICA Decl. ¶ 11-13; NCICU ¶¶ 12-15, 17; OAICU ¶¶ 12-15, 17; *see also* Amicus Br. of Higher Education Associations in Supp. of. Pls.' Mot for a Temp. Restraining Order at 3-4, ECF No. 73 (hereinafter "Amicus Br.") (noting ACTS introduces nearly 70,000 new reporting fields). The Department estimates the burden at an additional 200 hours per institution for the first year—more than double the estimated burden for all existing IPEDS components

18

combined. *See* Response to Comments at 7, 16. But even this estimate is inadequate: over half of respondents to a survey of institutional research professionals estimated they would need more than 250 hours of staff time per year to complete ACTS, and with 25% estimating that it would take over 500 hours. *See* D. Jones et al., *AIR Survey Results: Feedback to the Proposed Admissions and Consumer Transparency Supplement (ACTS),* Ass'n for Institutional Rsch. at 9 (2025), https://www.airweb.org/publication/ feedback-to-the-proposed-ACTS; NAICU Comments at 2-3. This was borne out in member's attempts to submit the first three years of ACTS data. And finishing these submissions will levy an equally heavy burden.

### B.  The Balance of the Equities and Public Interest Overwhelmingly Favor Relief.

As the Court found for the Plaintiff States, the equities and public interest favor immediate relief for the Associations' members.

If ACTS goes into effect, the Associations' members will suffer imminent harm from the burden of submitting further information, risk imminent financial and reputational harm based on likely problems in the data stemming from the Department's lack of clarity, and run considerable and compounding privacy risks.  In stark contrast, the harm to Defendants is minimal. The Associations' members will continue to provide information through other preexisting IPEDS components, as they always have. Given the problems with the ACTS survey, detailed above and in multiple other submissions in this case, the additional data sought will be of limited utility. The balance of the equities and public interest clearly favor the Associations. Defendants' own brief in opposition to the Plaintiff States' Motion for a TRO only underscores this imbalance of the equities: Defendants fail to muster even a single argument about the balance of equities and public interest.  *See* Defs.' Opp'n at 8-9 (reciting the legal standard), 9-20.

**IV.     Relief Under APA Section 705 Is Appropriate and Necessary.**

The Associations respectfully request that the Court stay the current April 8 deadline for full compliance with ACTS under Section 705 of the APA for the reasons explained in the amicus brief submitted by proposed Plaintiff-Intervenor AAU and other higher education associations, the brief submitted in support of AAU's motion for a temporary restraining order, and the brief submitted in support of AICUM's motion for a temporary restraining order. *See* Amicus Br. at 16-19; ECF No. 86 at 18; ECF No. 112 at 17-18.

### CONCLUSION

The Associations respectfully request a stay of the agency action pursuant to 5 U.S.C. § 705 and, alternatively, that this Court enjoin Defendants from:

(1) accessing information uploaded by the Associations' members for the ACTS survey;

(2) requiring that the Associations' members supplement their ACTS survey submissions by April 8, 2026;

(3) making ACTS data submitted by the Associations' members publicly available;

(4) assessing penalties on the Associations' members based on their submissions to the ACTS survey; and

(5) using the ACTS survey as a basis for any investigation or enforcement action against the Associations' members.

[*signatures on following page*]

20

Dated:  April 3, 2026

Respectfully submitted,

/s/ *Lindsay Harrison*

JENNER & BLOCK LLP

Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha *(pro hac vice)*
Lindsay C. Harrison *(pro hac vice)*
Elizabeth Henthorne *(pro hac vice)*
Hilary Ledwell *(pro hac vice* pending*)*
Mary-Claire Spurgin *(pro hac vice)*
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
BHenthorne@jenner.com
HLedwell@jenner.com
MSpurgin@jenner.com

*Counsel for Connecticut Conference of
Independent Colleges, Maine Independent
Colleges Association, North Carolina
Independent Colleges and Universities, and
Oregon Alliance of Independent Colleges
and Universities*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of April, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.


Dated: April 3, 2026

/s/ Lindsay C. Harrison

Lindsay C. Harrison (*pro hac vice)*
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LHarrison@jenner.com