**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 26-11229-FDS |
| DEPARTMENT OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

**SAYLOR, J.**

This matter involves a challenge to a new requirement promulgated by the United States Department of Education—the Admissions and Consumer Transparency Supplement ("ACTS")—that compels colleges and universities to disclose certain data concerning student admissions. Plaintiffs are 17 states, including Massachusetts, with public university systems that participate in federal student financial aid programs.

In substance, the ACTS mandates detailed reporting of admissions data—including information concerning race, ethnicity, gender, family income, parental education, and other demographic factors, as well as admission test scores and grade point averages—for all applicants, admitted students, and enrolled students, at both the undergraduate and graduate level, both currently and for the preceding six years. Plaintiffs seek to enjoin or stay the application of the ACTS on the ground that it violates the Administrative Procedure Act, 5 U.S.C. § 706(2).

The Department of Education, through the National Center for Education Statistics ("NCES"), has been collecting admissions data from colleges and universities for many years. Title IV of the Higher Education Act, which authorizes federal student financial aid programs, requires participating institutions to "complete surveys conducted as a part of the Integrated Postsecondary Education Data System" ("IPEDS").  20 U.S.C. § 1094(a)(17).  Historically, there have been thirteen such surveys, covering a variety of different topics, including not only admissions, but such matters as enrollment, graduation rates, and financial aid.  In order to ensure consistency and fairness, reduce undue burden on the institutions, and maintain student privacy, DOE has developed a comprehensive process to review and implement proposed amendments to the surveys that includes collaborative efforts with all stakeholders, including the use of Technical Review Panels ("TRPs").

On August 7, 2025, President Trump issued a memorandum directing the Secretary of Education to expand the scope of the IPEDS to track the "consideration of race in higher education admission" to ensure compliance with the Supreme Court's decision in *Students for Fair Admission, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023).  (Dkt. No. 69-6).  Critically, that memorandum directed her to do so within 120 days.  The same day, DOE Secretary Linda McMahon issued a memorandum to the Acting Commissioner of NCES directing him to collect certain types of data within the 120-day timeline.  (Dkt. No. 69-7).

Eight days later, on August 15, NCES published, and requested comment on, the ACTS. The August 15 posting did not include the actual ACTS survey, but only a generalized description of the information that would be added to the IPEDS.

NCES received more than 3,400 comments in response to the August 15 request.  Among other things, multiple commenters expressed concerns about the implementation of the survey in

a highly compressed time frame, given the magnitude of the new reporting requirements; the likelihood of impaired data quality, due among other reasons to lack of standardization of data elements; the increased administrative burden on responders; the lack of clear and practical guidance, including data definitions; the apparent failure to consider how to protect student privacy with disaggregated data reporting; the unavailability or inaccessibility of data necessary to comply with the requirement of retroactive responses; the challenges concerning the demand for data, particularly as to graduate schools, that is possessed only in a decentralized manner; and the likelihood of operational disruptions, particularly for smaller schools with limited resources.

In October 2025, NCES responded to each of those eight substantive categories of comments.  (Dkt. No. 9-2).  In each instance, it began by stating, using identical language, that the ACTS proposal was developed in direct response to President Trump's memorandum, including the 120-day deadline.  (*Id.* at 13-22).  Each response, in substance, then acknowledged the "concerns" (or "challenges" or "burdens") of the institutions, but addressed those concerns in largely cursory fashion, much of which consisted of optimistic statements and assurances about future guidance.

Thus, for example, in response to concerns about the short implementation timeline, NCES stated that it "recognizes the challenges," but that "the timeline has been specified by the Presidential Memorandum and Secretarial Directive."  (*Id.* at 13).  It expressed "confidence" that the institutions "can provide the high-quality data required by the ACTS components" and that it is "similarly confident in the operational success of the ACTS collection."  (*Id.*).

The response of NCES to concerns about the failure to employ the TRP process is particularly instructive.  It acknowledged that "historically" it had made use of TRPs to ensure clear definitions and instructions for data collection.  (*Id.* at 17).  It added, however, that "[i]n

3

light of the timeline established [by the President], the feasibility of an ACTS-related IPEDS TRP was deemed infeasible." (*Id.* at 17-18).

To be clear, the law does not require a lengthy gestation period for every proposed change to the NCES surveys.  Simply because in the past such changes involved a measured and collaborative process does not mean that NCES is legally required to engage in a similar process in every case.  It is, however, relevant that NCES developed that process over the years in order to permit careful consideration of complex issues and to permit the relevant institutions sufficient time to adapt to new requirements—and that it discarded that process here solely in order to try to meet the 120-day deadline.  That deadline was not driven by any exigency, by the complexity of the subject matter, or the burden imposed on the institutions; it was set in response to a presidential decree.  Indeed, NCES expressly acknowledged that the only reason it did not use the TRP process was because of the President's deadline.

In any event, on November 13, 2025, NCES posted a submission to the Office of Management and Budget for review and approval and a further request for comment on the ACTS survey component.  The only significant change was that the November request proposed exempting four-year institutions that accepted all applicants and do not award need-based aid.

The comment period for the November request closed on December 15, 2025.  OMB then approved the ACTS survey.  On December 18, NCES commenced the opening of the survey, with submissions for most institutions due on March 18, 2026.  Even then, the survey was not finalized; NCES materially changed the templates on January 26, 2026, and changed them again on February 17, 2026.

This lawsuit was then filed on March 6, 2026, seeking preliminary and permanent injunctive relief.  The complaint asserts three claims under the Administrative Procedure Act, 5

U.S.C. § 706(2):  first, that the agency exceeded its statutory authority in adopting the ACTS; second, that the agency did not observe procedures required by law, because it failed to follow the requirements of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, and the E-Government Act of 2002; and third, that the agency action was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law" within the meaning of § 706(2)(A).

Count 1 asserts that the survey itself is outside the statutory authority of NCES, and therefore illegal.  But at least at a general level, it seems clear that NCES can lawfully collect the requested data.  The statute grants it authority to collect, analyze, and report "information by gender, race, ethnicity, socioeconomic status . . . and other population characteristics," and to do so "when such disaggregated information will facilitate educational and policy decisionmaking." 20 U.S.C. § 9543(a)(3).  Indeed, NCES has collected such data for years.  One of the principal purposes of collecting and analyzing information about race, ethnicity, and similar demographics is to ascertain whether there are potentially troublesome anomalies or patterns that suggest the possibility of unlawful discrimination.  Whatever the flaws of the ACTS may be, its subject matter fits squarely within the authority granted by the statute.

Nor is there any obvious reason to restrict the purposes for which the information can be used in order to prohibit referrals for investigation or enforcement.  The statute authorizes the collection, analysis, and "reporting" of disaggregated data when it would "facilitate educational and policy decisionmaking." *Id.*  The facilitation of educational decisionmaking necessarily includes identifying potential problems (such as patterns of discrimination).  And if the data received from a particular institution seems to suggest possible illegal discrimination on the basis of race, surely NCES is not precluded from taking appropriate action in response.

5

The principal problem, then, lies not in the basic authority of NCES to collect, analyze, and make use of the data.  Rather, it arises from the rushed and chaotic manner in which the ACTS was promulgated.  The 120-day deadline imposed by the President led directly to the failure of NCES to engage meaningfully with the institutions during the notice-and-comment process to address the multitude of problems presented by the new requirements.  The manner in which NCES handled that process simply cannot be squared with the requirements of the APA— and, indeed, epitomizes arbitrary and capricious agency action.

Those problems are compounded by the fact that DOE is in the process of dismantling itself, and closing NCES, in response to another presidential directive.  On March 25, 2025, President Trump directed that Secretary McMahon, "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities."  Exec. Order No. 14242 § 2(a), 90 Fed. Reg. 13679, 13679 (Mar. 25, 2025).

Since that announcement, the number of DOE employees has been radically reduced. The parties dispute how those cuts have affected NCES; according to plaintiffs, the number of employees has been cut from approximately 100 to only 3, whereas the government contends that there are 13 employees remaining, and that "all of the data collection and processing" is being handled by private contractors.  (Def.'s Suppl. Opp'n 3, Dkt. No. 99).  But the government is conspicuously silent on the subject of how the surveys, and the data collected by those surveys, will be handled once NCES no longer exists or what the timetable is for its elimination.

This is not a merely technical issue.  The IPEDS process cannot be turned over to states and local communities; they have no authority under 20 U.S.C. § 9543(a)(3) to conduct such surveys.  Nor, for that matter, does any federal agency other than NCES.  Once NCES no longer

exists, the authority for ACTS vanishes—and with it the authority both to "collect" data and to "analyze" data collected from prior surveys. Whether and where that data will continue to exist, and who will have access to it, is entirely unclear.

During the notice-and-comment process, in response to concerns about the reductions in force and the eventual dismantling of the department, NCES simply stated that "NCES and its IPEDS contractor have confidence in their joint capacity to collect, validate, and report the ACTS data." (Dkt. No. 69-17, at 24). In response to the concern that "sufficient technical assistance will not be available to support institutions as they complete ACTS," NCES asserted that "[t]he IPEDS Helpdesk is available and prepared to respond to inquiries from institutions in all phases of collection." (*Id.*). At the very least, the fact that NCES simultaneously expressed a willingness to work with institutions on an ongoing basis to provide guidance, while failing to address the fact that it intended to cease operations as soon as "permitted by law," is further evidence that the promulgation of the ACTS was arbitrary and capricious.

In short, and for the reasons set forth below, plaintiffs have established, based on the record before the Court, that they are likely to succeed on the merits of their claim that the agency action was "arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law." *See* 5 U.S.C. § 706(2)(A). Furthermore, and notwithstanding the contention of the government, plaintiffs have established that immediate irreparable harm will result if the injunction does not issue. And they have likewise established that the balance of equities and the public interest favor preliminary injunctive relief. Accordingly, the motion for a preliminary injunction will be granted.

## I.      Background

### A.      Factual Background

#### 1.      Integrated Postsecondary Education Data System ("IPEDS")

Title IV of the Higher Education Act authorizes federal student financial aid programs for eligible colleges, universities, and technical and vocational schools. *See* 20 U.S.C. §§ 1070, *et seq*. Institutions that participate in the programs must meet certain conditions. As relevant here, they must "complete surveys conducted as a part of the Integrated Postsecondary Education Data System" ("IPEDS"). 20 U.S.C. § 1094(a)(17); *see also* 34 C.F.R. § 668.14(b)(19). Failing to submit the required data "in a timely manner and to the satisfaction of the Secretary" of Education risks fines and the loss of Title IV eligibility. 20 U.S.C. § 1094(a)(17); *see* 34 C.F.R. §§ 668.84; 668.85 & 668.86.[1]

IPEDS is a series of interrelated surveys administered annually through the National Center for Education Statistics ("NCES"), a component of the Institute for Education Sciences ("IES"). (Compl. ¶¶ 1, 36, 37, Dkt. No. 1). IES is the statistics, research, and evaluation arm of the Department of Education. (*Id.* ¶ 36). Its mission is "to provide parents, educators, students, researchers, policymakers, and the general public with reliable information" about education programs and practices. 20 U.S.C. § 9511(b)(1). Congress tasked IES with "compil[ing] statistics, develop[ing] products, and conduct[ing] research, evaluations, and wide dissemination activities in areas of demonstrated national need." *Id.* § 9511(b)(2). In doing so, it is required to "ensure that such activities . . . conform to high standards of quality, integrity, and accuracy;

---

[1] Specifically, federal regulation authorizes the Secretary to impose fines of up to $71,545 per violation. 34 C.F.R. § 668.84(a)(1).

and . . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." *Id.*

NCES is one of the four National Education Centers of IES. *See id.* § 9511(c)(3)(B). It is also DOE's primary statistical agency. (Compl. ¶ 37). Its statutory mission includes "collect[ing], analyze[ing], and report[ing] education information and statistics in a manner that . . . is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and . . . is relevant and useful to practitioners, researchers, policymakers, and the public." *Id.* § 9541(b)(3). Among its specific statutory duties are "collecting, analyzing, cross-tabulating, and reporting, to the extent feasible, information by gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, [and] suburban districts, and other population characteristics, when such disaggregated information will facilitate educational and policy decisionmaking." 20 U.S.C. § 9543(a)(3).

Before December 2025, IPEDS consisted of thirteen surveys, covering topics such as enrollment, academic libraries, admissions, degree completion, financial information of the institution, graduation rates, human resources information, institutional characteristics, outcome measures, and student financial aid. (Compl. ¶ 39). Those surveys have never included retroactive data—that is, data from previous academic years. (*Id.*. ¶¶ 6, 48).

For the most part, those surveys remained the same from year to year. (*Id.* ¶ 40). Since at least 2002, NCES has implemented major changes through a deliberate, multistep process. (*Id.* ¶ 91). That included review by Technical Review Panels ("TRPs") to ensure data quality and consistency, stakeholder collaboration, and posting the survey during the initial notice-and-comment period. (*Id.* ¶¶ 91, 93-97). Institutions also had a year of notice before new survey

components were mandated, and such changes were often preceded by an optional or preview year.  (*Id.* ¶ 97).

### 2. **Presidential Memorandum and Secretary McMahon Directive**

On August 7, 2025, President Trump issued a presidential memorandum entitled *Ensuring Transparency in Higher Education Admissions*.  (Dkt. No. 69-6).  It directed the Secretary of Education to, "[w]ithin 120 days . . . , and to be initiated this 2025-2026 school year," expand the scope of IPEDS to track the "consideration of race in higher education admissions" and ensure compliance with *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023).  (*Id.*).  He also directed the Secretary to "increase accuracy checks" and "take remedial action . . . if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data."  (*Id.*).

That same day, Secretary of Education Linda McMahon issued a memorandum to Matthew Soldner, the Acting Director of IES and Acting Commissioner of NCES.  Memorandum from Sec'y McMahon to Acting Dir. Matthew Soldner on Ensuring Transparency in Higher Education Admissions (Aug. 7, 2025), https://perma.cc/7KDJ-C79N ("McMahon Mem.").  She "direct[ed] NCES to . . . collect data disaggregated by race and sex relating to the applicant pool, admitted cohort, and enrolled cohort at the undergraduate level, and for specific graduate and professional programs" within the "120-day timeline contained in the Presidential Memorandum.  (*Id.* at 2).  She also "direct[ed] NCES to develop a rigorous quality assurance process for reported data."  (*Id.*).

### 3. **Admissions and Consumer Transparency Supplement ("ACTS")**

In response to the directives, DOE added a new Admissions and Consumer Transparency Supplement ("ACTS") survey component to IPEDS for four-year institutions with selective

college admissions.  (Dkt. No. 69-8).  DOE stated that it viewed those institutions as "hav[ing] an elevated risk of noncompliance with the civil rights laws."  (*Id.*).

On August 15, eight days after the presidential memorandum was issued, DOE, IES, and NCES posted an initial request for comment on the proposed change.  (*Id.*).  The initial request for comment did not include the ACTS survey itself.  (*Id.*).  Rather, it listed general categories of information that it "anticipated" would be included.  (*Id.*).  For all students, NCES anticipated collecting data disaggregated by race and sex on:

> (1) students' average cumulative GPA at the end of the academic year; (2) the average cost of attendance, and further disaggregated by admission test score quintiles, ranges of high school grade point average, ranges of family income, and enrollment via early action, early decision, or regular admissions. (3) graduation rates further disaggregated by admission test score quintiles and ranges of high school grade point average; and (4) graduates' final cumulative grade point average.

(*Id.*).  For undergraduates, it would also collect data on:

> (1) the count of institutions' applied, admitted, and enrolled cohorts, both overall and further disaggregated by admission test score quintiles, GPA quintiles, ranges of family income, Pell Grant eligibility, and parental education; (2) the average high school grade point average and admission test score quintiles for institutions' applied, admitted, and enrolled cohorts; (3) the count of students admitted via early action, early decision, or regular admissions.

(*Id.*).  For newly enrolled undergraduate students, the ACTS survey would also collect disaggregated data on any institutional, merit, need-based, or local, state, or federal aid.  (*Id.*).  Graduate-student data would be further disaggregated by field of study.  (*Id.*).

For the first year, the 2025-2026 survey, ACTS would collect data from that year and the six prior academic years to "to establish a baseline of admissions practices from before the Supreme Court decision in *SFFA* v. *Harvard*."  (*Id.*).  Moreover, NCES anticipated that it "may use [the] data to develop risk-based enforcement" of unlawful discrimination.  (*Id.*).

The comment period closed on October 14, 2025.  (Dkt. No. 9-2, at 4).  DOE received 3,462 comments, including comments submitted by the plaintiffs in this case.  (*Id.*; Dkt. No. 69-

9).  Many commenters raised concerns about the timeline for implementation; data standardization and quality; the burden on reporting institutions; the lack of clear guidance and data definitions; risks of potential identification of individuals in disaggregated data reporting; unavailability or inaccessibility of some of the requested data; challenges with collecting decentralized graduate admissions data; and disruption to college operations due to the rapid implementation of the expansive data collection.  As to each of those concerns, NCES's response began with the same form language "[t]hanking [the commenters] for [their] feedback regarding the proposed Admissions and Consumer Transparency Supplement (ACTS)" and noting that

> [t]he data collection proposed by ED is in direct response to priorities articulated by the Administration.  President Donald J. Trump issued a Presidential Memorandum on August 7, 2025 entitled "Ensuring Transparency in Higher Education Admissions," . . . . In that memorandum, President Trump directed the Secretary of Education to, within 120 days of that date, "expand the scope of required [IPEDS] reporting to provide adequate transparency into admissions."  On that same day, Secretary McMahon issued a directive to NCES to initiate a series of changes to IPEDS during the 2025-26 school year.

(Dkt. No. 9-2).

On November 13, DOE, IES, and NCES published a further notice submitting the new survey component to the Office of Management and Budget for approval and requesting comments.  (Dkt. No. 69-11).  DOE published the ACTS component with that notice.  (Dkt. No. 69-12).  Other than proposing an exemption for four-year institutions that accepted all applicants and did not award need-based aid, the second notice for comment introduced no substantive changes to the data sought, timeline, or level of disaggregation.  (Compl. ¶ 57).

That comment period closed on December 15, 2025, with 146 additional comments.  (*Id.* ¶ 58).  OMB then approved the ACTS survey and certified its compliance with the Paperwork Reduction Act ("PRA") requirements of 44 U.S.C. § 3506(c)(3).  (Dkt. No. 69-14).[2]  The

---

[2] Defendants allege, and plaintiffs do not dispute, that OMB approved and certified the ACTS survey component after the November notice-and-commend period closed.  (Def.'s Opp'n 6, Dkt. No. 68).  It is curious,

Department also published its responses to the November request for comment.  (Dkt. No. 69-17).

DOE opened the ACTS component on December 18.  (Dkt. No. 69-18).  Submissions were due for many institutions by March 18, 2026, giving institutions 90 days to complete the survey.  (*Id.*).  On March 5, NCES extended the deadline to April 8 for institutions that had submitted three years of ACTS data.  (Dkt. No. 69-19 ¶ 10).

Institutions had the option to submit student-level data to a third party through an "Aggregator Tool" or run a provided Python code locally to aggregate data internally.  (Compl. ¶ 106).  Several institutions received a warning that the Aggregator Tool contained a virus when they attempted to download it.  (Compl. ¶ 107).  The Python tool was not available until early 2026.  (Compl. ¶ 106).  On January 26, 2025, DOE's third-party contractor released updated data templates for institutions to submit data that clarified definitions, changed variables for reporting income, and removed certain data fields.  (*Id.* ¶ 108).  They provided another updated template on February 17.  (*Id.*).

B.    **The Parties**

Plaintiffs are seventeen states whose public colleges and universities participate in federal student financial aid programs under Title IV of the Higher Education Act.[3]  Defendants are the Department of Education; Linda McMahon, Secretary of Education; the Office of Management and Budget; and Russell Vought, Director of the Office of Management and Budget.

---

however, that the certification record defendants submitted shows a certification date of November 13, 2025—that is, the same day that DOE submitted the component to OMB.  (Dkt. No. 69-14).

[3] Massachusetts, California, Maryland, Colorado, Connecticut, Delaware, Hawaii, Illinois, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

### C.      Procedural Background

On March 11, 2026, plaintiffs filed a complaint challenging the ACTS survey.  (Dkt. No. 1).  The complaint asserts three APA claims.  Count 1 alleges that defendants exceeded their statutory authority by "collect[ing] data for purposes of partisan ends [and] for purposes of either monitoring compliance with or enforcing the law."  (*Id.* ¶ 124).  Count 2 alleges that the implementation of the ACTS survey did not comply with the procedures mandated by the Paperwork Reduction Act and E-Government Act of 2002.  (*Id.* ¶ 129).  Count 3 alleges that defendants' decision to adopt the ACTS survey is "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law" within the meaning of § 706(2)(A).

Two days later, on March 13, plaintiffs filed a motion for a temporary restraining order. (Dkt. No. 6).  That motion sought a stay of agency action pursuant to 5 U.S.C. § 705 for the pendency of the litigation and a temporary restraining order enjoining defendants from (1) accessing information uploaded by plaintiffs in the ACTS survey; (2) requiring plaintiffs complete the survey by March 18; (3) assessing penalties on plaintiffs based on their submissions; and (4) using the ACTS survey as the basis for any investigation or enforcement action.  (*Id.* at 1-2).

Later that day, the Court issued a temporary restraining order extending the deadline to complete the ACTS survey through March 25, 2026, to permit orderly briefing and a hearing on the motion.  (Dkt. No. 13).  On March 19, 2026, the Association of American Universities and various other national higher-education associations moved to file a brief as *amici curiae*, which the Court granted.  (Dkt. Nos. 52, 72).  Defendants filed an opposition on March 23, 2026.  (Dkt. No. 68).

The Court then held a hearing on March 24, 2026, and issued a brief further temporary restraining order extending the time period to April 6, 2026, for the 17 named plaintiffs and their

constituent institutions.  As stated at the hearing, because defendants have appeared in the case and filed a response, plaintiffs' motion will be treated as one seeking a preliminary injunction. Both plaintiffs and defendants then filed supplemental briefings.  (Dkt. Nos. 96, 99).

The Association of American Universities and Association of Independent Colleges and Universities in Massachusetts have also moved to intervene in this case.  (Dkt. Nos. 83, 109). Those motions remain pending and a hearing is scheduled for April 13, 2026.

## II.    Standard of Review

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctive relief. To grant a preliminary injunction, a district court must find that the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the balance of equities weighs in its favor, and (4) that an injunction or stay is in the public interest.  *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the government is the opposing party, the equities and public interest factors merge. *Massachusetts v. National Institutes of Health*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In addition, of those four factors, the likelihood of success on the merits "normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").

Separately, the APA authorizes courts "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process

15

to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.

Courts typically consider the same four factors in evaluating whether to issue a preliminary injunction, or a stay of agency action under § 705.  *See Johnson v. Allen*, 2022 WL 16823008, at *5 (D. Mass. Nov. 8, 2022) ("A motion for a temporary restraining order is evaluated by the same factors as a motion for preliminary injunction." (quoting *Snell v. Descoteaux*, 2022 WL 3327490, at *1 (D. Mass. Aug. 11, 2022))); *African Communities Together v. Noem*, 2026 WL 395732, at *4 (D. Mass. Feb. 12, 2026) (citing *National TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021)).

The court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits."  *Rohm & Haas Elec. Materials, LLC v. Electronic Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Boston Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).  Evidentiary issues such as hearsay "go to weight rather than admissibility" in ruling on a preliminary injunction.  *Gateway City Church v. Newsom*, 516 F. Supp. 3d 1004, 1009 n.3 (N.D. Cal. 2021) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016)).

### III.   Analysis

#### A.   Likelihood of Success on the Merits

Under the Administrative Procedure Act, 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), "in excess of statutory jurisdiction,

16

authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  Plaintiffs assert three claims under § 706(2).  They allege that defendants exceeded their statutory authority, did not observe the procedure required under the PRA, and acted arbitrarily and capriciously.[4]  The Court will address each in turn.

### 1.     Whether the Agency Exceeded its Statutory Authority

First, plaintiffs argue that the ACTS survey exceeds the statutory authority granted to NCES because its purpose in obtaining the additional data was to enforce compliance with federal civil rights law.

As noted, federal law provides that NCES "shall collect, report, analyze, and disseminate" certain "statistical data," including "information by gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, and other population characteristics, when such disaggregated information will facilitate educational and policy decisionmaking."  20 U.S.C. § 9543(a)(3).  The ACTS survey fits comfortably within that statutory provision:  it is a collection of statistical data on applicants, enrolled students, and graduates broken down by race/ethnicity, sex, test scores, and high school GPA, among other things.  (Dkt. No. 69-12, at 7-9).  And the government represents that this data will be used to facilitate policy decisionmaking by "providing greater transparency into colleges' admissions and compliance with civil rights laws."  (Def.'s Opp'n 14, Dkt. No. 68).  For those reasons, the ACTS survey appears to be a permissible exercise of the agency's statutory authority.

---

[4] Count 2 of the complaint also alleges that defendants violated the E-Government Act of 2002.  (Compl. ¶ 129).  Plaintiffs do not address that claim in their motion for preliminary relief.

Plaintiffs contend, however, that both NCES and IES have statutory "mission statements" that limit how they may carry out their statutory duties.  The mission of IES is to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need," and in doing so it is to "ensure that such activities . . . are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias."  20 U.S.C. § 9511(b)(2).  Similarly, the mission of NCES is to "collect, analyze, and report education information and statistics in a matter that is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias."  20 U.S.C. § 9541(b)(3).

Plaintiffs contend that the ACTS survey is not "neutral" because "the ACTS survey's purpose is to circumvent established law-enforcement mechanisms and convert IPEDS into a tool to identify alleged wrongdoers and drive enforcement actions."  (Pls.' Mem. Supp. TRO 11, Dkt. No. 7).  According to plaintiffs, only the Department's Office of Civil Rights has the authority to collect such information concerning compliance with federal law.

The statute does not, however, include the limitation on the use of IPEDS data that plaintiffs seek to read into it.  It seems clear that one of the primary reasons for the government to seek data broken down by race and ethnicity—as NCES is explicitly empowered to do, *see* 20 U.S.C. § 9543(a) —is to ascertain whether the data shows a potential pattern of racial discrimination.  Presumably, evidence of discrimination could serve as the basis for a referral to another agency for investigation or possible enforcement action.  And although plaintiffs suggest that the desire to use the data for enforcement actions renders the ACTS survey not "neutral," it is unclear why that is the case.  Presumably, a collection of information would not be neutral if it required different information from different respondents—for example, if it requested different

18

information from the University of California at Berkeley than it did from the University of Texas. But even assuming, without deciding, that the IES and NCES mission statements in fact create duties enforceable against the agency,[5] it is not clear why the desire to potentially use the data collected to aid in enforcing civil-rights law would render the ACTS survey not "neutral." And the mere fact that the Department's Office of Civil Rights could receive data from the ACTS in order to investigate potential violations does not mean that NCES is barred from seeking such information in the first instance. For those reasons, plaintiffs are not likely to succeed on their claim that the ACTS survey exceeds the agency's statutory authority.

### 2. Whether the Agency Violated the Paperwork Reduction Act

Next, plaintiffs contend that defendants violated § 706(2)(D) because the ACTS survey violated the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, in that the ACTS survey, as a "collection of information," failed to comply with several substantive limitations contained in that Act.

One of the purposes of the Paperwork Reduction Act is to "minimize the paperwork burden for . . . educational and nonprofit institutions . . . resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1). The relevant provision of the PRA, § 3506(c), imposes certain procedural limitations on government agencies "[w]ith respect to the collection of information." *Id.* § 3506(c). "Collection of information" is defined as

> the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of fats or opinions by or for an agency, regardless of

---

[5] In other circumstances, courts have recognized that statutory provisions that express the "sense of Congress" on a particular matter do not impose binding constraints on an agency. *See Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 958-62 (9th Cir. 1999) (holding that a "sense of Congress" provision was "non-binding, legislative dicta," *id.* at 961-62); *cf. Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 994-95 (1st Cir. 1992) (holding statute which noted the "sense of Congress" that states should change laws regarding treatment of mental health patients created no enforceable federal rights).

form or format, calling for either—(i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or (ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes.

*Id.* § 3502(3).[6]

The PRA requires that each agency conduct several internal processes before submitting the collection of information to the Director of the Office of Management and Budget for approval, *id.* § 3506(c)(1); provide 60-day notice in the Federal Register before the collection of information is implemented, *id.* § 3506(c)(2); and "certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information submitted to" OMB complies with several substantive standards, including, among others, that it "is necessary for the proper performance of the functions of the agency" and that it "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected," *id.* § 3506(c)(3).

There is some debate among courts about how the requirements of the PRA may be enforced by private parties. The statute provides that failure to comply with certain provisions of the PRA "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b). The PRA does not, however, include an express private right of action. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999). That fact notwithstanding, several courts, including another session of this court, have recognized that failure to comply with the PRA can, in some circumstances, be enforced under the APA by asserting that the relevant

---

[6] The definition explicitly excludes the collection of information for purposes of particular criminal or civil enforcement actions. *See* 44 U.S.C. § 3502(3), 3518(c).

20

agency action was taken "without observance of procedure required by law." *See Orr v. Trump*, 778 F. Supp. 3d 394, 425-26 (D. Mass. 2025); *see also Hyatt v. Office of Mgmt. & Budget*, 908 F.3d 1165, 1169 (9th Cir. 2018). The Court agrees, noting that the Supreme Court has recognized that the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

Where courts have found that certain requirements of the PRA can be enforced through APA challenges, however, they have been purely procedural requirements of the PRA. Thus, for example, courts have found information-collection efforts invalid where the agency failed to obtain approval from OMB as the statute requires. *See Center for Auto Safety v. National Highway Traffic Safety Admin.*, 244 F.3d 144, 144-49 (D.C. Cir. 2001). Similarly, certain information-collection efforts are invalid where the agency fails to publish the required 60-day notice in the Federal Register. *Orr*, 778 F. Supp. 3d at 426; *cf. Doctors for Am. v. Office of Personnel Mgmt.*, 766 F. Supp. 3d 39, 52 (D.D.C. 2025) (holding that violation of another notice provision of the PRA likely violated the APA).

Plaintiffs here, however, seek to go further. They contend that ACTS violates the PRA—not because DOE did not obtain approval from OMB, or did not provide the required notice in the Federal Register—but instead because the ACTS survey does not comply with several substantive limitations in the PRA.[7]

---

[7] In particular, plaintiffs contend that the ACTS survey is not "necessary for the proper performance of the functions of the agency"; is "unnecessarily duplicative of information otherwise reasonably accessible to the agency"; does not "reduce[] to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency"; is not "written using plain, coherent, and unambiguous terminology and is [not] understandable to those who are to respond"; is not "implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond"; was not "developed by an office that has planned and allocated resources for the efficient and effective management

The language of the PRA does not provide that a reviewing court may determine for itself whether an agency has complied with the various substantive requirements.  The statute requires only that an agency "certify" that its proposed collection of information meets the requirements and that it "provide a record supporting such certification."  44 U.S.C. § 3506(c)(3).  Thus, if an agency failed to provide the required certification, the collection of information would violate the APA, just as if the agency failed to provide the required notice or obtain OMB approval.  *See Orr*, 788 F. Supp. 3d at 426; *Center for Auto Safety*, 244 F.3d at 148-49.  The same would be true if the agency failed to provide any record whatsoever supporting such certification.  But the statute does not appear to prove a role for a reviewing court to analyze whether the substantive standards are met, as might be the case if the statute required that a collection of information *be* "necessary for the proper performance of the functions of the agency," not merely that the agency *certify* that it is.

To be sure, the requirement that the agency provide a record supporting its certification suggests that there may be some limited role for a reviewing court to evaluate the agency's reasoning.  *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 419-20 (1971) (discussing necessity of administrative record to permit reviewing court to determine whether informal agency adjudication was arbitrary or capricious); *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 249 (2d Cir. 1977) ("Adequate review of a determination requires an adequate record, if the review is to be meaningful.").  But as far as the Court can tell, no other court has engaged in that exercise under the PRA.  And particularly in the context of a preliminary-injunction proceeding, and in the absence of a developed factual record, the Court is

---

and use of information to be collected"; and does not "use[] effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected."  44 U.S.C. § 3506(c)(3).

disinclined to adopt a novel argument to support a finding of a likelihood of success on the merits.

In any event, plaintiffs' argument is not that the record underlying the certification is insufficient to support the certification; instead, they contend that the ACTS survey did not in fact comply with the requirements of § 3506(c)(3).[8] Evaluating that contention would exceed the proper scope of the Court's review. It is an oft-repeated principle of judicial review of administrative action that "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But that is precisely what plaintiffs invite the Court to do here: to apply its own judgment to determine whether the ACTS survey complied with the statutory requirements, rather than evaluating the decision-making process underlying the determination that it did. Where the agency has certified that it complied with the requirements of § 3506(c)(3), and the record at least arguably supports that certification, the reviewing court's role appears to be at an end. Because the Court concludes that the PRA certification complied with the requirements of § 3506(c)(3), plaintiffs are not likely to succeed on their claim that the ACTS survey violates the APA for failing to comply with the PRA's requirements.[9]

---

[8] In their reply memorandum, plaintiffs frame their argument as being that the record did not support the agency's certification. (Pls.' Reply 4-7, Dkt. No. 96). But the majority of their argument still focus on whether the ACTS survey itself met the requirements of § 3506(c)(3), not on the quality of the agency's decisionmaking. In any case, their initial memorandum in support of the motion addressed only the substantive issue, and "[a]rguments raised for the first time in a reply brief are generally deemed waived." *Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 473 (D. Mass. 2020).

[9] In their reply memorandum, plaintiffs also contend that the ACTS survey violated 44 U.S.C. § 3506(c)(2)(A) and 5 C.F.R. § 1320.8(d)(2) because defendants did not publish the full survey instrument in the Federal Register notice. (Pls.' Reply 3-4). As an initial matter, because this argument was not raised until plaintiffs' reply, it is similarly waived. *Murray*, 486 F. Supp. 3d at 473. In any event, it is unclear whether this argument is correct. The statute requires only that the agency "provide 60-day notice" without defining what that notice must include, and therefore failure to include the entire survey instrument does not appear to violate the statute. 44 U.S.C. § 3506(c)(2)(A). The regulation requires that, "[i]f the agency does not publish a copy of the proposed collection of information . . . as part of the Federal Register notice, the agency should" either "[p]rovide more than 60-day notice" or "[e]xplain how and from whom an interested member of the public can request and obtain a copy

Despite that conclusion, the Court notes that it is skeptical of one of the certifications made by DOE:  that the ACTS survey was "developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected."  44 U.S.C. § 3506(c)(3)(H).  It is a matter of public record that the executive branch is undertaking all efforts permitted by law to shutter DOE and transfer its functions to other agencies of the federal government or to states and local communities.  *See* Exec. Order No. 14242 § 2(a), 90 Fed. Reg. 13679, 13679 (Mar. 25, 2025) ("The Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities . . . .").  Because that fact is relevant to the Court's arbitrary-and-capricious review, it will address the issue in that context.

### 3.        **Whether the Agency's Action Was Arbitrary and Capricious**

Finally, plaintiffs assert that defendants' implementation of the ACTS survey was arbitrary and capricious because they failed to consider reliance interests, failed to consider an important aspect of the problem, deviated from past practices with inadequate explanation, and failed to consider reasonable alternatives.

The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  In making its decision, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,

---

without charge."  5 C.F.R. § 1320.8(d)(2).  The use of "should" here, rather than "shall" as used elsewhere in the regulation, makes it unclear whether this creates a mandatory duty that the agency must follow.  In any event, at the preliminary-injunction stage, plaintiffs have not shown that they are likely to succeed on claim.

463 U.S. 29, 30 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  A court's review "is deferential, and a court may not substitute its own policy judgment for that of the agency."  *Prometheus*, 592 U.S. at 423.

An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  The agency need not "consider all policy alternatives in reaching [its] decision."  *Id.* at 51.  But it "must consider and explain its rejection of . . . significant and viable and obvious alternatives," *National Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (citation modified), that are "within the ambit of the existing standard," *State Farm*, 463 U.S. at 51.  It must also "respond to 'relevant' and 'significant' public comments."  *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 719 n.3 (1st Cir. 1999) (quoting *Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 35 & n.58 (D.C. Cir.1977)).  Otherwise, "the opportunity to comment is meaningless."  *Home Box Office*, 567 F.2d at 35.

In addition, under the "change-in-position doctrine," an agency that "acts inconsistently with an earlier position [or] performs a reversal of its former views as to the proper course," must "display awareness that it *is* changing position and offer good reasons for the new policy." *F.D.A v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025) (citation modified).  In doing so, it "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Id.* (citation modified).

Presidential directives do not enable agencies to bypass those requirements.  The First Circuit has explained that "agency action that carries out a presidential directive is ordinarily subject to APA review."  *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025), *rev'd on other grounds*, *Trump v. Orr*, 146 S. Ct. 44 (2025); *see also New York v. Trump*, 811 F. Supp. 3d 215,

25

235 (D. Mass. 2025) ("Circuit precedent forecloses [the] argument" that "an agency is exempt from the requirements of § 706(2)(A) whenever it acts pursuant to a presidential command."), *appeal docketed*, No. 26-1174 (1st Cir. Feb. 23, 2026); *American Academy of Pediatrics v. Kennedy*, 2026 WL 733828, at *11 (D. Mass. Mar. 16, 2026) ("Defendants cannot disregard the APA's requirements simply because they are following the President's orders.").[10]  Other circuits agree.  *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

The record makes clear that NCES declined to use the same deliberate process for developing and implementing IPEDS changes that it used before because that process was incompatible with the President's timeline.  Nor did the agency meaningfully engage with comments that raised serious concerns about the impact of that rushed process.  Yet neither the President, nor the Secretary, nor the agency ever explained the purpose of the truncated timeline.  Rather, NCES developed and implemented the ACTS survey in accordance with an arbitrary limitation whose purpose was, and remains, entirely undisclosed.

As noted, the Presidential Memorandum directed the Secretary of Education "[w]ithin 120 days of the date of this memorandum, and to be initiated this 2025-2026 school year, . . . [to] expand the scope of required reporting to provide adequate transparency into admissions, as determined by the Secretary of Education, consistent with applicable law."  (Dkt. No. 69-6).  The memorandum offered no explanation, much less a reasoned one, for the 120-day timeline, nor did it describe the data collection as time sensitive.

---

[10] The Supreme Court's emergency docket order in *Trump v. Orr* does not disturb that precedent.  *See New York v. Trump*, 811 F. Supp. 3d at 235-37 (distinguishing *Trump v. Orr*).  There is an exception "where a statute . . . expressly delegates discretion to the President himself and 'require[s] [the agency] to follow' directives pursuant to that delegation."  *Id.* at 237 (quoting *Orr*, 146 S. Ct. at 46).  That was the case in *Orr*, but is not the case here.  *See* 22 U.S.C. § 211a (directing the Secretary of State to issue passports "under such rules *as the President shall designate* and prescribe" (emphasis added)).

Secretary McMahon then "direct[ed] NCES to make the [relevant] changes within the 120-day timeline contained in the Presidential Memorandum, which shall be initiated during the 2025-2026 school year." (McMahon Mem.). The only explanation the McMahon memorandum offered for the 120-day timeline was the presidential directive.

NCES then treated the 120-day timeline as essentially inviolable.[11] In October 2025, the agency published its responses to comments received during the initial 60-day comment period. (Dkt. No. 9-2). It noted that "288 comments had raised concerns about the adequacy of the timeline for implementing new data reporting requirements of this magnitude, both for institutions and for the IPEDS program." (*Id.* at 13). The agency responded:

> While NCES recognizes the challenges associated with implementing a new data collection quickly-both for institutions and the IPEDS program-the timeline has been specified by the Presidential Memorandum and Secretarial Directive, and ED is acting to meet that timeline.

(*Id.*). It went on to discuss "[s]everal factors [that] mitigate those potential challenges." (*Id.*). Bu it never explained why—or even tried to explain—why those challenges had been created in the first place.

As a result, NCES did not consider alternatives that were incompatible with that arbitrary timeline. For example, multiple commenters expressed concerns about "the need for guidance, including data definition" and "recommended a 'pilot' to test and refine data collection procedures." (*Id.* at 17). The agency's response was the following:

> NCES acknowledges and appreciates commentors' views on the role of pilot data collections, and related concerns around data definitions and need for guidance. They note that the IPEDS Technical Review Panel (TRP) has historically been an additional mechanism for gathering useful information about the feasibility of IPEDS data collection and approaches to surmounting potential challenges. Neither the President's memorandum nor the Secretary's directive make provisions for pilot or optional-year

---

[11] In the end, the ACTS was published on December 18, 2025, 13 days after the 120-day deadline set by the President.

data collections or their equivalents.  In light of the timeline established in the memorandum and its accompanying directive, the feasibility of an ACTS-related IPEDS TRP was deemed infeasible . . . .

(*Id.* at 17-18).

The agency's responses to the November 30-day comment period were similar. Commenters again "voice[d] concerns that the timeline . . . was too brief." (Dkt. No. 69-17, at 5).  The agency responded that the President's "timeline precludes technical review panels, pilot collections, phased in collection approaches, or other steps which might have been feasible in its absence." (*Id.*).  Other commenters offered technical suggestions for improving the data collection, such as changes to the format of templates, the use of sample surveys, or different categorizations. (*Id.* at 24).  The agency responded that it "will conduct a thorough review of all aspects of the ACTS data collection following its close in Spring, 2026.  . . . [S]uggestions like those provided by commentors will be considered at that time, and may inform future plans for the collection of ACTS data." (*Id.*).  But it did not explain why those suggestions could not be considered before the first (and most comprehensive) data collection.

The inescapable conclusion is that the agency rushed to implement the ACTS survey within the arbitrary timeline.  It tried to "mitigate" the fallout of those drastic changes.  But it dismissed any suggestion or concern that would necessitate a longer timeline as "infeasible."

To be clear, the problem is not simply the fact that there was a timeline or that the agency did not follow its historical process of more careful deliberation.  "[A]gencies [are] free to fashion their own rules of procedure," and the Court does not have the authority to "impose upon the agency its own notion of which procedures are 'best.'" *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544, 549 (1978).  The problem is that the

agency changed its historical position, and rejected multiple comments expressing concern, solely in order to achieve an arbitrary and unexplained deadline.[12]

Defendants contend that that the agency did explain its decision not to implement TRPs or a pilot year.  (Def.'s Opp'n (citing Dkt No. 69-10, at 18)).  In responding to comments, the agency noted that TRPs are discretionary.  (Dkt No. 69-10, at 18).[13]  It stated that it was "confident" that institutions would be able provide high-quality data given that "the majority of the underlying data elements needed to fulfill the ACTS survey component requirements are also necessary to complete other IPEDS surveys" and new elements were "commonly tracked by postsecondary institutions."  (*Id.*).  Institutions with further questions or concerns were "encouraged to contact the IPEDS Help Desk for assistance."  (*Id.*).  That purported explanation, however, immediately followed the agency's declaration that the use of TRPs or a pilot year was "infeasible" "[i]n light of the timeline established in the [President's] memorandum."  (*Id.* at 17-18).  The agency thus did not adequately consider an alternative course of action; instead, it simply rejected any alternatives as infeasible in light of the deadline, and instead pointed out

---

[12] Defendants do not challenge plaintiffs' contention that the agency's abandonment of the deliberate, multistep process for implementing new IPEDS components constitutes a change in position.  *See F.D.A. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025) ("The change-in-position doctrine [first] asks . . . whether an agency changed existing policy.").  The Court therefore assumes, without deciding, that the change-in-position doctrine applies.  *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed.").

Rather, defendants dispute whether that change in position upsets a legitimate reliance interest and the extent to which the agency explained its departure from past practice.  The Court is not convinced that plaintiffs' expectation that the agency would continue to employ the same deliberate process it historically used rises to the level of a "legitimate reliance interest." *See Wages & White Lion*, 145 S. Ct. at 927 (citation modified).  Nonetheless, the Court need not reach that question, as the agency did not provide a reasoned explanation for its change in position.

[13] Acknowledging the existence of the agency's discretion is not, of course, the same as an explanation of how that discretion is exercised.

ways in which the impact of its decision might be less harmful than anticipated or mitigated in the future.

Put another way, the agency failed to consider reasonable alternatives that were incompatible with its new (and unexplained) position that a new survey component must be initiated within 120 days. Commenters raised concerns about data definitions and quality. (Dkt. No. 9-2, at 17). But the agency could not conduct TRPs or seek stakeholder input to refine the data requested. Commenters noted the substantial burden of producing and ensuring the accuracy of six years of decentralized admissions data on a short timeline. (Dkt. No. 69-13, at 5). But the agency could not extend the timeline past the 2025-2026 school year. Commenters voiced concerns about the ACTs survey introducing new and untested submission procedures. (*Id.*). But those procedures could not be tested in a pilot or optional-year data collection.

Of course, an executive-branch agency is not free to ignore presidential directives. But if the President does not provide a reasoned explanation for a decision, then, at the very least, the agency implementing that decision must provide one. Otherwise, the agency is not in fact following the President's directive to act "consistent with applicable law." (Dkt. No. 69-6). If there were good reasons for the timetable, the agency has not explained them, and "[i]t is not the role of the [C]ourt[] to speculate." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). As a result, the Court finds that plaintiffs have shown a likelihood of success on their arbitrary-and-capricious claim.

Compounding those issues is the fact that the agency implemented a massive expansion of IPEDS at a time when the President ordered the agency to shut down. For some universities, ACTS doubled the burden of IPEDS reporting. (Dkt. No. 9-4 ¶¶ 21-22). The new survey seeks six years of sensitive, disaggregated data from thousands of institutions. (Dkt. No. 69-19 ¶ 7).

30

Yet in the summer of 2025, around the same time ACTS was initiated, NCES had reduced its staff to only three persons.  (Dkt. No. 9-27 ¶ 15; Dkt. No. 9-28 ¶15).  Before February 2025, there were eight staff members assigned to the team responsible for IPEDS.  (Dkt. No. 100-2 ¶ 2).  Now there are three staff members directly responsible for IPEDS.  (*Id.* ¶ 2).[14]

In response to concerns by commenters about the capacity of NCES to effectively manage the ACTS component and provide technical assistance, the agency simply responded that "NCES and its IPEDS contractor have confidence in their joint capacity to collect, validate, and report the ACTS data."  (Dkt. No. 69-17, at 24).  It never even acknowledged the existence of the staff reductions, much less explain how its reduced staff will be able to keep up with an increased workload.  Nor did it explain how the hollowed-out agency will be able to effectively conduct disclosure risk reviews, identify inaccurate data, and develop useful statistical analyses.  From defendants' response, it appears those tasks will be performed by contractors.  (Def.'s Suppl. Opp'n 3-4).  To what extent contractors have the authority to assume NCES functions, and what will happen when the Department of Education, and NCES with it, no longer exists, was likewise unexplained.

At the very least, the dismantling of the agency with the statutory authority to implement IPEDS—to collect the data, store it, analyze it, and address ongoing issues—is "an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  Without any acknowledgement that the problem exists, much less an explanation of how it will be resolved, the Court is left to conclude that the agency "entirely failed to consider" it.  *Id.*  That, too, is evidence that the agency action

---

[14] According to the government, the total number of people in NCES is now 12 staff members and one detailee.  (Dkt. No. 100-2 ¶ 2).  According to *amici*, the total number was approximately 100 before the current round of reductions began.  (Dkt. No. 73, at 8-9).

was arbitrary and capricious, and further supports the conclusion that plaintiffs are likely to succeed on the merits of their claim.

### B.    Likelihood of Irreparable Harm

Plaintiffs allege three types of irreparable harm absent interim relief:  the burden of completing the ACTS survey; the burden of being subject to enforcement actions for inadequate, incomplete, or erroneous data submissions; and privacy risks from revealing students' personal information.

The government's principal response is that plaintiffs' delay in filing suit undermines their claims of irreparable harm.  (Def.'s Opp'n 9).  Plaintiffs filed the complaint a week before the March 18, 2026 deadline for submitting the ACTS survey.  But that timeline must be placed in the context of the hasty development and implementation of the survey.  Plaintiffs first had access to the actual ACTS survey on November 13, 2025.  That component was not finalized— and therefore could not be challenged as a final agency action—until December 18, 2025. Plaintiffs then had ninety days to complete the survey.  They did not sit on their hands during that time.  (*See* Dkt. Nos. 9-3 to 9-26).  Rather, they encountered issues completing the ACTS survey, which was exacerbated by receiving changing information from the agency or its contractors.  Under those circumstances, any delay does not undercut their claims to irreparable harm.  More importantly, plaintiffs assert harms that can only occur after the deadline for submission has passed.  Any delay before the deadline has no bearing on those harms that will be suffered after the deadline.

First, plaintiffs allege ongoing harm from the burden of responding to the ACTS survey. The First Circuit has found that "administrative upheaval" from complying with government regulation may constitute an irreparable harm.  *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *petition for cert. filed*, No. 25-899 (U.S. Jan. 30, 2026).  Indeed, plaintiffs allege that completing

the ACTS survey entails restructuring their data-collection systems and diverting resources from essential tasks. (Pls.' Reply 8). For example, one institution "has not been able to complete projects like scholarship awards, accreditation, financial aid awards, and others because of the work required for the survey." (Dkt. No. 9-12 ¶ 24). Those are harms that are not compensable with money damages.

The Court acknowledges that some institutions have completely responded to the ACTS survey or submitted at least three years of data. (Dkt. No. 100-2 ¶ 17). What burden, if any, those universities faced to complete the survey is not before the Court. What is in the record are a score of affidavits from officials from the public university systems of plaintiffs detailing the substantial and ongoing challenges with completing the ACTS survey. (*See* Dkt. Nos. 9-3 to 9-26). And it is simply not the case that the University of Wisconsin and the University of California have, as defendants assert, "made no efforts to comply" with the survey. (Def.'s Suppl. Opp'n 8).[15]

Second, plaintiffs contend that they face an imminent risk of fines and loss of federal funding should defendants deem any submissions inadequate. Defendant contends that such harms are speculative because "enforcement action[s] are not automatic" and by regulation plaintiffs would have an opportunity to raise defenses at any such proceeding. (Def.'s Opp'n 11). Such enforcement actions, however, are hardly speculative.[16] The lack of clear definitions

---

[15] The University of California has "devote[d] substantial additional time and resources attempting to interpret ACTS' ambiguous reporting requirements." (Dkt. No. 9-3 ¶ 23). The University of Wisconsin institutions "divert[ed] important resources from other projects in order to complete the ACTS survey." (Dkt. No. 9-23 ¶ 25).

[16] It is perhaps more speculative whether the harm from fines or other enforcement actions is irreparable. Generally, "traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable." *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5 (1st Cir. 2019) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)). Plaintiffs may be able recover the cost of fines or lost federal funds post-judgment, although it is not clear through what mechanism. Regardless, defendants have not raised the argument that any monetary harm from a wrongful enforcement action could be recovered. (*See* Def.'s Opp'n 10-12).

and reporting standards, along with the tight timeline for reconciling any data issues, creates a strong risk that, despite their best efforts, plaintiffs will submit inconsistent and inaccurate data. (*See, e.g.*, Dkt. No. 9-11 ¶ 28).  Furthermore, the Presidential Memorandum contained a direct, if not specific, enforcement threat; it directed the Secretary of Education to "increase accuracy checks of submitted data" and "take remedial action, consistent with Title IV of the Higher Education Act of 1965 and other applicable laws, if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data."  (Dkt. No. 69-6).  Although the statute and regulation grant the Secretary the discretion to impose penalties, the presidential directive provides for no such leeway.  *Contrast* 35 C.F.R. §§ 668.84-86 ("The Secretary *may* impose a fine," "suspend an institution's participation," or "limit or terminate an institution's participation.") (emphasis added), *with* Dkt. No. 69-6 ("The Secretary of Education *shall* take remedial action" (emphasis added)).  Moreover, that directive does not grant the agency the flexibility to decline remedial action if an institution has a reasonable excuse for "submitt[ing] incomplete or inaccurate data."  (Dkt. No. 69-6).

Third, plaintiffs raise the considerable privacy risks associated with disaggregated data disclosure.  Defendants challenge the contention that plaintiffs have standing to allege such a privacy harm on behalf of their students.  There are potentially complex questions concerning the data privacy obligations of the universities as to their students, and the extent to which it can assert those obligations in this context.  Defendants have also outlined measures they intend to take to mitigate any privacy risks.  For present purposes, the Court will defer resolving those issues, and note that its finding of irreparable harm does not rest on any privacy risks.

## C.    **Balance of the Equities and Public Interest**

The Court has thus concluded that there is a substantial likelihood that plaintiffs will succeed on the merits of their claim that the promulgation of the ACTS was arbitrary and

34

capricious, and that they will suffer immediate irreparable harm if the implementation of the survey is not restrained. As noted, the two remaining factors, balance of the equities and the public interest, merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

There is a strong public interest in restraining the arbitrary exercise of power by the federal government, and ensuring that the rule of law is enforced. There is likewise a strong interest in relieving public universities of unnecessary risks and burdens that could be eliminated or mitigated through a reasoned and careful administrative process. Nonetheless, defendants assert three reasons for why the balance of the equities disfavor a preliminary injunction.

First, defendants contend that they have the authority to collect the requested data and that it would intrude on that authority to enter an injunction. (Def.'s Suppl. Opp'n 11). But the Court has concluded that while defendants likely do have the authority to collect the data, they do not possess the authority to do so under the circumstances presented here, given the arbitrary and capricious nature in which the ACTS was promulgated.[17]

Next, defendants contend that delay of data collection will delay the public release of admissions data that college applicants may rely on in the upcoming application cycle. As a consequence, they argue, applicants may "spend money on college application fees for schools to which they otherwise might not apply because the data shows that they have no realistic chance of admission." (*Id.*). But the stated purpose of the ACTS is to expose unlawful race-based admissions practices. Defendants point to no evidence that the survey was designed to benefit

---

[17] For support, defendants cite to *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). In that case, the Supreme Court found that there was a "fair prospect that [the] Court w[ould] reverse the decision below" and find for the government. *Id.* Here, the Court finds that the government is unlikely to prevail.

college applicants more broadly.  Rather, what defendants seem to suggest is that applicants will not apply to certain schools because they correctly believe, on the basis of the ACTS data, that those schools will unlawfully discriminate against those particular applicants on the basis of race. That reasoning is too attenuated without supporting evidence.  Moreover, if illegal conduct proves to be readily apparent from the ACTS data, applicants could seek an injunction against the discriminating schools.

Finally, defendants allege that delay will increase the risk that data will not be available for collection, as plaintiffs may destroy records currently in their possession.  (Def.'s Suppl. Opp'n 11-12).  That issue is easily resolved.  The Court will order plaintiffs to retain records that are responsive to the ACTS survey for the duration of this litigation.

In sum, the balance of the equities and the public interest likewise favor preliminary relief.

## IV.    Scope of Relief

Section 705 of the APA authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.

The scope of relief under § 705 is unsettled.  Although the Supreme Court's recent decision in *Trump v. CASA, Inc.* limited traditional equitable relief to the parties in the litigation, it explicitly declined to address "the distinct question" of relief under the APA.  145 S. Ct. 2540, 2548 & n.10 (2025).  It is true that there are good reasons to read a stay of agency action as operating globally, not just the parties to the case.  *See Career Colleges & Schools of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (concluding "that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action"); *Make*

*the Rd. New York v. Noem*, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (per curiam) (finding the government was "unlikely to succeed in its argument that Section 705 stays must be confined to the plaintiffs before the court."). Nonetheless, the Court does not need to reach the issue, as § 705 also authorizes courts to "issue all necessary and appropriate process . . . to preserve status or rights." The language of § 705 thus appears to offer reviewing courts a choice between issuing a stay of agency action or more limited equitable relief tailored to the case. *See Immigrant Defs. L. Ctr. v. Noem*, 2025 WL 2017247, at *14 (9th Cir. July 18, 2025) (limiting relief under § 705 to the party).[18]

Here, plaintiffs seek "preliminary relief for Plaintiffs." (Pls.' Reply 1). They do not seek "global relief." (Mot. Tr. 45, Dkt. No. 90). The Court will accordingly limit its order of preliminary relief, under § 705 and Rule 65, to the plaintiffs in this case and their constituent institutions. That order is without prejudice to such further modification as justice may require.

## V.    Conclusion

For the foregoing reasons, the motion of plaintiffs for a temporary restraining order, construed as a motion for a preliminary injunction or stay, is GRANTED to the extent it seeks preliminary injunctive relief as to the plaintiffs to this proceeding, and otherwise DENIED without prejudice. A separate preliminary injunction order will issue.

---

[18] *See also* Note, *Halting Administrative Action in the Supreme Court*, 137 HARV. L. REV. 2016, 2019 (2024) ("Section 705 also empowers courts to issue all 'necessary and appropriate process' to 'preserve status or rights' as challenges to agency action proceed. That authority includes courts' traditional equitable authority to issue injunctions." (footnote omitted) (quoting 5 U.S.C. § 706)).

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  April 3, 2026                                      United States District Court Judge