UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, ET AL.<br><br>                Plaintiffs,<br>v.<br><br>DEPARTMENT OF EDUCATION, ET AL.<br><br>                Defendants. | C.A. No.  26-11229-FDS |

## <u>MEMORANDUM IN SUPPORT OF THE INDEPENDENT COLLEGE GROUP'S MOTION TO INTERVENE</u>

**INTRODUCTION**

Barnard College ("Barnard"), Bryn Mawr College ("Bryn Mawr"), Middlebury College ("Middlebury"), Sarah Lawrence College ("Sarah Lawrence"), Swarthmore College ("Swarthmore"), and Vassar College ("Vassar") (collectively, the "Independent College Group Plaintiff-Intervenors" or the "ICG Plaintiff-Intervenors") respectfully move for leave to intervene in this action, which challenges the legality of the Department of Education's Admissions and Consumer Transparency Supplement ("ACTS") survey component. The ICG Plaintiff-Intervenors' circumstances are distinct from those of the parties and proposed plaintiff-intervenors already before this Court. The ICG Plaintiff-Intervenors are not public institutions in one of the Plaintiff States. They are not associations speaking on behalf of a broad membership. They are private, nonprofit colleges that were directly subjected to the ACTS survey's demands and that have already uploaded data under the survey—data now in Defendants' possession, compiled under the coercive pressure of an unlawful mandate, and vulnerable to use for the enforcement purposes the Department has publicly announced.

Each of the ICG Plaintiff-Intervenors uploaded some or all of the data demanded by the ACTS survey under the threat of fines, loss of federal funding, and enforcement proceedings. *See* 34 C.F.R. §§ 668.84–.86. Middlebury uploaded and locked its ACTS data as of March 9, 2026, while Barnard, Bryn Mawr, Sarah Lawrence, Swarthmore, and Vassar each partially uploaded three years of ACTS survey component data and received extensions to complete the survey by April 8, 2026.[1] These submissions were made before any court had an opportunity to evaluate

---

[1] Vassar and Barnard have continued to upload data but have yet to finalize the submission.

whether the ACTS survey component is lawful, or shortly thereafter under the continuing threat of enforcement.

On March 13, 2026, this Court entered a Temporary Restraining Order (ECF No. 12) that paused the ACTS survey component deadline for all institutions of higher education. On March 24, 2026, the Court narrowed that order (ECF No. 75) (the "March 24 Order"), confining relief to the 17 Plaintiff States and their constituent public institutions. On March 25, 2026, the Association of American Universities ("AAU") filed a motion to intervene and a motion for a temporary restraining order. ECF Nos. 83, 85. On March 30, 2026, the Association of Independent Colleges and Universities in Massachusetts ("AICUM") also filed a motion to intervene and a motion for a temporary restraining order. ECF Nos. 109, 111. On March 31, 2026, this Court provisionally granted those motions to intervene and issued a temporary restraining order extending the deadline through April 14, 2026 for proposed plaintiff-intervenors and their constituent institutions. ECF No. 118. On April 3, 2026, the Court issued a Memorandum and Order on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 142) and a Preliminary Injunction (ECF No. 143), finding that the Plaintiff States are likely to succeed on the merits of their claim that the ACTS survey was arbitrary and capricious and granting preliminary injunctive relief to the Plaintiff States and their constituent institutions.

Because this relief does not extend to all institutions of higher education, including the ICG Plaintiff-Intervenors, their data remain unprotected: already in Defendants' hands, with no judicial order restricting their access or use, and no existing party positioned to seek such protection on the ICG Plaintiff-Intervenors' behalf. The ICG Plaintiff-Intervenors now seek to join this action to press the same legal theory advanced by the Plaintiff States—that the ACTS survey is arbitrary and capricious—and to secure institution-specific protection that no existing party can obtain on

their behalf: an order barring Defendants from reviewing, relying on, or taking action based on data that the ICG Plaintiff-Intervenors were compelled to provide. Intervention as of right is warranted under Rule 24(a)(2). Should the Court disagree, permissive intervention under Rule 24(b) is amply justified.

**BACKGROUND**

**I.        The ICG Plaintiff-Intervenors**

Each of the ICG Plaintiff-Intervenors is a private, nonprofit college located in New York, Pennsylvania, or Vermont. Each participates in federal student financial aid programs and is required by statute and regulation to report data through the Integrated Postsecondary Education Data System ("IPEDS"). *See* 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). The ACTS survey component applies to each of the ICG Plaintiff-Intervenors and purports to require them to compile and report the extensive data demanded by the survey.

All of the ICG Plaintiff-Intervenors are members of organizations that submitted comments raising serious concerns about the ACTS survey's feasibility, timeline, and privacy implications. Bryn Mawr and Swarthmore are members of the Independent Colleges and Universities of Pennsylvania, and Middlebury is a member of the Association of Vermont Independent Colleges, both of which joined the National Association of Independent Colleges and Universities ("NAICU"), of which Boden and Sarah Lawrence are members, and more than 30 other higher education associations in submitting joint comments. *See* NAICU Comments on IPEDS, Docket ID ED-2025-SCC-0382, at 3 (U.S. Dep't Educ. Oct. 14, 2025) (https://naicuedu.sharepoint.com/sites/External/Shared%20Documents/Forms/AllItems.aspx?id=%2Fsites%2FExternal%2FShared%20Documents%2FSign%2DOn%20Letters%2F2025%2FNAICU%5FComments%5FACTS%5F2025%2E10%2E14%2Epdf&parent=%2Fsites%2FExternal

%2FShared%20Documents%2FSign%2DOn%20Letters%2F2025&p=true&ga=1) ("NAICU Oct. Comments"); NAICU Comments on IPEDS (Dec. 14, 2025) (https://www.regulations.gov/comment/ED-2025-SCC-0382-3588).

## II.    The ACTS Survey and Its Impact on the ICG Plaintiff-Intervenors

For decades, changes to the IPEDS reporting framework have followed a measured, consultative process that afforded institutions adequate notice, clear definitions, technical guidance, and reasonable lead times for implementation. The implementation of the ACTS survey abandoned that approach. The ACTS survey requires institutions to furnish a sweeping array of admissions, financial aid, and academic performance data, disaggregated by race-and-sex pairs and reaching back seven years. Schools were given only months to comply with the survey's demands, the level of which the Department had never previously imposed.

Feeling compelled to submit responses in order to avoid fines and potential loss of federal funding, each of the ICG Plaintiff-Intervenors either partially or fully uploaded ACTS survey component responses. None of the ICG Plaintiff-Intervenors uploaded data because they believed the survey was lawful; rather, the consequences of noncompliance—fines, potential loss of federal funding, and enforcement action—left them with no practical alternative. *See* 34 C.F.R. §§ 668.84–.86. The survey required each ICG Plaintiff-Intervenor to compile either three or seven years of retrospective data across numerous new data fields, including categories of information that the ICG Plaintiff-Intervenors had not previously been required to collect or maintain in the format specified by the survey. Each ICG Plaintiff-Intervenor devoted significant staff time and institutional resources to the effort, diverting personnel from other institutional priorities. The compressed timeline, combined with the lack of clear definitions and guidance from the

Department, made it difficult for the ICG Plaintiff-Intervenors to ensure that their data were complete, consistent, or reliable.

The data the ICG Plaintiff-Intervenors uploaded are now in Defendants' possession. The Department has announced its intention to use ACTS data to "establish a baseline of admissions practices" and "develop risk-based enforcement practices." Aug. 15 Request for Comment at 39385. The ICG Plaintiff-Intervenors thus face the prospect of investigation and enforcement premised on data they were given inadequate time and guidance to compile reliably, data they would not have uploaded at all but for the coercive pressure of the Department's deadline backed by the threat of institutional sanctions.

The survey also raises acute privacy concerns. The granular disaggregation of applicant and student data by race, sex, income, test scores, and GPA creates cells small enough to permit re-identification of individual students, particularly at relatively smaller institutions like the ICG Plaintiff-Intervenors. The Department has acknowledged this risk but has offered no concrete mitigation. *See* Response to Comments at 19. The ICG Plaintiff-Intervenors have now transmitted data carrying that risk to the federal government, with no assurance regarding how it will be stored, who will access it, or what safeguards will be applied.

That the ICG Plaintiff-Intervenors either fully or partially uploaded data does not extinguish their claims. If anything, it sharpens them. The harms the ICG Plaintiff-Intervenors have suffered are concrete, ongoing, and remediable only through participation in this proceeding.

## ARGUMENT

### III. The ICG Plaintiff-Intervenors Are Entitled to Intervene as of Right Under Rule 24(a)(2)

Federal Rule of Civil Procedure 24(a)(2) requires that a court permit intervention by anyone who, on timely motion, "claims an interest relating to the property or transaction that is the

6

subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The First Circuit applies a four-part test: the motion must be (1) timely; (2) the applicant must claim a legally cognizable interest in the subject matter of the litigation; (3) the disposition of the action must threaten to impair or impede the applicant's ability to protect that interest; and (4) the existing parties must not adequately represent the applicant's interest. *See R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009); *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 110 (1st Cir. 1999). The ICG Plaintiff-Intervenors satisfy each element.

### A.      The ICG Plaintiff-Intervenors' Motion is Timely.

The First Circuit evaluates timeliness under a four-factor framework that considers: (i) how long the prospective intervenor knew or should have known of its interest before seeking intervention; (ii) prejudice to existing parties from any delay; (iii) prejudice the prospective intervenor would suffer if excluded; and (iv) any unusual circumstances. *See Caterino v. Barry*, 922 F.2d 37, 40 (1st Cir. 1990); *United States v. Metro. Dist. Comm'n*, 865 F.2d 2, 5 (1st Cir. 1989). All four factors weigh decisively in the ICG Plaintiff-Intervenors' favor.

First, the ICG Plaintiff-Intervenors acted promptly once it became clear that intervention in this action was necessary to protect their interests. Each of the ICG Plaintiff-Intervenors uploaded ACTS data on or shortly after the Department's original March 18 deadline or qualifying extension dates. At that time, no lawsuit had been filed in which the ICG Plaintiff-Intervenors could have sought to intervene. When the Plaintiff States filed this action on March 11, 2026, and two days later obtained a Temporary Restraining Order extending the deadline for all institutions of higher education (ECF No. 12), the broad scope of the Court's initial relief gave the ICG Plaintiff-Intervenors reason to believe that a successful challenge to the ACTS survey would

7

benefit all affected institutions, not only the named plaintiffs. There was no reason for the ICG Plaintiff-Intervenors to seek separate party status so long as the litigation appeared likely to resolve the common legal questions in a manner that would protect all institutions, including those that had already submitted.

That changed on March 24, 2026. When the Court narrowed the TRO to cover only "the 17 named plaintiffs and their constituent institutions of higher education" (ECF No. 75 at 2), it became evident that the scope of relief in this action would be limited to the Plaintiff States and their public institutions. The Court's April 3, 2026 Preliminary Injunction confirmed this limitation (ECF Nos. 142, 143), declining to extend protection to all institutions of higher education. For the ICG Plaintiff-Intervenors, private institutions that are not constituents of any Plaintiff State, not members of either associational proposed intervenor, and whose data was already in the Department's possession, April 3 removed any remaining doubt that independent party status in this proceeding is necessary. The ICG Plaintiff-Intervenors' moved to jointly retain counsel and prepare their filings promptly thereafter.

Second, no party will be prejudiced by the ICG Plaintiff-Intervenors' intervention. This case remains in its infancy. The suit was filed fewer than four weeks ago. No answer or responsive pleading has been entered. No scheduling order, discovery plan, or briefing calendar is in place. No merits ruling has been issued. The ICG Plaintiff-Intervenors' entry at this stage will not disrupt any existing proceedings, require any party to revisit completed work, or delay any pending deadline. The ICG Plaintiff-Intervenors stand ready to adhere to whatever schedule the Court establishes and to align their efforts with those of the existing intervenors wherever doing so is appropriate and serves efficiency. Indeed, the Court has already scheduled a hearing for April 13, 2026, to consider the pending motions to intervene filed by AAU and AICUM. *See* ECF No. 142.

The ICG Plaintiff-Intervenors respectfully request that the Court add their motion to intervene to the April 13 hearing, which would allow the Court to consider all pending intervention motions at a single proceeding without any additional burden on the parties or the Court's calendar.

Third, the ICG Plaintiff-Intervenors would suffer significant and ongoing prejudice if excluded. Their data has been in the Department's custody since as early as March 9, 2026, and is available for Defendants to review and act upon at any time. Without party status, the ICG Plaintiff-Intervenors have no mechanism to seek relief protecting them from the consequences of those compelled submissions, and no way to ensure that any judgment in this case extends to their circumstances.

Finally, the unusual circumstances of this case strongly favor intervention. The ACTS survey was implemented on a radically compressed timeline over the objection of thousands of commenters. The ICG Plaintiff-Intervenors complied with the survey before or shortly after this lawsuit was filed, as the Department's original deadline and the threat of enforcement left no room for delay. The lawsuit was then filed on an emergency basis, and the TRO was entered, narrowed, and modified—all within two weeks. Since then, the Court has provisionally granted intervention to AAU and AICUM and issued further TROs (ECF No. 118), and on April 3 granted the Plaintiff States a preliminary injunction that the Court expressly limited to the Plaintiff States and their constituent institutions. The ICG Plaintiff-Intervenors' need for judicial protection emerged not from any failure to act, but from the progressive limitation of the Court's orders and relief to parties to which the ICG Plainitff-Intervenors' do not belong. These circumstances counsel strongly in favor of finding timeliness.

**B.    The ICG Plaintiff-Intervenors Hold a Direct, Legally Protectable Interest in This Action.**

Rule 24(a)(2) requires an interest that is "direct, substantial, and legally protectable." *Mosbacher*, 966 F.2d at 41; *see also Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011). That threshold is not demanding, and the ICG Plaintiff-Intervenors clear it by a wide margin.

The ICG Plaintiff-Intervenors are not bystanders to this dispute. They are among the thousands of institutions directly covered by the ACTS survey, and among the smaller number that have already complied in whole or in part. Their interests are tangible, specific, and currently at risk. At the most basic level, the ACTS survey required the ICG Plaintiff-Intervenors to produce data of a type, volume, and historical depth they have never before been asked to furnish—approximately 70,000 new reporting fields, including up to seven years of retrospective data spanning admissions, financial aid, and academic performance metrics disaggregated by race-and-sex pairs. Over half of institutions responding to the Department's own inquiry estimated that compliance would demand more than 250 hours of staff time. *See* NAICU Comments at 3. For each of the ICG Plaintiff-Intervenors, meeting that obligation required a significant commitment of institutional resources over a period of weeks.

The burden of compliance, however, extends well beyond the expenditure of time and labor. The survey's granular disaggregation of applicant and student data by race, sex, income, test scores, and GPA creates cells small enough to permit re-identification of individual students, particularly at relatively smaller institutions like the ICG Plaintiff-Intervenors. The Department has acknowledged this risk but has offered no concrete mitigation. *See* ECF No. 9 at Ex. B, U.S. Dep't Educ. Response to Public Comments at 19 ("Oct. Response to Comments"). The ICG Plaintiff-Intervenors have now transmitted data carrying that risk to the federal government, with no assurance regarding how it will be stored, who will access it, or what safeguards will be applied.

10

The privacy of the ICG Plaintiff-Intervenors' applicants and students, a responsibility that each institution takes seriously and is independently obligated to uphold, has been compromised by a survey that the ICG Plaintiff-Intervenors contend was never lawfully authorized.

Compounding these concerns is the direct enforcement exposure the submissions create. The Department has publicly stated that it intends to use ACTS data to "establish a baseline of admissions practices" and "develop risk-based enforcement practices." *See* Agency Information Collection Activities Comment Request, IPEDS 2024–25 Through 2026–27, 90 Fed. Reg. 39384, 39385 (Aug. 15, 2025) (Aug. 15 Request for Comment"). The ICG Plaintiff-Intervenors have already furnished data the Department says it will use for that purpose—data compiled under a timeline and conditions that made full verification impossible to achieve. The ICG Plaintiff-Intervenors thus face the concrete threat of investigation or sanction premised on information they could not adequately verify and uploaded only because the alternative was the risk of institutional penalties.

Finally, the ACTS survey threatens the ICG Plaintiff-Intervenors' interests in the integrity of their admissions processes. The ICG Plaintiff-Intervenors employ holistic, individualized approaches to admissions that evaluate candidates across a range of academic and personal dimensions. The survey's rigid quantitative framework cannot capture the nuance of those processes and risks producing distorted portraits of institutional practice. *See* American Counsel on Education Comment on IPEDS at 4–5 (Oct. 7, 2025) (https://www.acenet.edu/Documents/Comments-ED-ACTS-100725.pdf). Those distortions carry real consequences: the Department has announced that it will use the data to inform enforcement decisions, meaning that a misleading statistical snapshot generated by the survey's own design limitations could become the basis for federal action against the ICG Plaintiff-Intervenors.

Further, The ICG Plaintiff-Intervenors that only partially uploaded data also face the substantial additional administrative burdens that would be posed by gathering and uploading, and/or finalizing additional data as purportedly required by the ACTS survey component, once the applicable extensions expire. These burdens are not hypothetical. Each of the ICG Plaintiff-Intervenors who have not finalized full responses—Swarthmore, Barnard, Bryn Mawr, Sarah Lawrence, and Vassar—attests that its institutional research and administrative staff have devoted extensive time and resources to the ACTS submission process, with staff spending full weeks and significant overtime compiling data, far exceeding the effort required for prior-year IPEDS reporting. *See* Swarthmore Declaration in Support of ICG's TRO ("Swarthmore Decl.") ¶ 24 (one staff member logging over 200 hours and another over 100 hours—easily double the prior-year IPEDS effort); Barnard Declaration in Support of ICG's TRO ("Barnard Decl.") ¶¶ 9, 14–15; Bryn Mawr Declaration in Support of ICG's TRO ("Bryn Mawr Decl.") ¶ 16; Sarah Lawrence Declaration in Support of ICG's TRO ("Sarah Lawrence Decl.") ¶ 24; Vassar Declaration in Support of ICG's TRO ("Vassar Decl.") ¶¶ 9, 11. Yet despite these efforts, none of these institutions has been able to finalize its submission—each institution's ACTS data remains unlocked in the IPEDS system and subject to the April 8 deadline. *See* Swarthmore Decl. ¶ 24; Barnard Decl. ¶ 24; Bryn Mawr Decl. ¶¶ 13, 15; Sarah Lawrence Decl. ¶ 12; Vassar Decl. ¶ 12.

The conditions under which data is being compiled—the compressed timeline, shifting templates, ambiguous definitions, and the absence of historical vetting and quality-assurance processes—are not conducive to producing reliable, validated data, and several institutions acknowledge that their submissions may contain inconsistencies and errors as a result. *See* Bryn Mawr Decl. ¶ 16; Vassar Decl. ¶¶ 9, 11; Middlebury Decl. ¶¶ 12, 15. At Swarthmore, the problem is compounded by the fact that the ACTS surveys are interconnected with other IPEDS survey components, meaning that

correcting an error in one survey generates new errors in others, creating a cascade of compounding problems that staff continue to work through with no clear resolution in sight. *See* Swarthmore Decl. ¶ 24. And at Sarah Lawrence, the burden has forced the Registrar and primary operations leads in Admissions and Financial Aid—which are small offices—to divert efforts away from core institutional functions, including finalizing graduating students' degrees and processing applications and financial aid packages for incoming admitted students. *See* Sarah Lawrence Decl. ¶ 24. These ongoing burdens further underscore the concrete, legally protectable interests at stake for the ICG Plaintiff-Intervenors.

These are not speculative or generalized grievances. They are concrete, immediate, and personal to the ICG Plaintiff-Intervenors, rooted in compliance events that have already occurred and in ongoing risks that only judicial intervention can address. Rule 24(a)(2) asks for nothing more.

### C.    The Disposition of This Action Threatens to Impair the ICG Plaintiff-Intervenors' Ability to Protect Their Interests.

Rule 24(a)(2) requires a showing that the litigation's resolution "may as a practical matter impair or impede" the movant's ability to safeguard its interests. The First Circuit assesses this element pragmatically, looking to real-world consequences rather than formal preclusion doctrines. *See Daggett*, 172 F.3d at 111.

This case will, in all likelihood, produce the definitive judicial pronouncement on the legality of the ACTS survey component. If the Court sustains the survey, that ruling will effectively confirm the Department's authority to demand the ICG Plaintiff-Intervenors' compliance and to act on the data they have already provided, all without the ICG Plaintiff-Intervenors having had any voice in the proceedings. If the Court strikes down the survey but limits relief to the existing

parties, the ICG Plaintiff-Intervenors would be left without any order restraining the Department's use of data it has already collected from them.

The risk of harm remains acute notwithstanding the ICG Plaintiff-Intervenors' post-submission posture. The ICG Plaintiff-Intervenors' data has been in the Department's possession since as early as March 9, 2026. Unlike institutions that were shielded by the TRO and may not yet have submitted any data, the ICG Plaintiff-Intervenors cannot undo their partial or full compliance with what the ICG Plaintiff-Intervenors contend is an invalid survey requirement. If the Court enters relief that does not extend to the ICG Plaintiff-Intervenors, the Department would remain free to access, review, and act on their submissions, even if the survey that compelled them is ultimately invalidated. No other party is seeking, or is positioned to seek, an order specifically protecting the ICG Plaintiff-Intervenors' data. Without intervention, that data remains exposed.

A separate lawsuit would be an inferior alternative. It would require a different court to address the same legal questions on the same administrative record, inviting inconsistency and inefficiency. It would also subject the ICG Plaintiff-Intervenors to arguments that they should have sought to participate in the proceeding already underway. The most practical and effective vehicle for the ICG Plaintiff-Intervenors to protect their interests is the one currently before this Court.

**D.      The ICG Plaintiff-Intervenors' Interests Are Not Adequately Represented by the Existing Parties.**

The standard for demonstrating inadequacy of representation is "minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). A prospective intervenor need only establish that representation of its interests "may be" inadequate. *Id.*; *see also Mosbacher*, 966 F.2d at 44. That showing is readily made here.

The most fundamental gap lies in the divergence between the ICG Plaintiff-Intervenors' interests and those of the Plaintiff States. The ICG Plaintiff-Intervenors are private colleges that

operate independently of their respective state governments, receive no state appropriations, and are governed by their own boards of trustees. Although some of the states in which the ICG Plaintiff-Intervenors are located are among the 17 plaintiff states, the March 24 Order laid bare the limits of that relationship. When the Court confined its Temporary Restraining Order to the State Plaintiffs and their "constituent institutions of higher education," ECF No. 75 at 2, the Department treated the order as inapplicable to private institutions. The Court's April 3 Preliminary Injunction confirmed this structural limitation, expressly restricting relief "to the plaintiffs in this case and their constituent institutions" and by implication declining to extend protection to all institutions of higher education. ECF No. 142 at 37. The result was that the ICG Plaintiff-Intervenors received no more protection than institutions in states that had declined to participate in this litigation at all. That outcome reflects a structural reality: sovereign plaintiffs focused on their public systems cannot be expected to secure individualized relief for private institutions within their borders.

Nor can the two associational intervenors fill the gap. None of the ICG Plaintiff-Intervenors is a member of AAU or AICUM. Those organizations do not speak for the ICG Plaintiff-Intervenors, have no obligation to advance their interests, and owe them no duty of representation. To be sure, some members of both organizations were, like the ICG Plaintiff-Intervenors, compelled to upload data under the ACTS survey. *See* AAU Proposed Complaint ¶¶ 60–62, ECF No. 83-3; AICUM Proposed Complaint ¶¶ 60–62, ECF No. 109-2. And both organizations have sought injunctive relief that would, among other things, bar Defendants from accessing data uploaded by their members and from pursuing enforcement actions on the basis of those submissions. *See* AAU Proposed Complaint, Prayer for Relief ¶ d; AICUM Proposed Complaint, Prayer for Relief ¶ d. But the relief those organizations seek is framed in collective terms and runs to their respective memberships as a whole. Neither association is positioned to present the Court

with evidence about the ICG Plaintiff-Intervenors' particular data architectures, the specific deficiencies in their compelled submissions, or the way in which the ACTS survey's rigid reporting framework distorts their admissions processes. Associations by their nature litigate at a level of generality; the institution-level facts that define the ICG Plaintiff-Intervenors' harm can be developed and presented only by the ICG Plaintiff-Intervenors themselves.

More fundamentally, any relief entered for the proposed associational intervenors' memberships would not extend to the ICG Plaintiff-Intervenors. An order barring Defendants from accessing data submitted by AAU's 69 member universities or AICUM's 58 member colleges would leave the ICG Plaintiff-Intervenors' own submissions unprotected. The ICG Plaintiff-Intervenors would remain exposed to the very harms the associations seek to prevent for their constituents: the review and use of unreliable data compiled under pressure, and the initiation of enforcement proceedings premised on that data. They would have no judicial shield of their own. The fact that other institutions find themselves in a broadly similar predicament does not diminish the ICG Plaintiff-Intervenors' need for individualized participation; it underscores it. Each institution's submission was shaped by its own data systems, its own resource constraints, and its own compliance choices. The consequences of those submissions, including the enforcement exposure they create, are likewise institution-specific.

What the ICG Plaintiff-Intervenors require is an order tailored to their circumstances: one that specifically directs Defendants not to access or review the data the ICG Plaintiff-Intervenors uploaded, not to rely on that data for any investigative or enforcement purpose, and not to impose penalties on the ICG Plaintiff-Intervenors in connection with their ACTS survey component responses. No existing party is seeking that relief on the ICG Plaintiff-Intervenors' behalf. No existing party's success on the merits would automatically deliver it. And no existing party can

substitute for the ICG Plaintiff-Intervenors' direct participation in developing the factual record that supports it.

Because the ICG Plaintiff-Intervenors have demonstrated that the existing parties' representation of their interests "may be" inadequate, and because the litigation has already produced an outcome in which the ICG Plaintiff-Intervenors' interests went entirely unprotected, the final element of intervention as of right is satisfied.

**IV.     In the Alternative, the ICG Plaintiff-Intervenors Satisfy the Standard for Permissive Intervention Under Rule 24(b)**

Should the Court conclude that the ICG Plaintiff-Intervenors have not established every element of intervention as of right, the ICG Plaintiff-Intervenors respectfully submit that permissive intervention is warranted under Rule 24(b)(1)(B). That provision requires only that a proposed intervenor file a timely motion and assert a claim or defense sharing at least one common question of law or fact with the pending action. Fed. R. Civ. P. 24(b)(1)(B).

As set forth above, the ICG Plaintiff-Intervenors' motion is timely. And the overlap between the ICG Plaintiff-Intervenors' claims and those of the Plaintiff States is extensive. The ICG Plaintiff-Intervenors' proposed complaint in intervention alleges that Defendants acted in an arbitrary and capricious manner in approving and implementing the ACTS survey component, in violation of the APA, 5 U.S.C. § 706(2)(A). Every legal question and nearly every area of factual inquiry addressed in the ICG Plaintiff-Intervenors' proposed complaint is shared with the main action.

Where, as here, the threshold requirements are met, the Court has "very broad discretion" to grant permissive intervention. *T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 40 (1st Cir. 2020). Granting the ICG Plaintiff-Intervenors' motion will not delay the proceedings or prejudice any party; it will instead promote judicial economy by ensuring that the affected

institutions' claims are resolved in the same action, on the same record, and under the same schedule.

**V.    The ICG Plaintiff-Intervenors' Intervention Will Promote Judicial Economy and Cause No Prejudice.**

Regardless of the pathway, the ICG Plaintiff-Intervenors' participation in this case will promote the efficient resolution of a common set of legal and factual questions. The underlying agency action is the same. The administrative record is the same. The Defendants are the same. Adding the ICG Plaintiff-Intervenors as parties will not introduce new legal theories, expand the scope of merits briefing, or require any alteration to the Court's schedule. The ICG Plaintiff-Intervenors will abide by whatever timetable the Court prescribes and will coordinate with the Plaintiff States and existing proposed intervenors to present their arguments as efficiently as possible.

What the ICG Plaintiff-Intervenors do add is a vantage point the Court does not currently have. The Plaintiff States speak as sovereign entities. The associations speak as representatives. The ICG Plaintiff-Intervenors speak as regulated institutions that have lived through and face the prospect of further dealing with the compliance experience at the center of this case. Their accounts of what the ACTS survey demands in practice, and of the enforcement and privacy risks that flow from having already partially or fully complied, will give texture and specificity to the record in a way that serves the Court's resolution of the merits.

The alternative to intervention is a separate lawsuit. That would mean duplicative proceedings, the potential for conflicting rulings, and additional burden on the parties and the judiciary—all to resolve the identical questions that are already squarely before this Court. Consolidation here avoids those inefficiencies.

**CONCLUSION**

For the foregoing reasons, the ICG Plaintiff-Intervenors respectfully request that the Court grant their motion to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2), or, in the alternative, grant permissive intervention pursuant to Rule 24(b)(1)(B).


Dated: April 6, 2026                              Respectfully submitted,

                                                  HOLLAND & KNIGHT, LLP
                                                  Attorney for ICG Plaintiff-Intervenors


                                                  */s/ Jeffrey J. Nolan*
                                                  Jeffrey J. Nolan
                                                  Holland & Knight, LLP
                                                  10 Saint James Avenue
                                                  15th Floor
                                                  Boston, MA 02116
                                                  Telephone: (617) 854-1459
                                                  Fax: (617) 523-6850

19

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of April, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.


Dated: April 6, 2026                                   */s/ Jeffrey J. Nolan*
                                                        Jeffrey J. Nolan