**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.,* <br>           *Plaintiffs,* <br><br>       v. <br><br> U.S. DEPARTMENT OF EDUCATION, *et al.,* <br>           *Defendants.* | Case No. 1:26-cv-11229-FDS |

**MEMORANDUM IN SUPPORT OF INDEPENDENT COLLEGE GROUP PLAINTIFF-INTERVENORS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Barnard College ("Barnard"), Bryn Mawr College ("Bryn Mawr"), Middlebury College ("Middlebury"), Sarah Lawrence College ("Sarah Lawrence"), Swarthmore College ("Swarthmore"), and Vassar College ("Vassar") (collectively, the "Independent College Group Plaintiff-Intervenors" or the "ICG Plaintiff-Intervenors") are private, nonprofit liberal arts colleges that participate in federal student financial aid programs and have long reported data through the Integrated Postsecondary Education Data System ("IPEDS"). The ICG Plaintiff-Intervenors now seek emergency relief from the Admissions and Consumer Transparency Supplement ("ACTS") survey component—the single largest expansion of IPEDS in its more-than-forty-year history—which was implemented on a compressed timeline, without meaningful stakeholder engagement, and in departure from the well-established processes that have historically governed new IPEDS data collections. *See generally* Barnard Declaration in Support of ICG's TRO ("Barnard Decl."); Bryn Mawr Declaration in Support of ICG's TRO ("Bryn Mawr Decl."); Middlebury Declaration in Support of ICG's TRO ("Middlebury Decl."); Sarah Lawrence Declaration in Support of ICG's

TRO ("Sarah Lawrence Decl."); Swarthmore Declaration in Support of ICG's TRO ("Swarthmore Decl."); Vassar Declaration in Support of ICG's TRO ("Vassar Decl.")

The ICG Plaintiff-Intervenors have already submitted some or all of their ACTS data and did so under duress—facing the threat of fines of up to $71,545 per violation and potential loss of Title IV funding—while knowing that the compressed timeline and inadequate guidance made it likely that their submissions would contain inconsistencies. *See* Barnard Decl. ¶ 12, 15; Bryn Mawr Decl. ¶ 12, 15; Middlebury Decl. ¶ 13, 16; Sarah Lawrence Decl. ¶ 13, 16; Swarthmore Decl ¶ 13, 16; Vassar Decl. ¶ 13, 16. The Department of Education ("the Department" or "ED") has stated its intent to use ACTS data as a basis for civil rights enforcement actions, meaning that the ICG Plaintiff-Intervenors now face the prospect of investigation and sanction premised on data that may be unreliable through no fault of their own. *See* Barnard Decl. ¶ 17, 21; Bryn Mawr Decl. ¶ 17, 21; Middlebury Decl. ¶ 17, 20; Sarah Lawrence Decl. ¶ 17, 20; Swarthmore Decl. ¶ 17, 20; Vassar Decl. ¶ 17, 20. The ICG Plaintiff-Intervenors accordingly seek an order preserving their status and rights under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705— including a stay of the ACTS survey as applied to them—and enjoining Defendants from accessing, reviewing, or relying upon the ICG Plaintiff-Intervenors' already-submitted or partially uploaded data pending resolution of this matter.

This Court has already found, on multiple occasions, that the circumstances warrant emergency relief. On March 13, the Court issued a temporary restraining order ("TRO") for all institutions subject to the ACTS deadline. ECF No. 12. On March 24, the Court extended the TRO for the Plaintiff States and their constituent public institutions through April 6. ECF No. 75. On March 31, the Court provisionally granted intervention to the Association of American Universities ("AAU") and the Association of Independent Colleges and Universities in Massachusetts

("AICUM") and issued a further TRO extending the deadline through April 14 for those intervenors and their members. ECF No. 118. Most recently, on April 3, 2026, the Court granted the Plaintiff States' motion for a preliminary injunction, finding that the Plaintiff States had demonstrated a likelihood of success on the merits of their claim that the ACTS survey was promulgated in an arbitrary and capricious manner, that they would suffer irreparable harm absent relief, and that the balance of equities and public interest favored preliminary relief. ECF Nos. 142 Preliminary Injunction Memorandum ("PI Memorandum"), and 143, Preliminary Injunction Order ("PI Order"). The ICG Plaintiff-Intervenors are not members of AAU or AICUM, and are not public institutions in any of the Plaintiff States, and are therefore not covered by any existing TRO or the Court's preliminary injunction. They seek emergency relief on their own behalf for the same reasons this Court has already found compelling—and which it has now confirmed in detail in its April 3 PI Order.

## STATEMENT OF FACTS

Given the Court's familiarity with the underlying facts of this case, the ICG Plaintiff-Intervenors provide only a summary here. For a full account, the Court is respectfully directed to the ICG Plaintiff-Intervenors' simultaneously filed Proposed Complaint in Intervention and the Plaintiff States' motion for emergency relief, ECF No. 7.

### A.    Background on IPEDS and the Established Process for New Data Collections

IPEDS is administered by the National Center for Education Statistics ("NCES"), a component of the Institute for Education Sciences ("IES") within the Department. Institutions participating in federal student aid programs, including the ICG Plaintiff-Intervenors, are required by law to report data through IPEDS. 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). Failure to provide timely and accurate data exposes institutions to fines and the potential loss of eligibility for federal funding. 34 C.F.R. §§ 668.84, 668.85, 668.86.

For decades, when the Department has sought to add new components to IPEDS or substantially modify existing ones, it has followed a deliberative, multi-step process. *See* Barnard Decl. ¶ 5; Bryn Mawr Decl. ¶ 5; Middlebury Decl. ¶ 5; Sarah Lawrence Decl. ¶ 5; Swarthmore Decl. ¶ 5; Vassar Decl. ¶ 5. That process typically involved one or more Technical Review Panels ("TRPs")—multistakeholder panels convened to evaluate proposed changes for feasibility, clarity, and consistency—followed by at least one preview or optional year that allowed institutions to prepare for new requirements before compliance became mandatory. *Id*. The ICG Plaintiff-Intervenors, like other institutions, relied on these established procedures to ensure that new data collections would be clearly defined, technically feasible, and accompanied by adequate lead time to produce reliable data. *Id*.

B.      **The ACTS Survey**

None of that deliberative process occurred here. *See* Barnard Decl. ¶ 6; Bryn Mawr Decl. ¶ 6; Middlebury Decl. ¶ 6; Sarah Lawrence Decl. ¶ 6; Swarthmore Decl. ¶ 6; Vassar Decl. ¶ 6. On August 7, 2025, a Presidential Memorandum directed the Secretary of Education to expand IPEDS reporting requirements to provide "greater transparency" into university admissions practices within 120 days. *See* Presidential Memorandum § 3, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://perma.cc/JR8J-PRDC (hereinafter "Presidential Memorandum"). The Department opened the ACTS collection on December 18, 2025, and initially set a submission deadline of March 18, 2026—giving institutions approximately three months to comply with the most extensive new IPEDS data collection ever attempted.

ACTS requires institutions to compile and report an extensive set of new data fields—including, for the first time, retrospective data spanning seven prior academic years—resulting in approximately 70,000 new reporting fields per institution. *See* Barnard Decl. ¶ 7; Bryn Mawr Decl. ¶ 7; Middlebury Decl. ¶ 7; Sarah Lawrence Decl. ¶ 7; Swarthmore Decl. ¶ 7; Vassar Decl. ¶ 7.

This represents a dramatic departure from prior IPEDS practice and demands that institutions collect and format data they may never have been required to maintain in the manner now specified. *Id.*

The Department's implementation was marked by shifting requirements and inadequate guidance. On January 26, 2026, ED updated the data templates institutions use to compile and submit their data, including new definitions, changed variables for reporting income, and removed data fields. The templates were updated again on February 17, 2026—less than 30 days before the original submission deadline—forcing institutions that had already begun compiling data to reassess whether their work remained valid. Throughout this period, institutional research professionals reported widespread confusion over fundamental terms. *See* Barnard Decl. ¶ 9–10; Bryn Mawr Decl. ¶ 9–10; Middlebury Decl. ¶ 9–10; Sarah Lawrence Decl. ¶ 9–10; Swarthmore Decl. ¶ 10; Vassar Decl. ¶ 10 (describing ambiguities the ICG Plaintiff-Intervenors' staff encountered in interpreting ACTS's terms).

Throughout the notice-and-comment process, numerous stakeholders raised substantial concerns regarding ACTS's feasibility, timeline, burden, and privacy implications. The National Association of Independent Colleges and Universities ("NAICU") submitted comments on October 14, 2025 on behalf of multiple organizations, including the Independent Colleges and Universities of Pennsylvania (of which Bryn Mawr and Swarthmore are members) and the Association of Vermont Independent Colleges (of which Middlebury is a member). Among other concerns, NAICU emphasized that the compressed timeline was insufficient for institutions to compile the required volume of data; the actual survey instrument had not been published during the initial comment period; fundamental terms such as "selective admissions" and "first-generation" status lacked established regulatory definitions; much of the historical data ACTS

demands may not exist at many institutions; the level of disaggregation required creates serious risks to student privacy; and the compliance burden—estimated at over 200 hours per institution in the first year, and likely far more—would divert limited institutional resources from core educational functions. The Department's responses to these and other stakeholder concerns were largely formulaic—reciting nearly verbatim the language of the Presidential Memorandum and Secretarial Directive across eight substantively distinct categories of concern—rather than engaging meaningfully with the specific issues raised.

These problems have been exacerbated by the decimation of the very offices responsible for administering IPEDS. After recent reductions in force, only three of NCES's 100 employees remain, severely limiting the Department's capacity to provide the guidance and support that institutions have historically required and relied upon.

### C.    The ICG Plaintiff-Intervenors' Submissions Under Duress

Each of the ICG Plaintiff-Intervenors submitted ACTS data under the threat of severe penalties for noncompliance, including fines of up to $71,545 per violation and potential loss of Title IV funding. *See* Barnard Decl. ¶ 12; Bryn Mawr Decl. ¶ 12; Middlebury Decl. ¶ 13; Sarah Lawrence Decl. ¶ 13; Swarthmore Decl. ¶ 13; Vassar Decl. ¶ 13. On March 5, 2026, NCES extended the deadline to April 8 for institutions that had submitted at least three years of ACTS data. *See* Barnard Decl. ¶ 12; Bryn Mawr Decl. ¶ 12; Sarah Lawrence Decl. ¶ 12; Swarthmore Decl. ¶ 12; Vassar Decl. ¶ 12. As set forth below, several of the ICG Plaintiff-Intervenors uploaded such data and are operating under the April 8 extension, while Middlebury fully completed and locked its submissions.

Barnard uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered

three years of ACTS survey component data. Barnard has begun uploading the additional required data. Barnard's data is not currently locked.

Bryn Mawr uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Bryn Mawr's data is not currently locked.

Middlebury uploaded and locked responses to the ACTS survey component as of March 9, 2026.

Sarah Lawrence uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Only a portion of Sarah Lawrence's data is currently locked.

Swarthmore uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Only a portion of Swarthmore's data is currently locked.

Vassar uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Vassar has continued uploading the additional required data. Vassar's data is not currently locked.

The ICG Plaintiff-Intervenors struggled to compile the required data within the compressed timeframe. *See* Barnard Decl. ¶ 11, 16; Bryn Mawr Decl. ¶ 11, 16; Middlebury Decl. ¶ 11, 15; Sarah Lawrence Decl. ¶ 11, 16; Swarthmore Decl. ¶ 11, 16; Vassar Decl. ¶ 11, 16. The volume of new reporting fields, the retroactive scope of the data request spanning seven prior academic years,

the shifting templates, and the lack of clear definitional guidance all contributed to a process that the ICG Plaintiff-Intervenors do not believe produced reliable results. *See* Barnard Decl. ¶ 16; Bryn Mawr Decl. ¶ 16; Middlebury Decl. ¶ 16; Sarah Lawrence Decl. ¶ 16; Swarthmore Decl ¶ 16; Vassar Decl. ¶ 16. The ICG Plaintiff-Intervenors lack confidence in the quality and accuracy of the data they submitted or partially uploaded—not due to any lack of diligence on their part, but because the conditions under which the data was compiled were not conducive to producing the kind of reliable, validated information that IPEDS has historically demanded. *See* Barnard Decl. ¶ 16; Bryn Mawr Decl. ¶ 16; Middlebury Decl. ¶ 16; Sarah Lawrence Decl. ¶ 16; Swarthmore Decl. ¶ 16; Vassar Decl. ¶ 16.

### D.    Procedural History

On March 11, 2026, the Plaintiff States filed a complaint challenging the ACTS survey. ECF No. 1. On March 13, the Court issued a TRO extending the submission deadline through March 25 for all institutions. ECF No. 12. On March 24, the Court extended the TRO through April 6, but narrowed its scope to the Plaintiff States and their constituent public institutions. ECF No. 75. On March 25, AAU filed its motion to intervene and motion for a TRO, and on March 30, AICUM filed its own. On March 31, the Court provisionally granted those intervention motions for the limited purpose of considering their TRO requests, and issued a new TRO extending the deadline to April 14 for those intervenors and their members and restraining the Department from enforcing earlier deadlines against those institutions. On April 3, 2026, the Court granted the Plaintiff States' motion for a preliminary injunction, enjoining Defendants from enforcing any ACTS deadline against the Plaintiff States and their constituent institutions, seeking civil penalties or bringing enforcement actions against them, or otherwise penalizing them for not submitting ACTS data. ECF No. 143 at 1–2. In its accompanying PI Memorandum, the Court found that the Plaintiff States had demonstrated a likelihood of success on the merits of their claim that the

implementation of the ACTS survey was arbitrary and capricious. ECF No. 142 PI Memorandum at 16-32.

The ICG Plaintiff-Intervenors are not covered by any of these orders. They are private institutions and are not members of AAU or AICUM. The Court's preliminary injunction is expressly limited to the Plaintiff States and their constituent public institutions. ECF No. 143 at 1. The ICG Plaintiff-Intervenors now seek their own emergency relief.

### LEGAL STANDARD

The standard for a temporary restraining order is the same as for a preliminary injunction under Federal Rule of Civil Procedure 65[1]. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The movant must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm absent relief; (3) that the balance of the equities favors relief; and (4) that an injunction would serve the public interest. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). When the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021)

### ARGUMENT

### I.    The ICG Plaintiff-Intervenors Have Standing.

The ICG Plaintiff-Intervenors have standing to challenge the ACTS survey in their own right. Article III standing requires an injury in fact, fairly traceable to the defendant's conduct, that

---

[1] Notably, the Court stated in its March 24, 2026 order that "because defendants have appeared in the case and filed a response, plaintiffs' motion will be treated as one seeking a preliminary injunction." ECF No. 75 at 1.

is likely to be redressed by the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Each element is satisfied here. The ICG Plaintiff-Intervenors face concrete and imminent injury from the ACTS survey. They have already been compelled to submit or upload data under duress, and the Department has stated its intent to use that data for enforcement purposes. *See generally* Barnard Decl. ¶ 17; Bryn Mawr Decl. ¶ 17; Middlebury Decl. ¶ 13, 17; Sarah Lawrence Decl. ¶ 13, 17; Swarthmore Decl. ¶ 13, 17; Vassar Decl. ¶ 13, 17. The ICG Plaintiff-Intervenors are exposed to the risk of federal investigation, monetary penalties of up to $71,545 per violation, and potential termination of Title IV eligibility—all premised on data whose reliability has been compromised by the rushed and inadequately supported implementation process. *See* Barnard Decl. ¶ 12; Bryn Mawr Decl. ¶ 12; Middlebury Decl. ¶ 13; Sarah Lawrence Decl. ¶ 13; Swarthmore Decl. ¶ 13; Vassar Decl. ¶ 13. The ICG Plaintiff-Intervenors also confront privacy-related harms: ACTS's disaggregation requirements—which cross-tabulate admissions data by race, sex, income, and other characteristics—can produce data cells small enough to permit re-identification of individual students, particularly in smaller programs. *See* Barnard Decl. ¶ 18–20; Bryn Mawr Decl. ¶ 18–20; Middlebury Decl. ¶ 18–19; Sarah Lawrence Decl. ¶ 18–19; Swarthmore Decl ¶ 18–19; Vassar Decl. ¶ 18–19. This places the ICG Plaintiff-Intervenors in tension with their institutional obligations to respect the privacy of their students. *See* Barnard Decl. ¶ 20; Bryn Mawr Decl. ¶ 20; Middlebury Decl. ¶ 20; Sarah Lawrence Decl. ¶ 20; Swarthmore Decl. ¶ 20; Vassar Decl. ¶ 20.

These injuries are directly traceable to Defendants' implementation of the ACTS survey component, and they would be redressed by the relief the ICG Plaintiff-Intervenors seek: a stay of the ACTS survey under APA § 705 and an injunction preventing the Department from accessing or acting upon the ICG Plaintiff-Intervenors' submissions.

**II.    The ICG Plaintiff-Intervenors Are Likely to Succeed on the Merits.**

This Court has now found—not merely on the preliminary TRO record, but after full briefing and a hearing—that the Plaintiff States have demonstrated a likelihood of success on the merits of their arbitrary-and-capricious claim. ECF No. 142 at 24–31. The ICG Plaintiff-Intervenors raise the same core claims in their Proposed Complaint in Intervention. The Court's analysis applies with equal force to the ICG Plaintiff-Intervenors, who are subject to the same survey component, were given the same inadequate timeline, and whose associations, where applicable, received the same formulaic responses to their comments. The ICG Plaintiff-Intervenors' claim, consistent with the Court's April 3 PI Memorandum, is that the ACTS survey is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

Under the APA, agency action must be set aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency must articulate a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and it may not disregard "important aspect[s] of the problem." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). When an agency reverses course, it must account for the "serious reliance interests" that longstanding policies may have engendered. *Id.* This Court has already concluded that the ACTS survey fails these requirements. ECF No. 142 at 24–31.

First, the Department imposed an unprecedented data collection burden without adequate justification. ACTS represents the largest expansion in IPEDS history, demanding approximately 70,000 new reporting fields per institution, including retrospective data stretching back seven years. *See* Barnard Decl. ¶ 7; Bryn Mawr Decl. ¶ 7; Middlebury Decl. ¶ 7; Sarah Lawrence Decl. ¶ 7; Swarthmore Decl ¶ 7; Vassar Decl. ¶ 7. Yet the Department did not provide a reasoned basis for this extraordinary burden. When stakeholders raised detailed objections spanning eight distinct

categories, the Department responded to nearly every category with the same formulaic language, simply reciting the Presidential Memorandum. A rote invocation of a Presidential directive is not the "reasoned explanation" the APA demands. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 298–99 (D.C. Cir. 2001). As this Court found, "[t]he inescapable conclusion is that the agency rushed to implement the ACTS survey within the arbitrary timeline. It tried to 'mitigate' the fallout of those drastic changes. But it dismissed any suggestion or concern that would necessitate a longer timeline as 'infeasible.'" ECF No. 142 at 28–29. The Court further explained that "neither the President, nor the Secretary, nor the agency ever explained the purpose of the truncated timeline," and that NCES "developed and implemented the ACTS survey in accordance with an arbitrary limitation whose purpose was, and remains, entirely undisclosed." *Id*. at 26.

Second, the Department failed to consider or account for the reliance interests that decades of established IPEDS practice had created. Institutions had long relied on the Department's deliberative, multi-step process for introducing new data collections, including the use of Technical Review Panels and preview or optional years. *See* Barnard Decl. ¶ 5; Bryn Mawr Decl. ¶ 5; Middlebury Decl. ¶ 5; Sarah Lawrence Decl. ¶ 5; Swarthmore Decl. ¶ 5; Vassar Decl. ¶ 5. Before changing course, the Department was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. No such assessment occurred. As the Court found, "the agency changed its historical position, and rejected multiple comments expressing concern, solely in order to achieve an arbitrary and unexplained deadline." ECF No. 142 at 29. When commenters urged the agency to employ TRPs or a pilot year, the agency responded that such measures were "infeasible" "[i]n light of the timeline established in the [President's] memorandum." *Id.* at 27–28.

The Court concluded that "the agency did not adequately consider an alternative course of action; instead, it simply rejected any alternatives as infeasible in light of the deadline." *Id*. at 29–30. Presidential directives do not exempt agencies from these requirements. *See Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025); see also ECF No. 142 at 25–26 ("agency action that carries out a presidential directive is ordinarily subject to APA review") (citing *Agatha*).

Third, the data ACTS demands is unlikely to be reliable and consistent, undermining any rational connection between the survey and its stated purpose. Fundamental terms remain undefined or ambiguously defined. For example, institutions lack consistent guidance on how to define "selective admissions," "first-generation" status, or how to handle diverse formats for reporting grades and GPAs. See NAICU Comments at 1, see also Middlebury Decl. ¶ 10. This deficiency is particularly acute for the ICG Plaintiff-Intervenors. Having already uploaded some or all of their unlocked or locked data under these conditions, the ICG Plaintiff-Intervenors face the concrete risk that the Department will use inconsistent or unreliable data as the basis for enforcement actions. *See* Barnard Decl. ¶ 17; Bryn Mawr Decl. ¶ 17; Middlebury Decl. ¶ 17; Sarah Lawrence Decl. ¶ 17; Swarthmore Decl. ¶ 17; Vassar Decl. ¶ 17. The absence of a rational connection between the data collected and the Department's stated enforcement goals is the hallmark of arbitrary and capricious action.

Fourth, the Department implemented this massive expansion of IPEDS at the very time it was dismantling the agency responsible for administering it. As the Court found, "the fact that NCES simultaneously expressed a willingness to work with institutions on an ongoing basis to provide guidance, while failing to address the fact that it intended to cease operations as soon as 'permitted by law,' is further evidence that the promulgation of the ACTS was arbitrary and capricious." ECF No. 142 at 7. The Court noted that NCES staff has been reduced from

approximately 100 to as few as 3 employees, *Id.* at 30–31, and that "the dismantling of the agency with the statutory authority to implement IPEDS—to collect the data, store it, analyze it, and address ongoing issues—is 'an important aspect of the problem'" that the agency "entirely failed to consider." *Id*. at 31 (quoting State Farm, 463 U.S. at 43). Once NCES no longer exists, "the authority for ACTS vanishes—and with it the authority both to 'collect' data and to 'analyze' data collected from prior surveys." *Id*. at 6–7. The Court further observed that "[w]hether and where that data will continue to exist, and who will have access to it, is entirely unclear." *Id*. at 7. This concern is especially pressing for the ICG Plaintiff-Intervenors, whose sensitive student data has already been submitted and now resides in a system with no clear steward.

III.    **The ICG Plaintiff-Intervenors Will Suffer Irreparable Harm Absent Relief, and the Equities and Public Interest Favor a TRO.**

The ICG Plaintiff-Intervenors face irreparable harm on multiple fronts absent the emergency relief they seek. This Court has already found that the Plaintiff States demonstrated irreparable harm from the ACTS survey. *Id.* at 32–34. The ICG Plaintiff-Intervenors face the same categories of harm—and, in critical respects, more acute harm, because they have already uploaded data that may now be reviewed and used against them.

First, because the ICG Plaintiff-Intervenors have already uploaded some or all of their ACTS data (locked or unlocked), they confront the imminent prospect that the Department will review their submissions and initiate enforcement proceedings based on data that is unreliable— not because of any deficiency on the ICG Plaintiff-Intervenors' part, but because the rushed, poorly guided process all but guaranteed inconsistencies. *See* Barnard Decl. ¶ 21–22; Bryn Mawr Decl. ¶ 21–22; Middlebury Decl. ¶ 21–22; Sarah Lawrence Decl. ¶ 21–22; Swarthmore Decl. ¶ 21–22; Vassar Decl. ¶ 21–22. As the Court recognized, "[t]he lack of clear definitions and reporting standards, along with the tight timeline for reconciling any data issues, creates a strong risk that,

despite their best efforts, [institutions] will submit inconsistent and inaccurate data." ECF No. 142 at 34. This threat is neither hypothetical nor remote. The Presidential Memorandum directed the Secretary to "take remedial action" if institutions "fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data," and the Court found this language significant: "the presidential directive provides for no such leeway" as the discretion that the statute and regulations would otherwise afford. *Id*. And once the Department opens an investigation based on the ICG Plaintiff-Intervenors' submissions, the resulting reputational and institutional harm cannot be reversed. *See* Barnard Decl. ¶ 23; Bryn Mawr Decl. ¶ 23; Middlebury Decl. ¶ 22; Sarah Lawrence Decl. ¶ 22; Swarthmore Decl. ¶ 23; Vassar Decl. ¶ 22.

Second, the disaggregation requirements of the ACTS survey create risks to student privacy that the ICG Plaintiff-Intervenors have an obligation to protect. *See* Barnard Decl. ¶ 18–20; Bryn Mawr Decl. ¶ 18–20; Middlebury Decl. ¶ 18–20; Sarah Lawrence Decl. ¶ 18–20; Swarthmore Decl. ¶ 18–20; Vassar Decl. ¶ 18–20. For programs at the ICG Plaintiff-Intervenors' institutions that enroll small numbers of students, the level of disaggregation ACTS demands will produce data cells so small that individual students could be identified, potentially revealing students' academic records in tension with the student privacy interests reflected in, for example, the Family Educational Rights and Privacy Act ("FERPA"). *See* Barnard Decl. ¶ 20; Bryn Mawr Decl. ¶ 20; Middlebury Decl. ¶ 20; Sarah Lawrence Decl. ¶ 20; Swarthmore Decl. ¶ 19; Vassar Decl. ¶ 20. This concern is compounded by the Court's finding that it is "entirely unclear" where ACTS data "will continue to exist, and who will have access to it" once NCES ceases to exist. Mem. & Order at 7. The Department has not adequately addressed how it intends to prevent such disclosures. *See* Barnard Decl. ¶ 20; Bryn Mawr Decl. ¶ 20; Middlebury Decl. ¶ 20; Sarah Lawrence Decl. ¶ 20; Swarthmore Decl. ¶ 20.

Third, if the TRO is denied, the Department will be free to review and act upon the ICG Plaintiff-Intervenors' data immediately, exposing them to enforcement risk and privacy harms that cannot be remedied after the fact. *See* Barnard Decl. ¶ 23; Bryn Mawr Decl. ¶ 23; Middlebury Decl. ¶ 21–23; Sarah Lawrence Decl. ¶ 21–23; Swarthmore Decl. ¶ 21–23; Vassar Decl. ¶ 21–22. The harm to Defendants, by contrast, is minimal: a brief delay in reviewing the ICG Plaintiff-Intervenors' submissions while the Court considers the legality of the survey component imposes no cognizable injury on the government. As the Court found, "[t]here is a strong public interest in restraining the arbitrary exercise of power by the federal government, and ensuring that the rule of law is enforced. There is likewise a strong interest in relieving [institutions] of unnecessary risks and burdens that could be eliminated or mitigated through a reasoned and careful administrative process." ECF No. 142 at 35. To the extent Defendants raise concerns about data preservation, the ICG Plaintiff-Intervenors will take reasonable steps to preserve data within their possession that is responsive to the ACTS survey component, consistent with the preservation obligation the Court imposed on the Plaintiff States in its preliminary injunction. ECF No. 142 at 2, ¶ 3.

## IV.    Relief Under APA Section 705 Is Appropriate.

The ICG Plaintiff-Intervenors respectfully request that the Court issue relief under Section 705 of the APA, which authorizes courts, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705.  In its April 3 PI Memorandum, this Court recognized that § 705 provides reviewing courts "a choice between issuing a stay *of agency action* or more *limited equitable relief tailored to the case.*" ECF No. 142 at 37. The Court exercised that authority to grant party-limited preliminary relief to the Plaintiff States and their constituent public institutions under both § 705 and Rule 65. *Id.* The ICG Plaintiff-Intervenors seek relief of precisely the same kind: a stay of the ACTS survey component

as applied to them, and targeted injunctive relief preventing the Department from accessing or acting on their already-submitted data.

This request is squarely within the scope of relief this Court has already deemed appropriate. In the April 3 PI Order, the Court limited its preliminary relief "to the plaintiffs in this case and their constituent institutions," expressly declining to reach whether § 705 stays must operate universally. ECF No. 142 at 37. The ICG Plaintiff-Intervenors likewise seek relief only as to themselves—not universal relief. Their circumstances are, if anything, more compelling than those of institutions in Plaintiff States that have not uploaded responsive data, because the ICG Plaintiff-Intervenors have already uploaded some data and face imminent risk that the Department will access and act upon it.

The ICG Plaintiff-Intervenors additionally request that the Court enter an injunction specifically enjoining Defendants from accessing, reviewing, or relying upon the ICG Plaintiff-Intervenors' already-uploaded ACTS data pending final resolution of this suit.

### CONCLUSION

The ICG Plaintiff-Intervenors respectfully request that this Court grant the following relief:

    a.  A declaratory judgment that Defendants acted arbitrarily and capriciously in approving and implementing the ACTS survey;

    b.  Vacatur of the actions taken by Defendants to approve and implement the ACTS survey;

    c.  A stay of the implementation of the ACTS survey pursuant to 5 U.S.C. § 705;

    d.  A preliminary and permanent injunction prohibiting Defendants from: (i) accessing, reviewing, downloading, or otherwise using any information uploaded or entered by any of the ICG Plaintiff-Intervenors in connection with the ACTS survey component; (ii) sharing, disseminating, or publishing any data submitted by any of the ICG Plaintiff-Intervenors in connection with the ACTS survey component; (iii) penalizing any of the ICG Plaintiff-Intervenors in any way in connection with the ACTS survey component; (iv) initiating any enforcement action or investigation against any of the ICG Plaintiff-Intervenors on the basis of submissions related to the ACTS survey; and v) enforcing any

deadline for compliance with the ACTS survey component against any of the ICG Plaintiff-Intervenors that has not already complied fully with the survey component requirements.

e. An award of costs, reasonable attorneys' fees, and expenses pursuant to any applicable law; and

f. Such other and further relief as this Court deems equitable, just, and proper.

Dated: April 6, 2026

Respectfully submitted,

HOLLAND & KNIGHT, LLP

Attorney for Independent College Group

*/s/ Jeffrey J. Nolan*
Jeffrey J. Nolan
10 Saint James Avenue 15th Floor
Boston, MA 02116
Telephone: (617) 854-1459
Fax: (617) 523-6850

*Counsel for the Independent College
Group Plaintiff-Intervenors*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of April, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

Dated: April 6, 2026                                     */s/ Jeffrey J. Nolan*
                                                          Jeffrey J. Nolan