## DECLARATION OF MICHELLE MCCAULEY, PH.D.

I , Michelle McCauley, Ph.D., declare as follows:

1.      I am the Executive Vice President and Provost ("Provost") of Middlebury College ("Middlebury"), a private, nonprofit liberal arts and sciences college located in Middlebury, Vermont. I have held this position since August 1, 2022.

2.       As Provost, I have direct oversight of Middlebury's institutional research functions, including the College's participation in the Integrated Postsecondary Education Data System ("IPEDS").

3.      I have personal knowledge of the matters set forth in this declaration or have knowledge of such matters based on my review of information and records gathered by Middlebury personnel and could testify thereto.

4.      Middlebury has participated in federal student financial aid programs and reported data through IPEDS for many years. Middlebury takes its IPEDS reporting obligations seriously and has historically dedicated the time and resources necessary to ensure the accuracy and reliability of its submissions.

5.      In the past, when the Department of Education (the "Department") has introduced new IPEDS survey components, those changes have been subject to a well-established, multi-step process that included Technical Review Panels ("TRPs"), collaboration with affected institutions, and at least one preview or optional year. This process gave institutions like Middlebury adequate time and guidance to produce reliable data.

6.      No such process occurred for the Admissions and Consumer Transparency Supplement ("ACTS") survey.

7.      The ACTS survey, as implemented, required Middlebury to compile and report an extensive set of new data fields—including retrospective data spanning seven prior academic years—resulting in approximately 70,000 new reporting fields. This represented a dramatic departure from the scope and volume of any prior IPEDS data collection.

8.      The ACTS survey required Middlebury personnel to divert substantial time and resources from their core responsibilities to compile data that ACTS demanded.

9.      Middlebury's staff struggled to compile the required data within the compressed timeframe the Department imposed. The volume of new reporting fields, the retroactive scope of the data request, the shifting data templates—which were updated on January 26, 2026 and again on February 17, 2026, less than 30 days before the original submission deadline—and the lack of clear definitional guidance all contributed to a process that I do not believe produced consistent and reliable results.

10.      Critical terms in the ACTS survey remained undefined or ambiguously defined throughout the data compilation process. For example, Middlebury's staff lacked clear guidance on how to define "selective admissions," how to categorize "first-generation" status, and how to report grades and GPAs given the diverse formats in which such data is maintained. These ambiguities meant that Middlebury's institutional research staff were forced to make judgment calls without assurance that their interpretations were consistent with what the Department intended or with what other institutions were reporting.

11.      Much of the historical data that ACTS required Middlebury to report had not previously been collected or maintained in the format the survey specified. Compiling seven years of retrospective data—across categories including parental education, family income ranges, and test score quintiles—required Middlebury's staff to locate, extract, and reformat information from

multiple disparate systems, a process that was time-intensive and inherently prone to error given the compressed timeline.

12.    Middlebury did not seek an extension of the original March 18, 2026 ACTS submission deadline. Based on the Department's public statements and its response to the Association for Institutional Research's ("AIR") request for a three-month extension—to which the Department offered only a conditional three-week extension—Middlebury understood that meaningful deadline extensions were not being granted. Middlebury accordingly concluded that requesting an extension would not result in additional time sufficient to address its concerns about data quality.

13.    Faced with the choice between submitting under these conditions or risking fines of up to $71,545 per violation and the potential loss of Title IV eligibility, Middlebury felt compelled to submit its ACTS data.

14.    All of Middlebury's students who receive federal financial aid depend on the College's continued Title IV eligibility, and the loss of that eligibility would be devastating to Middlebury and the students it serves.

15.    Middlebury submitted its ACTS data for its undergraduate college on or about dates ranging from February 19, 2026 through March 9, 2026, and for its graduate programs at the Middlebury Institute for International Studies ("MIIS") on or about dates ranging from February 25, 2026 through March 9, 2026. It did so without the time or opportunity needed to reach assurance that its submission did not contain inconsistencies and errors resulting from the compressed timeline, the lack of clear guidance, and the absence of the quality-assurance processes that have historically ensured data integrity in IPEDS collections.

16.     Based on my oversight of the data compilation process, Middlebury does not have confidence in the quality or accuracy of the data it submitted. This is not due to any lack of diligence on the part of Middlebury's institutional research staff, who worked extensively to comply with the survey's requirements. Rather, the conditions under which the data was compiled—the compressed timeline, the shifting templates, the ambiguous definitions, and the absence of the vetting processes that have historically ensured data quality in IPEDS collections—were simply not conducive to producing the kind of reliable, validated information that IPEDS has historically demanded and that Middlebury has historically been proud to provide.

17.     Middlebury is deeply concerned that the Department will review its submission and draw conclusions or initiate enforcement actions based on data that Middlebury itself did not have enough time to verify was free from inconsistencies or errors, and that Middlebury is concerned was produced through a process that is not conducive to producing reliable, validated information.

18.     Middlebury is also deeply concerned about the privacy implications of the data it has submitted. The ACTS survey demands data at what is effectively the unit-record level for individual students—requiring institutions to cross-tabulate admissions and outcomes data by race, sex, income, test scores, and other characteristics.

19.     For an institution like Middlebury, which offers specialized undergraduate programs and graduate programs with smaller cohorts, this level of disaggregation produces data cells small enough to permit the re-identification of individual students. In some program-year combinations, the number of students in a given race-sex-income cell may be so small that the data effectively constitutes personally identifiable information.

20.     Middlebury has legal and institutional obligations to protect its students' personally identifiable information, obligations which are reflected for example in the Family Educational

Rights and Privacy Act ("FERPA"). The submission of this granular data to the Department—which has stated its intent to use ACTS data for enforcement purposes, and which has historically made IPEDS data publicly available—places those obligations in direct tension with the demands of the survey. The Department has not adequately addressed how it intends to safeguard this data or prevent the disclosure of personally identifiable student information.

21.     For all of these reasons, Middlebury believes that its already-submitted ACTS data should not be reviewed, relied upon, or used by the Department as a basis for any enforcement action. Middlebury cannot stand behind its submission as accurate, and production of the data raises serious privacy concerns for its students.

22.     Without emergency relief, the Department is free to access and review Middlebury's submission at any time, and once it does so, the resulting harm—including the initiation of enforcement proceedings based on unreliable data and the potential disclosure of student information—cannot be undone.

23.     If this Court denies Middlebury's motion for a temporary restraining order Middlebury and its students face enforcement risk, reputational harm, and/or privacy violations that cannot be remedied after the fact.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April 6th, 2026 in Monterey, California.

Michelle McCauley, Ph.D.