# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON, and STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget, <br><br> *Defendants*. | Case No.1:26-cv-11229 |

**DEFENDANTS' OPPOSITION TO (1) THE ASSOCIATION OF AMERICAN UNIVERSITIES' MOTION FOR A TEMPORARY RESTRAINING ORDER, (2) THE ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS' MOTION FOR A TEMPORARY RESTRAINING ORDER, (3) THE CONNECTICUT CONFERENCE OF INDEPENDENT COLLEGES, MAINE INDEPENDENT COLLEGES ASSOCIATION, NORTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, AND OREGON ALLIANCE OF INDEPENDENT COLLEGES AND UNIVERSITIES' MOTION FOR A TEMPORARY RESTRAINING ORDER, AND (4) INDEPENDENT COLLEGE GROUP'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.      THE ASSOCIATION OF AMERICAN UNIVERSITIES. ................................................. 4

II.     THE ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES
        IN MASSACHUSETTS. ............................................................................................ 5

III.    CONNECTICUT CONFERENCE OF INDEPENDENT COLLEGES, MAINE
        INDEPENDENT COLLEGES ASSOCIATION, NORTH CAROLINA
        INDEPENDENT COLLEGES AND UNIVERSITIES, AND OREGON
        ALLIANCE OF INDEPENDENT COLLEGES AND UNIVERSITIES ........................... 5

IV.     BARNARD, BRYN MAWR, MIDDLEBURY, SARAH LAWRENCE,
        SWARTHMORE, AND VASSAR ................................................................................ 6

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.      THE TIMING OF THE PUTATIVE INTERVENORS' MOTIONS COUNSELS
        AGAINST A PRELIMINARY INJUNCTION, INDICATING THAT THEY DO
        NOT FACE IRREPARABLE HARMS ........................................................................ 8

II.     IHES DO NOT NEED TO SUBMIT FALSE OR MISSING DATA, AND FACE
        NO IRREPARABLE HARM PREMISED ON HYPOTHETICAL
        ENFORCEMENT ACTIONS ...................................................................................... 10

III.    THE ALLEGED BURDEN OF THE ACTS COMPONENT HAS NOT
        PREVENTED THE PUTATIVE INTERVENORS FROM COMPLETING
        THEIR SUBMISSIONS, UNDERCUTTING THEIR ARGUMENTS ABOUT
        LIKELIHOOD OF SUCCESS ON THE MERITS ......................................................... 10

IV.     NEITHER THE DEPARTMENT NOR NCES ARE CLOSING ABSENT
        CONGRESSIONAL APPROVAL ............................................................................... 14

V.      THE BALANCE OF EQUITIES WEIGHS TOWARD DENIAL OF
        PRELIMINARY RELIEF .......................................................................................... 16

CONCLUSION ................................................................................................................... 18

i

**TABLE OF AUTHORITIES**

**CASES**

*Gillan v. Town of Carver*,
  2025 WL 1836609 (D. Mass. July 3, 2025) .................................................................................... 6

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ...................................................................................................................... 6

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................................................... 6

*State of New York, et al. v. Linda McMahon*,
  1:25-cv-10601-MJJ (D. Mass.),
  Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj., ECF No. 95 (April 11, 2025) ............................ 14

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .......................................................................................................................... 6

**STATUTES**

44 U.S.C. § 1094 .................................................................................................................... 2, 4, 17

**INTRODUCTION**

Six associations—the Association of American Universities (AAU), Association of Independent Colleges and Universities in Massachusetts (AICUM), Connecticut Conference of Independent Colleges (CCIC), Maine Independent Colleges Association (MICA), North Carolina Independent Colleges and Universities (NCICU), and Oregon Alliance of Independent Colleges and Universities (OAIC, together with AAU, AICUM, CCIC, MICA, and NCICU, the Associations)—and six institutions of higher education (IHEs)—Barnard College, Bryn Mawr College, Middlebury College, Sarah Lawrence College, Swarthmore College, and Vassar College (collectively, ICG and, together with the Associations, Putative Intervenors)—have filed motions to intervene[1] and motions seeking temporary restraining orders to enjoin the Department of Education (Department) from requiring IHEs receiving federal funds through Title IV of the Higher Education Act of 1965 to provide data on their admissions through the Admissions and Consumer Transparency Supplement (ACTS) component of the Integrated Postsecondary Education Data System (IPEDS). These motions for temporary restraining orders closely mirror that earlier filed by Plaintiffs, Mem. in Supp. of Pls.' Mot. for a TRO, ECF No. 7 ("Pls.' Br."), and should be denied for the same reasons. Moreover, the Putative Intervenors' delays in seeking emergency injunctive relief contradict their claims that they or their members face imminent irreparable harm, militating against preliminary injunctive relief. Further, most of the Putative Intervenors (or their members) have submitted all ACTS component data or made substantial progress on their submissions. Only a minority have elected to submit nothing. This almost universal compliance undercuts the Putative Intervenors' arguments for injunctive relief—an injunction cannot be used to remedy alleged burdens that have already accrued.

---

[1] Defendants do not oppose the four motions to intervene filed by the Putative Intervenors.

IHEs that receive Title IV funds enter statutorily required "program participation agreement[s]" with the Department in exchange for their Title IV benefits.  20 U.S.C. § 1094(a).  Among other things, IHEs participating in Title IV must "complete surveys conducted as a part of [IPEDS] . . . in a timely manner and to the satisfaction of the Secretary."  *Id.* at § 1094(a)(17).  A minority of IHEs now refuse to comply with this requirement.  Defendants respectfully ask this Court not to sanction that refusal by granting preliminary injunctive relief to the Putative Intervenors.  Putative Intervenors have not shown a likelihood of success on the merits, a risk of imminent irreparable harm, or the balance of equities leans toward injunction.

## BACKGROUND

The ACTS component has been open to IHEs for over three months—since December 18, 2025.  Ex. S: First Decl. of Matthew Soldner, ECF No. 69-19 ("1st Soldner Decl.") ¶ 2.  The original deadline for IHEs to submit their responses was March 18, 2026.  Second Decl. of Matthew Soldner, ECF No. 100-2 ("2nd Soldner Decl.") ¶ 11.  A few days before that deadline, seventeen states (Plaintiffs) sought to enjoin the Department's collection of ACTS data.  Pls.' Mot. for a TRO, ECF No. 6.  The Court issued a temporary restraining order extending the ACTS deadline to March 25 to permit a hearing and orderly resolution of the issues.  TRO, ECF. No. 12.  On March 19, AAU sought leave to file an amicus brief in support of the Plaintiffs' request for a temporary restraining order.  Associations' Mot. for Leave to File Br. as *Amici Curiae* in Supp. of Pls.' Mot. for a TRO, ECF No. 52.  On March 24, the Court held a hearing on Plaintiffs' motion seeking a temporary restraining order.  One day after that hearing, AAU filed a motion to elevate itself from amicus to intervenor, AAU's Mot. to Intervene, ECF No. 83, and a motion for a temporary restraining order, AAU's Mot. for TRO, ECF No. 85, that parrots the arguments made by Plaintiffs.

2

After expiration of the nationwide temporary restraining order on March 25, the Department extended the ACTS deadline for all IHEs to March 31, to give them time to complete their submissions in light of the shifting deadlines.  2nd Soldner Decl. ¶ 11.  On March 30, 2026—twelve days after the original ACTS deadline, six days after the expiration of the nationwide temporary restraining order and only one day before the March 31 extension unilaterally provided by the Department—AICUM filed a motion to intervene, AICUM's Mot. to Intervene, ECF No. 109, and a motion for a temporary restraining order, AICUMS's Mot. for TRO, ECF No. 111.

The next day, March 31, 2026, this Court issued a temporary restraining order extending the deadline to respond to the ACTS component to April 14 for AAU and AICUM.  TRO, ECF No. 118.  Thus, members of AAU and AICUM have received temporary restraining orders totaling 26 days: the 12 days ordered in the March 13 temporary restraining order extending the deadline nationwide until March 25 and the 14 days ordered in the March 31 temporary restraining order extending the deadline for AAU and AICUM members until April 14.  *Id.*, TRO, ECF No. 12.

On April 3, this Court issued a preliminary injunction preventing the Department from enforcing any ACTS component deadline against public IHEs in Plaintiff states or seeking civil penalties or enforcement actions against any Plaintiff public IHE for failure to provide responses to the ACTS component.  Prelim. Inj., ECF No. 143.  The preliminary injunction also prevents Plaintiffs' public IHEs from destroying any ACTS data during the pendency of this case.  *Id.*

Also, on April 3, 2026—three days *after* expiration of the deadline for ACTS submissions (absent an extension to April 8 for substantial compliance) for all IHEs not subject to this Court's preliminary injunction, four more associations—CCIC, MICA, NCICU, and OAIC—filed a motion to intervene, CCIC et al. Mot. to Intervene, ECF No. 130, and motion for a temporary restraining order, CCIC et al. Mot. for TRO, ECF No. 132.

On April 6, 2026—six days *after* expiration of the March 31 deadline for IHEs other than Plaintiffs' public IHEs and two days before the extended April 8 deadline for qualifying IHEs—Barnard, Bryn Mawr, Middlebury, Sarah Lawrence, Swarthmore, and Vassar—filed a motion to intervene, ICG Mot. to Intervene, ECF No. 145, and a motion for a temporary restraining order, ICG Mot. for TRO, ECF No. 153.

### I.     THE ASSOCIATION OF AMERICAN UNIVERSITIES

AAU's members are 71 universities, 69 of which are American universities that, if they receive federal funds through Title IV, are required to participate in IPEDS as a condition of receiving Title IV funds.  20 U.S.C. § 1094(a)(17).  Of AAU's 69 US member universities, 18 are public universities in Plaintiff states and are therefore already parties to this litigation subject to the preliminary injunction this Court ordered on April 3.[2]  Of the 51 other schools affiliated with AAU, most have submitted data for all years requested in the ACTS component.  Ex. A ¶ 2. The 51 non-Plaintiff AAU members represent 59 IPEDS respondees.[3]

As of April 7, of the 59 AAU IPEDS respondees not already represented by Plaintiffs in this case, 43 (73%) have submitted data for all requested years of the ACTS component, 12 (20%) have submitted data for at least 3 years, and four have made no good faith attempt to provide any information requested by the ACTS survey, as is required by their participation in Title IV and receipt of federal funds through Title IV, 20 U.S.C. § 1094(a)(17).  *Id.*  Those four are in the

---

[2] These universities are: Rutgers University – New Brunswick; Stony Brook University – The State University of New York; University at Buffalo – The State University of New York; University of California, Berkeley; University of California, Davis; University of California, Irvine; University of California, Los Angeles; University of California, Riverside; University of California, San Diego; University of California, Santa Barbara; University of California, Santa Cruz; University of Colorado, Boulder; University of Illinois Urbana-Champaign; University of Maryland at College Park; University of Oregon; University of Virginia; University of Washington; The University of Wisconsin – Madison.

[3] Some schools report IPEDS data for all their campuses as a single respondee, while others, such as The Ohio State University, respond separately for different campus locations.

minority of IHEs.  As of March 30, only around 2% of eligible institutions have submitted no ACTS data, failing to even respond to the screening questions used to determine whether they must complete the ACTS component.  2nd Soldner Declaration ¶ 18.

## II.  THE ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS

AICUM is an association of 58 private colleges and universities.  As with AAU, the majority of AICUM's members have submitted data for all years requested in the ACTS component.  Ex. A ¶ 2.  AICUM's 58 members represent 60 IPEDS respondees.  *Id.*  Of those 60 respondees, 43 (72%) have submitted data for all requested years of the ACTS component, 11 (18%) have submitted data for at least 3 years, and six have provided less than three years of data as of April 7.  *Id.*

## III.  CONNECTICUT CONFERENCE OF INDEPENDENT COLLEGES, MAINE INDEPENDENT COLLEGES ASSOCIATION, NORTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, AND OREGON ALLIANCE OF INDEPENDENT COLLEGES AND UNIVERSITIES

CCIC's members are fourteen IHEs in Connecticut.  MICA's members are eleven IHEs in Maine.  NCICU's members are 36 IHEs in North Carolina.  OAICU's members are eleven IHEs in Oregon.  The members of these four associations represent 68 IPEDS respondees that are required to submit ACTS data.[4]  *Id.*  Of those 68 respondees, 53 (78%) have submitted data for all requested years, 12 (18%) have submitted at least three years of data, and 3 have submitted less than three years of data.  *Id.*

---

[4] Several members of these four associations are not required to submit ACTS data because they do not meet the criteria set by the Department in response to comments regarding methods of limiting the burden of the ACTS component on IHEs.  Ex. A ¶ 2.

## IV.  BARNARD, BRYN MAWR, MIDDLEBURY, SARAH LAWRENCE, SWARTHMORE, AND VASSAR

As of April 7, five of the six schools that filed their motions to intervene and for a temporary restraining order on April 6 had submitted data for all years requested by the ACTS component. *Id.*  One school—Sarah Lawrence—had submitted data for five of the requested years and not submitted data for the remaining two.  *Id.*

### LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Gillan v. Town of Carver*, 2025 WL 1836609, at *1 (D. Mass. July 3, 2025) (explaining that "[c]ourts apply the same standard in assessing motions for a temporary restraining order and motions for a preliminary injunction").  The third and fourth factors of the analysis— harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### ARGUMENT

The Putative Intervenors' separate motions for temporary restraining orders all closely mirror the motion filed by the Plaintiffs on March 13.  Thus, these later-filed motions should be denied for the same reasons the Plaintiffs' motion should have been denied.  *See* Defs.' Opp'n to Pls.' Mot. for a TRO, ECF No. 68 ("Defs.' Opp."); Defs.' Suppl. Br. in Opp'n to Pls.' Mot. for a TRO, ECF No. 99 ("Defs.' Supp. Opp.").  Defendants incorporate all the arguments made in

Defendants' brief and supplemental brief in opposition to Plaintiffs' motion seeking a temporary restraining order.

In this brief, Defendants write briefly to emphasize that the facts of the Putative Intervenors' late-arising motions undercut the arguments made in Plaintiffs' and the Putative Intervenors' motions and counsel toward denying preliminary injunctive relief. First, as with Plaintiffs, the timing of the Putative Intervenors' motions belies their assertions of irreparable harm. Indeed, the Putative Intervenors' heavy reliance on the alleged burden of the ACTS component to demonstrate allegedly irreparable harm, combined with their rate of completion of the ACTS component, is at odds with injunctive relief, as injunctive relief cannot remedy past harms such as the alleged burden that IHEs have already incurred in responding to the ACTS component. Second, Putative Intervenors' arguments that they face irreparable harm from hypothetical enforcement actions they will face due to submitting false or non-existent data rests on a false premise—that they are required by the ACTS component to submit false or non-existent data. In fact, the ACTS component does not require IHEs to submit data they do not have. Rather, it expressly permits IHEs to indicate that they lack requested data or that the data they have may be inaccurate. Third, that the Putative Intervenors' members have, by and large, completed or made substantial progress on their ACTS component submissions contradicts the Plaintiffs' and Putative Intervenors' assertions that the ACTS component is unduly burdensome. Fourth, contrary to Putative Intervenors' and Plaintiffs' assertions, neither the Department nor NCES are being disbanded absent congressional approval and cuts to the Department have not somehow increased the burden on IHEs to respond to the ACTS component. Finally, that the vast majority of the Putative Intervenors' members have completed or made substantial progress on their ACTS component submissions shows that the balance of equities weighs against granting a preliminary

injunction. A preliminary injunction would harm both the Government and the public, whereas denial of a preliminary injunction would have no effect on the majority of IHEs represented by the Putative Intervenors, which have already submitted ACTS component data.

## I.    THE TIMING OF THE PUTATIVE INTERVENORS' MOTIONS COUNSELS AGAINST A PRELIMINARY INJUNCTION, INDICATING THAT THEY DO NOT FACE IRREPARABLE HARMS.

As explained in Defendants' opposition to Plaintiffs' motion seeking a temporary restraining order, delay in filing suit and seeking emergency injunctive relief belies any argument of imminent irreparable harm. Defs.' Opp. at 9-10. The Putative Intervenors delayed even longer than Plaintiffs in seeking temporary restraining orders, and thus their delay counsels even more strongly toward denial of a preliminary injunction. The Putative Intervenors filed their motions *after the original March 18 deadline* for submission of ACTS component data. AAU filed on March 24—six days after the initial March 18 deadline—and AICUM filed on March 30—twelve days after the initial March 18 deadline. Both AAU and AICUM filed motions seeking emergency relief a single day before extensions that came about due to this litigation. AAU filed a day before the Court's nationwide injunction lapsed on March 25. AICUM filed a day before the March 31 extended deadline granted by the Department to permit IHEs extra time to submit data after the lapse of that nationwide temporary restraining order. That both AAU and AICUM waited until after the original deadline and only a single day before the expiration of extensions that they had no reason to anticipate shows that the Associations do not face irreparable harm. They did not face irreparable harm posed by the March 18 deadline—had they faced an irreparable injury they would have sought injunctive relief before that deadline. Nor do they face irreparable harm from the extended March 25 or March 31 deadlines, which they did nothing to bring about. The other Putative Intervenors' motions were even more egregiously delayed—CCIC, MICA, NCICU, OAIC, Barnard, Bryn Mawr, Middlebury, Sarah Lawrence, Swarthmore, and Vassar did not file

their motions until after this court granted a preliminary injunction affecting Plaintiffs' public IHEs, several days after the March 31 deadline for IHEs that did not qualify for an April 8 extension.

Indeed, for the individual IHEs that have completed their ACTS component submissions, an injunction is not a legally valid tool for remedying alleged irreparable harm based on burdens that those schools have already accrued.  For these schools, which are identified at Ex. A ¶ 2, the delay in seeking temporary restraining orders is fatal to any injunctive relief premised on alleged burden.[5]  As explained *infra* at 9-10, the purported harm posed by enforcement actions is based on a false premise—that IHEs must submit false or nonexistent data—and thus cannot support injunctive relief.

For this reason, and the remaining reasons provided in Defendants' brief and supplemental brief in opposition to Plaintiffs' motion, the Putative Intervenors have not shown that they face irreparable harm and their motions seeking temporary restraining orders should be denied.

In its opinion granting a preliminary injunction for Plaintiffs, this Court acknowledged "that some institutions have completely responded to the ACTS survey or submitted at least three years of data," but stated that "[w]hat burden, if any, those universities faced to complete the survey is not before the Court."  PI Opinion at 33.  That issue is now squarely before the Court, as the majority of the Putative Intervenors, or their members, have completed the ACTS component and now seek injunctive relief based on burdens they have already borne and cannot be remedied through injunctive relief.

---

[5] For this reason, if this Court grants any preliminary injunctive relief, it should do so only for IHEs that have not completed their ACTS component submissions.

## II.   IHEs Do Not Need to Submit False or Missing Data, and Face No Irreparable Harm Premised on Hypothetical Enforcement Actions.

The Putative Intervenors—who, by and large, have completed their submissions or made substantial progress towards completing their submissions by submitting three years of data— argue that they face irreparable harm because the Department might initiate enforcement proceedings against them, based on their submission of incomplete data due the IHEs not having all requested data. *See, e.g.*, CCIC et al. Br. in Supp. of Mot. for TRO, ECF No. 133 ("CCIC et al, Br.") at 16.   This hypothetical chain of events is not an irreparable harm, as explained in Defendants' opposition brief.  Defs.' Opp. at 11.  The Putative Intervenors' argument is even more hypothetical than that of Plaintiffs, because they base their argument on purportedly missing data—but the Department does not require IHEs to submit missing data.  Defs.' Supp. Opp. at 11. If a school fabricates data or otherwise reports data that it does not have, it will not be because it was compelled to do so under duress by the Department or because it was required to do so by the ACTS component, which explicitly permits IHEs to indicate that they lack responsive data or that their data may not be accurate.

## III.   The Alleged Burden of the ACTS Component Has Not Prevented the Putative Intervenors from Completing their Submissions, Undercutting Their Arguments About Likelihood of Success on the Merits.

Most of the Putative Intervenors that are required to submit the ACTS component have submitted data for all requested years.  Ex. A¶ 2.  This response rate undercuts the Putative Intervenors' allegations that the ACTS component poses an unworkable burden which the Department allegedly ignored.  To the contrary, as explained in Defendants' responses to the Plaintiffs' motion seeking a temporary restraining order, the Department carefully considered the burden of the ACTS component, took steps to mitigate that burden, allowed an extended response time so that IHEs would have time to compile and submit the requested data, and weighed the

10

burden against the necessity of the requested data. Defs.' Opp. at 7, 8, 9. That the majority of IHEs have completed their submissions bears out the careful analysis that the Department conducted through two notice and comment periods—the ACTS component collects necessary information with a burden calibrated to the importance of that information.

Moreover, Putative Intervenors' arguments that the Department failed to adequately respond to comments about burden neglect parts of the Department's responses to comments. For example, several Putative Intervenors point repeatedly to allegedly unavailable data as posing a burden to IHEs that respond to the ACTS component. *See, e.g.*, AICUM Br. in Supp. of TRO, ECF No. 112 ("AICUM Br.") at 6, 9, 11-12, 14; CCIC et al, Br. at 8, 12-13, 17. But the Department has acknowledged that not all requested data may be available to IHEs and does not require IHEs to submit non-existent data. Defs.' Supp. Opp. at 11; Ex. D: Responses to Comments Received on November Notice, ECF No. 100-4 ("Nov. Notice Responses") at 11-12. Thus, these repeated arguments about potentially missing data are a red herring.

Also misplaced are assertions that the Department did not adequately respond to comments more generally raising the burden of compliance with the ACTS component. On the contrary, the Department did not merely point to the Presidential Memorandum and otherwise fail to respond to comments pertaining to burden. Rather, the Department considered all comments, estimated the burden at maximum 200 hours for any institution, and set the response deadline accordingly to give IHEs time to respond without having to sacrifice other aspects of their work. Exhibit F: Responses to Comments Received on August Notice ECF 100-6 ("Aug. Notice Responses") at 7. The Department also took steps to mitigate that burden:

- "NCES's data collection partner, RTI, has decades of expertise in IPEDS specifically and rigorous data collections with postsecondary institutions more generally. Because of this expertise, RTI was quickly able to develop a novel data collection methodology. The proposed approach is designed to substantially reduce institutional burden by

automating substantial portions of the ACTS submission and quality assurance processes." *Id.* at 12.

- "To offset burden where possible, NCES has sought to provide useful reporting resources and to offer novel data collection methodologies. NCES will continue to make every effort to minimize IPEDS reporting burden, be it from ACTS or other components, in future collections. We welcome suggestions on how this might best be done (e.g., one commenter suggested that ACTS items be spread across existing, related components as opposed to being a separate component). As always, institutions that encounter questions or concerns while completing the ACTS survey component are encouraged to contact the IPEDS Help Desk for assistance." *Id.* at 16.
- "In response, NCES is limiting eligibility to degree-granting four-year colleges and universities that are (1) primarily baccalaureate or above, or (2) graduate with no undergraduate." Nov. Notice Responses at 3.
- "NCES has taken two steps to mitigate burden to the extent possible. First, whenever appropriate, NCES has used variables and/or variable definitions that are used elsewhere within the IPEDS collection. This reduces the complexity of complying with a wholly new requirement. Second, NCES is introducing an innovation in IPEDS collection through the use of a new two-step process. In the first step, institutions prepare a student-level file aligned to predefined submission templates. In the second, institutions import the file into the IPEDS Aggregation Tool (or perform the aggregation locally) and then upload the resulting file to the IPEDS Collection System. This removes burden associated with local calculations or manual entry. As always, the IPEDS HelpDesk remains available to assist institutions who experience difficulties submitting their ACTS data." *Id.* at 45.
- "NCES proposes that a subset of institutions be made exempt from ACTS reporting. Specifically, institutions that, in a given year covered by the ACTS requirement, are (1) open admission *or* admit 100 percent of applicants, *and* (2) attest that they do not award any non-needbased financial aid may be exempted from that year's collection." *Id.* at 5.
- "As shown in Part A of the Supporting Statement accompanying this proposed collection, NCES anticipates the burden associated with this collection to not exceed 200 hours in its first year. This represents 25 workdays at 1.0 FTE or 50 workdays at 0.5 FTE. NCES believes this estimate is reasonable because (1) the bulk of data collected by the ACTS survey is already reported by institutions in existing IPEDS collections; (2) the cohorts of students reported on in the ACTS component are largely familiar, being used in other IPEDS surveys; and (3) the structure of the ACTS data files is identical year over year. As such, NCES anticipates that, once an institution creates their first year's set of data files, the marginal effort to create additional years should decrease. Some of that decreased effort may be offset by the need to adapt data cleaning and recoding procedures to respond to changing institutional data definitions over time or to pull older data from data warehouses. Some commenters specifically raise concerns that NCES's effort to reduce burden through the use of record-level data to generate an uploadable aggregate file may actually increase burden. NCES believes otherwise, given our successful use of recordlevel templates in other collections involving thousands of postsecondary institutions (e.g., the National Postsecondary Student Aid Study)." *Id.* at 21-22.

12

Similarly, assertions that the Department failed to adequately respond to comments about the timeline for implementing the ACTS component fail to account for the Department's responses. In response to 228 comments on the August Notice addressing the adequacy of the timeline for implementing the ACTS component for both IHEs and NCES, the Department first explained—in addition to pointing to the Presidential Memorandum—that NCES had considered both the burden on IHEs and on itself and had confidence that both IHEs and NCES would be able to provide and review ACTS data, in part because:

- "The majority of the underlying data elements needed to respond to ACTS are also necessary to complete other IPEDS surveys (e.g., Admissions, Cost, Completion, Fall Enrollment, Graduation Rates) and are likely to be available, accurate, and familiar to submitters.  Although a small number of the data elements have not previously been collected by IPEDS (e.g., GPA, parental education, remedial course-taking), many of these are commonly tracked by postsecondary institutions and/or are defined elsewhere by the Department (e.g., via FAFSA processing), increasing the feasibility of their reporting." Aug. Notice Responses at 13.
- "NCES has also staggered the data collection window of the ACTS component with that of other winter surveys such that they are not wholly overlapping." *Id.*
- "NCES's data collection partner, RTI, has decades of expertise in IPEDS specifically and rigorous data collections with postsecondary institutions more generally. Because of this expertise, RTI was quickly able to develop a novel data collection methodology. The proposed approach is designed to substantially reduce institutional burden by automating substantial portions of the ACTS submission and quality assurance processes. Similarly, RTI's long-standing role as provider of IPEDS Help Desk service positions them effectively to assist institutions who may be experiencing challenges while preparing or submitting ACTS data." *Id.*

Finally, Putative Intervenors note that the Department has historically provided feedback on IPEDS submissions to help IHEs identify and correct errors and imply that because of the Department's reduction in force it is no longer providing this service, increasing their burden. AAU Br. at 4; AICUM Br. at 4; CCIC et al. Br. at 4.  That implication is incorrect.  The Department has long used a contractor, RTI, to help IHEs identify and correct errors, and that service is still in place.  2nd Soldner Decl. ¶¶ 5-7.  NCES increased its contract with RTI for the ACTS component, including by increasing funding for RTI staff Help Desk training.  *Id.* ¶ 8.

13

For the foregoing reasons, and those provided in Defendants' briefs in opposition to the Plaintiffs' motion seeking a temporary restraining order, the Putative Intervenors have failed to show a likelihood of success on the merits as to their argument that the Department failed to consider comments asserting that the ACTS component would be burdensome. The record shows that the Department did not merely rely on the Presidential Memorandum to justify the added burden of the ACTS component but instead justified that burden and took definite steps to limit that burden. The evidence of completion of the ACTS component bears out the administrative record's evidence of the Departments' careful consideration of the burden of the ACTS component.

## IV. NEITHER THE DEPARTMENT NOR NCES ARE CLOSING ABSENT CONGRESSIONAL APPROVAL.

In this Court's opinion granting a preliminary injunction to Plaintiffs, it incorrectly stated that the Department is "in the process of dismantling itself, and closing NCES, in response to another presidential directive." Mem. on Pls.' Mot. for a Prelim. Inj., ECF No. 142 ("PI Opinion") at 6. None of the Department, the Institute of Educational Sciences (IES), or NCES will shut down absent congressional approval.

Both President Trump and Secretary McMahon have been unequivocal that it will take an act of Congress to ultimately shutter the Department. *See State of New York, et al. v. Linda McMahon*, 1:25-cv-10601-MJJ (D. Mass.), Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj., ECF No. 95 at 13-14 (April 11, 2025.) Absent that congressional approval the Department is *not* "in the process of dismantling itself, and closing NCES."

In a March 25, 2025, Executive Order, the Secretary of Education was directed "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14242 § 2(a), 90 Fed. Reg. 13679, 13679 (Mar. 25, 2025) ("Department Executive Order"). The Department Executive Order states that it should

14

"be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

The Secretary has described her role pursuant to the Department Executive Order as "an overhaul" of the Department of Education. U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. As part of the overhaul, the Department has implemented a reduction in force, which impacts "[a]ll divisions within the Department," with some divisions requiring "significant reorganization to better serve students, parents, educators, and taxpayers." U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force. The purpose of the reduction in force is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.*

After the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview." *Id.* The Secretary stated that she planned to keep fifty percent of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112. These key programs include NCES and its collection of IPEDS data, as outlined in the Department's "strategy for relevance and renewal" for IES and NCES. Ex. E: Reimagining the Institute of Education Sciences, ECF No. 100-5 ("Reimagining") at 5 (explaining that the IPEDS NCES dataset has become an integral component of the education data infrastructure). As the Acting Director of IES and Interim Deputy

15

Commissioner of NCES has explained, "mission critical components" of contractors' "work on IPEDS continue—and continue to be monitored" by NCES. 2nd Soldner Decl. ¶ 7. Indeed, the Department's strategy for IES includes future hiring. Reimagining at 74 (recommending that IES hire "a small team of contracting experts" to "streamline the contracting process"); *id.* at 79-80 (explaining the efficiency benefits of using contractors to perform staffing-intensive activities, such as operating helpdesks).

The Department adequately and appropriately responded to comments raising concerns about NCES's "capacity to effectively manage the ACTS component" by stating that "NCES and its IPEDS contractor have confidence in their joint capacity to collect, validate, and report the ACTS data," based, in part, on NCES's successful collections and processing of the Fall 2025-26 IPEDS collection, in which RTI played a similar role. Nov. Notice Responses at 24.

## V.    THE BALANCE OF EQUITIES WEIGHS TOWARD DENIAL OF PRELIMINARY RELIEF.

As explained in Defendants' supplemental brief, the balance of equities weighs toward denial of a preliminary injunction because, if this Court were to grant a preliminary injunction, it would interfere with the Department's statutory authority to collect information from IHEs and would delay much-needed transparency into IHEs admissions which will benefit the public, and in particular benefit those who will be applying to IHEs in a few short months. Defs.' Supp. Opp. at 11.

In this Court's opinion regarding a preliminary injunction for Plaintiffs, it stated that "Defendants point to no evidence that the survey was designed to benefit college applicants more broadly," and thus rejected the argument that college applicants would be among the public harmed by being deprived of access to information gleaned through the ACTS component. PI Opinion at 35-36. Contrary to this Court's determination, public transparency is the ultimate goal of the ACTS component.    The component's very name—Admissions and *Consumer Transparency*

16

Supplement—shows that consumer transparency into college admissions is at the heart of the ACTS component.  The history of the ACTS component proves that transparency has always been a main goal.  The Presidential Memorandum—entitled "*Ensuring Transparency* in Higher Education Admissions"—stated that "American students and taxpayers deserve confidence in the fairness and integrity of our Nation's institutions of higher education, including confidence that they are recruiting and training capable future doctors, engineers, scientists, and other critical workers vital to the next generations of American prosperity."  Presidential Memorandum, ECF No. 69-6 (emphasis added).  The Department's responses to comments reiterated the goal of transparency.  Nov. Notice Responses at 8 (purpose of the ACTS component is "to ensure institutions of higher education receiving Federal financial assistance are transparent in their admissions practices" and to address "'persistent lack of available data' related to the college admissions process").  Thus, the administrative record provides ample support for the proposition that applicants are among the intended beneficiaries of the ACTS component.

That the Associations' members and ICG schools have, by and large, completed or made substantial progress toward completing their ACTS component submissions proves that the balance of equities militates against granting a preliminary injunction.  If this Court denies an injunction, it will change nothing for the vast majority of schools, which have made good faith efforts to comply with the requirements of 20 U.S.C. § 1094(a)(17) by submitting data required by the ACTS component.  Only a handful of schools have elected not to submit the requested information, and this Court should not grant the extraordinary remedy of enjoining lawful agency action to reward those schools for that choice.

17

## CONCLUSION

For the foregoing reasons, and the reasons given in Defendants opposition and supplemental brief in opposition to Plaintiffs' motion seeking a TRO, ECF Nos. 68 and 99, Defendants respectfully ask this Court to deny the Putative Intervenors' motions seeking temporary restraining orders.

Dated:  April 9, 2026                               Respectfully submitted,

                                                    BRETT A. SHUMATE
                                                    Assistant Attorney General


                                                    MICHELLE BENNETT
                                                    Assistant Director, Federal Programs Branch


                                                    */s/ Brittany S. Bruns*
                                                    BRITTANY S. BRUNS (D.C. Bar 1658394)
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    Civil Division, Federal Programs Branch
                                                    1100 L ST. N.W.
                                                    Washington, DC 20005
                                                    Tel:  (202) 531-1325
                                                    brittany.s.bruns@usdoj.gov
                                                    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing (NEF).

Dated:  April 9, 2026                    Respectfully submitted,


*/s/ Brittany S. Bruns*
BRITTANY S. BRUNS