# EXHIBIT 1

**<u>SUPPLEMENTAL DECLARATION OF AAU PRESIDENT BARBARA R. SNYDER</u>**

I, Barbara R. Snyder, declare as follows:

1.      I am President of the Association of American Universities ("AAU").

2.      I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by AAU personnel and personnel from our member universities and could testify thereto.

3.      On April 9, 2026, the Interim Deputy Commissioner of the National Center for Education Statistics submitted a declaration in which he shared information regarding institutional progress in submitting the data called for by the ACTS survey. *See* Second Declaration of Matthew Soldner, Interim Deputy Commissioner of the National Center for Education Statistics ¶¶ 1-3, ECF No. 168-1 ("Second Soldner Decl."). The government has asserted that it is clear from the face of this declaration that only a small number of schools have not completed their ACTS submissions. *See* Defs.' Opp'n to Intervenors' Mot. for Temp. Restraining Order 4-5, 7-8, ECF No. 167. But that does not accurately or fully depict the status of institutions' data submissions or reflect the remaining burden on many institutions of higher education ("IHEs"), including AAU's members.

4.      As an initial matter, all institutions face at least one similar form of irreparable harm regardless of the status of the institution's data submission. In announcing the ACTS survey, the Presidential Memorandum provides that "if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data," the Department "shall take remedial action." Presidential Memorandum, *Ensuring Transparency in Higher Education Admissions* § 3(c) (Aug. 7, 2025). Because of, among other things, the highly compressed time frame for responding combined with the magnitude of the reporting requirements, the lack of standardization of the data elements and lack of clear guidance regarding definitions and other open questions, and

1

the unavailability or inaccessibility of data necessary to comply with the requirements for retroactive responses, *all* institutions face the imminent risk of fines and loss of federal funding should the government deem their submissions inadequate.

5.      Even as to the specific irreparable harm from the burdens of responding to the ACTS survey, a substantial majority of AAU's members continue to face that harm. I will respond to the government's chart specifically. The government divides the chart into eight different statuses related to ACTS submission. *See* Second Soldner Decl. ¶ 3.

6.      I understand based on the Soldner Declaration that only one of the eight statuses—"Completed"—reflects a final ACTS submission for a given year. So, only IHEs with a "completed" status for all seven years could even arguably be considered to have finished their ACTS submission. Conversely, any IHE without seven "completed" files, by definition, has not finished submitting ACTS data. Of the 191 unique ACTS respondees on the government's chart, only 61 are marked as having "completed" their data submission for all seven years.[1] Thus roughly two-thirds of institutions listed in the chart still bear the heavy burden of finalizing their ACTS submission.

7.      The first status code "Not Applicable" is defined in the Soldner Declaration as meaning that the institution need not complete the ACTS Survey. As further explained below, each of the other six status codes refer to a stage in the process in which an institution has significant work remaining.

8.      For a school to know whether it is required to comply with the ACTS survey, it must first answer several screening questions. My understanding of the government's submissions

---

[1] Because some IHEs, including some AAU members, report their ACTS data by campus rather than as a single institution, the number of ACTS respondees on the chart is slightly higher than the total number of IHEs represented by the Associations in this case.

is that the "NO DATA" (all caps) status means that an institution has not yet answered these screening questions, and then once an IHE has completed the screening questions, but before it has uploaded *any* data into the system, it will be in the "No Data" category.

9.    The next step on the government's chart is "Uploaded." To upload data, an IHE must run its data through an aggregator tool. This can be done either by: (1) using the code provided by the contractor RTI; or (2) inputting data into a portal hosted by RTI. My understanding is that many IHEs downloaded the code because they were concerned that uploading information to the portal would give RTI (an external party) access to data submissions. But using the code has also been very burdensome: for example, as I noted in a prior declaration in this case, the code was delayed in being provided, and when many schools tried to use it, their systems flagged it as a virus.

10.    At yesterday's hearing, Defendants referred to uploading data as a major step toward completion, but uploaded data is nowhere near final. When data is uploaded, the institution has taken only a preliminary step in preparing its ACTS submission: any errors in the data still need to be resolved, and institutions will often still have questions about what data is relevant to which questions (especially given the lack of clarity from the Department on survey definitions).

11.    The next status identified in this process on the government's chart is "Edited." Once an IHE has uploaded all of the data it has for a given year, errors identified by the Department of Education must be resolved. Such errors may include, for example, missing data or a mismatch between a data point submitted in response to ACTS that did not align with an earlier IPEDS submission. For example, if a school included "deferred students" in its ACTS submission, then it generated an error. The way to resolve the error was to remove deferred students; however, this created a misalignment with data definitions used for submissions to other IPEDS surveys

3

(specifically, the admissions and enrollment surveys). We have consistently heard from members that they are concerned about the error-resolution process, as it may make them vulnerable to enforcement later on, particularly in light of the Presidential Memorandum's directive that the Department initiate enforcement based on "incomplete or inaccurate data."

12.     When an institution is in the "Edited" stage, there is significant back and forth between institutions and the IPEDS Help Desk. That process has been particularly cumbersome during the ACTS implementation because of long hold times and technical difficulties.

13.     Resolving edit errors can also degrade IPEDS data from previous years. If ACTS calls for data to be defined in a certain way and that does not match how an IHE submitted that data for previous IPEDS surveys, the institution will be required to unlock and edit those earlier IPEDS surveys from past years to match the current ACTS submission. For example, AAU members have been instructed that the ACTS survey does not cover deferred students for a given year, in contrast to, for example, the admissions survey and enrollment survey. To correct the resulting mismatch in statistics, institutions had to unlock their prior IPEDS admissions surveys and modify them by deleting any data about deferred students. This adds additional time and burden during this phase of the submission process. This process also degrades the quality of the data in IPEDS and will lead to issues with all trend data for an institution.

14.     Once all critical errors are resolved to the Department's satisfaction, the data is considered clean and, according to the government's chart, a file will be defined as in "Cleaned" status. Critically, this does not mean that an institution is satisfied with its data submission or that all errors a school is aware of or concerned about have been resolved. It means simply that the errors that literally prevent submission have been addressed.

15.     At this point, the school can proceed to lock its data file, after which point the data will show as in a "Locked" file status, according to the Soldner Declaration.

16.     Once the "final lock" is "applied," the Soldner Declaration states that a data file will be in "completed" status. Only then can an IHE's ACTS submission for a given year be considered complete.

17.     With that understanding, the government's chart makes clear that many of AAU's members still have a lot of work to do before they finalize their ACTS data. And even then, IHEs are likely to lack certainty as to the accuracy of their data. Of course, each institution—including AAU's members—is diligently attempting to ensure accuracy in the data it submits. But for all of the reasons AAU, the other Associations, the Six Independent Colleges, and the State Plaintiffs have explained, diligence does not necessarily translate to accuracy given the lack of clarity and guidance from the Department.

18.     The ACTS survey does instruct schools that they can submit their surveys with missing data and that, to the extent certain data might be misleading, they should submit without that data. And the survey instructions further direct IHEs to explain why that data is unavailable. But, while these instructions provide a technical path for schools to submit incomplete data, they are cold comfort to IHEs, including AAU's members, given the Presidential Memorandum's instruction to Secretary McMahon that she "*shall* take remedial action." Pres. Mem. § 3(c) (emphasis added). Our members are unaware of any competing directive that indicates that good faith attempts to comply would insulate them from enforcement and liability.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 14, 2026, in Washington, D.C.


5

BARBARA R. SNYDER

6