**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **COMMONWEALTH OF MASSACHUSETTS, et al.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 26-11229-FDS** |
| **DEPARTMENT OF EDUCATION, et al.,** | ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM AND ORDER ON MOTION OF INTERVENORS FOR PRELIMINARY INJUNCTIVE RELIEF OR A STAY

**SAYLOR, J.**

This matter involves a challenge to a new requirement promulgated by the United States Department of Education—the Admissions and Consumer Transparency Supplement ("ACTS")—that compels colleges and universities to disclose certain data concerning student admissions.

In substance, the ACTS survey mandates detailed reporting of admissions data— including information concerning race, ethnicity, gender, family income, parental education, and other demographic factors, as well as admission test scores and grade point averages—for all applicants, admitted students, and enrolled students, at both the undergraduate and graduate level, both currently and for the preceding six years.

The original plaintiffs are 17 states, including Massachusetts, with public university systems that participate in federal student financial aid programs. On April 3, 2026, this Court issued a preliminary injunction enjoying the application of the ACTS survey as to the 17

plaintiffs on the ground that it likely violates the Administrative Procedure Act, 5 U.S.C. § 706(2).  The Court concluded that while it was likely that DOE has the statutory authority to collect race and other demographic information concerning college admissions, the process by which the ACTS survey was adopted likely violated the APA.

Since the issuance of that order, several associations of colleges and universities and one group of colleges have intervened in this proceeding.  All seek essentially the same relief as the original plaintiffs—that is, a preliminary injunction or stay of the ACTS requirement.

For the reasons set forth below, while there are some differences between the claims of the intervenor-plaintiffs and the original plaintiffs, they are not sufficiently significant to warrant a different result.  Accordingly, the Court will extend the scope of its preliminary injunction to include the intervenor-plaintiffs.  As in its April 3, 2026 Order, the Court is not vacating the ACTS survey in its entirety, which will continue to apply to colleges and universities that are not part of this lawsuit.  Instead, it is enjoining its application only to the intervenor-plaintiffs (and, by extension, the colleges and universities that are members of the relevant associations).

I.    **Background**

A.    **Introduction**

Familiarity with the Court's Memorandum and Order of April 3, 2026, is presumed. Nonetheless, and for the convenience of the reader, the Court will repeat its introductory paragraphs here.

The Department of Education, through the National Center for Education Statistics ("NCES"), has been collecting admissions data from colleges and universities for many years. Title IV of the Higher Education Act, which authorizes federal student financial aid programs, requires participating institutions to "complete surveys conducted as a part of the Integrated

Postsecondary Education Data System" ("IPEDS").  20 U.S.C. § 1094(a)(17).  Historically, there have been thirteen such surveys, covering a variety of different topics, including not only admissions, but such matters as enrollment, graduation rates, and financial aid.  In order to ensure consistency and fairness, reduce undue burden on the institutions, and maintain student privacy, DOE has developed a comprehensive process to review and implement proposed amendments to the surveys that includes collaborative efforts with all stakeholders, including the use of Technical Review Panels ("TRPs").

On August 7, 2025, President Trump issued a memorandum directing the Secretary of Education to expand the scope of the IPEDS to track the "consideration of race in higher education admission" to ensure compliance with the Supreme Court's decision in *Students for Fair Admission, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023).  (Dkt. No. 69-6).  Critically, that memorandum directed her to do so within 120 days.  The same day, DOE Secretary Linda McMahon issued a memorandum to the Acting Commissioner of NCES directing him to collect certain types of data within the 120-day timeline.  (Dkt. No. 69-7).

Eight days later, on August 15, NCES published, and requested comment on, the ACTS. The August 15 posting did not include the actual ACTS survey, but only a generalized description of the information that would be added to the IPEDS.

NCES received more than 3,400 comments in response to the August 15 request.  Among other things, multiple commenters expressed concerns about the implementation of the survey in a highly compressed time frame, given the magnitude of the new reporting requirements; the likelihood of impaired data quality, due among other reasons to lack of standardization of data elements; the increased administrative burden on responders; the lack of clear and practical guidance, including data definitions; the apparent failure to consider how to protect student

privacy with disaggregated data reporting; the unavailability or inaccessibility of data necessary to comply with the requirement of retroactive responses; the challenges concerning the demand for data, particularly as to graduate schools, that is possessed only in a decentralized manner; and the likelihood of operational disruptions, particularly for smaller schools with limited resources.

In October 2025, NCES responded to each of those eight substantive categories of comments. (Dkt. No. 9-2). In each instance, it began by stating, using identical language, that the ACTS proposal was developed in direct response to President Trump's memorandum, including the 120-day deadline. (*Id.* at 13-22). Each response, in substance, then acknowledged the "concerns" (or "challenges" or "burdens") of the institutions, but addressed those concerns in largely cursory fashion, much of which consisted of optimistic statements and assurances about future guidance.

Thus, for example, in response to concerns about the short implementation timeline, NCES stated that it "recognizes the challenges," but that "the timeline has been specified by the Presidential Memorandum and Secretarial Directive." (*Id.* at 13). It expressed "confidence" that the institutions "can provide the high-quality data required by the ACTS components" and that it is "similarly confident in the operational success of the ACTS collection." (*Id.*).

The response of NCES to concerns about the failure to employ the TRP process is particularly instructive. It acknowledged that "historically" it had made use of TRPs to ensure clear definitions and instructions for data collection. (*Id.* at 17). It added, however, that "[i]n light of the timeline established [by the President], the feasibility of an ACTS-related IPEDS TRP was deemed infeasible." (*Id.* at 17-18).

To be clear, the law does not require a lengthy gestation period for every proposed change to the NCES surveys. Simply because in the past such changes involved a measured and

4

collaborative process does not mean that NCES is legally required to engage in a similar process in every case.  It is, however, relevant that NCES developed that process over the years in order to permit careful consideration of complex issues and to permit the relevant institutions sufficient time to adapt to new requirements—and that it discarded that process here solely in order to try to meet the 120-day deadline.  That deadline was not driven by any exigency, by the complexity of the subject matter, or the burden imposed on the institutions; it was set in response to a presidential decree.  Indeed, NCES expressly acknowledged that the only reason it did not use the TRP process was because of the President's deadline.

In any event, on November 13, 2025, NCES posted a submission to the Office of Management and Budget for review and approval and a further request for comment on the ACTS survey component.  The only significant change was that the November request proposed exempting four-year institutions that accepted all applicants and do not award need-based aid.

The comment period for the November request closed on December 15, 2025.  OMB then approved the ACTS survey.  On December 18, NCES commenced the opening of the survey, with submissions for most institutions due on March 18, 2026.  Even then, the survey was not finalized; NCES materially changed the templates on January 26, 2026, and changed them again on February 17, 2026.

This lawsuit was then filed on March 6, 2026, seeking preliminary and permanent injunctive relief.  The complaint asserts three claims under the Administrative Procedure Act, 5 U.S.C. § 706(2):  first, that the agency exceeded its statutory authority in adopting the ACTS; second, that the agency did not observe procedures required by law, because it failed to follow the requirements of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, and the E-

Government Act of 2002; and third, that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of § 706(2)(A).

Count 1 asserts that the survey itself is outside the statutory authority of NCES, and therefore illegal. But at least at a general level, it seems clear that NCES can lawfully collect the requested data. The statute grants it authority to collect, analyze, and report "information by gender, race, ethnicity, socioeconomic status . . . and other population characteristics," and to do so "when such disaggregated information will facilitate educational and policy decisionmaking." 20 U.S.C. § 9543(a)(3). Indeed, NCES has collected such data for years. One of the principal purposes of collecting and analyzing information about race, ethnicity, and similar demographics is to ascertain whether there are potentially troublesome anomalies or patterns that suggest the possibility of unlawful discrimination. Whatever the flaws of the ACTS may be, its subject matter fits squarely within the authority granted by the statute.

Nor is there any obvious reason to restrict the purposes for which the information can be used in order to prohibit referrals for investigation or enforcement. The statute authorizes the collection, analysis, and "reporting" of disaggregated data when it would "facilitate educational and policy decisionmaking." *Id.* The facilitation of educational decisionmaking necessarily includes identifying potential problems (such as patterns of discrimination). And if the data received from a particular institution seems to suggest possible illegal discrimination on the basis of race, surely NCES is not precluded from taking appropriate action in response.

The principal problem, then, lies not in the basic authority of NCES to collect, analyze, and make use of the data. Rather, it arises from the rushed and chaotic manner in which the ACTS was promulgated. The 120-day deadline imposed by the President led directly to the failure of NCES to engage meaningfully with the institutions during the notice-and-comment

6

process to address the multitude of problems presented by the new requirements.  The manner in which NCES handled that process simply cannot be squared with the requirements of the APA—and, indeed, epitomizes arbitrary and capricious agency action.

Those problems are compounded by the fact that DOE is in the process of dismantling itself, and closing NCES, in response to another presidential directive.  On March 25, 2025, President Trump directed that Secretary McMahon, "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities."  Exec. Order No. 14242 § 2(a), 90 Fed. Reg. 13679, 13679 (Mar. 25, 2025).

Since that announcement, the number of DOE employees has been radically reduced.  The parties dispute how those cuts have affected NCES; according to plaintiffs, the number of employees has been cut from approximately 100 to only 3, whereas the government contends that there are 13 employees remaining, and that "all of the data collection and processing" is being handled by private contractors.  (Def.'s Suppl. Opp'n 3, Dkt. No. 99).  But the government is conspicuously silent on the subject of how the surveys, and the data collected by those surveys, will be handled once NCES no longer exists or what the timetable is for its elimination.

This is not a merely technical issue.  The IPEDS process cannot be turned over to states and local communities; they have no authority under 20 U.S.C. § 9543(a)(3) to conduct such surveys.  Nor, for that matter, does any federal agency other than NCES.  Once NCES no longer exists, the authority for ACTS vanishes—and with it the authority both to "collect" data and to "analyze" data collected from prior surveys.  Whether and where that data will continue to exist, and who will have access to it, is entirely unclear.

During the notice-and-comment process, in response to concerns about the reductions in force and the eventual dismantling of the department, NCES simply stated that "NCES and its IPEDS contractor have confidence in their joint capacity to collect, validate, and report the ACTS data." (Dkt. No. 69-17, at 24). In response to the concern that "sufficient technical assistance will not be available to support institutions as they complete ACTS," NCES asserted that "[t]he IPEDS Helpdesk is available and prepared to respond to inquiries from institutions in all phases of collection." (*Id.*). At the very least, the fact that NCES simultaneously expressed a willingness to work with institutions on an ongoing basis to provide guidance, while failing to address the fact that it intended to cease operations as soon as "permitted by law," is further evidence that the promulgation of the ACTS was arbitrary and capricious.

### B.    **The Parties**

The original plaintiffs are 17 states whose public colleges and universities participate in federal student financial aid programs under Title IV of the Higher Education Act.[1]

Defendants are the Department of Education; Linda McMahon, Secretary of Education; the Office of Management and Budget; and Russell Vought, Director of the Office of Management and Budget.

Six of the plaintiff-intervenors are associations: the Association of American Universities; the Association of Independent Colleges and Universities in Massachusetts; the Connecticut Conference of Independent Colleges; the Maine Independent Colleges Association; the North Carolina Independent Colleges and Universities; and the Oregon Alliance of

---

[1] Massachusetts, California, Maryland, Colorado, Connecticut, Delaware, Hawaii, Illinois, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

Independent Colleges and Universities.[2]

The Association of American Universities ("AAU") is an association of 71 leading research universities in the United States and Canada, 69 of which are located in the United States. Its member institutions include schools with highly selective admissions processes (for example, Massachusetts Institute of Technology, California Institute of Technology, Stanford University, University of Chicago, Duke University, Northwestern University, and all eight Ivy League schools). Many of its schools are relatively large (for example, it includes every Big Ten school but one). *See Our Members*, Ass'n of Am. Univs., https://perma.cc/V3W4-4Z6S.

The Association of Independent Colleges and Universities in Massachusetts is an association of 58 colleges and universities, including Amherst College, Boston College, Boston University, Brandeis University, Harvard University, College of the Holy Cross, Massachusetts Institute of Technology, Mount Holyoke College, Northeastern University, Smith College, Tufts University, and Wellesley College. *See Member List*, Ass'n of Indep. Colls. & Univs. in Mass., https://perma.cc/Q7Q4-5PAT.

The Connecticut Conference of Independent Colleges is an association of 14 colleges and universities, including Connecticut College, Trinity College, and Yale University. *See Members Institutions*, Conn. Conf. of Indep. Colls., https://perma.cc/5QNB-YJ8L.

The Maine Independent Colleges Association is an association of 11 colleges, including Bates College, Bowdoin College, and Colby College. *See* Me. Indep. Colls. Ass'n, https://perma.cc/2F8F-SDSY.

---

[2] It does not appear that the government contests that the six associations have standing to assert the claims of their member institutions.

The North Carolina Independent Colleges and Universities is an association of 36 colleges and universities, including Davidson College, Duke University, and Wake Forest University.  *See Find Your College*, N.C. Indep. Colls. & Univs., https://perma.cc/Y452-EHTT.

The Oregon Alliance of Independent Colleges and Universities is an association of 11 colleges and universities, including Lewis & Clark College, Reed College, and Williamette University.  *See Member Colleges & Universities*, Or. All. Of Indep. Colls. & Univs., https://perma.cc/38JP-B8CB.

In addition, six private institutions have also intervened:  Barnard College; Bryn Mawr College; Middlebury College; Sarah Lawrence College; Swarthmore College; and Vassar College (collectively, "Independent College Group").

### C.      Procedural Background

On March 11, 2026, the Commonwealth of Massachusetts and sixteen other states filed a complaint challenging the ACTS survey under the APA.  (Dkt. No. 1).  According to the complaint, the relevant institutions of higher education were required to complete the challenged survey by March 18, 2026.  Two days later, on March 13, plaintiffs filed a motion for a temporary restraining order.  (Dkt. No. 6).  Later that day, the Court issued a temporary restraining order extending the deadline to complete the ACTS survey from March 18, 2026, to March 25, 2026, to permit orderly briefing and a hearing on the motion.  (Dkt. No. 12).

On March 19, 2026, the Association of American Universities and various other national higher-education associations moved to file a brief as *amici curiae*, which the Court granted. (Dkt. Nos. 52, 72).

The Court then held a hearing on March 24, 2026.  At the hearing, plaintiffs represented that they sought relief only for the plaintiffs, not "global" relief.  (Dkt. No. 90 at 45).  The Court then issued a brief further temporary restraining order extending the deadline to April 6, 2026,

for the 17 named plaintiffs and their constituent institutions.  (Dkt. No. 75).  As stated at the hearing, because defendants had appeared in the case and filed a response, plaintiffs' motion would be treated as one seeking a preliminary injunction.

The next day, on March 25, 2026, the Association of American Universities filed a motion to intervene and a motion for a temporary restraining order.  (Dkt. Nos. 83, 85).  That motion for a temporary restraining order represented that the Department of Education had extended the deadline for all institutions of higher education to complete the ACTS survey to March 31, 2026.  (Dkt. No. 85 at 1).

On March 30, 2026, the Association of Independent Colleges and Universities in Massachusetts also filed a motion to intervene and a motion for a temporary restraining order. (Dkt. Nos. 109, 111).

On March 31, 2026, the Court issued a temporary restraining order extending the deadline for the proposed plaintiff-intervenors to April 14, 2026, and scheduled a hearing on those motions for April 13, 2026.  (Dkt. Nos. 118, 119).

On April 3, 2026, the Connecticut Conference of Independent Colleges, Maine Independent Colleges Association, North Carolina Independent Colleges and Universities, and Oregon Alliance of Independent Colleges and Universities filed a motion to intervene and a motion for a temporary restraining order.  (Dkt. Nos. 130, 132).  They contended that some of their member schools had submitted a preliminary set of data and therefore received a short extension to April 8, 2026, to complete all years of the ACTS survey.  (Dkt. No. 133 at 1).

Later that day, the Court preliminarily enjoined defendants from enforcing any deadline for compliance with the ACTS survey against the 17 current plaintiffs pending further order of the Court or trial on the merits.  (Dkt. No. 143).  The Court found that plaintiffs were likely to

succeed on their claim that the ACTS survey was arbitrary and capricious in violation of the APA, that they would suffer irreparable harm absent preliminary relief, and that the balance of the equities weighed in their favor.  (Dkt. No. 142).

On April 6, 2026, the Independent College Group filed a motion to intervene and a motion for a temporary restraining order.  (Dkt. Nos. 145, 153).  Except for Middlebury, which had already submitted its responses, those colleges had submitted a preliminary set of data and obtained an extension to April 8, 2026.  (Dkt. No. 154 at 6-7).

The Court then issued a temporary restraining order extending the deadline for the new proposed plaintiff-intervenors to April 14, 2026.  (Dkt. No. 166).

On April 13, 2026, the Court held a hearing on all proposed plaintiff-intervenors' motions to intervene and motions for a temporary restraining order.  Defendants did not oppose the motions to intervene, and the Court granted those motions.

There are now twelve plaintiff-intervenors in this case:  six higher-education associations and six independent colleges.  Collectively, they represent approximately 178 institutions of higher education, excluding the original plaintiffs, that are required to comply with the ACTS survey.  (Dkt. No. 181, at 1-7).

All plaintiff-intervenors challenge the ACTS survey on substantially the same grounds as the 17 original plaintiffs.[3]  Unlike the original plaintiffs, however, the plaintiff-intervenor associations seek a stay of agency action under § 705 that would effectively operate universally.  (Dkt. No. 86 at 18; Dkt. No. 112 at 17; Dkt. No. 133 at 20).  As with the motion of the original plaintiffs, the motions of plaintiff-intervenors for a temporary restraining order will also be

---

[3] The Independent College Group "seek[s] relief only as to themselves—not universal relief."  (Dkt. No. 154, at 17).

treated as ones seeking a preliminary injunction or stay of agency action during the pendency of the litigation.

Following the hearing, the Court issued a brief further temporary restraining order extending the time period to April 24, 2026, for the plaintiff-intervenors to complete the ACTS survey. (Dkt. No. 170).

## II.    Standard of Review

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctive relief. To grant a preliminary injunction, a district court must find that the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the balance of equities weighs in its favor, and (4) that an injunction or stay is in the public interest. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the government is the opposing party, the equities and public interest factors merge. *Massachusetts v. National Institutes of Health*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In addition, of those four factors, the likelihood of success on the merits "normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").

Separately, the APA authorizes courts, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

13

Courts typically consider the same four factors in evaluating whether to issue a preliminary injunction or a stay of agency action under § 705.  *See African Communities Together v. Noem*, 2026 WL 395732, at *4 (D. Mass. Feb. 12, 2026) (citing *National TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Colorado v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021)).

The court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits."  *Rohm & Haas Elec. Materials, LLC v. Electronic Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction."  *Boston Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).  Evidentiary issues such as hearsay "go to weight rather than admissibility" in ruling on a preliminary injunction.  *Gateway City Church v. Newsom*, 516 F. Supp. 3d 1004, 1009 n.3 (N.D. Cal. 2021) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016)).

## III.    Analysis

### A.    Likelihood of Success on the Merits

Under the Administrative Procedure Act, 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

14

Like the original plaintiffs, the plaintiff-intervenors, other than the Independent College Group, assert three claims under § 706(2).[4]  They allege that defendants exceeded their statutory authority, did not observe the procedure required under the PRA, and acted arbitrarily and capriciously.  (Dkt. Nos. 112, 133).

In its Memorandum and Order of April 3, 2026, the Court concluded that the original plaintiffs had established a likelihood of success on the merits of their claim that the agency action was arbitrary and capricious.  (Mem. and Order at 24-32).  Because the claims of plaintiff-intervenors are substantially identical, the Court will make the same finding here, for the same reasons identified in that Memorandum and Order, which are adopted by reference.

Among the issues that the Court addressed in its April 3 Memorandum and Order are the ongoing dismantling of the Department of Education and the role played by contractors in the collection and analysis of ACTS data.  The parties continue to dispute the status of both issues. The government contends that DOE, and its components such as NCES, will not be shut down in their entirety absent congressional authority.  (Dkt. No. 167 at 14-15).  Nonetheless, as intervenor-plaintiffs point out, the President appears to be taking a different position; in his remarks at an Easter lunch at the White House, on April 1, 2026, he stated the following:

> . . . Linda McMahon, she's done such a great job.

> She's moved education back to the states.  And you know what?  You need Congressional approval.  I said don't worry about it, just do it.  She did it. They're largely back in the states, we have all these buildings, empty education buildings.

---

[4] The Independent College Group assert a single claim under the APA—the claim that the agency action was arbitrary and capricious under § 706(2)(A).  (Dkt. No. 154).

15

President Donald J. Trump, *Remarks:  Donald Trump Addresses An Easter Lunch at the White House* (Apr. 1, 2026), https://perma.cc/V7F3-KJY4 (citation modified).[5]

Defendants further maintain that NCES staff monitor critical components of the work of contractors on IPEDS.  (Dkt. No. 167 at 15-16).  They also note that the Department "has long used a contractor, RTI, to help [institutions of higher education] identify and correct errors, and that service is still in place."  (*Id.* at 13).  Plaintiff-intervenors, however, contend that the Department of Education is transitioning to a new contractor and "the Department will no longer have the benefit of RTI's decades of experience."  (Dkt. No. 177, at 2; *see also* Dkt. No. 179).

In any event, the Court need not resolve the dispute at this stage, because the current state of the Department of Education is not relevant to the Court's APA review.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the full administrative record that was before the [agency] *at the time* [it] made [its] decision." (emphasis added)), *abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Rather, for present purposes, the problem is the agency's failure to consider, respond to, or acknowledge concerns about its capacity to implement a massive expansion of IPEDS on an expedited timeline while eliminating the NCES altogether or undertaking (at a minimum) a substantial downsizing.

### B.    Likelihood of Irreparable Harm

Intervenor-plaintiffs, like the original plaintiffs, allege three types of irreparable harm absent interim relief:  the burden of completing the ACTS survey; the burden of being subject to

---

[5] The government notes that Secretary McMahon "has described her role pursuant to the Department Executive Order as 'an overhaul' of the Department of Education."  (Dkt. No. 167, at 15 (quoting Linda McMahon, *Secretary McMahon:  Our Department's Final Mission*, U.S. DEP'T OF EDUC. (Mar. 3, 2025), https://perma.cc/PNW4-S2YV)).

enforcement actions for inadequate, incomplete, or erroneous data submissions; and privacy risks from revealing students' personal information.

The government's principal response, like its response to the original plaintiffs' claims, is that the delay by the intervenor-plaintiffs in filing suit undermines their claims of irreparable harm.  (Dkt. No. 167 at 10).  For substantially the reasons set forth in the April 3 Memorandum and Order, the Court concludes here that any delays by the intervenor-plaintiffs do not undercut their claims to irreparable harm.

The Court likewise concludes here, for the same reasons set forth in the April 3 Memorandum and Order, that the intervenor-plaintiffs face ongoing harm from the burden of responding to the ACTS survey; that they face an imminent risk of fines and loss of federal funding should defendants deem any submissions inadequate; and that it will not reach the issue of protection of student privacy.

Nonetheless, there is a potential issue arising out of the substantial differences in the reporting status of the 178 plaintiff-intervenor institutions.  The government contends that because some of the plaintiff institutions have completed, or substantially completed, the ACTS survey, they are not at risk of immediate irreparable harm.  (Dkt. No. 167 at 10-11).

It is certainly true that the intervenor colleges and universities stand in different positions in terms of their submission of ACTS data.[6]  The status of the AAU schools is instructive.  Of the 69 U.S. member institutions of the AAU, 18 are members of the original plaintiff group, as to which preliminary relief has already been granted.[7]  As of this writing, the remaining 51 schools

---

[6] It would stand to reason that the more selective the school, or the larger the school, the greater the burden of compliance with the ACTS survey.  There is little evidence in the current record, however, as to that issue. Different schools also have different record-keeping practices, particularly as to information from past years that was not previously reportable.  (*See, e.g.*, Dkt. No. 87 ¶ 16).

[7] Those members are the University of Colorado; the University of Maryland; the University of Oregon; Rutgers University; the University of Virginia; the University of Washington; the University of Wisconsin; the

have responded to the surveys in different ways.

The NCES website reports the status of the ACTS surveys for each of the relevant academic years, including both the current year (2025-26) and the six prior years (going back to 2019-20).  *See IPEDS 2025-26 Data Collection System*, surveys.nces.ed.gov/ipeds/public/reporting-status (last visited April 24, 2026).  The survey "status indicators" include the following:

- NO DATA – Screening questions have not been answered.  Responses to all screening questions are required before data collection pages will be generated.

- No Data – No data provided.

- Has Data – Data have been entered.  'Perform Edits' must be run to determine if data are clean.

- Edited – Edits have been run; institutions should go to the edit report to resolve edit errors.

- Clean – All edit errors have been resolved; data are clean; proceed to Lock.

- Locked – Data have been successfully submitted.  Final lock must still be applied.

- Complete – All locks have been applied.

*Id.*

Of the 51 remaining AAU schools, NCES reports a variety of different status indicators:

- Some are "Complete" as to all years (e.g., Ohio State, Texas, Texas A&M)

- Some are "Locked" as to all years (e.g., Arizona)

- Some are "Clean" as to all years (e.g., Brown, Chicago, Dartmouth, Northwestern, Penn, Princeton, Stanford)

- Some are "Edited" as to all years (e.g., Columbia)

- Some are "No Data" as to all years (e.g., Notre Dame, Yale)

University of Illinois; eight campuses of the University of California (Berkeley, Davis, Irvine, Los Angeles, Riverside, San Diego, Santa Barbara, and Santa Cruz); and two campuses of the State University of New York (Buffalo and Stony Brook).

18

*Id.*[8]

As to other AAU schools, NCES reports mixed status indicators as to different years. For example, Caltech is reported as "No Data" for two years and "NO DATA" for five; Harvard is reported as "Edited" for three years and "No Data" for four; Columbia is reported as "Edited" for two years and "Clean" for five; and NYU is reported as "Clean" for one year and "Edited" for six. *Id.*

The other five plaintiff-intervenors that are associations likewise have members with differing status indicators, ranging from "Complete" as to all survey years (e.g., Davidson College) to "NO DATA" or "No Data" as to all (e.g., Saint Augustine's University). Similarly, the six colleges in the Independent College Group have differing status indicators. Bryn Mawr, Swarthmore, and Vassar are reported as "Clean" for all years; Middlebury is "Complete" as to all years; Barnard is "Clean" as to three years and "Edited" as to four; and Sarah Lawrence is "Complete" as to three years and "Clean" as to four. *Id.*

As noted, the government contends that the majority of the schools at issue have either completed or substantially completed the ACTS survey as to all seven years, and that therefore those schools will not suffer immediate irreparable harm. The Court disagrees with that contention.

Even assuming that the requirement of a showing of immediate irreparable harm applies to all members of the six associational intervenor-plaintiffs (not just the associations themselves) as well as the six members of the Independent College Group, such a showing has been made

---

[8] Of the 18 AAU member schools as to whom preliminary relief has been granted, the status indicators are "Clean" as to four schools (Colorado, Illinois, Stony Brook, Virginia); "Edited" as to one (Maryland); "No Data" as to two (Oregon and Washington); "NO DATA" as to nine (Wisconsin and the eight University of California schools); and mixed as to two (Rutgers ("No Data" for four years and "Edited" for three) and Buffalo ("Locked" for two years and "Clean" for five)). (*Id.*).

19

here.  The claimed immediate injury requiring preliminary relief arises from two principal

sources:  the ongoing harm from the burden of responding to the ACTS survey and the

imminent, non-speculative risk of fines and loss of funding should the government deem any

submission inadequate.

As to the former, it appears to be true that the handful of schools that have been deemed

to have "completed" the survey have a much lower risk of immediate irreparable injury in the

form of compliance burdens or "administrative upheaval."  *See Doe v. Trump*, 157 F.4th 36, 79

(1st Cir. 2025), *petition for cert. filed*, No. 25-899 (U.S. Jan. 30, 2026).  However, the remaining

schools—which are almost all of them—continue to face such an injury.

As to the latter, the prospect of immediate irreparable harm remains substantial.  As the

Court stated in its April 3 Memorandum and Order:

> . . . [P]laintiffs contend that they face an imminent risk of fines and loss of federal
> funding should defendants deem any submissions inadequate.  Defendant
> contends that such harms are speculative because "enforcement action[s] are not
> automatic" and by regulation plaintiffs would have an opportunity to raise
> defenses at any such proceeding.  Such enforcement actions, however, are hardly
> speculative.  The lack of clear definitions and reporting standards, along with the
> tight timeline for reconciling any data issues, creates a strong risk that, despite
> their best efforts, plaintiffs will submit inconsistent and inaccurate data.
> Furthermore, the Presidential Memorandum contained a direct, if not specific,
> enforcement threat; it directed the Secretary of Education to "increase accuracy
> checks of submitted data" and "take remedial action, consistent with Title IV of
> the Higher Education Act of 1965 and other applicable laws, if institutions fail to
> submit data in a timely manner or are found to have submitted incomplete or
> inaccurate data." (Dkt. No. 69-6).  Although the statute and regulation grant the
> Secretary the discretion to impose penalties, the presidential directive provides for
> no such leeway.  *Contrast* 35 C.F.R. §§ 668.84-86 ("The Secretary *may* impose a
> fine," "suspend an institution's participation," or "limit or terminate an
> institution's participation.") (emphasis added), *with* Dkt. No. 69-6 ("The
> Secretary of Education *shall* take remedial action" (emphasis added)).  Moreover,
> that directive does not grant the agency the flexibility to decline remedial action if
> an institution has a reasonable excuse for "submitt[ing] incomplete or inaccurate
> data."

(Mem. and Order at 33-34) (certain citations omitted)).  That same risk of injury applies with equal force here.[9]

In short, the Court concludes that the requirement of immediate irreparable harm has been satisfied as to all plaintiff-intervenors and their member institutions.

### C.    Balance of the Equities and Public Interest

As noted, the two remaining factors, balance of the equities and the public interest, merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

For the reasons set forth in the April 3 Memorandum and Order, the balance of equities and the public interest favor the issuance of preliminary relief.  There is a strong public interest in restraining the arbitrary exercise of power by the federal government, and ensuring that the rule of law is enforced.  There is likewise a strong interest in relieving universities of unnecessary risks and burdens that could be eliminated or mitigated through a reasoned and careful administrative process.

Accordingly, intervenor-plaintiffs have established that they are likely to succeed on the merits of their claim that the agency action was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A); that immediate irreparable harm will result if the injunction does not issue; and that the balance of equities and the public interest favor preliminary injunctive relief.  Accordingly, the motion for a preliminary injunction will be granted.

## IV.    Scope of Relief

That leaves the issue of relief.  As noted, in its April 3 Memorandum and Order, the Court did not stay or vacate the agency action in its entirety under 5 U.S.C. § 705, but instead

---

[9] It is also noteworthy that the practical effect of carving out from injunctive relief those schools that have "completed" the survey—that is, those schools that appear to have made a good-faith effort to comply with its requirements—would be to make them *more* vulnerable to enforcement actions, compared to those schools that have not done so and are thus protected by a preliminary injunction.

issued preliminary injunctive relief only as to the 17 states (and thus their respective state universities).  The question now is whether the Court should issue an order that provides the same relief to the intervenor-plaintiffs as to the original plaintiffs; a narrower order, specifically tailored to each institution (or a subset of institutions); or a broader order, staying the ACTS survey on a national level.[10]

To begin, it appears clear that the Court has the statutory authority to stay the ACTS survey in its entirety, should the circumstances so warrant.  Section 705 of the APA provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.

The government contends that § 705 simply confirms the authority of the courts to issue traditional equitable relief, and does not grant any greater authority.  (Dkt. No. 174 at 3).[11]  In *Trump v. CASA, Inc.*, the Supreme Court held that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts" in the Judiciary Act of 1789.  145 S. Ct. 2540, 2548 (2025).  According to the government, relief under § 705 likewise must be party-specific.  (Dkt. No. 174, at 2).

The prevailing view, however, is that the authority to grant relief under the APA is not coextensive with the equitable authority granted under the Judiciary Act of 1789.  Section 706 of

---

[10] Plaintiff-intervenors contend that a stay would be "more modest" than injunctive relief because it "operates on the legal status of the rule[] rather than commanding executive behavior."  (Dkt. No. 172 at 1).  They acknowledge, however, that the practical effects of a stay would be broader.  (*Id.*).  In addition, the government— that is, the party being restrained—asks that any preliminary relief be party-specific rather than based on § 705. (Dkt. No. 174 at 5).

[11] Because the Court finds that § 705 authorizes nationwide relief, it does not reach the question of whether the government timely raised that argument.  (*See* Dkt. No. 172 at 3; Dkt. No. 174 at 1-2).

the APA authorizes a reviewing court to "set aside agency action" found to be unlawful.  5

U.S.C. § 706(2).  The Supreme Court has "assumed" that this language authorizes vacatur of

agency action, *United States v. Texas*, 143, S. Ct. 1964, 1996 n.7 (2023) (Alito, J., dissenting)

(citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020)),

and the First Circuit has applied it that manner, *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir.

2002) (Vacatur "is a proper remedy when an agency fails to explain its reasoning

adequately.").[12]  Reading § 705's "postpone[ment] . . . of an agency action" alongside § 706(2)'s

"sett[ing] aside [of an] agency action," postponement under § 705 "functions as a 'temporary

form of vacatur.'"  *Make the Rd. New York v. Noem*, 2025 WL 3563313, at \*16 (D.C. Cir. Nov.

22, 2025) (per curiam) (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th

210, 254 (5th Cir. 2023), *rev'd on other grounds, Food & Drug Admin. v. All. for Hippocratic

Med.*, 144 S. Ct. 1540 (2024)); *see also Career Colleges & Schools of Texas v. United States

Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (concluding "that the scope of preliminary

relief under Section 705 aligns with the scope of ultimate relief under Section 706").  And

because vacatur acts on the agency action itself, it is not generally party-specific.  *See Corner

Post, Inc. v. Bd. of Governors*, 144 S. Ct. 2440, 2463 (2024) (Kavanaugh, J., concurring) ("When

a reviewing court determines that agency regulations are unlawful, the ordinary result is that the

rules are vacated—not that their application to the individual petitioners is proscribed." (quoting

*Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *Career Colleges*, 98 F.4th at

255 ("Against this backdrop of specific statutory text and longstanding administrative law

---

[12] In his concurrence in *United States v. Texas*, Justice Gorsuch contemplated that the APA may not authorize vacatur.  143 S. Ct. 1964, 1976-86 (2023) (Gorsuch, J., concurring in the judgment).  He acknowledged, however, that such a finding "would be a sea change in administrative law as currently practiced in the lower courts." *Id.* (Alito, J., dissenting) (citing *id.* at 1984-85 (Gorsuch, J., concurring in the judgment)).

principles, the Department's arguments that general equitable and constitutional principles require the panel to limit any relief to the named parties do not hold water.").

The *CASA* Court observed that "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" is a "distinct question" from the limits of equitable relief under the Judiciary Act of 1789. *CASA*, 145 S. Ct. at 2554 n.10 (citing 5 U.S.C. § 706(2)). The holding *of CASA* therefore does not control the scope of relief available under § 705 of the APA. *See Make the Rd. New York*, 2025 WL 3563313, at *34; *CASA*, 606 U.S. at 2569 (Kavanaugh, J., concurring) ("Going forward, . . . different district courts may . . . grant or deny the functional equivalent of a universal injunction . . . by preliminarily setting aside or declining to set aside an agency rule under the APA.").

Of course, simply because a court has the broad authority to exercise relief does not mean it is necessary or appropriate to exercise it. In particular, the Court notes the concerns expressed by Justice Gorsuch in his concurrence in *United States v. Texas*, 143 S. Ct. 1964 (2023):

> The temptations a single district judge may face when invited to vacate agency rules are obvious. . . . Judges may think efficiency and uniformity favor the broadest possible relief. But there are serious countervailing considerations. As with universal injunctions, vacatur can stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes. Vacatur can also sweep up nonparties who may not wish to receive the benefit of the court's decision.
>
> * * *
>
> More importantly still, universal relief, whether by way of injunction or vacatur, strains our separation of powers. It exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide.
>
> * * *
>
> At a minimum, then, district courts must carefully consider all these things before doing out universal relief.

*Id.* at 1985-86 (Gorsuch, J., concurring in the judgment).  Thus, "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief."  *Id.* at 1985 (citation modified).

Many of the concerns outlined by Justice Gorsuch, such as those involving judicial overreach, forum-shopping, and separation of powers, are present here, as in virtually any APA challenge.  His concern as to "sweep[ing] up nonparties who may not wish to receive the benefit of the court's decision," *id.* at 1985, is also potentially implicated here, as there are upward of 2000 four-year schools that have not sought relief.

The central question appears to be whether considerations of efficiency and uniformity, which tend to favor a nationwide stay, are sufficient to outweigh the factors counseling judicial restraint.  Under the circumstances presented here, the Court concludes that they are not.  The present issue concerns only preliminary relief; the Court has not made a final judgment that the agency action is unlawful.  Allowing survey results from nonparties to be made publicly available substantially mitigates the government's concern that applicants to schools for the 2027-28 academic year will not have access to data.  Schools that are not parties may have confidence in their data and may not want relief while this case is being litigated.  And while uniform requirements for data collection, publishing, and analysis are certainly desirable, the lack of uniformity while this case is being litigated is not clearly harmful to nonparties.  Certainly it does not provide the parties a competitive advantage over nonparties by exempting them from burdensome regulation to which others are subject.

In short, the Court will decline to order additional preliminary relief that extends beyond the intervenor-plaintiffs in this lawsuit.  It will therefore issue a preliminary injunction that essentially mirrors the injunction issued on April 3, but that is applicable only to the six

25

intervenor-plaintiff associations (and their member schools) and the six colleges in the

Independent College Group.

## V.    Conclusion

For the foregoing reasons, the motion of plaintiffs for a temporary restraining order,

construed as a motion for a preliminary injunction or stay, is GRANTED to the extent it seeks

preliminary injunctive relief as to the intervenor-plaintiffs to this proceeding, and otherwise

DENIED without prejudice.  A separate preliminary injunction order will issue.

**So Ordered.**


/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  April 24, 2026                    United States District Judge