UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, ET AL.<br><br>            Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF EDUCATION, ET AL.<br><br>            Defendants. | C.A. No.  26-11229-FDS |

**INDEPENDENT COLLEGE GROUP'S
AMENDED COMPLAINT IN INTERVENTION**

**INTRODUCTION**

1.     The Admissions and Consumer Transparency Supplement ("ACTS", "survey", or "ACTS survey component"), a new component of the Integrated Postsecondary Education Data System ("IPEDS"), imposes far-reaching data collection obligations on institutions of higher education ("IHEs"), including Plaintiff-Intervenors Barnard College ("Barnard"), Bryn Mawr College ("Bryn Mawr"), Middlebury College ("Middlebury"), Sarah Lawrence College ("Sarah Lawrence"), Swarthmore College ("Swarthmore"), and Vassar College ("Vassar") (collectively, the "Independent College Group Plaintiff-Intervenors" or the "ICG Plaintiff-Intervenors"), on a rushed timeline and with inadequate guidance. These obligations present meaningful compliance burdens, raise concerns about the privacy of student information, and introduce significant risks of data quality problems.

2.     The ICG Plaintiff-Intervenors are private, nonprofit colleges located in either New York, Pennsylvania, or Vermont, and are among the IHEs required to complete the ACTS survey component. As detailed below, the ICG Plaintiff-Intervenors have already uploaded either full (to

the best of their ability) or partial responses to the ACTS survey component, under the threat of fines and potential loss of federal funding, but continue to face substantial and imminent risks of harm due to the invalid ACTS requirements.

3.      The ICG Plaintiff-Intervenors were compelled to compile and upload extensive data under tight deadlines, knowing that the resulting submissions may contain inconsistencies due to the compressed timeline and lack of clear guidance, and that the Department of Education ("the Department") has indicated it may use such data as the basis for enforcement actions. The ICG Plaintiff-Intervenors uploaded their ACTS data under these conditions, and the Department should be enjoined from accessing or relying on those uploads.

4.      For the reasons set forth below, the actions taken by Defendants to approve and implement the ACTS survey component are contrary to law, exceed statutory authority, violate the Administrative Procedure Act ("APA"), the Paperwork Reduction Act ("PRA"), and the E-Government Act of 2002, and the Department should therefore be precluded from enforcing any deadline for compliance with the ACTS survey component, seeking civil penalties, bringing enforcement action or otherwise penalizing the ICG Plaintiff-Intervenors in any manner for not submitting data required by the ACTS survey component, or accessing or reviewing the data already uploaded by the ICG Plaintiff-Intervenors in response to the invalid ACTS survey component requirements.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are agencies and officers of the United States sued in their official capacities. A

substantial part of the events at issue in this Complaint occurred and continue to occur in this district.

**PARTIES**

7. Each of the ICG Plaintiff-Intervenors is a private, nonprofit college located in either New York, Pennsylvania, or Vermont. Each of the ICG Plaintiff-Intervenors participates in federal student financial aid programs and is required to submit data through IPEDS. ACTS applies to ICG Plaintiff-Intervenors and purports to require them to compile and report the extensive data demanded by the survey.

a. Barnard College ("Barnard") is an independent women's liberal arts college located in New York City, NY. Founded in 1889, it enrolls approximately 3,200 undergraduate students. Barnard uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Barnard has begun uploading the additional required data. Barnard's data is not currently locked.

b. Bryn Mawr College ("Bryn Mawr") is a private women's research college located in Bryn Mawr, Pennsylvania. Founded in 1885, it enrolls approximately 1,400 undergraduate students and over 300 graduate students. Bryn Mawr uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Bryn Mawr's data is not currently locked.

c. Middlebury College ("Middlebury") is a private liberal arts and sciences college located in Middlebury, Vermont. Founded in 1800, it enrolls approximately 2,800

undergraduate students and 700 graduate students. Middlebury uploaded and locked responses to the ACTS survey component as of March 9, 2026.

d.      Sarah Lawrence College ("Sarah Lawrence") is a private liberal arts college located in Yonkers, New York. Founded in 1926, it enrolls approximately 1,500 undergraduate students and 225 graduate students. Sarah Lawrence uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Only a portion of Sarah Lawrence's data is currently locked.

e.      Swarthmore College ("Swarthmore") is a private liberal arts college located in Swarthmore, Pennsylvania. Founded in 1864, it enrolls approximately 1,600 undergraduate students. Swarthmore uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Swarthmore's data is not currently locked.

f.      Vassar College ("Vassar") is a private liberal arts college located in Poughkeepsie, New York. Founded in 1861, it enrolls approximately 2,500 undergraduate students. Vassar uploaded a preliminary set of data for the purpose of obtaining an extension of the deadline from March 18, 2026 to April 8, 2026, which was granted. This initial upload covered three years of ACTS survey component data. Vassar has continued uploading the additional required data. Vassar's data is not currently locked.

8.      Defendant United States Department of Education ("the Department") is a cabinet-level agency within the executive branch. 20 U.S.C. § 3411. The National Center for Education

Statistics ("NCES") and the Institute for Education Sciences ("IES") are components of the Department.

9.      Defendant Linda McMahon is the Secretary of the United States Department of Education and the agency's highest-ranking official, responsible for the supervision and management of all decisions and actions of the Department. 20 U.S.C. § 3412. She is sued in her official capacity.

10.      Defendant United States Office of Management and Budget ("OMB") is a component of the executive branch responsible for oversight of federal agencies' performance and administration of the federal budget. 31 U.S.C. §§ 501–507.

11.      Defendant Russell Vought is the Director of OMB and that agency's highest-ranking official. 31 U.S.C. §§ 502–503. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. IPEDS Background

12.      IES and its component NCES operate as the statistics, research, and evaluation arm of the Department.

13.      IES is required by statute to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need." 20 U.S.C. § 9511(b)(2).

14.      NCES's statutory mission is "to collect, analyze, and report education information and statistics in a manner that is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias." 20 U.S.C. § 9541(b)(3).

15.      The Higher Education Act of 1965, as amended, requires that institutions that participate in federal student aid programs report data through IPEDS. See 20 U.S.C. §

1094(a)(17); 34 C.F.R. § 668.14(b)(19). IHEs that fail to provide timely and complete data face fines and other consequences, including the potential loss of eligibility for federal funding. *See* 34 C.F.R. §§ 668.84, 668.85, 668.86.

16.    Each of the ICG Plaintiff-Intervenors has previously participated in the IPEDS surveys, which, until now, have been generally consistent from one year to the next.

17.    In the past, when the Department has sought to introduce new survey components or undertake significant modifications, those changes were subject to a well-established, deliberate, multi-step process.  That process typically included one or more Technical Review Panels ("TRPs"), collaboration with impacted IHEs and stakeholder organizations, publication of the survey instrument during the notice-and-comment period, and at least one preview or optional year allowing IHEs to familiarize themselves with new requirements before compliance became mandatory. This approach ensured that new data collections were clearly defined, technically feasible, and supported by adequate lead time to produce reliable data.

## B. The ACTS Survey and Implementation

18.    ACTS was developed following a Presidential Memorandum issued on August 7, 2025, which directed the Secretary of Education to broaden IPEDS reporting requirements to provide greater transparency into university admissions practices within 120 days. *See* Presidential Memorandum § 3, *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://perma.cc/JR8J-PRDC ("Presidential Memorandum"). The Presidential Memorandum also directed the Secretary to "increase accuracy checks" and "take remedial action . . . if institutions fail to submit data in a timely manner or are found to have submitted incomplete or inaccurate data."

19.     That same day, Secretary of Education Linda McMahon issued a memorandum to Matthew Soldner, the Acting Director of IES and Acting Commissioner of NCES. *See* Memorandum from Secretary McMahon, to Acting Director Matthew Soldner, Ensuring Transparency in Higher Education Admissions (Aug. 7, 2025), https://perma.cc/7KDJ-C79N ("McMahon Memorandum").

20.     The McMahon Memorandum "direct[ed] NCES to . . . collect data disaggregated by race and sex relating to the applicant pool, admitted cohort, and enrolled cohort at the undergraduate level, and for specific graduate and professional programs" within the 120-day timeline contained in the Presidential Memorandum, and "direct[ed] NCES to develop a rigorous quality assurance process for reported data." McMahon Memorandum.

21.     The Department then moved rapidly to finalize and implement the ACTS survey over the ensuing months.

22.     On August 15, 2025, the Department published a Request for Comment in the Federal Register regarding the proposed ACTS survey component addition to IPEDS. *See* Integrated Postsecondary Education Data System (IPEDS) 2024–25 Through 2026–27 Information Collection Request, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, 90 Fed. Reg. 39,384 (Aug. 15, 2025), https://perma.cc/Q6EZ-235K ("Aug. 15 Request for Comment").

23.     The August 15 Request for Comment applied to all four-year institutions with selective admissions, including ICG Plaintiff-Intervenors. *See id.*

24.     Notably, and inconsistent with past practice, the August 15 Request for Comment did not include the actual survey instrument that IHEs, including ICG Plaintiff-Intervenors, would be required to complete. *See id.*

25.      Instead, it described only the general categories of information the Department expected to collect, including data disaggregated by race-sex pairs on applicant, admitted, and enrolled cohorts, as well as financial aid data, cumulative GPAs, graduation rates, and data for graduate students disaggregated by broad fields of study. *See id*.

26.      Significantly, the August 15 Request for Comment indicated that the new component would seek to capture data not only from the 2025–26 academic year but also from the six prior academic years. *See id*.

27.      On information and belief, IPEDS had never before sought retroactive data from institutions.

28.      Throughout the notice-and-comment process, numerous stakeholders, including leading higher education associations, identified substantial concerns regarding ACTS's feasibility, the compressed implementation timeline, the burden it would impose on institutions, and privacy risks to students.

29.      On October 14, 2025 the National Association of Independent Colleges and Universities (NAICU) (of which Barnard and Sarah Lawrence are members) responded to the August 15 Request for Comment on behalf of multiple organizations, including the Independent Colleges and Universities of Pennsylvania (of which Bryn Mawr and Swarthmore are members) and the Association of Vermont Independent Colleges (of which Middlebury is a member). *See* NAICU Comments on IPEDS, Docket ID ED-2025-SCC-0382, at 3 (U.S. Dep't Educ. Oct. 14, 2025)

(https://naicuedu.sharepoint.com/sites/External/Shared%20Documents/Forms/AllItems.aspx?id=%2Fsites%2FExternal%2FShared%20Documents%2FSign%2DOn%20Letters%2F2025%2FNAICU%5FComments%5FACTS%5F2025%2E10%2E14%2Epdf&parent=%2Fsites%2FExternal

%2FShared%20Documents%2FSign%2DOn%20Letters%2F2025&p=true&ga=1)      ("NAICU

Comments").

30.     The NAICU comments raised the following concerns, among others:

a.  The ACTS data collection is proceeding without thorough review or assessment and respectfully request that it be deferred until critical privacy, timing, and formatting issues have been resolved;

b.  The current design and timeframe risks the publication of inaccurate and inconsistent data, which could in turn mislead students and families;

c.  Critical variables like *selective admissions*, *first-generation status*, *graduate degree*, *application*, and many other key terms are undefined;

d.  Methods for identifying graduating cohorts, standardizing GPA quintiles, and other proposed metrics are unclear;

e.  Significant data gaps exist due to system updates, privacy purges, changing definitions, and - most importantly - information that has never been collected for admissions or financial aid purposes (e.g., parent education, family income, and test scores);

f.  Graduate and professional admissions data are not delineated, risking inaccurate aggregation and inconsistent reporting across institutions;

g.  Institutions will struggle to meet requirements on time and accurately report their data, raising the chance of incomplete reporting, inconsistent methods of collecting data across campuses, and errors.

31.     The comment period closed on October 14, 2025. The Department received 3,462 comments, including the NAICU comments.

32.     The Department's responses to the comments were largely formulaic and did not meaningfully engage with the concerns raised in the comments that were submitted. As to each of those concerns, NCES's response began with the same form language "[t]hanking [the commenters] for [their] feedback regarding the proposed [ACTS survey component] and stating that:

[t]he data collection proposed by ED is in direct response to priorities articulated by the Administration. President Donald J. Trump issued a Presidential

Memorandum on August 7, 2025 entitled "Ensuring Transparency in Higher Education Admissions," . . . . In that memorandum, President Trump directed the Secretary of Education to, within 120 days of that date, "expand the scope of required [IPEDS] reporting to provide adequate transparency into admissions." On that same day, Secretary McMahon issued a directive to NCES to initiate a series of changes to IPEDS during the 2025-26 school year.

33.    On November 13, 2025, the Department published a second Request for Comment as part of its submission of the ACTS survey component to OMB for review. *See* Agency Information Collection Activities, Docket No. ED-2025-SCC-0382, OMB Control No. 1850-0582, 90 Fed. Reg. 50,940 (Nov. 13, 2025), https://perma.cc/4LDJ-BND5 ("Nov. 13 Request for Comment"). The Department published the ACTS component with the Nov. 13 Request for Comment.

34.    The November 13 Request proposed an exemption for institutions that accept all applicants and do not award need-based aid, but otherwise introduced no substantive changes to the data sought, the required timeline, or the level of disaggregation. The second comment period closed on December 15, 2025, with 146 additional comments, including additional comments from NAICU. *See* NAICU Comments on IPEDS (Dec. 14, 2025) (https://www.regulations.gov/comment/ED-2025-SCC-0382-3588).

35.    A mere three days after the second comment period closed, on December 18, 2025, OMB approved the ACTS survey. The Department then released the mandatory survey and set an initial submission deadline for many institutions of March 18, 2026, thus giving those institutions only 90 days to complete the survey. IPEDS, This Week in IPEDS, ACTS Collection Dates and Required Instructions (Dec. 18, 2025), https://perma.cc/P62G-ZNQY. On March 5, NCES extended the deadline to April 8 for institutions that had submitted three years of ACTS data. As noted above, several of the ICG Plaintiff-Intervenors (i.e., Barnard, Bryn Mawr, Sarah Lawrence,

Swarthmore, and Vassar) uploaded such partial data and are currently operating under this April 8 extension.

36.    As ultimately implemented, ACTS requires institutions, including the ICG Plaintiff-Intervenors, to compile and report an extensive set of new data fields—including, for the first time, retrospective data spanning seven prior academic years—resulting in approximately 70,000 new reporting fields per institution.  The scope of this new requirement represents a significant departure from prior IPEDS practice and demands that institutions collect and format data they may never have been required to maintain in the manner now specified.

## C. The Plaintiff States' Lawsuit and Subsequent Proceedings

37.    On March 11, 2026, the Plaintiff States filed a complaint for declaratory and injunctive relief challenging the ACTS survey, which sought a stay of agency action pursuant to 5 U.S.C. § 705 for the pendency of the litigation and a temporary restraining order enjoining Defendants from (1) accessing information uploaded by plaintiffs in the ACTS survey; (2) requiring plaintiffs to complete the survey by March 18; (3) assessing penalties on plaintiffs based on their submissions; and (4) using the ACTS survey as the basis for any investigation or enforcement action.

38.    On March 13, 2026, the Plaintiff States moved for a temporary restraining order, and the Court that day issued a temporary restraining order extending the submission deadline through March 25, 2026, for all IHEs, which included each of the ICG Plaintiff-Intervenors.  ECF No. 12.

39.    On March 24, 2026, the Court held a hearing and extended the temporary restraining order until April 6, 2026, but limited its application to the named Plaintiff States and

their constituent IHEs, which did not include the ICG Plaintiff-Intervenors, as they are not public institutions located in one of the Plaintiff States. ECF No. 75.

40.     On March 25, 2026, the Association of American Universities ("AAU") filed a motion to intervene and a motion for a temporary restraining order in this action. ECF Nos. 83, 85.

41.     On March 30, 2026, the Association of Independent Colleges and Universities ("AICUM") in Massachusetts also filed a motion to intervene and a motion for a temporary restraining order. ECF Nos. 109, 111.

42.     On March 31, 2026, this Court provisionally granted the motions to intervene for the limited purpose of considering the proposed AAU and AICUM plaintiff-intervenors' motions for a temporary restraining order; and issued a temporary restraining order extending the deadline to complete the ACTS survey for proposed plaintiff-intervenors and their constituent institutions of higher education through April 14, 2026, and restraining defendants from enforcing the deadline of March 18, 2026, or March 31, 2026, against those institutions. ECF No. 118.

43.     On April 3, 2026, the Connecticut Conference of Independent Colleges ("CCIC"), the Maine Independent Colleges Association ("MICA"), the North Carolina Independent Colleges and Universities ("NCICU"), and Oregon Alliance of Independent Colleges and Universities ("OAICU") (collectively with AAU and AICUM, the "Associations") also moved to intervene and for a temporary restraining order, seeking declaratory injunctive relief for their member colleges and universities. ECF Nos. 130, 132.

44.     Later on April 3, 2026, the Court issued a Memorandum and Order on Plaintiffs' Motion for a Preliminary Injunction, ECF No. 142 ("April 3 Order") and a Preliminary Injunction, ECF No. 143 ("April 3 PI"). The April 3 Order held in sum that the Plaintiff States are likely to succeed on the merits of their claim that the challenged agency action was arbitrary and capricious

and that the grounds for preliminary injunctive relief were otherwise met, and the April 3 PI ordered that Defendants could not, pending further order from the Court, enforce any deadline for compliance with the ACTS survey component against the Plaintiff States or any of their state colleges, universities, or other IHEs, or seek civil penalties, bring any enforcement action, or otherwise penalize plaintiffs in any manner for not submitting the data required by the ACTS survey component.

45.    On April 6, the ICG Plaintiff-Intervenors moved to intervene in this action and moved for a temporary restraining order, seeking declaratory and injunctive relief. ECF Nos. 145, 153.

46.    On April 13, the Court held a hearing on the pending motions that had been filed by the ICG Plaintiff-Intervenors and the Associations. ECF No. 179. The Court granted the ICG Plaintiff-Intervenors' and Associations' motions to intervene.

47.    On April 24, 2026, the Court granted a preliminary injunction as to each of the ICG Plaintiff-Intervenors and the members of the Associations, extending the relief it had granted to Plaintiff States. ECF No. 185. The Court ordered that, pending further order of the Court or trial on the merits of this action, defendants shall not enforce any deadline for compliance with ACTS against the ICG Plaintiff-Intervenors or the members of the Associations, and shall not seek civil penalties, bring any enforcement action, or otherwise penalize members of the ICG or the Associations for not submitting the data required by the ACTS survey component. *Id.*

**D. ICG Plaintiff-Intervenors' Upload of ACTS Data**

48.    Prior to the preliminary relief granted by this Court and feeling compelled to partially upload responses in order to avoid fines and potential loss of federal funding, each of the

ICG Plaintiff-Intervenors either partially or fully uploaded, as noted above, ACTS survey component responses.

49.    The ICG Plaintiff-Intervenors struggled to assemble the required data within the compressed timeframe. The ACTS survey component requires or required each ICG Plaintiff-Intervenor to compile either three or seven years of retrospective data across numerous new data fields, including categories of information that the ICG Plaintiff-Intervenors had not previously been required to collect or maintain in the format specified by the survey.

50.    Each ICG Plaintiff-Intervenor has devoted significant staff time and institutional resources to the effort, diverting personnel from other institutional priorities.

51.    The compressed timeline, combined with the lack of clear definitions and guidance from the Department, made and make it difficult for each of the ICG Plaintiff-Intervenors to ensure that their data were and are complete, consistent, or reliable. Each of the ICG Plaintiff-Intervenors is concerned about the quality of data it uploaded under the compelled and rushed timeline.

52.    The ICG Plaintiff-Intervenors' experiences illustrate the broader data quality concerns raised by commenters during the notice-and-comment process.

53.    Each of the ICG Plaintiff-Intervenors is also concerned about the privacy implications of having uploaded data at the level of disaggregation required by ACTS. The survey effectively demands unit-record-level student information, disaggregated across race, sex, income, test scores, GPA, and other categories.  For relatively smaller institutions like the ICG Plaintiff-Intervenors, this level of granularity creates a significant risk that individual students could be identified from the uploaded data. Now that the ICG Plaintiff-Intervenors have either partially or fully uploaded this information, the Department's access to view and potentially use or disseminate that data poses a direct threat to the privacy of ICG Plaintiff-Intervenors' students.

54.    The ICG Plaintiff-Intervenors that only partially uploaded and/or have not locked data (i.e., Barnard, Bryn Mawr, Sarah Lawrence, Swarthmore and Vassar) also face the substantial additional administrative burdens that would be posed by gathering and submitting additional data and/or finalizing submissions of data as purportedly required by the ACTS survey component, once the applicable extensions expire.

**E. The ACTS Survey is Arbitrary and Capricious**

55.    Defendants' implementation of the ACTS survey was arbitrary and capricious.

56.    For example, Defendants failed to consider important aspects of the problem, failed to consider or explain their rejection of significant, viable and obvious alternatives, failed to respond substantively or meaningfully to relevant and significant public comments, failed to consider or be cognizant of serious reliance interests of IHEs that must be taken into account, and deviated from longstanding practice without adequate explanation.

57.    Since at least 2002, NCES has employed a consistent process for introducing new IPEDS survey components, including deliberation by TRPs, collaboration with affected institutions, publication of the survey instrument during the comment period, and a preview year. Since 2002, 71 TRPs have been convened to review proposed changes to IPEDS, and all new IPEDS survey components underwent TRP review before implementation.

58.    For the ACTS survey, the Department abandoned this established approach entirely, eliminating the TRP process and implementing the survey on a truncated schedule.

59.    The Department offered only one justification for departing from its standard process: the timelines established in the Presidential Memorandum and McMahon Memorandum. *See* Response to Comments at 17-18.  This explanation does not adequately account, for example, for the Department's failure to consider less burdensome alternatives, such as implementing a

voluntary pilot program, phasing in new data elements over time, or requesting data for only a single academic year.

60.     The absence of the TRP process has also contributed to ongoing ambiguity in survey definitions and data elements, which in turn increases the risk that data uploaded by the ICG Plaintiff-Intervenors will be inconsistent and of limited analytical value when compared to different institutions. The TRP process would also have addressed concerns about duplicative data collection, as IPEDS already tracks aggregated data on applications, enrollments, financial aid, and completions under separate processes.

61.     Defendants also failed to account for IHEs' important student data privacy obligation-related aspects of the problem.

62.     In addition, the Defendants failed to account for the simultaneous efforts to dismantle the Department of Education and reduce the resources and staffing of NCES and IES.

**F. The ACTS Survey Exceeds Statutory Authority and Is Contrary to Law**

63.     Defendants' implementation of the ACTS survey is contrary to law and exceeds statutory authority. Neither NCES nor IES is authorized to collect data for law enforcement purposes, and the implementation of the survey is contrary to statutory law.

64.     Both NCES and IES operate under specific statutory mandates that constrain the purposes for which they may collect data. IES is directed to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need" and to "ensure that such activities conform to high standards of quality, integrity, and accuracy; and are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." 20 U.S.C. § 9511(b)(2)(A) & (B). NCES's mission is "to collect and analyze education information and statistics in a manner that

meets the highest methodological standards" and in a manner that "is objective, secular, neutral, and nonideological and is free of partisan influence." *Id.* § 9541(b)(1), (2), & (3)(A).

65.    Neither statute authorizes NCES or IES to collect data for the purpose of monitoring legal compliance or driving enforcement actions against IHEs.

66.    The Presidential Memorandum and McMahon Memorandum make clear, however, that the ACTS survey is designed not for statistical research but to serve as an enforcement tool. The Presidential Memorandum states that "[g]reater transparency is essential to exposing unlawful practices." The McMahon Memorandum directs NCES to collect data that will be used to "establish a baseline of admissions practices" and to "develop risk-based enforcement practices."

67.    Neither NCES nor IES, however, is charged by statute with monitoring or enforcing compliance with civil rights laws or any other federal law. That function belongs to the Department's Office for Civil Rights, which has its own independent statutory authority to "collect or coordinate the collection of data necessary to ensure compliance with civil rights laws." 20 U.S.C. § 3413(c)(1). By repurposing NCES and IES as instruments of enforcement, Defendants have exceeded the statutory boundaries Congress established.

68.    The consequences of exceeding this statutory authority are particularly severe for institutions like the ICG Plaintiff-Intervenors. Each is a small, private, nonprofit college that participates in IPEDS because it receives Title IV funding. 20 U.S.C. § 1094(a)(17); 34 C.F.R. § 668.14(b)(19). The extreme consequences of failing to submit data through IPEDS (including fines and potential loss of federal funding eligibility) confirm that Congress did not intend IPEDS to serve as a broad-spectrum enforcement surveillance mechanism. The ICG Plaintiff-Intervenors now face the prospect that data they were compelled to submit under threat of these penalties will be used against them in enforcement proceedings, a purpose Congress never authorized.

69.     In addition, federal law expressly prohibits the federal government from "develop[ing], implement[ing], or maintain[ing] . . . a Federal database of personally identifiable information" of students at postsecondary institutions. 20 U.S.C. § 1015c(a). The ACTS survey, as applied to institutions like the ICG Plaintiff-Intervenors, risks creating precisely the kind of student information database that Congress prohibited.

70.     The risk of identifying individual students is particularly acute for the ICG Plaintiff-Intervenors. Each is a relatively small institution, enrolling between approximately 1,400 and 3,200 undergraduate students. When data is disaggregated across the categories demanded by ACTS — race, sex, income, test scores, GPA, parental education, academic program, and more — the resulting reporting cells at institutions of this size will inevitably contain only a handful of students, or even a single student. At that level of granularity, the ACTS survey effectively demands unit-record-level student information, creating a database from which sensitive, personal information about individual students and their families can readily be identified.

71.     The E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921 (2002), independently requires agencies to conduct a privacy impact assessment before implementing an electronic information collection that implicates personally identifiable information.

72.     The highly disaggregated nature of the ACTS data creates a substantial risk that individual students may be identified. Despite this risk, the Department did not conduct a privacy impact assessment as required by the E-Government Act.

**G. The ACTS Survey violates the Paperwork Reduction Act**

73.     In addition, the ACTS Survey violates the requirements of the PRA.

74. The PRA and its implementing regulations establish mandatory requirements that federal agencies must satisfy before conducting any collection of information from the public. 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320. The ACTS survey constitutes a collection of information subject to the PRA.

75. Under the PRA, an agency "shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" it has satisfied a series of sequential and cumulative prerequisites: internal review, 44 U.S.C. § 3506(c)(1); public comment through a sixty-day Federal Register notice, *id.* § 3506(c)(2); certification of compliance with the PRA's substantive requirements, *id.* § 3506(c)(3); and OMB approval, *id.* § 3507(a)(2). The ACTS survey is a collection of information subject to these requirements.

76. Before seeking such approval from the OMB, the agency must undertake a substantive evaluation of the proposed collection, including whether it is "necessary" for the agency's proper functions and whether the information will have "practical utility." 44 U.S.C. § 3506(c)(2)(A)(i); 5 C.F.R. § 1320.8(d)(1)(i).

77. The ACTS survey fails to satisfy this threshold requirement of necessity for the functioning of the Department. IPEDS has long collected admissions data as well as data related to gender, race, and ethnicity through its existing survey components. Furthermore, the Department's Office for Civil Rights already has independent statutory authority to "collect or coordinate the collection of data necessary to ensure compliance with civil rights laws." 20 U.S.C. § 3413(c)(1). Defendants have not explained why the ACTS survey is necessary for the Department's proper functions in light of these existing mechanisms. Moreover, the rushed timeline, undefined terminology, and lack of standardized data definitions mean that the data

collected through ACTS will be unreliable and inconsistent across institutions, undermining any claim that the information will have "practical utility."

78.    In addition, the ACTS data lacks practical utility for the Department because — as this Court has recognized — the Department is in the process of dismantling itself and closing NCES in response to another presidential directive. *See* ECF No. 186.

79.    The PRA further mandates that agencies certify that each information collection satisfies a series of substantive requirements before it may be submitted to OMB for review. 44 U.S.C. § 3506(c)(3). Among other things, the agency must certify that the collection:

   a.  "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency," *id.* § 3506(c)(3)(C);

   b.  "is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond," *id.* § 3506(c)(3)(D);

   c.  "is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond," *id.* § 3506(c)(3)(E);

   d.  "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public," *id.* § 3506(c)(3)(H);

   e.  "uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected," *id.* § 3506(c)(3)(I);

   f.  "indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified," *id*. § 3506(c)(3)(F); and

   g.  "to the maximum extent practicable, uses information technology to reduce burden and improve data quality, agency efficiency and responsiveness to the public," *id*. § 3506(c)(3)(J).

80.    The ACTS survey does not satisfy any of these mandatory prerequisites. As set forth above, ACTS imposes extraordinary burdens on IHEs; uses terminology that numerous commenters identified as ambiguous and undefined; demands data in formats incompatible with

the ICG Plaintiff-Intervenors' (and other IHE's) existing systems, requiring them to locate, extract, and reformat information from multiple disparate systems; was developed without TRP review or other established processes that would ensure sound statistical methodology; and was deployed using error-prone information technology tools rather than technology designed to "reduce burden and improve data quality" as the statute requires.

81.    Moreover, the Department imposed a uniform, compressed timeline on all affected IHEs regardless of size or institutional capacity, rather than "establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond," as Section 3506(c)(3)(C)(i) requires.

82.    The Department's certification of compliance with the PRA was both premature and substantively unsupported. The certification is dated November 13, 2025, which is the very same date the Department submitted the ACTS survey to OMB for review and first published the actual survey instrument and instructions. *See* ECF No. 69-14. Because the PRA's requirements are sequential (the agency must first evaluate public comments and then certify compliance based on the record including those comments, *see* 44 U.S.C. §§ 3506(c)(2)–(3), 3507(a)(1)(A)–(C)) the Department could not have meaningfully evaluated public comments on the specific data collection instrument before certifying compliance. A second round of 146 comments, many raising concerns directly relevant to the certification, had not even been submitted, let alone evaluated. The certification is therefore insufficient as a matter of law.

83.    The records submitted in support of the certification undermine rather than support the Department's representations. The Department's own supporting documents state that "[t]he majority of the underlying data elements needed to respond to ACTS are also necessary to complete other IPEDS surveys (e.g. Admissions, Cost, Completion, Fall Enrollment, Graduation

Rates)," directly contradicting the certification that the collection "is not unnecessarily duplicative of information otherwise reasonably accessible to the agency." 44 U.S.C. § 3506(c)(3)(B). Similarly, the records reflect hundreds of comments raising concerns about undefined data definitions and recommending pilot testing, yet the Department declined to take corrective measures.

84.    The PRA's implementing regulations further prohibit OMB from approving any collection that requires respondents to retain records — other than health, medical, government contract, grant-in-aid, or tax records — for more than three years, unless the agency demonstrates that such retention is necessary to satisfy a statutory requirement or other substantial need. 5 C.F.R. § 1320.5(d)(2)(iv). The ACTS survey demands that institutions submit seven academic years of data, requiring the retention of records well beyond the three-year limit. The Department has offered no adequate justification for this retroactive data requirement, nor has it demonstrated a statutory basis or substantial need for data spanning seven years.

85.    In addition, the PRA's implementing regulations require that when an agency's initial sixty-day Federal Register notice does not include the proposed information collection instrument, the agency must either extend the comment period to allow adequate public review or explain how members of the public may obtain a copy. 5 C.F.R. § 1320.8(d)(2). The Department failed to comply with either alternative: it did not include the ACTS survey instrument with the August 15 Request for Comment, did not extend the initial comment period, and did not explain how interested parties could obtain the survey in advance. As a result, IHEs, including the ICG Plaintiff-Intervenors, were unable to offer meaningful feedback on the specific data elements and submission procedures during the first comment period.

86.    OMB's approval of the ACTS survey was also contrary to law. Before granting approval, OMB must confirm that the agency has demonstrated that the proposed collection is the least burdensome means necessary for the agency's proper functions and that it has practical utility. 5 C.F.R. § 1320.5(d)(1)(i), (iii). Because the Department failed to make these required showings, OMB lacked authority to approve the ACTS survey.

**H. The ICG Plaintiff-Intervenors Have Suffered and Will Continue to Suffer Harm Absent Relief**

87.    The ICG Plaintiff-Intervenors face concrete and imminent harm from the ACTS survey. As set forth above, the ICG Plaintiff-Intervenors have already either partially or fully uploaded ACTS data, some of which is not yet accessible by the Department, under compulsion and face concrete and imminent harm as a result.

88.    As detailed more fully in the ICG Plaintiff-Intervenors' memorandum in support of their motion for injunctive relief and accompanying declarations, the ICG Plaintiff-Intervenors now face the harm of having the Department access and use data that was compiled under conditions virtually certain to produce unreliable results. *See* ECF Nos. 146, 154.

89.    The ICG Plaintiff-Intervenors that have not yet complied fully with the ACTS survey component requirements also face significant administrative burdens if they are required to finalize and/or submit more complete responses after their applicable extensions expire. This Court acknowledged that harm in its opinion granting a preliminary injunction to the Plaintiff-Intervenors. *See* ECF No. 186.

90.    Because each of the ICG Plaintiff-Intervenors has already uploaded at least some data, they each face an acute risk of enforcement actions premised on information that may be unreliable given the compressed timeline, the lack of clear guidance, and the absence of the vetting processes that have historically ensured data quality in IPEDS collections. The Department has

stated its intent to use ACTS data as a basis for enforcement, meaning that each of the ICG Plaintiff-Intervenors could be subject to investigations, fines, or other adverse consequences based on the data it was compelled to upload under these conditions. Preventing the Department from accessing, using, or retaining any of the ICG Plaintiff-Intervenors' uploads is necessary to avoid these harms.

91.    Additionally, the ICG Plaintiff-Intervenors face potential harms related to their obligations to protect and respect the privacy interests of their students. The granular level of disaggregation required by the ACTS survey creates the potential for cells so small that individual students could be identified, particularly within specific programs. The ICG Plaintiff-Intervenors have legal and/or institutional policy obligations to safeguard the privacy of its students' information, and the Department has not put in place adequate protections to mitigate those risks.

## CAUSES OF ACTION

### COUNT I

**Violation of the Administrative Procedure Act—Arbitrary and Capricious Action**

92.    ICG Plaintiff-Intervenors incorporate by reference the allegations set forth in paragraphs 1 – 91.

93.    The APA directs a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

95.     An action is also arbitrary and capricious where the agency "failed to consider . . . important aspect[s] of the problem" before it. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020).

96.     When an agency departs from established policy or practice and that departure implicates serious reliance interests, the agency must offer a more thorough justification than would be necessary for a policy developed from scratch. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

97.     Defendants failed to provide a reasoned basis for the substantial new burdens imposed by the ACTS survey component. They did not adequately acknowledge or address IHEs' well-established reliance interests in the Department's longstanding process for introducing new IPEDS components.

98.     Defendants departed from established practice by eliminating TRP review, omitting a preview year, and compressing the implementation timeline without adequate explanation.

99.     Defendants failed to evaluate reasonable alternatives that would have reduced the burden on institutions.

100.     Defendants implemented the survey in an inconsistent manner, with mid-collection changes to templates and definitions that compounded the difficulties facing institutions.

101.     These failures render Defendants' actions arbitrary and capricious in violation of the APA.

## COUNT II

### Violation of the Administrative Procedure Act—Contrary to Law and In Excess of Statutory Authority

102.     The ICG Plaintiff-Intervenors incorporate by reference the allegations set forth in paragraphs 1 – 101.

103.    Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

104.    The approval and implementation of the IPEDS ACTS survey constitute final agency action. 5 U.S.C. § 704.

105.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).

106.    An agency may not take any action that exceeds the scope of its statutory authority or is contrary to law.

107.    No authority authorizes federal agencies to act outside their statutory authorities or to violate federal law.

108.    The statutory mandates of NCES and IES are set forth in 20 U.S.C. § 9511 and 20 U.S.C. § 9541.

109.    The Department has indicated that it plans to use the ACTS data for purposes not outlined in NCES and IES's statutory mandates, including for law enforcement purposes. *See* August 15 Request for Comment; Presidential Memorandum; McMahon Memorandum.

110.    Neither statutory mandate authorizes these components of the Department of Education to collect data for law enforcement purposes, rendering Defendants' actions contrary to law under the APA.

111.    In addition, Defendants violated the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921 (2002), by failing to conduct a privacy impact assessment for the ACTS survey despite the fact that it constitutes an electronic information collection implicating personally identifiable information.

## COUNT III

### Violation of the Administrative Procedure Act—Contrary to Law
### (Noncompliance with the Paperwork Reduction Act)

112. The ICG Plaintiff-Intervenors incorporate by reference the allegations set forth in paragraphs 1 – 111.

113. The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).

114. The PRA imposes binding procedural and substantive requirements on any information collection conducted by a federal agency. 44 U.S.C. § 3501 *et seq*.; 5 C.F.R. § 1320.

115. The ACTS survey constitutes such an information collection and is subject to these requirements.

116. Defendants acted contrary to law and without observance of legally required procedures by implementing the ACTS survey in a manner that failed to comply with the PRA's mandates.

117. These failures render Defendants' implementation of the ACTS survey contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A), (2)(D).

### **PRAYER FOR RELIEF**

WHEREFORE, the ICG Plaintiff-Intervenors respectfully request that this Court grant the following relief:

a. A declaratory judgment that Defendants acted arbitrarily and capriciously, contrary to law, and in excess of statutory authority in approving and implementing the ACTS survey;

b. Vacatur of the actions taken by Defendants to approve and implement the ACTS survey;

c. A stay of the implementation of the ACTS survey pursuant to 5 U.S.C. § 705;

d. A preliminary and permanent injunction prohibiting Defendants from: (i) accessing, reviewing, downloading, or otherwise using any information uploaded or entered by any

of the ICG Plaintiff-Intervenors in connection with the ACTS survey component; (ii) sharing, disseminating, or publishing any data submitted by any of the ICG Plaintiff-Intervenors in connection with the ACTS survey component; (iii) retaining any information (or copies of any information) uploaded or entered by the ICG Plaintiff-Intervenors to the ACTS survey; (iv) penalizing any of the ICG Plaintiff-Intervenors in any way in connection with the ACTS survey component; (v) initiating any enforcement action or investigation against any of the ICG Plaintiff-Intervenors on the basis of submissions related to the ACTS survey component; and (vi) enforcing any deadline for compliance with the ACTS survey component against any of the ICG Plaintiff-Intervenors that has not already complied fully with the ACTS survey component requirements.

e.  An award of costs, reasonable attorneys' fees, and expenses pursuant to any applicable law; and

f.  Such other and further relief as this Court deems equitable, just, and proper.

Dated: May 15, 2026                    Respectfully submitted,

                                       Attorneys for ICG Plaintiff-Intervenors

                                       */s/ Jeffrey J. Nolan*
                                       Jeffrey J. Nolan (BBO #625091)
                                       Olivia L. O'Dwyer (BBO #705961)
                                       Krithika Rajkumar (BBO #706554)
                                       Ashley V. Hart (BBO #709247)
                                       Allison L. Carvalho (BBO #717091)
                                       Holland & Knight, LLP
                                       10 Saint James Avenue
                                       15th Floor
                                       Boston, MA 02116
                                       Telephone: (617) 854-1459
                                       Fax: (617) 523-6850
                                       jeffrey.nolan@hklaw.com
                                       olivia.odwyer@hklaw.com
                                       krithika.rajkumar@hklaw.com
                                       ashley.hart@hklaw.com
                                       allison.carvalho@hklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.


Dated: May 15, 2026                                        */s/ Jeffrey J. Nolan*